1   JONATHAN WEISSGLASS (185008)
    LINDA LYE (215584)
2   Altshuler Berzon LLP
    177 Post Street, Suite 300
3   San Francisco, California 94108
    Telephone:  (415) 421-7151
4   Facsimile:  (415) 362-8064
    jweissglass@altshulerberzon.com
5   llye@altshulerberzon.com

6   Attorneys For Plaintiffs International
    Union, United Automobile, Aerospace and Agricultural
7   Implement Workers of America, Local 2244,
    and International Union, United Automobile,
8   Aerospace and Agricultural Implement Workers
    of America
9

10

11                  UNITED STATES DISTRICT COURT FOR THE

12                     NORTHERN DISTRICT OF CALIFORNIA

13

14  INTERNATIONAL UNION, UNITED          )   Case No. C-08-1242-TEH
    AUTOMOBILE, AEROSPACE AND            )
15  AGRICULTURAL IMPLEMENT WORKERS       )   **FIRST AMENDED COMPLAINT**
    OF AMERICA, LOCAL 2244, and          )   **TO CONFIRM ARBITRATION**
16  INTERNATIONAL UNION, UNITED          )   **AWARDS AND TO COMPEL**
    AUTOMOBILE, AEROSPACE AND            )   **ARBITRATION**
17  AGRICULTURAL IMPLEMENT WORKERS       )
    OF AMERICA,                          )
18                                       )
              Plaintiffs,                )
19                                       )
          v.                             )
20                                       )
    NEW UNITED MOTOR MANUFACTURING,      )
21  INC.,                                )
                                         )
22            Defendant.                 )
                                         )
23  _____  )

24

25

26

27

28

1

<u>INTRODUCTION</u>

2       1.      Plaintiffs International Union, United Automobile, Aerospace and Agricultural

3   Implement Workers of America and its local affiliate, International Union, United Automobile,

4   Aerospace and Agricultural Implement Workers of America, Local 2244 (collectively "Union"

5   or "UAW") are parties to a collective bargaining agreement with New United Motor

6   Manufacturing, Inc. ("Company" or "NUMMI").  This action seeks to confirm two arbitration

7   awards, which collectively find the Company to have violated the parties' collective bargaining

8   agreement, and to compel the Company to arbitrate over the remedy for its contractual breach.

9

<u>JURISDICTION</u>

10      2.      This court has subject matter jurisdiction pursuant to Section 301 of the Labor-

11  Management Relations Act, 29 U.S.C. §185 ("Section 301"), which provides that "suits for

12  violation of contracts between an employer and a labor organization . . . may be brought in any

13  district court of the United States having jurisdiction of the parties, without respect to the

14  amount in controversy or without regard to the citizenship of the parties."  This court also has

15  subject matter jurisdiction pursuant to 28 U.S.C.§1331.

16

<u>VENUE AND INTRADISTRICT ASSIGNMENT</u>

17      3.      Venue is proper in the Northern District of California, pursuant to Section

18  301(c), 29 U.S.C. §185(c), which provides that actions by labor organizations may be brought

19  in "any district in which [the organization's] duly authorized officers or agents are engaged in

20  representing or acting for employee members."  The Union is engaged in representing and

21  acting for their employee members in Fremont, California.

22      4.      Venue is also proper in the Northern District of California, pursuant to 28 U.S.C.

23  §1391(b) because Defendant NUMMI resides in this district and because a substantial part of

24  the events or omissions giving rise to Plaintiffs' claims occurred in this district.

25      5.      Assignment to the San Francisco-Oakland Division of the Court is proper

26  because the events which gave rise to this action for relief occurred in Alameda County.

27  ///

28  ///

PARTIES

6.      Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 2244 is a labor organization located in Fremont, California.  It is a "labor organization" as that term is defined in 29 U.S.C. § 152(5) and, therefore, is a "labor organization" within the meaning of Section 301.

7.       Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America is a labor organization.  It has a regional office in Fremont, California.  It is a "labor organization" as that term is defined in 29 U.S.C. § 152(5) and, therefore, is a "labor organization" within the meaning of Section 301.

8.      Defendant NUMMI is a California corporation, located in Fremont, California, that has been, and currently is, party to a collective bargaining agreement ("CBA") with the Union.  NUMMI is an "employer" as that term is defined in 29 U.S.C. § 152(2) and, therefore, is an "employer" within the meaning of Section 301.

FACTS

9.      The Union and the Company have been parties to a written CBA since the mid-1980s.  The term of the current CBA is August 6, 2005 through August 8, 2009.  A copy of the CBA is attached as Exhibit A.

10.      The CBA sets forth the terms and conditions of work for NUMMI employees.  Among other things, the CBA contains a provision governing sick leave.  CBA, Article XXIII. The CBA also contains a dispute resolution mechanism that provides for "final and binding" arbitration.   CBA, Article X.

11.      In fall 2005, the Company implemented a new sick leave policy.  Pursuant to that new policy, the Company terminated approximately 100 employees who were at the time on sick leave.  The Union filed a grievance challenging the new sick leave policy, under the contractual dispute resolution procedure.

12.      The parties submitted the grievance to arbitration before an arbitrator mutually selected by the parties.  As is common in labor arbitration, the parties first addressed "liability" and reserved "remedy" issues for a later phase.

13.    The arbitrator broke the "liability" issues into two phases and issued two arbitration awards, one on each of the two phases.  In those arbitration awards, the arbitrator ruled in the Union's favor and found that the Company violated the collective bargaining agreement by implementing its new sick leave policy and terminating employees pursuant to that policy.  The second arbitration award also stated that the parties retained the right to seek arbitral resolution of remedy issues.  The two arbitration awards are attached as Exhibits B and C.

14.    After the arbitrator ruled in the Union's favor on the liability issues, the Union attempted to negotiate with the Company regarding implementation of the remedy and advised the Company that it would seek arbitration on the remedy issues if the parties were unable to reach a settlement by mid-January 2008.  The Company refused to engage in meaningful discussions.  The Company has refused to reinstate any of the employees that it terminated pursuant to the sick leave policy that the arbitrator found to violate the parties' collective bargaining agreement.

15.    The Union sought to arbitrate the remedy issues.  The Company now contends that the two arbitration decisions are invalid.  The Company has refused to recognize the validity of the two arbitration decisions or to arbitrate the remedy issues.

16.    The Company's actions constitute an unwarranted refusal to recognize the final and binding nature of the two arbitration awards, to participate in the contractual grievance process, and to return to arbitration on the remedy issues arising from the grievance that the parties have submitted to arbitration.

17.    The Company has acted in bad faith by refusing to recognize the final and binding nature of the two arbitration awards, by refusing to participate in the contractual grievance process, and by refusing to arbitrate the remedy issues arising from the grievance.

## FIRST CAUSE OF ACTION

(Section 301 and Federal Arbitration Act - Confirm arbitration awards)

18.    Plaintiffs reallege and incorporate by reference the allegations contained in each and every paragraph above as if fully set forth herein.

19. A binding and valid CBA existed and continues to exist between the Union and the Company. The parties' CBA is a "contract[] between an employer and a labor organization" within the meaning of Section 301. The CBA also involves "commerce" within the meaning of the Federal Arbitration Act ("FAA").

20. The Union filed a grievance challenging a new sick leave policy implemented by the Company in the fall of 2005. The parties submitted the grievance to arbitration pursuant to the CBA's dispute resolution mechanism. The arbitrator issued two arbitration awards that collectively found the Company to have violated the collective bargaining agreement by implementing its new sick leave policy and terminating employees pursuant to that policy. The second arbitration award also stated that the parties retained the right to seek arbitral resolution of remedial issues. Pursuant to the CBA's dispute resolution mechanism, these arbitration awards are "final and binding on all parties."

21. After attempting unsuccessfully to negotiate over the remedy for the Company's violation of the CBA, as found by the arbitrator, the Union sought to arbitrate the remedy issues. The Company has refused to comply with the arbitration awards and now contends they are invalid. In particular, the Company has refused: to recognize the validity of the two arbitration decisions, to reinstate the employees terminated pursuant to the sick leave policy found by the arbitrator to violate the parties' collective bargaining agreement, or to arbitrate the remedy issues.

22. The Company's refusal to comply with the two arbitration awards constitutes a "violation of [a] contract[] between an employer and a labor organization" within the meaning of Section 301.

23. The Union has no other speedy or adequate remedy to compel the Company to comply with the arbitration awards. Unless the Court issues an order confirming the arbitration awards, the Company will continue to refuse to comply with the arbitration awards.

24. The Company's bad faith refusal to comply with the two arbitration awards has produced, and will continue to produce, hardship for the Union and its members because those members have not been reinstated, and are being denied rights established by the parties' CBA,

1  and the Union is unable to avail itself of contractual grievance procedures contained in that

2  CBA.

3      25.     Pursuant to Section 301 and the FAA, this Court has the power to confirm the

4  two arbitration awards issued by the arbitrator (Exhibits B & C).

5                          SECOND CAUSE OF ACTION

6                  (Section 301 and Federal Arbitration Act - Compel arbitration)

7      26.     Plaintiffs reallege and incorporate by reference the allegations contained in each

8  and every paragraph above as if fully set forth herein.

9      27.     The Company has refused, and continues to refuse, to participate in the

10  contractual grievance process or to arbitrate the remedy issues arising from the Union's

11  grievance, in violation of the parties' CBA.

12      28.     The Company's refusal to arbitrate constitutes a "violation of [a] contract[]

13  between an employer and a labor organization" within the meaning of Section 301.

14      29.     The Union has no other speedy or adequate remedy to compel the Company to

15  arbitrate.  Unless the Court issues an order compelling arbitration, the Company will continue

16  to refuse to arbitrate the remedy issues arising from the Union's grievance.

17      30.     The Company's bad faith refusal to participate in the grievance process or to

18  arbitrate the remedy issues arising from the Union's grievance has produced, and will continue

19  to produce, hardship for the Union and its members because those members have not been

20  reinstated, and are being denied rights established by the parties' CBA, and the Union has been

21  unable to avail itself of contractual grievance procedures contained in that CBA.

22      31.     Pursuant to Section 301 and the FAA, this Court has the power to compel the

23  Company to arbitrate in an expeditious manner the remedy issues arising from the Union's

24  grievance, pursuant to the parties' CBA.

25                          PRAYER FOR RELIEF

26      WHEREFORE, the Union prays that this Court:

27      1.     Issue an order and final judgment confirming the two arbitration awards issued

28  by the arbitrator on the Union's grievance;

FIRST AMENDED COMPLAINT TO CONFIRM ARBITRATION AWARDS & TO COMPEL
ARBITRATION, Case No. C-08-1242 TEH                                              5

1    2.    Issue an order and final judgment ordering Defendant NUMMI to participate in

2  the contractual grievance process and to arbitrate in an expeditious manner the remedy issues

3  arising from the Union's grievance;

4    3.    Grant the Union costs of this suit;

5    4.    Award the Union reasonable attorneys' fees, available as a result of the

6  Company's bad faith failure to comply with the two arbitration awards and its bad faith failure

7  to participate in the contractual grievance process or to arbitrate the remedy issues arising from

8  the Union's grievance; and

9    5.    Grant such other and further relief as it deems just and proper.

10

11  Dated:   April 8, 2008

12                                        JONATHAN WEISSGLASS
                                          LINDA LYE
13                                        Altshuler Berzon LLP

14

15                                        By:   /s/Linda Lye
16                                             Linda Lye

17                                        Attorneys for Plaintiffs  International
                                          Union, United Automobile, Aerospace and
18                                        Agricultural Implement Workers of America,
                                          Local 2244 and International Union, United
19                                        Automobile, Aerospace and Agricultural
                                          Implement Workers of America.

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# AGREEMENT

## Between

## NEW UNITED MOTOR MANUFACTURING, INC.

### and the

### UAW

 

### August 6, 2005

# COLLECTIVE BARGAINING AGREEMENT

between

New United Motor Manufacturing, Inc.

and

International Union, United automobile,
Aerospace and Agricultural Implement
Workers of America, UAW

and its

Affiliated Local Union, 2244

**August 6, 2005**

# Table of Contents

| Section | Title | Page # |
|---|---|---|
| I. | Introduction | 1 |
| II. | Commitments and Responsibilities | 1 |
| III. | Job Security | 6 |
| IV. | Equal Opportunity | 6 |
| V. | Recognition | 7 |
| VI. | Union Security | 7 |
| VII. | Dues Checkoff | 8 |
| VIII. | Representation | 11 |
| IX. | Joint Conference | 17 |
| X. | Problem Resolution Procedure | 18 |
| XI. | Seniority | 25 |
| XII. | Transfers | 28 |
| XIII. | Shift Assignment | 32 |
| XIV. | Team Concept | 34 |
| XV. | Bargaining Unit Work | 34 |
| XVI. | Team Leader Selection Procedure | 35 |
| XVII. | Wage | 36 |
| XVIII. | Cost of Living Allowance | 41 |
| XIX. | Working Hours | 45 |
| XX. | Overtime | 47 |
| XXI. | Holidays | 51 |
| XXII. | Vacation (and PAA) | 55 |
| XXIII. | Leaves of Absence | 61 |
| XXIV. | Group Insurance | 67 |

ii

| Section | Title | Page # |
|---|---|---|
| XXV. | Health, Safety and Ergonomics | 67 |
| XXVI. | Bulletin Boards | 80 |
| XXVII. | Prohibition of Strikes and Lockouts | 81 |
| XXVIII. | Standardized Work | 81 |
| XXIX. | General Provisions | 84 |
| XXX. | Entire Agreement and Waiver | 88 |
| XXXI. | Term of Agreement | 89 |
| Appendix "A" | Lunch Period Agreement | 91 |
| Appendix "B" | Benefits Outline | 93 |
| Appendix "C" | Standardized Work | 127 |
| Appendix "D" | Team Leader Selection Procedure | 129 |
| Exhibit "1" | Authorization for Check-Off of Dues | 140 |
| Memorandum | Deduction of UAW V-CAP | 141 |
| Memorandum | Assignment and Checkoff of Contributions to UAW V-CAP | 143 |
| Letter | To Nate Gooden | 145 |
| Letter | To Nate Gooden – Health and Safety | 155 |
| Letter | To Chairman, Bargaining Committee | 164 |
| Exhibit "A" | Performance Pay Plan (PPP) | 172 |
| Letter | To Chairman – Division II | 181 |
| Letter | To Chairman – Plastics | 184 |
| Letter | To Chairman – Stamping | 185 |
| Diagram | Movement to/from Specific Groups, Paint, Body, and Plastics | 186 |
| Letter | To Chairman, Bargaining Committee | 187 |

iii

| Section | Title | Page # |
|---|---|---|
| Letter | To Chairman, Bargaining Committee | 188 |
| Letter | Nate Gooden – Expanded Work Force | 190 |
| Letter | Nate Gooden | 192 |
| Letter | Nate Gooden - Benchmarking | 194 |
| Letter | Nate Gooden – Retiree Lump Sum | 195 |
| Index | | 196 |

# I. INTRODUCTION

1.1 This Agreement is made and entered into this 6th day of August, **2005** by and between New United Motor Manufacturing, Inc., hereinafter referred to as the COMPANY, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW and its affiliated Local Union 2244, hereinafter referred to as the UNION.

The Parties recognize that this is a historic endeavor and that progress for the Company and the members of the Union is to a large extent interdependent and therefore together we are committed to building and maintaining the most innovative and harmonious labor-management relationship in America.

1.2 In the administration of this Agreement, and in our day to day relationship, we will exhibit mutual trust, understanding and sincerity, and, to the fullest extent possible, will avoid confrontational tactics.

Should differences or misunderstandings occur they will be resolved through full and open communication. The manufacturing environment will be based on teamwork, mutual trust and respect that gives recognition to the axiom that people are the most important resource of the Company. We are cognizant that if this endeavor is to be a success, labor and management must work together as members of the same team.

# II. COMMITMENTS AND RESPONSIBILITIES

1.1 The Company's primary objective is to grow and prosper. Since the catalyst for its progress is its employees, it recognizes its obligation to keep them employed and improve their wages and working conditions. It accepts Union organizing and collective bargaining as an essential and constructive force in our democratic society.

1

1.2 The Union's primary objective is to improve the quality of life for its members and their families by assuring that they will be treated with dignity and provided with economic security. In addition, it is essential to the Union's purpose to assure that workers are afforded the opportunity to master their work environment; to achieve not only improvement in their economic status but, of equal importance, to gain from their labours a greater measure of dignity, self-fulfillment and self-worth. It recognizes, however, the necessity of increasing productivity as a factor in its role in contributing to the development of the Company, which is the source of its members' employment and income.

1.3 To achieve the common goal of maintaining and improving the quality of life for employees and their families through Company growth the Parties are committed to:

- Maintain a prosperous business operation necessary to maintain fair wages and benefits that will assure a satisfactory standard of living and to provide secure jobs with the opportunity for advancement;

- Provide workers a voice in their own destiny in decisions that affect their lives before such decisions are made;

- Provide that the plant is operated under methods, which will promote, to the fullest extent possible, economy of operation, quality and quantity of output, cleanliness of the plant, and protection of property;

- Work together as a team;

- Build the highest quality automobile in the world at the lowest possible cost to the consumer;

- Promote full communication over the established policies and procedures;

2

- Cooperate with established standards of conduct and promote fair and equitable treatment;

- Maintain a safe work place utilizing new and innovative programs that could be a model for use throughout the entire industry;

- Resolve employee concerns through procedures using problem solving and non-adversarial techniques that are based on consensus instead of confrontation;

- Recognize the full worth and dignity of all employees, both bargaining unit and non-bargaining unit, and to treat each other with respect;

- Constantly seek improvement in quality, efficiency and work environment through KAIZEN, QC circles, and suggestion programs; and

- Recognize and respect each other's rights and perform all responsibilities sincerely.

1.4 **Management Responsibilities**

In carrying out the above commitments, the Company has the exclusive responsibility, except as specifically relinquished in this Agreement, to plan, direct, and control Company operations, including items such as products to be manufactured; method of manufacturing, including tools and equipment, schedules or production, and processes of manufacturing or assembling; establishment of standardized work; purchase or making of products or services to be incorporated into the products manufactured or processes; establish standards of conduct, including discipline or discharge for good and just cause; hiring, laying off, assigning, transferring, promoting, training and communication with all employees. In performing these responsibilities, the Company will inform the Union about the following matters:

3

- The inauguration or retirement of top management;

- Annual Company objectives;

- Major organizational changes;

- Semi-annual business plans;

- Company's long-range plans and policies;

- Establishment of quarterly production schedules;

- Contemplated in sourcing or outsourcing decisions;

- Technological changes that will impact the bargaining unit; and

- Other major events.

Additionally, the Company will meet and confer and make its best efforts to reach a consensus with the Union prior to initiating or changing Company policies relating to terms and conditions of employment. The Company shall make no change in Company policies contrary to the terms of this Agreement except as by mutual agreement of the Parties.

**1.5 Union Responsibilities**

The Union has the exclusive responsibility of representing its membership regarding all terms and conditions of employment and to ensure that they are treated consistent with the terms of this Agreement and that they receive fair and equitable wages and benefits.

The Union accepts the responsibility to promote the common objectives and to cooperate with the Company in administering, on a fair and equitable basis, standards of conduct; attendance plans and problem resolution; to promote constant improvements

in quality and productivity; and to cooperate with the Company in dealing with governmental entities.

**1.6 Employee Responsibilities**

The Company and the Union recognize and accept their responsibility to strive to create and maintain a positive work environment. To accomplish the same for the present and the future, all employees shall have the following responsibilities:

- Support the performance of the total team and actively support other members of the team;

- Meet reasonable team goals and participate in setting of team goals;

- Work within reasonable Company guidelines and philosophy;

- Respect the individual rights of others;

- Support and abide by reasonable standards of conduct and attendance policies;

- Promote good housekeeping and maintain a safe work environment;

- Promote KAIZEN by continually looking for opportunities to make the Company more efficient;

- Achieve quality goals and improve quality standards;

- Support the team concept; and

- Assist the Company in meeting production goals and schedules.

## III. JOB SECURITY

New United Motor Manufacturing, Inc. recognizes that job security is essential to an employee's well being and acknowledges that it has a responsibility, with the cooperation of the Union, to provide stable employment to its workers. The employee has either seniority at least equal to the lowest seniority employee in the group, or where the employee would be the highest seniority employee on the transfer list.

The Company will take affirmative measures before laying off any employees, including such measures as, the reduction of salaries of its officers and management, assigning previously subcontracted work to bargaining unit employees capable of performing this work, seeking voluntary layoffs, and other cost saving measures.

In summary, the Parties to this Agreement recognize that job security for bargaining unit employees will help to ensure the Company's growth and that the Company's growth will ensure job security.

## IV. EQUAL OPPORTUNITY

1. The Company and the Union will abide by all applicable Equal Employment Opportunity laws. Both parties agree that the provisions of this Agreement shall apply to all employees covered by this Agreement without discrimination, and in carrying out their respective obligations under this Agreement neither will unlawfully discriminate against any employee on account of race, color, national origin, age, sex, sexual orientation, marital status, religion or against any disabled employee as per applicable law.

2. Any employee determined to be disabled under the ADA and requiring reassignment as reasonable accommodation will be assigned consistent with the bargaining agreement to any vacant

6

position in any department, including positions outside the home department, for which the employee is otherwise qualified.

ADA qualified team member's will be assigned to an open permanent position within a group where they can perform a full team rotation within their medical restrictions and where the employee's commitments in Article II of this Agreement are a significant step towards the realization of stable employment. Hence, the Company agrees that it will not lay off employees unless compelled to do so by severe economic conditions that threaten the long-term financial viability of the Company.

## V. RECOGNITION

1. The Company hereby recognizes the Union, as the sole and exclusive representative of all employees described in Section 2 below, for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other terms and conditions of employment.

2. **Bargaining Unit.**
The term employee shall include all production and maintenance employees employed by the Company at its Fremont facility located at 45500 Fremont Blvd., Fremont, California 94538; excluding guards and supervisors as defined in the Act and all other employees of the Company.

## VI. UNION SECURITY

1.1 Any employee who is a member of the Union in good standing on the effective date of this Agreement shall, as a condition of employment, maintain membership in the Union to the extent of paying periodic membership dues and initiation fees uniformly levied against all Union members. Such employee's membership dues and initiation fees may be deducted from the employee's earnings by signing the form for "Authorization for Checkoff of Dues", or if no such authorization is in effect, the employee must pay membership dues and initiation fees directly to the Union.

7

1.2 Any employee who is not a member of the Union in good standing on the effective date of this Agreement, shall, on the 31st day after such date or on the 31st day following employment, or on the 31st day following transfer into the bargaining unit, whichever is later, as a condition of employment, become a member and maintain membership in the Union to the extent of paying periodic membership dues and initiation fees uniformly levied against all Union members. Such employee may have membership dues and initiation fees deducted from the employee's earnings by signing the form for "Authorization for Checkoff of Dues" (attached as Exhibit 1), or if no such authorization is in effect, the employee must pay membership dues and initiation fees directly to the Union.

1.3 The Union will furnish the Company, within fifteen (15) days from the effective date of this Agreement, the names of all members paying dues directly to the Union.

1.4 Initiation fees for membership in the Union shall be an amount not to exceed the maximum prescribed by the Constitution and Bylaws of the Union, and which is uniformly required of each applicant for membership in the Local Union.

1.5 The Union shall accept into membership each employee covered by this Agreement who pays to the Union the dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union.

1.6 The Union shall indemnify and hold the Company harmless against all claims or liabilities that may arise out of actions by the Company in complying with this Article.

## VII. DUES CHECKOFF

1.1 During the life of this Agreement, the Company agrees to deduct Union membership dues levied by the International Union or Local Union in accordance with the Constitution and Bylaws of the Union, from the pay of each employee who executes or has

executed the "Authorization for Checkoff of Dues" form marked Exhibit "1" and attached hereto.

1.2 A properly executed copy of such "Authorization for Checkoff of Dues" form for each employee for whom Union membership dues are to be deducted hereunder shall be delivered to the Company before any payroll deductions are made. Deductions shall be made thereafter only under "Authorization for Checkoff of Dues" forms which have been properly executed and are in effect. Any "Authorization for Checkoff of Dues" which is incomplete or in error will be returned to the Union by the Company.

1.3 Checkoff deductions, under all properly executed "Authorization for Checkoff of Dues" forms which have been delivered to the Company on or before the effective date of this Agreement, shall continue for the duration of this Agreement.

1.4 Thereafter the Union shall deliver to the Company any executed "Authorization for Checkoff of Dues" forms under which Union membership dues are to be deducted beginning with the following calendar month. In the event that membership dues other than those for the calendar month in which the deduction is made and initiation fees have become due and owing by an employee subsequent to the form, but prior to the first deduction by the Company thereunder, such membership dues and initiation fees will be deducted by the Company at the time it makes the first deduction for membership dues. The Union will notify the Company, in writing, when it makes delivery of "Authorization for Checkoff of Dues" forms of the amounts owing by employees who executed these forms.

1.5 In the case of employees rehired, or returning to work after layoff or leave of absence, or being transferred back into the bargaining unit, who have previously properly executed "Authorization for Checkoff of Dues" forms, deductions will be made for membership dues as provided herein.

1.6 In cases where a deduction is made which duplicates a payment already made to the Union by an employee, or where a deduction is not in conformity with the provisions of the Union Constitution and Bylaws, refunds to the employee will be made by the Union.

1.7 Dues deductions shall be remitted to the designated financial officer of the Local Union once each month within one (1) calendar week after such deductions are made. Any deductions made from subsequent payrolls in that month shall be included with the remittance for the following month. The Company shall furnish the designated financial officer of the Union, monthly, with a list of those for whom deductions have been made and the amounts of such deductions.

1.8 Any employee whose employment is terminated during his or her evaluation period, or any employee who is transferred to a classification not in the bargaining unit, or any employee whose seniority is broken by death, quit, discharge, layoff or sick leave of absence shall cease to be subject to checkoff deductions beginning in the month immediately following the month in which such termination or transfer occurred or seniority was thus broken. The Company will notify the Union following the end of each month of the names of such employees and will designate the reason each such employee ceased to be subjected to the checkoff.

1.9 Any dispute which may arise as to whether or not an employee properly executed or properly revoked an "Authorization for Checkoff of Dues" form, shall be reviewed with the employee by a representative of the Union and a representative of the Company.

1.10 The Company shall not be liable to the International Union or the Local by reason of the requirements of this Article of the Agreement for the remittance or payment of any sum other than that constituting actual deductions made from employees' wages earned.

1.11 The deduction for monthly dues will be made from the second pay day for the calendar month.

1.12 If the deduction is not made at the time described above, the deduction shall be made from the next pay.

1.13 If an employee receives a back pay settlement or award for any calendar month when no dues have been deducted, a deduction for each month shall be made from the settlement or award.

1.14 The Union shall indemnify and hold the Company harmless against all claims or liabilities that may arise out of actions taken by the Company in complying with any of the provisions of this section.

## VIII. REPRESENTATION

For the purposes of representing the employees relative to the terms and conditions of this Collective Bargaining Agreement and to carry out the mutual commitments and responsibilities set forth in Article II, the Union shall have the following representation structure:

1. **Local Union President**
1.1 The Local Union President who is elected from the employees of the Company, will be responsible for representing the Union in a variety of functions in, as well as out of the plant. The President shall perform functions as defined in the Problem Resolution Procedure, Article X, and such other Articles as may be applicable.

1.2 The President shall have such other duties and responsibilities as shall be determined by the Parties, such as coordination and assistance in the areas of safety, training, education, orientation and Joint Company/Union Programs.

2. **Chairperson Of The Bargaining Committee**

2.1 The Chairperson of the Bargaining Committee, who is elected from among the employees of the Company, shall represent the entire bargaining unit. The Chairperson shall be responsible at the Local Union level for the overall administration of the Collective Bargaining Agreement. The Chairperson shall perform functions as defined in the Problem Resolution Procedure, Article X, and such other Articles as may be applicable. The Chairperson shall make assignments to members of the Bargaining Committee and the Zone Committeepersons consistent with the terms of this Agreement.

2.2 One of the key mutual goals of the Parties is to resolve problems at the earliest possible stage. The Chairperson of the Bargaining Committee will meet with the Manager of Team Member Relations on a day to day basis to discuss how best to carry out that goal, and how best to meet the mutual commitments of the Parties as set forth in Article II.

3. Acting Chairperson Of The Bargaining Committee
The Chairperson of the Bargaining Committee shall designate any member of the Committee as Acting Chairperson, who will perform the duties of the Chairperson in the Chairperson's absence.

3.1 Zone Committeeperson
The Zone Committeeperson will have the following responsibilities:

• Prepare cases for the Problem Resolution Procedure including gathering all evidence, notes and other pertinent data from the District Committeeperson (The District Committeeperson has the sole responsibility to turn over all information to the Zone Committeeperson prior to the case being prepared).

• Upon request from the District Committeeperson or by direction from the Chairman of the Bargaining Committee, assist in any investigation.

• Other duties as assigned by the Chairman of the Bargaining Committee.

4. The Bargaining Committee
The Bargaining Committee shall consist of the Chairperson, Two (2) Bargaining Committeepersons, Two (2) Zone Committeepersons and the President of the Local Union. The Bargaining Committee shall have the responsibility, in conjunction with the International Union, of negotiating a new Collective Bargaining Agreement to replace the present agreement or make modifications thereto. The Two (2) Bargaining Committeepersons will also function as District Committeepersons as defined in Section 5, below. There will be one (1) bargaining committeeperson on 1st shift elected by 1st shift employees and one (1) bargaining committeeperson on 2nd shift elected by 2nd shift employees. Bargaining Committeepersons must be elected from the district committeepersons on each shift.

There will be one (1) zone committeeperson on 1st shift elected by 1st shift employees and one (1) zone committeeperson on 2nd shift elected by 2nd shift employees.

5. District Committeepersons
5.1 For the purpose of representation, the Chairperson of the Bargaining Committee and the Manager of Team Member Relations, shall by mutual agreement, establish Districts in the plant. There shall be Six (6) Districts on the Day Shift and Six (6) Districts on the Night Shift (2nd Shift).

5.2 Where there is an overlap period between shifts where employees are working outside of the normal two (2) shifts, the Chairperson of the Bargaining Committee shall assign the responsibility of representing those employees to one or more of the above District Committeepersons.

**5.3** One (1) Union Representative for the Expanded Work Force will be appointed by the Chairperson of the Bargaining Committee.

**6. Duties Of District Committeepersons**

Each District Committeeperson shall have responsibilities relating to proper administration of this Agreement with the Company. These duties include:

- Meeting with Company representative to resolve complaints under the Problem Resolution Procedure;

- Participating with the Company in Standards of Conduct and Attendance Counseling Committees;

- Joint investigations with the Company in potential suspension/discharge cases;

- Represent an employee(s) (if requested by the employee(s)) in disciplinary action that may result in suspension or discharge; and

- Implementing this Agreement and cooperating with the Company in implementing Labor Relations Policies such as attendance control, vacation scheduling, safety records, call-in duties, lost time accident reports, and leaves of absence.

**7. Alternate District Committeeperson**

There shall be one (1) Alternate District Committeeperson for each regular District Committeeperson who shall be designated by the Union. In cases where a District Committeeperson is absent, the Alternate District Committeeperson may function in the Committeeperson's place during such absence. However, the Alternate shall not function or be paid for performing representational duties when the Committee person is absent and being paid by the Company for the Committeeperson's representational duties.

**8. General Representatives**

Eight (8) representatives, appointed by the International Union, will be assigned to positions in the Safety, Ergonomics, Employee Benefits, Employee Assistance, Return to Work and Apprenticeship/Skilled/Cross Training and Community Involvement areas of the Human Resources Department. The General Representatives will have regular full time duties determined by the Company and the Union.

**9. Rate Of Pay**

The Local Union President, the Chairperson of the Bargaining Committee, **Zone Committeepersons**, the District Committeepersons and the General Representatives shall be paid according to the mutual agreement of the Parties for time spent in representational duties at the plant. In addition, the President of the Local Union shall be paid up to sixteen (16) hours per week and the Chairperson shall be paid for up to sixteen (16) hours per week according to the mutual agreement of the Parties for time spent on representational duties off the plant premises. Before leaving the plant premises, arrangements must be made with the Manager of Team Member Relations. Normally Committeepersons will not perform representational duties off premises but they may, when given permission by the Manager of Team Member Relations. Requests for permission to perform off premises representational duties must come from the Chairperson of the Bargaining Committee.

**10. Union Coordinator**

**10.1** There shall be one (1) Union Coordinator designated by the Union for every **four (4)** Groups in the Plant by **July 1, 2006**. The Groups will be combined by the Manager of Team Member Relations and the Chairperson of the Bargaining Committee. The Union Coordinator shall be selected from among the employees in the Group that the employee represents. The Union Coordinator will perform a full-time job in the Plant.

**10.2** The function of the Union Coordinator, in part, is to provide representation and assistance in the solution of problems and

potential problems within the Groups where the Coordinator works. It is the intent of the Parties, in the spirit of true teamwork, that all best efforts be made by the affected employee(s), Union Coordinator and Group Leader to quickly resolve problems arising within the Group, in an informal atmosphere and on a non-precedent setting basis. The Union Coordinator will perform functions as defined in the Problem Resolution Procedure, Article X, and other activities as agreed to by the Parties, including but not limited to, Group Meetings.

10.3 Meetings with the Union Coordinator or problem handling shall be arranged during the periods in which there is clearly no interference with the job duties of both the Coordinator and Employee, such as lunch or break time. Union Coordinators will be paid two (2) hours pay per week at their straight-time hourly rate for performing their representational duties. This two (2) hours pay shall not be included for purposes of computing overtime.

## 11. General Provisions

11.1 Upon entering a section to perform representational responsibilities and in order to facilitate communication and create a positive atmosphere, all Union representatives shall notify the Manager, **Assistant Manager or Group Leader** of that area of their presence and purpose.

11.2 The names of all Union Officers, Committeepersons and Union Coordinators shall be given to the Human Resources Department in writing by the President of the Local Union, the Chairperson of the Bargaining Committee, or an International Representative. No person shall be allowed to function in these positions until forty-eight (48) hours after such notice.

11.3 Upon the request of the President or Chairperson of the Bargaining Committee of the Local Union, or an International Representative, the Company shall excuse an employee without pay for all or part of a shift, unless such excuse would substantially interfere with production, for the purpose of

16

conducting Union business of such nature as attendance at the UAW Convention, attendance at Board Meetings of the Local Union, and summer programs conducted by the UAW, etc. The Manager of Team Member Relations shall receive a written absence notification from the Local Union President, Chairperson of the Bargaining Committee or an International Representative as far in advance as possible, but in no event less than forty-eight (48) hours before the absence.

## IX. JOINT CONFERENCE

### 1. Purpose

The Company and the Union will have periodic Joint Conferences to allow both parties full understanding of situations within and surrounding the Company and the Union. The purpose of these Joint Conferences is to facilitate joint efforts in establishing a work environment and relationship characterized by mutual respect and trust.

### 2. Level/Composition

2.1 Joint Conferences shall be held at the Company Level (Executive Joint Conference), and sectional level within the bargaining unit (Section Joint Conference).

2.2 Executive Joint Conferences shall be composed of the President, Executive Vice President, Vice Presidents, and other designated management personnel relating to the issues to be discussed, and the International Representative, President of the Local Union, Bargaining Committee Chairperson, and Committeepersons.

2.3 Section Joint Conferences shall be composed of Section Manager, Assistant Manager, if any, and designated personnel related to the issues, the Committeepersons and Union Coordinators within the Sections.

### 3. Agenda

17

An agenda shall be determined by mutual agreement and shall not include problems defined in Article X, or negotiation matters. Each party shall furnish the other with an agenda which they wish to discuss as far in advance of the meeting as possible.

4. **Meeting Hours**

Executive Joint Conferences shall be held at a mutually agreeable time. Section Joint Conferences shall be held at a mutually agreeable time after working hours.

## X. PROBLEM RESOLUTION PROCEDURE

1. **Scope Of Problem**

1.1 In the event any employee has a "problem" concerning the interpretation or application of any terms of this Agreement, or any other work-related problem, such matters shall be adjusted according to procedures in this Article except where the Agreement specifically states that a certain matter shall not be subject to this Problem Resolution Procedure or where a certain matter is subject to other resolution procedures.

1.2 The Union agrees that this procedure shall be the exclusive procedure for any problem resolution and it further agrees to discourage any employee to appeal to any court or other government agency any resolution rendered through this procedure.

2. **FIRST STEP: Informal Discussion – Team Effort For Resolving Problem**

2.1 The Company and the Union shall encourage all employees to attempt to resolve problems within the Group using problem-solving methods. Any employee with a problem shall first discuss the problem with the employee's Group Leader. If the problem is not settled to the satisfaction of the employee, the employee may discuss the problem with the Union Coordinator during the period in which there is clearly no interference with their job duties such as lunch, break period, etc.

18

2.2 Because of the value and importance of full discussion in clearing up misunderstandings and preserving harmonious relations, every reasonable effort shall be made to resolve problems promptly at this point through discussion. The resolution of an employee problem at this stage shall not set a precedent or a binding past practice on either party.

2.3 The Group Leader shall answer the problem within three (3) working days from the date on which the problem is made known to the Group Leader. The Group Leader's answer shall state the basis for the Group Leader's position. If the problem is not resolved through discussion with the Group Leader, the Union Coordinator or the employee(s) may request the Group Leader to call the District Committeeperson. **The Group leader shall place the Committeeperson call within twenty-four (24) hours of the request.** The Team Member Relations Representative shall be notified by the District Committeeperson within five (5) working days after the Group Leader answers the problem.

2.4 Investigation of Problem: The Committeeperson and Team Member Relations Representative shall jointly complete the investigation of the circumstances of the problem within three (3) working days from the notification to the Team Member Relations Representative. Thereafter, they shall discuss the problem with the Section Manager and others concerned in order to resolve it.

3. **SECOND STEP**

3.1 If the matter remains unresolved, within three (3) working days after completion of the investigation, the Committeeperson may present the problem to the Manager of Team Member Relations on a Problem Notice Form supplied by the Company and agreed to by the Union.

3.2 The Problem Notice Form shall state the nature of the problem and the pertinent facts, the date on which the act or conduct

19

forming the basis for the problem occurred, the contract provision or provisions alleged to have been violated, the nature of the problem and the remedy requested, and be signed by the grieving employee and/or the Union. All employees involved in a group problem shall be identified on the form. The form shall also be signed and dated by the Committeeperson.

3.3 The Chairperson of the Bargaining Committee and Manager of Team Member Relations, or their authorized designees, shall meet on Tuesdays at 10:00 a.m.(or such other time as the parties may mutually agree upon) to review all Problem Notices filed in the previous week. They shall review the investigation made at the First Step and shall seek to resolve the problem. If they are not able to resolve the problem at the Second Step meeting, the Manager of Team Member Relations shall give the Chairperson of the Bargaining Committee a written Second Step answer to the problem within three (3) working days after the Second Step meeting, stating the reasons for his position. If the Problem Notices from the previous week are not heard at the Tuesday Second Step meeting they may be dispositioned by the Company.

**4.** **THIRD STEP: Appeal To Joint Union/Management Committee**

4.1 If the second step written answer does not resolve the problem, the Chairperson of the Bargaining Committee may give the Team Member Relations Manager a written "Notice of Unresolved Problem", on forms supplied by the Company and agreed to by the Union. The written Notice of Unresolved Problem shall be presented within three (3) working days from the time of the written answer in the Second Step.

4.2 Within five (5) working days, the Company and the Union shall prepare and exchange three (3) copies of a written "Statement of Unresolved Problem" setting forth their positions, the facts of the case and provisions of this Agreement in support of their positions. Following the exchange of statement, the Joint Union/Management Committee shall be convened to review the Problem and to discuss it fully to resolution. The Joint Union/Management Committee shall consist of three (3)

Company representatives—Vice President, Human Resources, Manager of Team Member Relations, and a General Manager related to the problem or their designee(s), and three (3) Union representatives—International Representative, President and Bargaining Committee Chairperson of the Local Union or their designee(s).

4.3 If the case is not resolved by the Joint Union/ Management Committee, the Company shall give its decision in writing to the Union's Joint Union/Management Committee Member within five (5) working days after the Joint Union/Management Committee meeting.

**5.** **FOURTH STEP: Arbitration**

5.1 If the Union is not satisfied with the Company's Third Step written decision, the International Representative, within fifteen (15) calendar days from receipt of the Company's written decision in the Third Step, shall submit a completed 'Notice of Appeal to Arbitration' form to the Team Member Relations Manager, on a form supplied by the Company and agreed to by the Union.

5.2 This notice shall specify the issues involved in the problem, all new facts ascertained by the Union, and remedy requested. Problem(s) appealed in this manner shall be discussed by the Union's Regional Director or a designated staff member and Vice President, Human Resources or designee prior to presentation before the Arbitrator.

5.3 Problem(s) not adjusted at this time may be referred to the Arbitrator in writing by either party to this discussion.

**6.** **Arbitrator**

6.1 Within fifteen (15) calendar days of the meeting described in the preceding paragraph, the parties shall jointly request the

American Arbitration Association to furnish both parties with an appropriate panel of seven (7) Arbitrators.

6.2 The parties shall then select an Arbitrator from this panel by mutual agreement or by alternately striking a name therefrom until one (1) name is left. The selection shall be made within five (5) working days after receipt of the panel list. The parties may jointly select an available arbitrator when necessary in order to expedite the arbitration process. The arbitration shall be conducted in accordance with the rules of the American Arbitration Association.

6.3 All costs of arbitration, including the arbitrator's fees and expenses, shall be shared equally by the Company and the Union. Each party shall bear the expense of its own presentation, including attorney's fees, outside consultants and the like.

7. **Power Of Arbitrator**

7.1 The Arbitrator shall be empowered to hear, investigate and decide any differences between parties concerning the interpretation or application of the provisions of this Agreement. The Arbitrator shall have no power or authority to rule on or to decide any matter which is not covered by express provisions of this Agreement or which is left to the responsibility or discretion of the Company. The Arbitrator shall have no power to: (1) add to, subtract from, or otherwise modify any of the provisions of the Collective Bargaining Agreement; (2) establish or modify any wage; (3) rule on problems concerning standardized work; (4) rule on problems concerning the Company's Benefit Plans, such as the Group Insurance Program, Health Care Insurance Program, Retirement Plan, Savings Plan, or Reserve Fund Plan; (5) rule on problems concerning health and safety; (6) rule on those issues or disputes in which the parties waived their rights under Article XXX; or (7) rule on any matter specifically excluded from the Problem Resolution Procedure by any part of this Agreement.

7.2 During the hearing, the Arbitrator may conduct such investigations as appropriate and reasonable.

8. **Arbitrator's Decision**

All decisions within the defined authority of the Arbitrator shall be final and binding on all parties.

9. **Time Limits**

9.1 A written problem shall be filed within fifteen (15) working days after occurrence of the event-giving rise to the problem unless the circumstances of the case make it impossible for the employee or the Union to know that there were grounds for the claim prior to that date. If a written problem is not filed within the time limit, the problem is not valid under this Problem Resolution Procedure.

9.2 Any problem not appealed within the time limits shall be considered settled on the basis of the last decision and not subject to further appeal or to arbitration. However, an employee who does not appeal a problem from one step to another shall be given one (1) automatic two (2) day extension of time to properly perfect his appeal. An employee or Union who uses this extension shall have no further extension at any step of the Problem Resolution Procedure. If the Company does not answer a problem within the time period specified, the problem shall be deemed denied and may be taken to the next step of the Problem Resolution Procedure.

9.3 The time limits provided for in this Article may be extended by written agreement of the parties. The party requesting the extension shall initiate the request in writing.

9.4 Prior to the hearing by the Arbitrator, the parties may agree to refer a problem back to the preceding step of the Problem Resolution Procedure for the purpose of further discussion or investigation including new evidence not set forth in the prior written record.

9.5 At any step prior to the hearing by the Arbitrator, the Union Representative(s) and Company Representative(s) designated for

that step shall have the authority to resolve a problem, provided that the problem settlement does not supersede or conflict with any provisions of this Agreement.

9.6    During or after the hearing by the Arbitrator, a problem may be withdrawn by agreement of the parties.

### 10.    Effect Of Resolution

10.1   Any claim against the Company shall not be valid for the period prior to the date the written problem was first filed, except that:

(a)    For a back wage claim based on a non-continuing violation, the claim should be valid for a period of not more than fifteen (15) days prior to the date the written problem was first filed, or

(b)    For a back wage claim based on a continuing violation, the claim shall be limited retroactively to a thirty (30) day period prior to the date the claim was first filed in writing, if the circumstances of the case made it impossible for the employee or the Union to know that there were grounds for the claim prior to that date.

10.2   Amount of Back Wage:  The claim for back wages shall not exceed the amount of wages the employee would otherwise have earned at the employee's regular rate, including overtime, less:

(a)    any unemployment or workers' compensation the employee received, or was entitled to; or,

(b)    any compensation for personal services received or earned during the period covered by the problem that the employee would not have earned if the employee had been working.

### 11.    Discipline And Discharge

11.1   If an employee is called to the Team Member Relations Section or to a meeting with a supervisor concerning discipline, the

24

employee may request the presence of the District Committeeperson for representation during the interview.

11.2   Immediately after any corrective suspension or issuance of second and any subsequent written corrective notice for violation of the Standards of Conduct or Good Attendance program, the Good Conduct and Attendance Counseling Committee shall confer with the employee.  The Committee will discuss all relevant facts and circumstances to assist the employee in improving the employee's conduct or attendance.  In addition, the committee shall impress upon the employee the importance of Good Conduct and Attendance.

11.3   The Good Conduct and Attendance Counseling Committee shall consist of a Group Leader, Team Member Relations Representative and Committeeperson.

11.4   A written corrective notice is not subject to Problem Resolution Procedure in this Article; provided, however, that if a problem involving a suspension or discharge is appealed to arbitration, all written corrective notices preceding the suspension or discharge also may be contested during the arbitration.

11.5   Any problem regarding suspension and discharges shall be filed in the Third Step provided in Section 4 of the Problem Resolution Procedure, within three (3) working days from the disciplinary action taken. If a problem regarding discharge is not resolved in the Problem Resolution Procedure, it shall be expedited to the Arbitration Step taking precedent over all other problems and the Arbitration shall be held within two (2) weeks where possible.

11.6   The employee and the Union will be provided a copy of any written corrective notice, suspension or discharge entered in the employee's personnel file.

### XI.    SENIORITY

### 1.    Definition

25

Seniority means an employee's unbroken service with the Company in years, months and days since the employee's most recent date of hire. Seniority shall be established on a Company-wide basis and separately within Division I and Division II.

2.

2.1 **Evaluation Period**

An employee may acquire seniority after successfully completing an initial evaluation period of ninety (90) calendar days starting with the most recent date of hire. The employee will receive credit for seven (7) calendar days for each pay period the employee works except hiring week. After completion of the initial evaluation period, seniority shall date back to ninety (90) days from the date seniority is acquired.

2.2 The initial evaluation period will be used to measure performance based on ability to perform required tasks, quality and quantity of work, attendance, punctuality, and ability to work as a team member. The retention of an employee during the evaluation period shall be at the Company's discretion, and termination of such employee shall not be subject to the Problem Resolution Procedure. In the event of a potential termination of employment during the evaluation period, a member of the Team Member Relations Section and a Committeeperson will review any unusual or mitigating conditions and circumstances relevant to the potential termination of the employee.

2.3 If two employees have the same amount of seniority, the employee with the lowest last four numbers on his or her social security number will have the greatest seniority, and if that still does not break the tie, the lowest last (5) numbers on his or her social security number will have the greatest seniority.

3. **Loss Of Seniority**

Seniority will be broken and lost, and employment shall cease for the following reasons:

a. Discharge for just cause;

b. Quit or Retirement;

c. Failure to report to work for four (4) consecutive working days without prior notice, unless unusual conditions or circumstances exist;

d. Failure to report to work within six (6) consecutive working days (excluding Saturday and Sunday) without a Company approved leave of absence unless unusual conditions or circumstances exist;

e. Failure to return to work within four (4) consecutive working days (excluding Saturday and Sunday) after the expiration of a leave of absence unless unusual conditions or circumstances exist;

f. Accepting employment while on leave of absence, unless prior written approval has been granted by the Company, or specifically permitted by other language in this agreement; or

g. Being on a sick leave beyond the leave period set forth in Paragraphs 9.3 and 9.4, Article XXIII, of this Agreement.

h. Falsifying or omitting pertinent information on any Company record, with regards to employment application, the rule shall be one (1) year from hire date.

4. **Transfer**

4.1 When an employee is transferred permanently from Division I to Division II, the employee shall establish seniority in Division II as of the date of transfer (entry date). When an employee is transferred temporarily from one Division to another, the employee shall retain accumulated seniority as of the date of the transfer in the Division from which the employee was transferred and continue to accrue seniority.

4.2 Employees who leave the bargaining unit **for a Salaried position** after 8/6/05 shall have their bargaining unit seniority frozen **for**

one year and will not accumulate bargaining unit seniority while in a salaried position. If the employee remains in a Salaried position beyond the one year period, all bargaining unit seniority will be lost.

## XII. TRANSFERS

**5. Seniority List**
The Company will furnish the Union with a seniority list on a quarterly basis, or on request of the Chairperson of the Bargaining Committee.

**1. Definitions**
Transfer means an employee moving from one Group or Section to another. A regular transfer is a transfer for more than three (3) months. A temporary transfer is for no more than three (3) months.

**2. Regular Transfer**
The Company may transfer employees. If efficiency and production needs permit, the Company will give priority to employees who have made application for a posted transfer as set forth below.

**3.**
**3.1 Application For Transfer**
Except in the case of Quality Assurance Audit Team Members, if an employee has worked in a section or group for at least twelve (12) months, an employee may file an application to be transferred to an open job in another Group during the Ten (10) working day posting period for an opening. Quality Assurance Audit Team Members must have worked for at least thirty six (36) months on the Audit Team in order to be eligible to transfer from that assignment.

Notice of the openings will be located on the Company's Bulletin Boards throughout the plant for a period of Ten (10) working days. The Job Posting notice shall include the following information:

- **The date and time of the posting**
- **The date and time of the closing**
- **The group**
- **The Location**
- **The shift the opening is on**
- **The physical requirements of the job**

The application, available in Team Member Relations, must be filed with the Team Member Relations Section no later than the date and time of closing. The application shall include:

a. employee's current job and all previous jobs held in the Company;

b. employee's plant and division seniority dates;

c. job for which a transfer is sought; and

d. experience, qualifications, and knowledge the employee has for the job.

Employees not filing an application by the date and time of closing shall forfeit any claim to the position.

**3.2** Once an employee accepts a transfer, all other pending applications for current job postings are automatically cancelled. An employee who is transferred is not eligible to apply for another transfer until after twelve (12) months from the effective date of the transfer.

**4. Selection**
**4.1** When an open job is to be filled, the Company will review all applications which have been submitted prior to the date and time of closing, and select the most qualified applicant. Those applications on file for the job. Production needs permitting, the Company will select for transfer the employee or employees it

believes have the capability and knowledge to perform the job. For Division I, where two or more employees have relatively equal capability, and production needs permit the selection of any one of them, the employee with the greatest seniority will be transferred. For Division II, where two or more employees have relatively equal capability and knowledge, and production needs permit the selection of any one of them, the employee with the greatest seniority will be transferred. If no employee makes application for the job and the production needs permit, the Company will transfer volunteer(s) or the least seniority employee(s) among those who are qualified for the job in the Group from which transfers are required. Current employees who have made application for transfer will be given preference over new hires for permanent openings.

4.2 Transfers will occur by the Monday following fifteen (15) working days after the Company has notified the employee of the Transfer.

4.3 **When a vacancy occurs within a team, the opening will first be offered by seniority within the group where the opening exists. Only one such move will be allowed.**

4.4 If an employee files a transfer application based on health reasons, the Company will make a decision whether or not to transfer after consultation with the Company Medical Office.

5. **Temporary Transfer**
5.1 The Company may temporarily transfer employee(s) for a maximum period of three (3) months per transfer, without regard to the other provisions of this Article. Where practical, the Company will transfer a volunteer or applicant. If there is none, the employee having the least seniority among those who are capable of doing the required job in the team from which the transfer is required will be transferred.

5.2 An employee temporarily transferred from Division II to Division I shall be paid at his/her regular Division II rate. An employee

who is temporarily transferred to Division II will receive the rate of pay for the job being performed for all hours worked.

6. **Notification**
6.1 Except in emergency cases, the Company shall give prior notice to the employee who is to be transferred.

6.2 For transfers from one shift to another, the Company will give one (1) week notice where possible.

6.3 Management will furnish the Chairperson of the Bargaining Committee a list of such permanent openings as far in advance as possible of such transfers.

7. **Consideration On Return**
7.1 If an employee is involuntarily reassigned from one section or group to another as a result of a change in takt time or other reduction in force, and if production needs and qualifications permit, that employee will be permitted to fill openings in the employee's original section or group before regular transfer applications are considered. The following provisions apply to consideration for return:

7.1 An employee must make application to return to the section or group. Applications may be submitted only during the **first thirty (30) days** after the employee's reassignment.

7.2 The application for return will be considered for openings occurring in the section or group during a twelve (12) month period following the submission of the application. After the twelve (12) month period, openings will be filled in accordance with normal transfer procedures.

7.3 Refusal of an opportunity to return to the section or group under these provisions automatically cancels the application.

7.4 If an employee returns to a section or group in accordance with these provisions, any open transfer requests on file at the time of return will be **valid**.

7.5 If two persons qualify for a single opening in accordance with these provisions, preference will be given to the employee with greater seniority.

## 8. Reduction in Force

8.1 In the event a takt time change or other reduction in force results in the need to move employees from one Group to another, the Company will attempt to honor the requests of volunteers in selecting any employees to be moved. If there are no volunteers and when production needs permit, employees will be reduced out of the Group according to seniority and qualifications.

8.2 In the event a team leader position is eliminated from the Group, the team leader may elect to:

A) remain in the Group on another team as a team leader provided he/she has the seniority and qualifications;

B) be reassigned to an available team leader opening within the section or;

C) be demoted to team member and remain in the Group provided he/she has the seniority and qualifications.

8.3 If there are no available team leader openings in the team leader's section or the team leader does not have the seniority or qualifications to remain in their original group, then the team leader will be demoted to team member and reduced in accordance with section 8.1.

## XIII. SHIFT ASSIGNMENT

1.1 The parties recognize that it is necessary, from time to time, to reassign employees to different shifts to maintain quality, efficiency of production among shifts, to train other employees, or to accommodate employees' desires. It is also recognized that employees who desire to change shift should be given shift preference based on seniority and qualifications. During the initial evaluation period, the new employee will be assigned to an appropriate shift decided by the Company for training purposes up to the first ninety (90) days of employment.

1.2 Assignment from one shift to another shall be in the following manner:

a. Once every six (6) months an employee may make a written application to the Group Leader for reassignment to the corresponding Group on another shift.

b. An applicant who is eligible under the terms of the Agreement, shall be reassigned to the requested shift as soon as possible, but not later than the first Monday following ten (10) working days from the date the application is filed. This reassignment shall be made in accordance with seniority in the respective Division, subject to the applicant's qualification to perform the required work and the ability of the employees on the former shift to perform the remaining work. The employee who is displaced as a result of a greater seniority employee exercising shift preference rights under this Article will be reassigned to the corresponding Group on the other shift **and will be given ten (10) days written notice by management of the new shift assignment.**

1.3 When the Company believes it is necessary to reassign an employee(s) from one shift to another to maintain quality, efficiency or for training, these reassignments shall be made first from qualified volunteers who can be released from their current shift assignment. If there are no such volunteers, reassignments shall be made from the least seniority employees who are qualified to perform the work. Such reassignment shall not normally exceed three (3) months except where to do so would adversely effect the Company's operation.

1.4 When the Company implements a new shift(s), the Company may assign the lowest seniority qualified employee from the present shift to the new shift to maintain quality and efficiency of production. Employees who have made a written application for the new shift will be given preference. Employees who have been reassigned may make application to be reassigned to another shift after three (3) months, in accordance with this Article.

1.5 In the event of the addition of a Production shift, there will be no shift preference for ninety (90) days. In cases of model changeover which require more than one (1) week shutdown, there will be no shift preference for thirty (30) days.

## XIV. TEAM CONCEPT

1.1 The parties agree that the Company will utilize a team concept, whereby employees will be organized into teams of approximately 5-10 members. All members of a team share responsibility for the work performed by the team, and for participation in Quality/Productivity improvement programs such as QC Circles and KAIZEN. Generally, and as practical, team members are expected to rotate jobs within the team.

1.2 Each team will have a Team Leader selected in accordance with Article XVI in this Agreement. Team Leaders shall be members of the bargaining unit.

## XV. BARGAINING UNIT WORK

1.1 Salaried employees or other non-bargaining unit employees will not be used as substitutes for hourly employees nor will they deprive bargaining unit employees of available work.

1.2 The principal function of the Group Leader is to direct the activities of workers in a particular area. The Parties recognize, however, that it may be necessary for the Group Leader or other non-bargaining unit employees, including employees of Toyota Motor Corporation, to perform the work that is normally performed by bargaining unit employees for the following reasons:

34

- Assisting in engineering or breakdowns;
- Kaizen and training employees;
- Performing work of an experimental nature; and
- Unexpected circumstances requiring immediate attention to avoid interruption of work, (i.e. Breakdown, etc.)

## XVI. TEAM LEADER SELECTION AND ADMINISTRATION PROCEDURE

1.1 The Parties seek to attract, retain and motivate individuals who contribute to the mutual growth and success of the total team. An objective of the Parties is to identify the most capable individual for team leader positions within the Company. In so doing, the Company tries to provide growth opportunities for employees and to assist them in developing to their full potential.

1.2 The Company and the union will establish selection criteria and promote employees from those qualified who are most capable for the team leader position. Candidates must have level 2 attendance or above (except in the case of level 1 attendance resulting from an authorized Leave of Absence) to be considered. Where two or more candidates are considered most capable, the employee with the greater seniority will be selected. In identifying qualified candidates for promotion to team leader, the following guidelines will be utilized: experience, ability, capacity to perform the team leader job, etc.

1.3 New team leaders will be subject to a four (4) month evaluation period to assess their ability on the job. The evaluation period will start as soon as the Team Leader is promoted. Criteria used to measure team leader performance will include, without limitation, the demonstrated capability to perform all the jobs on the team. In addition, the new Team Leader will attend the post-promotion training class within the four (4) month evaluation period. Team Leaders who fail to perform satisfactorily during the evaluation period will be returned to their former groups as team members.

35

1.4 The joint Team Leader Selection committee shall review current team leader training and propose continuing education for team leaders once a year. A joint report for training shall be generated and given to the Bargaining unit Chairman and the General Manager of Human Resources for review and implementation.

1.5 Team Leaders who experience performance difficulties will be referred to the Review Committee. Any potential demotion of a team leader will be referred to the Review Committee process.

## XVII. Wage

1. **Base Wage Rate**

1.1 All employees covered by this Agreement shall be paid the following base wage rates:

(a) Division I:

1. Effective 8/6/2005 the New Hire Rates will be as follows:

| Months of Service | Hired on or before 8/6/2005 | Hired after 8/6/2005 |
|---|---|---|
| 0-6 months | $20.06 | $19.58 |
| 7-12 months | $21.38 | $20.98 |
| 13-18 months | $22.70 | $22.38 |
| 19-24 months | $24.02 | $23.77 |
| 25-30 months | $25.33 | $25.17 |
| 31-36 months | $26.65 | $26.57 |
| After 36 months | $27.97 | $27.97 |
| Plus applicable COLA | | |

(2) Effective August 6, 2007 the New Hire Rates with the inclusion of the GWI will be as follows:

| Months of Service | Hired on or before 8/6/2005 | Hired after 8/6/2005 |
|---|---|---|
| 0-6 months | $20.45 | $19.97 |
| 7-12 months | $21.80 | $21.40 |
| 13-18 months | $23.15 | $22.82 |
| 19-24 months | $24.50 | $24.25 |
| 25-30 months | $25.83 | $25.68 |
| 31-36 months | $27.18 | $27.10 |
| After 36 months | $28.53 | $28.53 |
| Plus applicable COLA | | |

(3) Effective August 4, 2008 the New Hire Rates with the inclusion of the GWI will be as follows:

| Months of Service | Hired on or before 8/6/2005 | Hired after 8/6/2005 |
|---|---|---|
| 0-6 months | $21.05 | $20.57 |
| 7-12 months | $22.45 | $22.04 |
| 13-18 months | $23.84 | $23.51 |
| 19-24 months | $25.23 | $24.98 |
| 25-30 months | $26.60 | $26.45 |
| 31-36 months | $28.00 | $27.92 |
| After 36 months | $29.39 | $29.39 |
| Plus applicable COLA | | |

(b) Division II:

(1) Effective 8/8/05 the New Hire Rates will be as follows:

| Months of service | Hired on or before 8/6/2005 | Hired after 8/6/2005 |
|---|---|---|
| First 90 days | $27.74 | $27.49 |
| After 90 days | $32.34 | $32.34 |
| Plus applicable COLA | | |

(2) Effective 8/6/07 the New Hires Rates with the includes of the GWI will be as follows:

| Months of service | Hired on or before 8/6/2005 | Hired after 8/6/2005 |
|---|---|---|
| First 90 days | $28.29 | $28.04 |
| After 90 days | $32.99 | $32.99 |
| Plus applicable COLA | | |

(3) ) Effective 8/4/08 the New Hires Rates with the includes of the GWI will be as follows:

| Months of service | Hired on or before 8/6/2005 | Hired after 8/6/2005 |
|---|---|---|
| First 90 days | $29.13 | $28.88 |
| After 90 days | $33.98 | $33.98 |
| Plus applicable COLA | | |

1.3 If an employee is absent for a full pay period(s) for any reason except vacation, jury duty, military leave, leave of absence due to industrial injury, leave of absence qualified under the Family and Medical Leave Act, or California Family Rights Act, California Pregnancy disability Act, or Union leave of Absence, the required period(s) to increase the wage rate shall extend for such pay period(s).

1.4 Employees permanently transferred from Division I to Division II shall receive the hiring rate effective as set forth in Section 5 of this Article. Employees permanently transferred from Division II to Division I shall receive the relative wage rate based on the employee's prior period from hiring. The automatic rate increase shall start, if the employee is still crediting toward the maximum rate, as set forth in Section 5 of this Article.

2.0 **Team Leader Premium**

38

---

Team Leaders shall be paid a premium of sixty cents ($.60) per hour, effective the date of promotion and in accordance with Section 5 of this Article.

3.0 **Night Shift Premium**

3.1 A night shift premium will be paid an employee for hours worked, including overtime hours, on a shift scheduled to start in accordance with the following chart:

| Scheduled Shift Starting Time | Amount of Shift Premium Week Ending |
|---|---|
| a) On or after 11:00 a.m. and before 7:00 p.m. | 5% per hour |
| b) On or after 7:00 p.m. and before 4:45 a.m. | 10% per hour |
| c) On or after 4:45 a.m. and before 6:00a.m. (also see Par. B 10 of letter to Nate Gooden of 8/6/2005 | 10% per hour until 7:00 a.m. |

3.2 When an employee covered by (a) above is scheduled to work more than nine (9) hours and beyond 2:00 a.m., the employee will be paid ten percent (10%) for hours worked after 12:00 midnight.

3.3 In applying the above night shift premium provisions, an employee shall be paid the premium rate, if any, which attaches to the shift the employee works on a particular day.

4.0 **Special Lump Sum Payment**

4.1 The Special Lump Sum Payment provided herein recognizes that a continuing improvement in employees' standard of living depends upon technological progress, better tools, methods, processes, and equipment and a cooperative attitude on the part of the parties in such progress.

4.2 Accordingly, a Special Lump Sum Payment will be made to each eligible employee according to the following table:

| Year | Eligibility Date | Amount | Pay Date |
|---|---|---|---|
| First Year | August 6, 2005 | $3000.00 | Sept. 9, 2005 |

39

4.3

| Second Year | August 4, 2006 | Three Percent (3%) of Qualified Earnings | Sept. 8, 2006 |
|---|---|---|---|

Eligible employees are those employees (excluding summer hires) who as of the eligibility date are on the active payroll or on one of the following leaves of absence not exceeding ninety (90) days: sick leave, education, military, personal, Workers' Compensation, and Family Medical Leave Act (FMLA)/California Family Rights Act (CFRA).

The Special Lump Sum Payment will be based on the Qualified Earnings paid to an employee during the prior twelve (12) months ending on the eligibility date.

4.4 Qualified Earnings are defined as income received by an eligible employee during the eligibility year resulting from the following:

- Straight Time Hourly Base Wages
- Straight Time COLA
- Straight Time Shift Premium
- Straight Time Team Leader Premium
- Overtime Premium for Overtime Hours
- Vacation (including PAA)
- Holiday Pay
- Bereavement Pay
- Jury Duty Pay
- Call In Pay
- Short Term Military Duty Pay
- Back pay awards related to the designated eligibility year

5. Base Rate Increases

5.1 Base rate wage increases under this Agreement shall be as follows:

3rd Year: General Wage Increase of $0.56/hr (to $28.53) to the fully grown in rate for Division I and $0.65 (to $32.99) to the fully grown in rate for Division II, to be effective August 6, 2007.

4th Year: General Wage Increase of $0.86/hr (to $29.39) to the fully grown in rate for Division I and $0.99 (to $33.98) to the fully grown in rate for Division II, to be effective August 4, 2008.

40

---

## XVIII. COST OF LIVING ALLOWANCE

1 Cost Of Living Allowance ("COLA")
Each employee covered by this Agreement shall receive a Cost of Living Allowance adjustment. It is agreed that only the Cost of Living Allowance will be subject to reduction. The Cost of Living Allowance provided in this section shall be carried as an add-on to and not as a part of the employee's base hourly wage rate and will be adjusted up or down as provided in Paragraph 2.2.

2 Adjustment
2.1 The Cost of Living Allowance will be determined by changes in the official Consumer Price Index for Urban Wage Earners and Clerical Workers (current series CPI-W), (for all items, less medical care, not seasonally adjusted) (United States City Average), published by the Bureau of Labor Statistics, U.S. Department of Labor, (1982-1984=100), referred to as the BLS Consumer Price Index.

2.2 Beginning with the execution of this Agreement, the current $1.61 Cost of Living Allowance shall be added to the base wages of each Division in effect on that date. Thereafter, adjustments in the Cost of Living Allowance shall be made quarterly at the following times:

| Schedule of COLA Adjustments | |
|---|---|
| Adjustment Date | Based on CPI 3 Month Average for: |
| September 5, 2005 | May, June, July 05 |
| December 5, 2005 | August, September, October 05 |
| March 6, 2006 | November, December 05, January 06 |
| June 5, 2006 | February, March, April 06 |
| September 4, 2006 | May, June, July 06 |
| December 4, 2006 | August, September, October 06 |
| March 5, 2007 | November, December 06, January 07 |
| June 4, 2007 | February, March, April 07 |
| September 3, 2007 | May, June, July 07 |
| December 3, 2007 | August, September, October 07 |
| March 3, 2008 | November, December 07, January 08 |

41

| Schedule of COLA Adjustments | |
| --- | --- |
| June 2, 2008 | February, March, April 08 |
| September 1, 2008 | May, June, July 08 |
| December 1, 2008 | August, September, October 08 |
| March 2, 2009 | November, December 08, January 09 |

In determining the three month average of the index, the computed average shall be rounded to the nearest 0.01 Index Point, using the engineering rounding method. In no event will a decline in the three-month average Consumer Price Index below 183.18 provide a basis for a reduction in the wage scale by job classification.

## 3   Amount of COLA

3.1 The amount of the Cost of Living Allowance shall be zero cents per hour effective with the effective date of this Agreement and ending September 5, 2005. Effective September 5, 2005, and for any period thereafter as provided in Sections 1 and 2, the Cost of Living Allowance shall be calculated as follows:

## COLA SCHEDULE

| Three-Month Average Consumer Price Index | Cost of Living Allowance |
| --- | --- |
| 183.18 or less | $ 0.00 per hour |
| 183.19-183.26 | 0.01 |
| 183.27-183.35 | 0.02 |
| 183.36-183.43 | 0.03 |
| 183.44-183.51 | 0.04 |
| 183.52-183.59 | 0.05 |
| 183.60-183.67 | 0.06 |
| 183.68-183.75 | 0.07 |
| 183.76-183.84 | 0.08 |
| 183.85-183.92 | 0.09 |
| 183.93-184.00 | 0.10 |
| 184.01-184.08 | 0.11 |
| 184.09-184.16 | 0.12 |
| 184.17-184.24 | 0.13 |
| 184.25-184.33 | 0.14 |
| 184.34-184.41 | 0.15 |

And so forth with $.01 adjustment for each 0.0816 change in the Average Index.

3.2 For each adjustment during the 15 three-month periods beginning September 5, 2005 and ending March 2, 2009, in which an increase in the Cost of Living Allowance shall be required according to the above table, the amount of increase so required each three-month period shall be reduced two cents ($0.02), or by the amount of the increase, whichever is less.

Following the adjustment for the three month period beginning March 2, 2009, the sum reduced during the fifteen periods shall be subtracted from the Cost of Living Allowance table, and the table shall be adjusted so that the actual three-month Average Consumer Price Index equates to

the allowance payable during the period beginning March 2, 2009.

### 4. Application

The amount of Cost of Living Allowance in effect at the time shall be included in computing overtime premium, night shift premium, vacation pay, holiday payment, jury duty payment, call-in pay, bereavement pay, and short term military duty pay.

### 5. BLS Consumer Price Index

5.1 If the Bureau of Labor Statistics does not issue the appropriate Consumer Price Indexes by the beginning of the pay period referred to in Paragraph 2.2, any adjustments in the Cost of Living Allowance required by the Indexes shall take effect at the beginning of the first pay period after receipt of the Indexes.

5.2 No adjustment, retroactive or otherwise, shall be made because of any subsequent revision in the published figures for the BLS Consumer Price Index for any months specified in Paragraph 2.2.

5.3 The continuance of the Cost of Living Allowance depends upon the availability of the monthly BLS Consumer Price Index in its present form and calculated on the same basis as the Indexes for June, 2005 unless otherwise agreed upon by the Parties. If the Bureau of Labor Statistics changes the form or the basis of calculating the BLS Consumer Price Index for Urban Wage Earners, the Parties will request the Bureau to make available, for the life of this Agreement, a monthly Consumer Price Index in its present form and calculated on the same basis as the Index for June, 2005.

5.4 The company will notify the International Union U.A.W., Transnational Department of the quarterly COLA calculation and amount prior to adjustment date.

# XIX. WORKING HOURS

## 1. Hours Of Work

1.1 The regular workday shall consist of not more than eight (8) consecutive hours (exclusive of the lunch period referred to in Appendix "A") in any twenty-four (24) hour period. The regular workweek shall be five (5) consecutive eight (8) hour days, Monday through Friday. The provisions of this paragraph shall not be construed as a guarantee that any employee will receive any specific number of hours of work per day or per week.

1.2 The Company shall provide a thirty (30) minute lunch as contained in Appendix "A," and two (2) fifteen (15) minute rest periods per shift. One rest period shall be scheduled during the first half of the shift and the other during the last half. Rest periods during overtime shall be provided as follows:

- One hour overtime scheduled. Seven (7) minutes.

- Two hours overtime scheduled. Fourteen (14) minutes.

- Breaks to be taken at the beginning of scheduled overtime hours.

1.3 The Company may vary or change the scheduled hours and the work week whenever or wherever it is deemed advisable or necessary. If a change in the starting time of a shift or if a work schedule is decided upon, such change will be discussed with the Chairperson of the Bargaining Committee as far in advance as possible. The Company shall post notices of major changes in the work schedule a reasonable time before such changes shall become effective.

## 2. Computation Of Overtime Premium

2.1 For computing overtime premium pay, the regular working day is eight (8) hours and the regular working week is forty (40) hours.

2.2 Employees will be compensated on the calendar day when their shift starts working, for the regular working hours of that shift.

The employee's working week shall be a calendar week beginning on Monday.

2.3 Employees will be compensated as follows:

**Straight Time**

(a) For the first eight (8) hours worked in any continuous twenty-four (24) hours, beginning with the starting time of the employee's shift.

(b) For the first forty (40) hours worked in the employee's working week, less all time for which daily, Saturday, Sunday or holiday overtime has been earned.

(c) For time worked during the regular working hours of any shift which starts on the day before and continues into a specified holiday or a Saturday.

**Time-and-One-Half**

(a) For time worked in excess of eight (8) hours in any continuous twenty-four (24) hours, beginning with the starting time of the employee's shift, except if such time is worked on a Sunday or holiday when double time will be paid as provided below.

(b) For time worked in excess of forty (40) hours in the employee's working week, less all time for which daily, Saturday, Sunday, or holiday overtime has been earned.

(c) For time worked on any shift which starts on Saturday.

**Double Time**

(a) For time worked during the first eight (8) hours on any shift that starts on Sunday or on a specified holiday.

(b) For time worked on the calendar Sunday or a specified holiday in excess of the first eight (8) hours worked on any shift that starts on Sunday or a specified holiday.

(c) For time worked on a Sunday or specified holiday in excess of eight (8) hours worked on a shift which starts the previous day and runs over into Sunday or a specified holiday.

(d) For time worked in excess of twelve (12) hours in any continuous twenty-four (24) hours beginning with the starting time of the employee's shift.

3. **Hours Worked**

3.1 The following shall not be counted as hours worked in computing overtime:

(a) Vacation pay, bereavement pay, jury duty pay, holiday pay, or short term military duty;

(b) Call-in or reporting pay if no work is performed, provided the employee is immediately released;

(c) Lunch periods;

3.2 Premium payments shall not be duplicated for the same hours worked.

XX. OVERTIME
1. **General**

1.1 The parties recognize that the nature of the automobile business often requires employees to work overtime. Overtime to repair breakdowns on essential equipment is often necessary to prevent or minimize interruptions in plant operations. Overtime also may be necessary on bottleneck jobs, during certain times of the year in order to meet model change deadlines, to satisfy fluctuations in customer demand for the Company's products, and for other good reasons.

1.2 An individual employee's personal problems in connection with working overtime should be given careful consideration and the employee's individual needs should be recognized. The

individual employee's request to be excused from an overtime work assignment, when made a reasonable period of time in advance, should receive every possible consideration. When the employee's request is granted the employee will be notified as far in advance as possible so that the employee can make personal plans accordingly. Thereafter, any cancellation or change in the arrangements to excuse the employee will only be made with the employee's consent.

**2.**
**2.1 Mandatory Overtime**
Daily Overtime: Hours in excess of ten (10) hours worked per shift shall be voluntary, for an employee who shall have notified the Company in accordance with Paragraph 2.5.

2.2 Saturday Overtime: Employees may be required to work Saturdays; however, except as otherwise provided in this Article, an employee who has worked two or more consecutive Saturdays may decline to work the following (third) Saturday provided (a) the employee shall have notified the Company in accordance with Paragraph 2.5 and, (b) the employee has not missed any day during the week preceding the Saturday.

2.3 Sunday Overtime: Except as otherwise provided in this Section, overtime work on Sundays shall be voluntary; provided however, that (a) the employee shall have notified the Company in accordance with Paragraph 2.5 and, (b) the employee has not missed any time during the week preceding such Sunday, except for a Saturday which the employee declined to work pursuant to Paragraph 2.2 above.

2.4 Continuous Operations: This section shall not apply to employees working on continuous operations. The Company will meet and confer with the Union about any overtime problems connected with employees on such operations.

2.5 Notice: With respect to all voluntary hours provided for in this Section in a given week, the employee may decline to work such

48

hours if the employee notifies the Group Leader, on a form to be provided by the Company, before the end of the shift on the preceding Wednesday, provided the employee has been notified of the overtime schedules for such week not later than the preceding day. If the employee is not so notified, the employee shall give such notice to the Group Leader before the end of the shift following the day of such notice, provided that if the employee is not so notified until the day on which the overtime is scheduled, the employee shall give notice by at least one hour before the end of the shift in which the employee received such notice from the Company.

3. Maintenance: Maintenance work after regular production or on Saturday or Sunday that is essential to smooth production may be required of employees in Division II, regardless of other provisions in this Article. **Scheduled mandatory overtime will be announced by the end of shift on Wednesday of each week. If additional overtime is required for emergency or essential operations after the Wednesday announcement, the Bargaining Committee Chairman or designee will be informed.** However, the Company will grant, where practicable, an employee's request to be excused from such overtime work on a given day for good reason. Such request should be made as far in advance as possible and in writing. The employee will be promptly notified of the disposition of the request.

**4. Critical Operations**
4.1 Critical operations are those that are essential to meeting scheduled production needs, and as a result, must operate, in whole or in part, seven (7) days a week.

4.2 The Company may, from time to time, designate operations as critical, provided, however, that fifteen (15) days prior to making such designations, it will inform the Union, which will indicate its objections, if any, to an operation being so designated.

4.3 Any operation that the Company designates as critical, shall for a period of ninety (90) days after it is so designated, be exempt

49

from the provisions of this Article. After an operation has been initially designated as critical, it may thereafter be redesignated as such by mutual agreement.

**5. Annual Automatic Exemptions**

5.1 The provisions of this Article shall be ineffective in the plant (a) beginning on a date two (2) weeks preceding the announced build-out date and ending on the build-out date, i.e., when the plant produces for sale the last unit of the model it has been producing; provided, however, the above-mentioned provisions may be ineffective for up to two (2) additional weeks, provided the Company gives advance notice of supply or other problems which would interfere with the build-out, and (b) for the week in which it launches, i.e., after the build-out, frames the first unit of a new model, and for three (3) weeks thereafter or until the line reaches scheduled production, whichever is later.

5.2 These provisions shall likewise be ineffective during model change time each year for periods to be designated by the company that shall not exceed, in the aggregate, four (4) weeks. The Union will be advised in advance of such designated periods.

**6. Concerted Activity**

Any right to decline daily overtime or Saturday or Sunday work that this Article confers on any employee must be exercised only by each employee acting separately and individually.

**7. Emergencies**

The provisions of this Article that limit or restrict the right of the Company to require employees to work daily overtime or Saturdays or Sundays shall be suspended if operations are interrupted by emergency situations, such as single breakdowns of four (4) hours or more, government mandated work, power shortages, strike, fire, tornado, flood or acts of God, for a period of time necessary to overcome such emergencies.

50

**8. Work Force Requirements**

Nothing herein shall preclude the Company from expanding its work force beyond the normal requirements or its operations by hiring new employees up to 90 days and adopting a program pursuant to which employees of the plant may have one (1) or two (2) days off per week (which days need not be Saturdays or Sundays), provided that the Company shall meet and mutually agree with the Union prior to taking such action.

**9. Balancing**

Extra work in periods of overtime operations will be balanced among the employees in the Group engaged in similar work, as far as practical. Information concerning balancing of hours status will be openly displayed in every team room so that every employee involved may check their standing.

## XXI. Holidays

**1. Holidays**

The Company will pay employees eight (8) hours pay at their regular assigned rates of pay subject to eligibility, for the following holidays:

| 2005 – 2006 | Holidays | Date | Day |
| --- | --- | --- | --- |
| | Labor Day | Sept. 5, 2005 | Monday |
| | Thanksgiving Day | Nov. 24, 2005 | Thursday |
| | Day After Thanksgiving | Nov. 25, 2005 | Friday |
| | Christmas Shutdown | Dec. 26, 2005 | Monday |
| | | Dec. 27, 2005 | Tuesday |
| | | Dec. 28, 2005 | Wednesday |
| | | Dec. 29, 2005 | Thursday |
| | | Dec. 30, 2005 | Friday |
| | Personal Holiday | **T.B.D.** | **T.B.D.** |
| | Martin Luther King Jr. Birthday | Jan. 16, 2006 | Monday |
| | President's Day/Cesar Chavez | Feb. 20,2006 | Monday |
| | Memorial Day | **T.B.D.** | **T.B.D.** |
| | Good Friday | **April 14, 2006** | Friday |
| | Memorial Day | May 29, 2006 | Monday |

51

**2005 - 2006**

| Holiday | Date | Day |
| --- | --- | --- |
| Day before Independence Day | July 3, 2006 | Monday |
| Independence Day | July 4, 2006 | Tuesday |

**2006 - 2007**

| Holiday | Date | Day |
| --- | --- | --- |
| Labor Day | Sept. 4, 2006 | Monday |
| Election Day | Nov. 7, 2006 | Tuesday |
| Thanksgiving | Nov. 23, 2006 | Thursday |
| Day after Thanksgiving | Nov. 24, 2006 | Friday |
| Christmas Shutdown | Dec. 25, 2006 | Monday |
| | Dec. 26, 2006 | Tuesday |
| | Dec. 27, 2006 | Wednesday |
| | Dec. 28, 2006 | Thursday |
| | Dec. 29, 2006 | Friday |
| | Jan. 1, 2007 | Monday |
| Martin Luther King Jr. Birthday | Jan. 15, 2007 | Monday |
| President's Day/Cesar Chavez | Feb. 19, 2007 | Monday |
| Good Friday | April 6, 2007 | Friday |
| Memorial Day | May 28, 2007 | Monday |
| Independence Day | July 4, 2007 | Wednesday |
| Personal Holiday | T.B.D. | T.B.D. |

**2007 - 2008**

| Holiday | Date | Day |
| --- | --- | --- |
| Labor Day | Sept. 3, 2007 | Monday |
| Thanksgiving | Nov. 22, 2007 | Thursday |
| Day after Thanksgiving | Nov. 23, 2007 | Friday |
| Christmas Shutdown | Dec. 24, 2007 | Monday |
| | Dec. 25, 2007 | Tuesday |
| | Dec. 26, 2007 | Wednesday |
| | Dec. 27, 2007 | Thursday |
| | Dec. 28, 2007 | Friday |
| | Dec. 31, 2007 | Monday |
| | Jan. 1, 2008 | Tuesday |
| Martin Luther King Jr. Birthday | Jan. 21, 2008 | Monday |
| President's Day/ Cesar Chavez | Feb. 18, 2008 | Monday |
| Good Friday | March 21, 2008 | Friday |
| Memorial Day | May 26, 2008 | Monday |
| Independence Day | July 4, 2008 | Friday |
| Personal Holiday | T.B.D. | T.B.D. |

**2008 - 2009**

| Holiday | Date | Day |
| --- | --- | --- |
| Labor Day | Sept. 1, 2008 | Monday |
| Election Day | Nov. 4, 2008 | Tuesday |
| Veteran's Day | Nov. 10, 2008 | Monday |
| Thanksgiving | Nov. 27, 2008 | Thursday |
| Day after Thanksgiving | Nov. 28, 2008 | Friday |
| Christmas Shutdown | Dec. 24, 2008 | Wednesday |
| | Dec. 25, 2008 | Thursday |
| | Dec. 26, 2008 | Friday |
| | Dec. 29, 2008 | Monday |
| | Dec. 30, 2008 | Tuesday |
| | Dec. 31, 2008 | Wednesday |
| | Jan. 1, 2009 | Thursday |
| | Jan. 2, 2009 | Friday |
| Martin Luther King Birthday | Jan. 19, 2009 | Monday |
| President's Day/ Cesar Chavez | Feb. 16, 2009 | Monday |
| Good Friday | April 10, 2009 | Friday |
| Memorial Day | May 25, 2009 | Monday |
| Day before Independence Day | July 3, 2009 | Friday |
| Personal Holiday | TBD | TBD |

2. **Personal Holiday**

2.1 Each employee who has completed the initial evaluation period will be eligible to take one (1) eight (8) hour personal holiday each year of the current agreement. The personal holiday must be requested in writing on a form provided by the Company, and scheduled and approved by the Group Leader at least two weeks in advance of the proposed day off. A request for a specific day will be considered on a first come, first served

basis. Where two employees request the same day at the same time, the employee with greater seniority will be given priority. Employees will be notified of the approval or denial of the requested personal holiday date within one (1) week from the date the request is received by the Group Leader. Approval may be withheld due to production needs. Personal holidays are not subject to the 10% vacation scheduling rule.

2.2 Personal holidays may not be carried over from contract year to contract year. A personal holiday to which the employee was entitled but did not use during either of the 2005/06, 2006/07, 2007/08 and 2008/09 contract years will be paid no later than the third pay period in August following the end of that contract year. The rate of pay for the personal holiday will be in accordance with Article XXI of this Agreement.

**3.**

**Eligibility**

3.1 All employees, including employees who have not yet completed their initial evaluation period are eligible for holiday pay.

3.2 To receive pay for a recognized holiday, eligible employees must work the last regularly scheduled full shift the day before the holiday and the first regularly scheduled full shift the day after the holiday. An exception shall be made if an employee reports to work within one-hour from the scheduled start of their shift. Employees scheduled to work on a designated holiday and who fail to do so will not be eligible for holiday pay for that day.

3.3 For the purpose of Paragraph 3.2 above, work is defined as actually working a full shift on the scheduled work day or being on an approved absence such as vacation or scheduled PAA (must be scheduled and approved at least two (2) weeks in advance of the holiday), or a leave qualified under the Family and Medical Leave Act or the Family School Partnership Act where vacation or PAA was applied, bereavement leave, jury duty leave, short-term military leave, or union activity leave for that day.

**4.**

**Pay For Holidays**

4.1 Holiday pay for eligible employees will be calculated on the basis of eight (8) hours pay at the employee's regular base rate plus COLA, shift premium, and Team Leader premium if applicable.

4.2 Employees who are required to work on a scheduled holiday will receive overtime pay in accordance with Section 2, Article XIX. Only actual

hours worked on the holiday will be included in the overtime calculation.

4.3 Employees who work on a designated holiday and who are otherwise eligible for holiday pay may request that eight (8) hours be credited to their vacation hours. This request will be in lieu of receiving holiday pay. "Holiday Bank Hours" must be used by the following August. Any "Holiday Bank Hours" not used by the following August will be paid no later then the third (3rd) pay period in August. "Holiday bank Hours" for the fourth (4th) of July Holiday period will be carried over to August of the next year.

4.4 In order to provide sufficient time for administration, the employees must submit their request to withhold holiday pay and credit their vacation hours in writing. This request must be made no later than the last regularly scheduled workday of the week in which the holiday occurs.

**5.**

**Provisions**

5.1 If a holiday occurs during an employee's vacation, it will be treated as a holiday and not charged against vacation time.

5.2 If a holiday occurs while an employee is on jury duty leave, or short-term military leave, the employee will be entitled to receive the difference between normal holiday pay and any amount received for that day as a result of being on leave.

## XXII. VACATION (AND PAA)

**1.  Vacation Hours And Vacation Allowance**

1.1 The Vacation Accrual date for all regular full-time employees will be the Monday of the first pay period in February, May, August or November, based on date of hire, as follows:

| HIRE DATE | ACCRUAL YEAR |
| --- | --- |
| January 1 - March 31 | January 1 - December 31 |
| April 1 - June 30 | April 1 - March 31 |
| July 1 - September 30 | July 1 - June 30 |
| October 1 - December 31 | October 1 - September 30 |

1.2 Employees are eligible for paid vacation based on attendance and seniority attained in the preceding Accrual year as of the first day

of the current Accrual Year in accordance with the schedule below:

## SCHEDULE OF VACATION HOURS

| Full Years of Seniority | Level 1 | Level 2 | Level 3 |
|---|---|---|---|
| 1 | 64 | 80 | 88 |
| 2 | 80 | 100 | 108 |
| 3 | 80 | 100 | 108 |
| 4 | 96 | 120 | 128 |
| 5 | 96 | 120 | 128 |
| 6 | 96 | 120 | 128 |
| 7 | 96 | 120 | 128 |
| 8 | 96 | 120 | 128 |
| 9 | 96 | 120 | 128 |
| 10 - 13 | 112 | 140 | 148 |
| 14 or more | 128 | 160 | 168 |

1.3 Level of Attendance for the preceding Accrual Year will be determined as of the first day of the current Accrual Year.

1.4 Level 2 Attendance

An employee's attendance is "Level 2" if the employee has not missed more than ten (10) days in the previous Accrual Year, nor more than six (6) days in the previous six (6) months prior to the eligibility date for earned vacation hours.

Certain approved absences are not counted for this purpose: vacation, holiday, jury duty, bereavement leave, military leave, personal leave, Union activity leave, FMLA/CFRA leave, pregnancy disability leave taken under state law, Industrial Injury/Illness, subpoenaed to appear in a court of law and suspension. Additionally, approved sick leave for an employee with less than six (6) months seniority is not counted for this purpose.

1.5 An employee's attendance is considered "level 3" if the employee has not missed any day in the previous Accrual Year prior to the eligibility date for earned vacation hours. Certain approved absences are not counted for this purpose: vacation, holidays, jury duty, subpoenaed to appear in a court of law, bereavement leave, military leave, FMLA/CFRA leave, pregnancy disability leave taken under state law, and union activity leave. When one period of absence due to illness or injury includes time in two (2) eligibility periods and this period of absence results in level 1 attendance, that period of absence will not be included in calculating level 2 attendance for the second eligibility period unless the employee misses additional time during that eligibility period.

1.6 Newly hired employees will receive twenty-eight (28) hours of vacation on the second pay period of the month following six (6) months of service.

1.7 Vacation Allowance is calculated in accordance with the following:

Vacation Allowance = Rate of pay (*1) x Earned Vacation Hours x Earned Vacation Allowance percentage (*2).

*1 Rate of pay (base wage rate, COLA, shift premium, and Team Leader premium, if applicable) as of the pay period in which the vacation occurs or is paid in lieu of vacation.

*2 The Earned Vacation Allowance Percentage is based on the number of pay periods the employee earned in the twelve (12) months of the employee's preceding Accrual Year, calculated as follows:

| Pay Periods Earned in Preceding 12-Month Period | Earned Vacation Allowance Percentage |
|---|---|
| 26 | 100% |
| 25 | 96% |
| 24 | 92% |
| 23 | 88% |
| 22 | 84% |
| 21 | 80% |
| 20 | 76% |
| 19 | 73% |
| 18 | 69% |
| 17 | 65% |
| 16 | 61% |
| 15 | 57% |
| 14 | 53% |
| 13 | 50% |
| Less than 13 | 0% |

For employees with six (6) months seniority and level 2 attendance, the earned vacation allowance percentage shall be a hundred percent (100%) regardless of the number of pay periods earned.

## 2. Vacation Scheduling

2.1 Employees will give written notice of their desired vacation dates and alternate dates for eligible vacation hours during the "vacation year" (April 1 – March 30) of each year. The notice shall be given on a form provided by the Company, by February 1, of each succeeding year.

2.2 Earned paid vacation is to be used for the period from the employee's eligibility date to the next eligibility date. However, the employee may carry over up to forty (40) hours of earned paid vacation for an additional twelve (12) month period. **This forty (40) hours carry over does not include "holiday bank hours"**

2.3 If the Company shuts down for vacation periods or changeover, employees entitled to vacation must schedule that vacation during

the shutdown (unless the employee is scheduled for work during the shutdown). Normally, Vacation shutdown periods will be announced by February 1. **In regards to any shutdown scheduled during 2006, the Company will offer Team Members three options:**

- **The use of Vacation/PAA**
- **No Work, No Pay, No Penalty**
- **Work will be provided**

2.4 The Company will try to accommodate each employee's schedule. Normally, no more than ten (10) percent of the employees in a Group will be permitted to take vacation at any one time with no more than one employee per team on vacation at any one time. Normally, Team Members will give no less than two (2) calendar weeks notice prior to the date they intend to start their vacation. In case of conflict, employees with greater seniority will be given priority. **When a mandatory Saturday is scheduled, those team members granted approved vacation for the Friday before or Monday after the mandatory Saturday will be allowed to take the mandatory Saturday off without use of vacation, consistent with this section and based on seniority. Requests thereafter will be based on the date of vacation submission.**

2.5 Employees will be notified of their approved dates by March 1st. Vacation dates once approved will not be changed by the Company except for unusual and unexpected production requirements. Employees may exchange approved vacation dates upon approval by their Group Leader. However, an employee cannot use seniority to displace another employee's vacation dates.

## 2.6 Vacation

Employees are encouraged to take vacation hours in forty (40) hour increments. However, upon approval by their Group Leader, employees will be permitted to take vacation hours in no less than four (4) hour increments up to forty (40) hours, or sixteen (16) hours for less than one (1) year seniority employees.

**2.7 Vacation used as Personal Absence Allowance (PAA)**
Upon approval by their Group Leader, employees will be permitted to use vacation hours as PAA up to forty (40) hours, or twelve (12) hours for less than one (1) year seniority employees. This portion of the vacation (PAA purpose) shall be used automatically in all cases before any employee takes a day off without pay except, in the case of an approved personal (i.e., non-industrial) sick leave of absence of five (5) days or more where utilization of the PAA portion will be at the option of the employee.

**3. Pay In Lieu Of Vacation**
3.1 Any earned vacation hours not used during period provided in Paragraph 2.2 will be paid within three (3) weeks after the eligibility date.

3.2 Team members may, upon one (1) calendar week's notice to the Payroll Department, receive pay in lieu of vacation in excess of forty (40) hours. Vacation payouts shall be in forty (40) hour increments, or, if the balance remaining as of the date of the request is less than forty (40) hours, the entire balance.

**4. Vacation Pay Upon Separation**
4.1 An employee who is terminated or quits for any reason on or after the employee becomes entitled to a vacation and before the employee has received a vacation will be paid a lump sum in lieu of vacation computed as the amount to which the employee would be entitled if the employee's vacation were to begin on the day on which employment was terminated.

4.2 If an employee retires or dies, but in no other event, prorated vacation from the employee's last accrual date will be paid in addition to the vacation earned in Paragraph 4.1.

**5. Vacation Pay**
Employees will be paid their earned vacation allowance on the last work day immediately preceding their vacation period,

provided the employee submits an earned vacation allowance request at least two (2) weeks in advance.

## XXIII. LEAVES OF ABSENCE

**1. Definition**
A leave of absence means approved time off from work with or without pay for a specific period of time for serious or compelling reasons as described below.

**2. Eligibility**
2.1 Employees who have not completed their initial evaluation period are not eligible for a leave of absence, except where such leave is legally required.

2.2 The Company will grant time off without pay in lieu of a leave to employees ineligible for leave where it is determined that serious or compelling reasons exist.

**3. Bereavement Leave**
3.1 In case of a death in the immediate family, employees are eligible for a leave of absence, not to exceed three (3) consecutive working days, or five (5) consecutive working days in the case of the death of a current spouse, parent, child or step-child, to attend the service unless circumstances make attendance at the service impossible.

3.2 Immediate family is defined as the employee's spouse, parent, stepparent, grandparent, great grandparent, child, stepchild, grandchild, brother, stepbrother, half-brother, sister, stepsister, half-sister, current spouse's parent, current spouse's stepparent, current spouse's grandparent, and current spouse's great grandparent.

3.3 The employee must take the leave within ten (10) days of the date of death unless the service is delayed. If the service is delayed, the bereavement leave may be delayed until the date of the service.

3.4 Employees who have completed the evaluation period will receive their regular base rate, plus COLA, shift premium and Team Leader premium, if applicable, for each day they would otherwise have been scheduled to work.

In instances where an employee is on an approved leave of absence or vacation and when death occurs during the first seven (7) calendar days of the leave, the employee shall be paid as described above. This pay shall not exceed eight (8) hours per day for three (3) days.

3.5 If time off in excess of paid bereavement leave is required and approved by the Company due to travel or other unusual circumstances, it may be charged against earned vacation hours or taken as time-off without pay, depending upon the employee's preference. Time off in excess of paid bereavement leave must be approved by the Company.

3.6 Employees requesting bereavement pay must submit an "Application For Bereavement Pay" form to the Company.

4. **Jury Duty Leave**
4.1 Employees legally summoned for jury duty are eligible for jury duty leave upon providing the Company with a copy of their summons.

Employees with an established shift starting time on or after 7:00 p.m. and on or before 4:45 a.m. will be excused from work on either their shift immediately preceding the jury service, or their shift immediately following the completion of the jury service, at the option of the employee. Such employee must notify their immediate supervisor of their election prior to being absent for jury duty.

4.2 Employees who have completed the initial evaluation period at the time the leave begins will receive payment equal to the difference between their regular base rate, plus COLA, shift

premium and Team Leader premium if applicable, and any pay received from the court (excluding travel) for each day on which they are required to report or perform jury duty and would otherwise have been scheduled to work. Such pay will not exceed eight (8) hours per day.

4.3 Employees must submit satisfactory documentation to the Company that jury duty was performed on the days for which pay is requested.

4.4 Employees legally subpoenaed to appear in a court of law will be granted an allowable absence without pay or penalty. Such employees must submit satisfactory documentation to the Company for the days for which the allowable absence is requested.

5. **Short-Term Military Leave**
5.1 Employees who are members of the U.S. Armed Forces Reserve or National Guard and are called to short-term military duty are eligible for a leave of absence for the length of call-up to a maximum of thirty (30) calendar days.

5.2 Upon notice to report for military duty employees must provide the Company with a copy of their military orders.

5.3 Employees who have completed at least six (6) months of seniority will receive payment equal to the difference between their regular base rate, plus COLA, shift premium and Team Leader premium if applicable, and the amount of military base pay received (excluding rations, subsistence, and travel) for each day they would otherwise have been scheduled to work. Such pay will not exceed eight (8) hours per day and is limited to a maximum of ten (10) working days in each calendar year except in cases of call-up for public emergency.

5.4 Employees may elect to take earned vacation hours during this period with no reduction in pay for any military pay received.

5.5 Employees must submit a copy of their military pay record to the Company if pay is requested.

5.6 If employees desire to take voluntary training leave that is not required for maintenance of membership in a reserve unit, they may apply for a personal leave of absence without pay.

## 6. Long-Term Military Leave

6.1 Employees who leave work to enter the U.S. Armed Forces are eligible for an unpaid military leave of absence for the duration of their service, or four (4) years, whichever is less, unless additional leave is required by law.

6.2 Employees returning from a military leave of absence will be eligible for reinstatement in accordance with applicable laws.

6.3 Employees who fail to report for work within ninety (90) calendar days of (a) the date of discharge or after (b) a hospitalization which continued after discharge will be considered as having voluntarily resigned.

## 7. Leave For Public Office

7.1 Employees who have completed the evaluation period and are elected or appointed to full-time public office are eligible for an unpaid leave of absence for the duration of the first term of office.

7.2 A request for this leave of absence must be made in writing and submitted to the Company immediately after being elected or appointed.

7.3 At the option of the Company, this leave may be renewed for successive terms of office.

## 8. Personal Leave

8.1 Employees who have completed the evaluation period are eligible to request an unpaid leave of absence for legitimate personal reasons for a reasonable period, for not less than five (5)

consecutive nor more than thirty (30) consecutive working days. Such leaves will be extended or renewed for serious or compelling reasons at the option of the Company.

8.2 Personal leaves are granted at the discretion of the Company and are not intended to be used for vacation purposes.

## 9. Sick Leave

9.1 Employees who become ill or disabled are eligible for an unpaid leave of absence after an absence of five (5) consecutive working days. Requests for such leave will be submitted within this five (5) day period and will include medical documentation from their attending physician indicating they are unable to work and the estimated duration of their absence. The Company may, at its expense, request an impartial medical opinion from a mutually agreed upon medical examiner.

9.2 Sick leave for pregnancy will begin as of the date the employee's physician certifies the employee is no longer able to perform her normal job duties. This leave will end as of the date the employee's physician releases her to return to normal job duties. A pregnant employee will promptly notify the Company about the pregnancy so that appropriate consideration can be made.

9.3 A sick leave of absence may not exceed the employee's length of seniority as of the date of the illness or disability, or eighteen (18) months for an employee with less than one (1) year of seniority, or thirty-six (36) months for an employee with more than one (1) year of seniority, whichever is greater.

9.4 In compensable injury and legal occupational disease cases, sick leave will be granted automatically and seniority will accumulate for the full period of legal temporary disability. Employees disabled during evaluation period by compensable injury or legal occupational disease shall be given credit for the period of such disability toward acquiring seniority.

**9.5**

At least one (1) day prior to the anticipated return to work date, employees must present evidence to the Medical Department that they have been released to return to their normal job duties. The Company will make the final decision as to the employee's ability to return to the employee's normal job duties.

**10. Union Activity Leave**

When Union activity related to the Union business necessitates the absence of an employee from work, the Company will grant this leave of absence to the employee without pay for the time specified. This absence shall not jeopardize the employee's position or status as an employee of the Company. This leave of absence will not be extended for more than a period of one (1) year or for the duration of the term of elected office. Request for this leave must be made at least five (5) working days prior to the date the leave is to begin.

**11. Educational Leave Of Absence**

**11.1** Employees with one or more years of seniority may make application for a leave of absence for any full-time further education.

**11.2** One continuous leave of absence for such education will be granted without pay to eligible employees for a period not to exceed twelve (12) months, subject to Company approval.

**12. Application For Leave Of Absence Procedure**

Employees seeking a leave of absence must request the leave in writing to the Company, as far in advance as possible of the date the leave is to begin, but no later than five (5) days prior to the date the leave is to begin. In case of a medical emergency or a death in the family, a written or verbal request for leave must be made not later than five (5) calendar days after the first day of absence.

**13. Return From Leave**

The Company will return the employee to the original Group held prior to the leave seniority and qualifications permitting, provided

that the employee returns from the leave within **thirty (30)** days from the start of the leave.

**14. Accumulation Of Seniority**

Seniority will accumulate during the period of absence for the leaves described in this Article.

**XXIV. GROUP INSURANCE PROGRAM, HEALTH CARE INSURANCE PROGRAM, RETIREMENT PLAN, SAVINGS PLAN, RESERVE FUND PLAN, LEGAL SERVICES PLAN AND SUPPLEMENTAL WORKERS' COMPENSATION PLAN**

**1.1** A Group Insurance Program, Health Care Insurance Program, Retirement Plan, Savings Plan, Reserve Fund Plan, Legal Services Plan and Supplemental Workers' Compensation Plan and agreement with respect to their administration have been agreed to by the parties and are made part of this Agreement by this reference. The provisions of the plans and programs shall be applicable to employees represented by the Union for the term of this Agreement. An outline of the provisions of the plans and programs are shown on Appendix B.

**1.2** The Company may change the insurance carrier through which it provides the Group Insurance Program and the Health Care Program. However, prior to any change in carrier the parties will meet and confer over the reasons for any change at least sixty (60) days in advance of such change. The change in carrier shall not result in any loss of benefits to the employees.

**1.3** The provisions of this Article are not subject to the Problem Resolution Procedure Article X.

**XXV. HEALTH, SAFETY AND ERGONOMICS**

**1.1** The Company recognizes its obligations and responsibilities to provide a safe and healthful working environment for its

employees. The Company is proud of its past accomplishments in this area and is committed to continue to work closely with the Union in developing and implementing health, safety, & Ergonomics programs that could be a model for use throughout the industry. Fundamental to achieving this goal is the active involvement of all employees. To support those joint programs, the Company recognizes that the Union General Representatives in Health & Safety and the UAW Coordinator for Health, Safety and Ergonomics will participate in every aspect of such programs. The parties recognize their obligation to cooperate in maintaining and improving a safe and healthful working environment, and to use all their best efforts jointly to achieve these objectives.

1.2 Therefore, it is agreed by the parties that a Joint Safety Committee be established which will have the overall responsibility and authority to establish, maintain and supervise a complete, total and comprehensive Health and Safety Program in the plant that will meet the objectives noted above.

1.3 Nothing in this Article creates any rights against the Union enforceable by the Company or by an individual employee.

2. Joint Safety Committee

2.1 The Joint Safety Committee shall consist of six (6) Representatives of each party:

**The Union Representatives will be:**
President of the Local Union; and The UAW Coordinator for Health, Safety and Ergonomics; and The UAW General Representatives for Health and Safety; and The Bargaining Committee Chairperson; and One (1) Bargaining Unit Employee, who will serve for One (1) year rotating term, appointed by the Union.

**The Company Representatives will be:**
The Vice President of Human Resources; and The Vice President of Manufacturing; and The **General Manager** of Engineering;

68

and The Manager of Safety; and The Manager, Team Member Relations; and The General Manager(s) of Manufacturing.

2.2 The President of Local Union and the Vice President of Manufacturing, shall serve as Co-Chairperson of the Joint Safety Committee. The committee shall meet monthly.

2.3 **The committee objectives are to:**
Effectively implement and monitor key program elements. Among them are:

• injury and illness prevention;
• ergonomics;
• noise abatement and hearing conservation;
• training;
• preventative maintenance;
• new machinery and equipment review;
• toxic material reduction;
• lockout;
• confined space entry;
• fall prevention;
• ventilation; and
• audit and ensure compliance with safety rules, procedures and programs.
• **Rigging**

The UAW Coordinator for Health, Safety and Ergonomics will be notified in advance of health and safety inspections by OSHA, insurance loss control and boiler inspectors, City of Fremont Fire Department, Alameda County Department of Health officials, and licensed health and safety inspectors required or by health and safety consultants retained by the Corporation, and will be afforded an opportunity to accompany such officials or consultants and provide any pertinent information to them. A copy of such reports, including those of insurance inspectors, will be provided to the UAW Coordinator for Health, Safety and Ergonomics.

69

2.4 The Joint Safety Committee will convene a working group comprised of but not limited to, the Safety Section Representatives, the UAW Representatives for Ergonomics, Health and Safety, the UAW International Transnational Department, the Health Safety Department, and Regional Representatives to conduct an annual review of the entire safety program. Additional specific experts will be invited to provide expertise as needed. This review is to be completed in the month of January each year. Results of the annual review will be used to develop a joint annual plan of action to address the top safety issues. Quarterly status checks will be conducted jointly in June, September and December of each year to review the progress of the annual action plan. The initial action plan will start development in November 2005 with completion by the end of January 2006.

The working group will review the completion of health and safety issues contained in the Health and Safety side letter, developing a yearly training plan, developing modifications to or creation of safe operating practices, improving the ergonomics process, the adoption of best practices, identification of top focus areas and groups, and performing activities that will directly address the root causes of the issues affecting the safety of the Team Members. The findings and action plan will be presented to the Joint Safety Committee for review, comment and authorization by the end of January of each year. The Joint Annual Plan will be in effect from April 1st thru March 31st and will be renewed yearly.

3. **Problem Resolution**

3.1. Every reasonable effort shall be made to settle problems promptly and through discussion. Employees should discuss and attempt to resolve health and safety issues with the appropriate Group Leader. Failing resolution, the problem should be reduced to writing by the appropriate Union representative(s) on a safety problem resolution form. Problems will be resolved by means of

70

the Health, Safety and Ergonomics Problem Resolution Procedure set forth below:

3.2 Health, Safety and Ergonomics Problem Resolution Procedure.

| STEP | UNION REPS | COMPANY REPS | TIME LIMIT |
| --- | --- | --- | --- |
| 1 | District Committee-person or General Representatives for Health and Safety or the UAW Coordinator for Health, Safety and Ergonomics | Section Manager | 5 days |
| 2 | Bargaining Committeeperson and the General Representatives for Health and Safety or the UAW Coordinator for Health, Safety and Ergonomics | General Manager | 5 days |
| 3 | International Rep., UAW Chairperson, Bargaining Committee | Vice President Manufacturing Company and Vice President Of HR | As agreed between the Company and Union up to a maximum of 30 days |
| 4 Final Resolution Ultimate Resolution | UAW Vice President | Vice President Of HR | As agreed among the parties |

The time frames set forth in the above table may be extended upon mutual agreement of the parties.

4. **Ergonomics**

4.1 The Company and the UAW have established a comprehensive ergonomics program at NUMMI. The elements of the program include Injury and Illness Analysis, Job Evaluation, Implementation of countermeasures, Medical Management and Training.

71

The program is administered by the Joint Safety Committee.

All ergonomics activities within NUMMI will be conducted under the direction of the Joint Safety Committee. Ergonomic kaizen activities that may occur in teams, groups, sections and departments will be encouraged and supported.

The Company will designate a management representative to work on ergonomics with the Union General Representative for Ergonomics.

Department/Section Ergonomics Committees are established which consist of a UAW Committeeperson, a skilled trades representative, the UAW General Representatives for Health and Safety, a Company Ergonomics Representative, the UAW Coordinator of Health, Safety and Ergonomics, Manager(s), Department Engineer and the Safety Coordinator designated to perform job evaluations. The Section Manager will chair the committee. Meeting minutes will be kept.

**4.2 Injury and Illness Analysis**

The Company has implemented occupational injury and illness data systems. Reports are generated on a regular basis and circulated to members of management and posted in designated locations in the plant. The reports show trends, distribution by type of injury and areas highest in injury frequency. The Joint Safety Committee and Section Ergonomics Committees utilize the reports to focus efforts in areas where risk is highest and to monitor the overall effectiveness of the ergonomics program.

**4.3 Job Evaluation**

The Company and Union agree to jointly kaizen the existing ergonomic job evaluation methods. These methods of evaluation will incorporate the best practices of past methods of evaluation and include additional criteria based on the latest scientific information and guidelines used by other auto manufacturers that have been found to be effective and support the Toyota Production System. Job evaluation methods will be continuously

72

improved, based on mutual agreement, to ensure that they accurately reflect the risks on jobs. Computerized data collection systems NEBA or subsequent analysis tool will be utilized. The Company will continue to encourage employees to report to their Group Leader, orally or in writing, symptoms of ergonomic injury or ergonomic risk without fear of reprisal or discrimination.

Symptom surveys will be conducted in all plant operations every two years. Symptom surveys will be jointly developed and may include health and safety related questions.

The Union and Company agree to establish a special ergonomics task force to conduct job analysis and recommend countermeasures. The task force will include four full time UAW members selected by the Vice President, Director, of the UAW International Transnational Department. Additional members will be added as necessary. **Two (2) task force members will be assigned to the day shift (1st shift) and two (2) task force members will be assigned to the night shift (2nd shift) by seniority.** The Company will designate a representative to oversee day-to-day functioning of the task force including areas of responsibility. The ergonomics task force will be assigned to the Plant Operations Departments.

Jobs are evaluated with an ergonomic assessment tool (NEBA and/or NIOSH Lifting Guidelines) within two weeks of an injury or complaint. A copy of the evaluation will be provided to the Group Leader, injured team member, the Section Manager and Safety Section.

The Company has developed a computerized inventory of all production jobs on the **Truck and Passenger** assembly lines. **The Job Safety Analysis (JSA) system along with NEBA will be used to link** injuries and evaluations to specific production jobs.

73

The Company will provide appropriately furnished workstations for the ergonomic task force members to conduct business.

Evaluations will be performed on all jobs in production sections, including Conveyance and Production Control, and when:

- An employee reports complaint of injury or risk of ergonomic injury;
- An employee is diagnosed with an ergonomic injury;
- The Company becomes knowledgeable of an ergonomic risk in a specific work activity;
- There is a major model change. (Performed at the earliest stage of development and always prior to production);
- A Safety Concern Activity Report form is submitted alleging an ergonomic risk.

Evaluations will be updated when an employee is newly diagnosed with an ergonomic injury or when the job or operation is substantially changed or after countermeasures have been implemented.

The components of a worksite evaluation will include but are not limited to; 1) asking the team member which work activity may be causing the injury or symptom, 2) identifying the specific work activities that are likely contributors to the ergonomic risk, symptom, or diagnosis, 3) observation of job, 4) identification and evaluation of potential countermeasures to reduce ergonomic risk 5) asking the employee for ideas about minimizing ergonomic risk factors and 6) a description of the feasible control measures to be implemented. Such analysis includes input from team members whose jobs will be affected by the modification.

All job evaluations including updates, will be documented. This includes evaluations performed on new jobs prior to a model change.

Upon receipt of an ergonomic job evaluation from an ergonomics task force member, the Group Leaders will take action to implement countermeasures within 5 days. If the problem job is

not resolved within 5 days, the problem will be reported to the Assistant Manager by the ergonomics task force member. If the Assistant Manager does not resolve the problem job within 5 days, it will be reported to the Manager. If the problem job is not resolved within 5 days, it will be referred to the Department Assistant General Manager and/or General Manager.

## 4.4 Countermeasures

The Company will use feasible engineering controls and administrative controls to eliminate or reduce **Safety Hazards and ergonomic risk.** Control measures are deemed necessary when any work-related ergonomic risk causes or aggravates symptoms of an ergonomic injury **or illness,** or when job activities are substantially likely to result in the development of an injury **or illness.**

Engineering controls will be utilized whenever feasible. When engineering controls are determined to be necessary, feasible administrative controls will be used as necessary to control ergonomic risk before engineering controls are implemented. Administrative controls will not be used as a substitute for engineering controls.

Control measures will be implemented in a timely manner, based on the severity of the hazard.

A master list of all ergonomic problem jobs for the facility will be maintained. Problem jobs that are not corrected within two months will be placed on the agenda for the next meeting of the Joint Safety Committee.

## 4.5 Training:

**Two hours of ergonomics training will be provided for Car and Truck departments during Twenty minute safety meetings for the life of this contract. Four additional hours of ergonomic training will be provided to Car department during Major Model Launch.** The training will include symptoms and consequences, risk factors (posture, force and

repetition), methods to minimize risk and the importance of reporting problem jobs, ergonomic injuries and symptoms. Team Leaders, Group Leaders, Assistant Managers and Managers will receive a minimum of 4 hours of initial ergonomics training. Refresher training will be provided as necessary.

The Company will provide one week of training for ergonomic task force members each year. Training provided during the first year of the contract will include: anthropometry, ergonomic design guidelines, risk factors, countermeasures, the NIOSH 1991 Lifting Formula, human anatomy, types of cumulative trauma disorders, shop floor practice using analysis tools and checklists, and gathering data on forces. A member of the UAW Health and Safety Department staff may assist in the development and delivery of the training.

In addition to the training above, members of the ergonomics task force will be scheduled to attend one joint UAW Ergonomics conference a year. The Company will cover all related expenses.

Members of the Pilot Teams will receive a minimum of 24 hours of initial ergonomics training. **Training will cover process of ergonomic review prior to jobs being released to floor. This process will include a preliminary checklist and final evaluation with NEBA.**

4.6 **Medical Management.**

- The Company maintains a system of medical management, which includes employee access to medical personnel who are trained in current procedures for evaluation and treatment of cumulative trauma disorders.

- The Company's medical management program includes early detection and evaluation of work-related ergonomic injuries and symptoms of ergonomic injuries.

- When there is an ergonomic injury related work restriction, the medical personnel shall prepare a work status report, which clearly describes the motion of activity that is to be avoided or reduced. Employees will be placed only on jobs

76

within their medical restrictions. An employee may request a re-evaluation of medical restrictions if a problem occurs in performing the activities of the assigned job.

- The Company will provide, upon request, a copy of the medical records to the employee.

- When a team member uses a medication or medical supply from a Comfort Kit for a work related condition, the Group Leader will list on a log the team member's name, date, nature of illness or injury and items taken from the kit. The Company will continue to refer team members to the medical department for appropriate medical care and OSHA log recording.

4.7 **Annual Review**

The Company and Union will jointly audit the entire ergonomics process each year and make recommendations for improvements to the Joint Safety Committee.

The Company will take whatever action is necessary to comply with applicable laws and regulations pertaining to employees' health, safety and ergonomics. Where the Company has reason to believe that a violation of a law or regulation is occurring or may occur, it may take whatever action is necessary to discontinue or prevent such violation.

5. **Professional Development**

The Company will continue to support and fund professional development for Union Health and Safety and Ergonomics Representatives and the UAW Coordinator for Health, Safety and Ergonomics, unless the parties mutually agree to modifications.

6. **Noise**

The Company will continue to administer a Noise Control and Hearing Conservation Program. The goal of the program will be to continuously reduce the percentage of employees required to wear hearing protection. A noise abatement plan will be developed on an annual basis and reviewed with the Local Union to provide an opportunity for suggestions intended to improve the

77

plan. The Company recognizes the importance of considering the noise level when purchasing new equipment. The Company will make its best efforts to achieve an 80 dB standard, if and where technologically and financially feasible, and when the Company controls the purchasing decision.

A joint Noise Control Committee will be established. The Noise Control Committee will consist of representatives from Plant Engineering, Manufacturing Operations, Medical, Safety and Industrial Hygiene Section and the Joint Safety Committee, and others as deemed appropriate by the Joint Safety Committee, such as certain skilled trades personnel, and/or other employees. The Noise Control Committee has the responsibility to seek input from plant personnel in identifying noise sources and potential ways to reduce noise levels.

The Noise Control Committee will meet regularly, record minutes and report quarterly to the Joint Safety Committee regarding progress on the Noise Abatement Plan. The annual evaluation will include:

1. Copies of the plant's noise abatement program;

2. A summary of audiometric tests;

3. The number of employees that experienced standard threshold shift;

4. The number of employees that are required to wear hearing protection;

5. The number of employees at risk of exposure at or above 85 DBA;

6. The number of employees at risk of exposure above 90 DBA;

7. **Hazardous Material Review**
Effective control of hazardous materials will serve to protect the employees of NUMMI. The Company is committed to the goal of continuous reduction in the use of hazardous materials. This is

78

being accomplished through the implementation of a written program which established the Hazardous Materials Review Committee (HMRC). The HMRC will be co-chaired by the Environmental and Quality Control Engineering sections and its membership will include representatives from Purchasing, Security and the Safety sections, and the UAW General Representatives for Health and Safety and Ergonomics and the UAW Coordinator for Health, Safety and Ergonomics. The HMRC will define the hazardous material approval process and will emphasize ongoing efforts to identify safer substitutes for new as well as materials currently in use. These efforts will be directed by the HMRC and are expected to reduce employee exposures and protect the environment.

8. **Training**
Development of the health and safety training plan and selection of safety trainers for hourly employees will be performed jointly with the Union, including such training performed by the Safety Section and the Engineering Training Center for Skilled Trades. The Company will use its best efforts to continue to use as trainers qualified hourly employees, where practical and desirable.

9. **Task Based Risk Assessment**
The Company will continue to develop its process for performing a task based risk assessment on all robotic and automated operations in the plant, with primary emphasis on the body shop. This assessment will include identification of task, hazards associated with each task, level of risk for each hazard and associated appropriate control measures, if any, to protect employees. Risk assessments will be documented.

10. **Contractor Safety**
The Company will maintain its Outside Contractor Safety Program. The program will include training for project managers, engineers and enforcement of guidelines. Engineers and project managers will monitor contractor performance on a regular basis.

79

11. **Safety Coordinators**

The Company recognizes the importance of hourly employees who function as members of the Section Safety Committees and are known as "safety coordinators." Safety coordinators will participate with the Group Leader in conducting inspections while the line is running, attending meetings and raising health and safety concerns. Safety coordinators will receive eight hours of health, safety and ergonomic training per year.

12. **New Equipment**

The Company will establish and implement a procedure of advance notification and involvement of Company and Union health and safety personnel in the review of new production equipment and machinery.

13. **Confined Space Entry Procedure**

The Company and Union will continue to improve the Confined Space Entry Program. All confined spaces will be posted, training will be provided for those employees that must enter confined spaces and those that issue permits. Necessary equipment will be made available and the program will be periodically monitored. The Company and Union will visit each confined space location and ensure that it is properly identified and marked.

**XXVI. BULLETIN BOARDS**

1.1 The Company will furnish eleven (11) bulletin boards to be used by the Union for posting of notices of meetings, elections, recreational events, and similar notices. Bulletin boards shall be glass enclosed and lockable. Notices referring to controversial matters shall not be posted. The bulletin boards shall be placed in conspicuous places on the Company's property, as agreed by both parties. Additional informational areas shall be provided for by mutual agreement.

1.2 All notices must be signed by the President or Chairperson of the Bargaining Committee prior to posting.

80

**XXVII. PROHIBITION OF STRIKES AND LOCKOUTS**

1.1 During the term of this Agreement or any extension thereof, there shall be no lockout of employees by the Company.

1.2 During the term of this Agreement or any extension thereof, neither the Union nor its agents or representatives will cause, engage in, or authorize its members to engage in any strike, sympathy strike, work stoppage, picketing, boycott, sick- out, slowdown or other concerted activity to interrupt work against the Company.

1.3 If any action or activity prohibited by Paragraph 1.2 occurs, the Company shall notify the Union and the Union shall notify its members to return to work and to cease the unauthorized stoppage.

1.4 Any employee who engages in any activity specified in Paragraph 1.2 above will be subject to discipline up to and including discharge subject to review by the Problem Resolution Procedure.

**XXVIII. STANDARDIZED WORK**

1. **Description And Objective**

1.1 For some time prior to the execution of this Agreement, the Company has been utilizing a procedure for establishing and changing Standardized Work. Under this procedure, described in Appendix "C" and based on Toyota Production Methods, employees are encouraged and expected to participate with their Team Leaders and Group Leaders in designing and establishing Standardized Work. The objective of the Standardized Work procedure is to insure that employees work at a safe and reasonable pace, in the most efficient and safe manner, while maintaining quality standards. In the interest of safety, efficiency, best quality and other production needs, the Company may establish and change Standardized Work by continuing this procedure. The Standardized Work includes items such as required Manpower, Takt time, model mix, operation arrangements, tools, operation methods, and required times for performing operations.

81

1.2   As part of the New United Motor's production system, employees are expected to use their best efforts in performing the job within the Takt time and to alert their Group/Team Leader of production or quality problems. If the problem in production or quality is such that they cannot complete their tasks in the proper manner, they are expected, without being subject to discipline, to pull the cord or push the button to sound the alarm, and ultimately stop the line, alerting a Group/Team Leader of the problem. If the problem is of a recurring nature, the employees will work together to KAIZEN the operation according to the procedure set forth in Appendix "C".

1.3   The Company will explain and discuss monthly production schedules with the Union for mutual understanding, at the monthly **General Manager Meeting.** This meeting will be held monthly for discussion of production related matters, including three (3) month production forecast, manpower balance between sections, assembly line Takt time, model mix, and estimated scheduled overtime.

2.    **Procedure For Review Of Standardized Work Problems**
2.1   Problems relating to Standardized Work or production standards shall be subject to the procedures set forth in this Article.

2.2   The purpose of this procedure is to establish a method consistent with our philosophy of mutual trust and respect whereby the Union and Company jointly assess Standardized Work concerns which are not resolved through reasonable and best team effort by first involving **Team Leaders and Team Members on the team, from both shifts.**

2.3   Any employees **who have** has a problem with Standardized Work, **that has not been** resolved by using the best team effort (refer to 2.2) shall discuss their concern with the Group Leader. The Group Leader will initiate a Standardized Work Assessment and Tracking (SWAT) form. If a proposed resolution between the Group Leader and employees has not

2.4   **The Production Assistant Manager will meet jointly with the Group Leaders, Team Leaders and District Committee Persons from both shifts to conduct a fact-finding investigation. This investigation will include, but not be limited to the following:**

a)    Review of Standardized Work charts, manpower, and current Kaizen efforts (if any) to improve work process/sequence on both shifts;

b)    Ergonomic assessment ;

c)    Evaluate current processes on both shifts (to determine how Team Members are performing the operations);

d)    Nature and extent of training received by the employee(s);

e)    Tooling and process; and

f)    Quality and location of stock.

2.5   Upon completion of the investigation, the Production Manager of that section will review the specific nature of the problem and make appropriate correction(s).

2.6   If, within twenty (20) working days from completion of the investigation, the problem is not resolved by the Section Management, the Assistant General Manager of the department and a Bargaining Committee member will review the findings of the SWAT investigation and implement a resolution. If the problem is not resolved at this step, the

been reached within ten (10) working days from the date the employee(s) first addressed the problem to the Group Leader, the Group Leader shall submit the SWAT form to the Production Assistant Manager, Team Member Relations Representative, District Committee Person and Team Member.

monthly General Manager Meeting will be utilized and the General Manager and Chairman of the Bargaining Committee will reinvestigate as needed for resolution of the problem. **If the problem is not resolved at this level, either party may call upon the V.P. of Manufacturing and the UAW V.P. for final resolution of the problem.**

2.7 Both parties agree to utilize this procedure in the event that problems arise. This procedure shall be the exclusive remedy for any problem on Standardized Work or work standards.

## XXIX. GENERAL PROVISIONS

**Definitions**

1. For the purpose of this contract:

   Department shall be defined as that "area" which is Vice President or General Manager responsible.
   Example: Manufacturing

   Section shall be defined as that "area" which is included in a Department and is Manager responsible.
   Example: Assembly-Truck, Paint-Passenger

   Group shall be defined as that "area" which is included within a Section and is Group Leader responsible.
   Example: Trim II

   Team shall be defined as that "area" which is included within a Group and is Team Leader responsible.
   Example: Team 1, 2, 3, etc. in Trim II Group

2. **Medical**
   Employees, required to undergo a medical examination by the Company as a result of job requirement or to diagnose a medical condition, may have a third party physician (appointed by the employee's physician and the Company's medical advisor) resolve

any dispute between the Company and the employee on the findings of the Company's medical examination.

3. **Report Pay And Call-In Pay**

3.1 Any employee called to work, or permitted to come to work without proper notification that there will be no work, shall be provided with four (4) hours work or, at the Company's option, four (4) hours pay in lieu of work at the employee's regular straight-time hourly rate. The employee must remain available for work until assigned or released by the Company.

3.2 This Section shall not apply if conditions beyond the control of the Company interfere with work being provided or notice being given.

4. **Skilled Trades And Apprenticeship Training**

4.1 The parties mutually agree to establish and put into effect a comprehensive system for Skilled Trades and Apprenticeship Training. This system shall include an annual meeting in September with the UAW/NUMMI joint committee on skilled trades/apprenticeship/training in which **the anticipated technology changes and the anticipated number of apprentices is discussed. Future plans and changes to equipment shall be considered to determine skilled trades training needs.** Factors to consider when forecasting apprenticeship needs include targeted headcount, actual headcount, retirements, attrition, business needs, and projects.

4.2 A Joint Union-Management Committee on Skilled Trades/Apprenticeship/Training shall be responsible for designing and implementing such a system, and to advise the Union Representatives (designated in Article VIII) and the Human Resources Department regarding matters related to Skilled Trades.

4.3 The Committee shall consist of equal numbers of Company and Union Representatives. The UAW General Representative for

Skilled Trades/Apprenticeship/Training shall be one of the Union members of the Committee.

4.4 Prior to hiring or transferring a Team Member to Division II, the Company will review the applicant's journey person's credentials with the Chairperson of the Bargaining Committee or designee.

4.5 Training of NUMMI's Maintenance personnel is critical to our success and progress. Our employees' skills can be improved through class room, hands-on and on the job training. Specific training classes must be focused on the skills necessary for the employee to grow in knowledge and at the same time meet the needs of current and new technology being implemented in machinery, equipment and process systems. The Training Center and Maintenance Sectional Management shall coordinate, track, and ensure that a target of Ninety-six (96) hours of training be provided to each division II team member per year. **The targeted Ninety-six (96) hours of training shall consist of approximately Forty (40) hours of relevant "cross training"** performed in the Training Center approximately **Forty (40) hours of "Shop Specific" training performed by the specific section requiring the training and approximately Sixteen (16) hours of required Safety Training provided by the Training Center and the Safety Department. Cross Training and Shop Specific Training shall have written objectives jointly developed by the Training Center and the Shop Maintenance Management for each course and shall have a "Hands On" proficiency evaluation to assure effective training, student comprehension and competency.** Periodic reviews of these tasks shall be conducted and the results forwarded to the UAW skilled trades representative. Issues involving the number of team members trained and training schedules and changes (increase or decrease) to the allocation of the Eighty (80) hours of required training may be addressed during monthly Maintenance Training Center meetings and quarterly Sectional Maintenance meetings respectively.

Specific courses should be discussed and agreed upon through the joint efforts of the Chairperson of the Bargaining Committee and

the UAW Skilled Trades representative, or their designee(s), and management representatives.

Training and/or applicable certification will continue to be given through the Training Center in the following areas:

- Basic welding
- Maintenance shop machine, equipment and tools
- Basic electrical
- Safety
- Fall protection
- Lock Out/Tag Out
- **Rigging**

The training and/or applicable certification designated below may be given to employees who, after consultation with the Skilled Trades Committee and in the opinion of the Company, have the skills and aptitude to benefit from and apply them at work. Employees may be given training in the Training Center from among the following:

- Welding
- Industrial controls for electrical systems
- Programmable logic controls
- Hydraulics and pneumatics
- Machine shop technology for Die and Tool and Maintenance apprentices.
- Safety
- Confined space entry
- Low voltage electrical systems

4. When a new classification or department is established, involving work of any kind which has been performed by the bargaining unit or is related to any jobs, duties or functions of the bargaining unit, the Union will be notified, and, at the request of either party, negotiations will take place promptly as to whether such classification or department properly should be in the included or excluded group. If no agreement is reached, the matter shall be subject to the arbitration procedures of the Agreement.

5.1 **Production Kaizen Teams shall have access to at least one (1) Division II member as a resource when the assignment requires this assistance. This Division II assistance will be provided as quickly as is reasonable.**

6. **Non-Discrimination Against Union Activities**

6.1 The Company will not interfere with, restrain or coerce employees because of membership or lawful activity in the Union, nor will it, by discrimination in respect to hire, tenure or employment or any term of condition of employment, attempt to discourage membership in the Union.

6.2 The Union agrees that neither the Union nor its members will intimidate or coerce any employee in respect to his/her right to work or in respect to Union activity or membership, and further that there shall be no solicitation of employees for Union membership or dues during working time. The Union further agrees the Company shall take disciplinary action for any violations of this provision.

## XXX. ENTIRE AGREEMENT AND WAIVER

1. **Entire Agreement And Waiver**
This Agreement constitutes the entire Agreement between the parties, except as modified by written side letters to this Agreement and signed by the Company's Vice President, Human Resources and the UAW Vice President. During the negotiations which resulted in this Agreement, each party had the right and opportunity to make demands and proposals on any subject or matter not removed by law from the area of collective bargaining. The understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Furthermore, for the term of this Agreement or any extension thereof, each party waives all statutory rights to bargain collectively over the subject matter of this Agreement.

2. **Separability**

88

If the applicable law renders invalid or unenforceable any of the provisions of this Agreement, the Company and the Union may agree upon a replacement for the affected provision(s). Such replacement provision(s) shall become effective immediately upon agreement of the Parties, without the need for further ratification by the Union membership, and shall remain in effect for the duration of this Agreement. The legal invalidity or unenforceability of provisions of this Agreement shall not affect the remaining provisions thereof.

## XXXI TERM OF AGREEMENT

1. **Effective Dates**
This Agreement shall be in effect from the **6th** day of August, 2005, through 2:00 a.m. on the 8th day of August, 2009, and shall continue in effect from year to year unless either party provides the notice of intent to modify or terminate as set forth in Section 2

2. **Method Of Modification/Termination**
In order to modify or terminate this Agreement, the party seeking such modification or termination must give written notice to the other party of its intention to seek modification or termination of this Agreement at least sixty (60) days prior to the date on which this Agreement is due to expire. Failure to provide such timely notice will convert this Agreement into a year to year contract, with said sixty (60) day notice being required before this Agreement can be modified or terminated.

3. **Negotiations For A New Agreement**
Within ten (10) days after receipt of the notice to seek modification or termination described above, a conference will be arranged to negotiate proposals for a new contract, in which case this Agreement shall continue in full force and effect until terminated. In the event the parties are unable to reach agreement on a new contract before the expiration date of this Agreement then in effect, the parties may mutually agree, in writing, to extend this Agreement for the purpose of maintaining harmonious labor relations, pending the execution of a new agreement.

89

New United Motor Manufacturing, Inc

Y. Azuma
R. McCullough
S. Imaeda
W. Odisho
J. W. Potts III
R. Ponsonby
P. Fong
Y. Yamakado
J. Nelson
E. Winter
D. Johnson
D. Ciesco
J. Young
N. Higa
R. Petry
J. Oakson
D. Darab
J. Armstrong
R. Valentine
S. Torres
L. Gasper

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW

N. Gooden
J. Wells
T. Bolte
E. Mays
J. Stackpoole
A. Miller
A. Comai

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW Local 2244

V. Quesada
G. Nano
J. Contreras
C. Stimpson
J. Hernandez
J. Silva
R. Scott
J. Enos
E. Valdez
R. Grange
P. Rothschild
E. Parra

# APPENDIX "A" LUNCH PERIOD AGREEMENT

It is the intent and purpose of the parties to outline specific terms and conditions of a thirty (30) minute lunch period for all employees presently employed at the Company's Fremont, California plant as follows:

1. The Company shall continue to provide a thirty (30) minute lunch period.

2. The pay for this lunch period has been included within the agreed upon Base Wage Rate in Article XVII of the Labor Agreement.

3. Lunch time will not be treated as "hours worked".

4. Employees will not be required to eat at their work stations.

5. During lunch, employees will not be required to perform any duties.

6. During the paid lunch period, employees will be free to eat lunches and engage in any other conduct consistent with plant rules, but shall be required to stay within the building structure. If the employee leaves the building structure (the patio area is part of the building structure) during lunch, the employee's pay for that day will be reduced by the amount of money (1/2 hour x base rate plus COLA; the base rate calculated without the paid lunch period) that has been included in the agreed upon Base Wage Rate as Paid Lunch. Activities and/or movement in or on other parts of the Company property such as parking lots, shall not be permitted during the lunch period.

7. During the paid break periods, employees will be free to engage in any conduct consistent with plant rules, but shall be required to stay within the building structure. Activities

and/or movement in or on other parts of the Company property such as parking lots, shall not be permitted during the break period.

8. **In the event of an early break or lunch, the Manager of the effected section will inform the team members as to the cause of the early break or lunch. Notification will be given by written posting throughout the section the following day.**

9. If the applicable law renders invalid or unenforceable any of the provisions of this Agreement, the Company and the Union may agree upon a replacement for the affected provision(s). Such replacement provision(s) shall become effective immediately upon agreement of the Parties, without the need for further ratification by the Union membership, and shall remain in effect for the duration of this Agreement. The legal invalidity or unenforceability of provisions of this Agreement shall not affect the remaining provisions thereof.

APPENDIX "B"

1. Current Health Care Insurance Plans will remain in effect until September 30, 2005. The effective date of any modifications to benefits detailed in this Appendix "B" will be October 1, 2005 **except as otherwise stated in this Appendix B.** There will be an open enrollment period for such plans during the month of August 2005, and annually thereafter.

2. The Group Insurance Program, Health Care Insurance Program, Retirement Plan, Savings Plan, Reserve Fund Plan, Legal Plan, and Supplemental Workers' Compensation Plan are summarized in this Appendix. The interpretation and application of these plans will be in accordance with the provisions for the specific coverage as described in the official plan documents. The following are brief outlines highlighting significant features of each program and are not to be construed as specific terms and conditions of each plan.

3. The Benefits Outline in this Appendix "B" includes the following Plans:

   a. Group Insurance Program
      1. Life and ADD Insurance
      2. Temporary Disability
      3. Long-Term Disability
   b. Health Care Insurance Program
      1. Medical Insurance – H.M.O's – Comprehensive
      2. Dental Programs
      3. Vision Program
      4. Mental Health/Substance Abuse Program
      5. Part B Medicare
      6. Retiree Supplemental Health Insurance Plan (SHP)
   c. Retirement Plan
   d. Savings Plan
   e. Reserve Fund Plan
   f. Legal Plan
   g. Supplemental Workers' Compensation Plan

4.  Dependent as used in these plans means a) spouse, b) any unmarried child, step-child, or adopted child or child in the **process of being adopted** for whom employee has legal requirement to provide support who is under 19 years of age, c) any unmarried child, step-child, or adopted child for whom employee has a legal requirement to provide support who is under 25 years and who is a full time student (12 or more semester units or the equivalent) in an accredited institution, d) any unmarried child, step child, or adopted child over 19 years of age who is totally and permanently disabled and incapable of providing self-support, and are currently enrolled in the team member's health plan, or e) domestic partner (for purposes of medical, dental and vision programs). **In addition, and except in the case of domestic partners, dependents must be legally claimed by the employee as an exemption under Section 151 of the Internal Revenue Code for Federal income tax purposes. Team members must furnish the Company with a valid social security number for each dependent prior to or at time of enrollment. Failure to enroll a dependent within 30 days of eligibility including a life event shall result in the dependent waiting until the next open enrollment period. The provisions in this paragraph are effective immediately.**

5.  Definition of a domestic partner: (a) be the same sex; (b) have filed a Declaration of Domestic Partnership with the Secretary of State in team member's state of residency;   (c) have shared a continuous committed relationship for at least six months, intend to do so indefinitely and have no such domestic partner relationship with any other person; (d) reside in the same household; (e) share responsibility for each other's welfare and financial obligations; (f) not be related by blood ties closer than would bar marriage in the state; (g) be over age 18, of legal age and legally competent to enter a contract; (h) reside in a state where marriage between two persons of the same sex is not recognized as valid under law and; (i) not be married to any other person.

6.  Dependents, for whom the team member has legal custody other than those defined in paragraph 4, are not eligible for coverage under the Company programs.  However, existing dependents who are currently covered on Company plans and who are legal wards will be allowed to remain on all such plans until they reach age 19 with the provision that the team member pay for the monthly cost of providing coverage; such cost to be 25% of the family rate for the team member's selected benefit plans.

7.  A dependent may not be covered for optional dependent life insurance by more than one (1) employee.  In cases of conflict, the child will be allowed to be covered only by the team member with the greatest seniority.

8.  When both husband and wife are employed by the Company, and desire different plans each may select their own medical and/or dental plan; however, in no event will an employee be covered under more than one Company paid health plan. Dependents may be covered under either parent's plan, but not both. Team member hired on or after 10/1/2005 shall be covered by the same health plan as their spouse or qualified domestic partner.

9.  **Effective 10/01/05, team members and their dependents that receive any type of financial consideration from any party or entity for participation in these plans shall be terminated from and precluded from participation in the plans for any plan year in which they receive such financial consideration.**

## A. GROUP INSURANCE PROGRAM

### 1.    LIFE INSURANCE

Type:           Term Insurance

Eligibility:     First day of the month following one (1) month of service

Employee
Contribution:   None

Benefit:

| Base Rate ($) | Life Amount $ |
|---|---|
| 19.58 | 50,000 |
| 19.97 | 51,000 |
| 20.06 | 51,000 |
| 20.45 | 52,000 |
| 20.57 | 53,000 |
| 20.98 | 54,000 |
| 21.05 | 54,000 |
| 21.38 | 55,000 |
| 21.40 | 55,000 |
| 21.80 | 56,000 |
| 22.04 | 56,000 |
| 22.38 | 57,000 |
| 22.45 | 57,000 |
| 22.70 | 58,000 |
| 22.82 | 58,000 |
| 23.15 | 59,000 |
| 23.51 | 60,000 |
| 23.77 | 61,000 |
| 23.84 | 61,000 |
| 24.02 | 61,000 |
| 24.25 | 62,000 |
| 24.50 | 63,000 |
| 24.98 | 64,000 |
| 25.17 | 64,000 |
| 25.23 | 65,000 |
| 25.33 | 65,000 |
| 25.68 | 66,000 |
| 25.83 | 66,000 |
| 26.45 | 68,000 |
| 26.57 | 68,000 |
| 26.60 | 68,000 |
| 26.65 | 69,000 |
| 27.10 | 69,000 |
| 27.18 | 70,000 |
| 27.49 | 70,000 |
| 27.74 | 71,000 |
| 27.92 | 71,000 |
| 27.97 | 72,000 |
| 28.00 | 72,000 |
| 28.04 | 72,000 |
| 28.29 | 72,000 |
| 28.53 | 73,000 |
| 28.88 | 74,000 |
| 29.13 | 75,000 |
| 29.39 | 75,000 |
| 32.34 | 83,000 |
| 32.99 | 84,000 |
| 33.98 | 87,000 |

Moral Exclusions: No benefit exclusion will apply for deaths due to intentionally self-inflicted injuries.

Accelerated Benefit: The Company will offer an accelerated death benefit payment option for a terminally ill employee who has a life expectancy not to exceed twelve (12) months. Team members would be eligible to receive up to 50% of their benefit early. Beneficiaries would receive the remaining benefits after death.

## ACCIDENTAL DEATH & DISMEMBERMENT

Type: Term Insurance

Eligibility: First day of the month following one (1) month of service

Employee Contribution: None

Benefit: 100% of company provided life amount if accidental death while on company business.

50% if accidental death while not on company business. Schedule of benefits for loss of limbs, hearing, speech, or sight.

## OPTIONAL/SUPPLEMENTAL INSURANCE

Type: Term Insurance

Eligibility: First day of the month following three (3) months of service.

Employee Contribution: This is an optional plan that requires team member contributions to be made through monthly payroll deductions. Team Members on a Leave of Absence can pay the Company directly for their coverage.

Evidence of Insurability: A statement of insurability will be required to purchase additional life insurance any time following original eligibility date.

Coverage Options:

| | | | | | |
|---|---|---|---|---|---|
| I | $10,000 | V | $50,000 | IX | $150,000 |
| II | $20,000 | VI | $75,000 | X | $175,000 |
| III | $30,000 | VII | $100,000 | XI | $200,000 |
| IV | $40,000 | VIII | $125,000 | | |

- Current monthly rates are available in the Benefits section of the Human Resources department.

**Note: optional/supplemental life insurance coverage is subject to termination by carrier if the employee does not make premium payment to the Company the month prior to the month of coverage.**

## RETIREMENT LIFE INSURANCE:

Type: Term Insurance

Eligibility: $10,000 Group Insurance coverage will be provided to Team Members retiring on or after 1/1/95 who retired after attaining age 65 with 10 years of service.

## DEPENDENT LIFE INSURANCE:

Type: Term Insurance

Eligibility: Team Members are eligible to purchase on the first day of the month following three (3) months of service.

Employee Contribution: This is an optional plan that requires team member contributions to be made through monthly payroll deductions. Team Members on a Leave of Absence can pay the Company directly for their coverage.

Coverage Options:

1. $10,000 Spouse/$5,000 Dependent
2. $15,000 Spouse/$7,500 Dependent
3. $20,000 Spouse/$10,000 Dependent
4. $25,000 Spouse/$12,500 Dependent
5. $30,000 Spouse/$15,000 Dependent
6. $35,000 Spouse/$17,500 Dependent
7. **$40,000 Spouse/$20,000 Dependent**
8. **$45,000 Spouse/$22,500 Dependent**
9. **$50,000 Spouse/$25,000 Dependent**

Current monthly rates are available in the Benefits section of the Human Resources Department. **Note dependent life insurance coverage is subject to termination by carrier if the employee does not make the premium payment to the Company the month prior to the month of coverage.**

Evidence of
Insurability: A statement of insurability will be required to purchase life insurance any time other than original eligibility date.

## 2. TEMPORARY DISABILITY

Eligibility: First day of the month following six (6) months of service.

Employee
Contribution: None

Benefits Paid: Certified disability due to illness or injury begins on eighth day away from work, and continues until recovery or 52 weeks, whichever is earlier.

Benefit: Level of benefit determined by base hourly rate according to schedule. The benefit amount for any period that a Team Member is otherwise eligible for benefits during any period of disability occurring prior to the day one year of seniority is attained shall be approximately 75% of the benefit amount. Weekly payments will be the difference between amounts from legally required programs, such as State Disability or Social Security, and any eligible pay.

| Base Rate | Weekly Benefit ($'s) | 75% Weekly Benefit ($'s) |
| --- | --- | --- |
| $19.58 | 430 | 320 |
| $19.97 | 440 | 330 |
| $20.06 | 440 | 330 |
| $20.45 | 450 | 340 |
| $20.57 | 450 | 340 |
| $20.98 | 460 | 350 |
| $21.05 | 460 | 350 |
| $21.38 | 470 | 350 |

| Base Rate | Weekly Benefit ($'s) | 75% Weekly Benefit ($'s) |
| --- | --- | --- |
| $21.40 | 470 | 350 |
| $21.80 | 480 | 360 |
| $22.04 | 480 | 360 |
| $22.38 | 490 | 370 |
| $22.45 | 490 | 370 |
| $22.70 | 500 | 380 |
| $22.82 | 500 | 380 |
| $23.15 | 510 | 380 |
| $23.51 | 520 | 390 |
| $23.77 | 520 | 390 |
| $23.84 | 530 | 400 |
| $24.02 | 530 | 400 |
| $24.25 | 530 | 400 |
| $24.50 | 540 | 410 |
| $24.98 | 550 | 410 |
| $25.17 | 550 | 410 |
| $25.23 | 560 | 420 |
| $25.33 | 560 | 420 |
| $25.68 | 560 | 420 |
| $25.83 | 570 | 430 |
| $26.45 | 580 | 440 |
| $26.57 | 580 | 440 |
| $26.60 | 590 | 440 |
| $26.65 | 590 | 440 |
| $27.10 | 600 | 450 |
| $27.18 | 600 | 450 |
| $27.49 | 600 | 450 |
| $27.74 | 610 | 460 |
| $27.92 | 610 | 460 |
| $27.97 | 620 | 470 |
| $28.00 | 620 | 470 |

| Base Rate | Weekly Benefit ($'s) | 75% Weekly Benefit ($'s) |
|---|---|---|
| $28.04 | 620 | 470 |
| $28.29 | 620 | 470 |
| $28.53 | 630 | 470 |
| $28.88 | 640 | 480 |
| $29.13 | 640 | 480 |
| $29.39 | 650 | 490 |
| $32.34 | 710 | 530 |
| $32.99 | 730 | 550 |
| $33.98 | 750 | 560 |

## 3. LONG-TERM DISABILITY

Eligibility: First day of the month following six (6) months of service.

Employee Contribution: None.

Benefits Plan: After 52 consecutive weeks of total disability or after final payment is made under the Temporary Disability, whichever is later.

Benefits: A team member will be considered disabled if they cannot perform any job available within the plant for which they may be eligible.

Duration: **Disability resulting from a mental illness or substance abuse is limited to 24 months during an employee's lifetime.**

Disabilities commencing prior to age 60: Benefits are paid while the team member remains totally disabled,

---

up to their length of service, or until their 65th birthday, whichever is earlier.

Disabilities commencing after age 50 for team members with 10 or more years of service will be paid until age 65 or until recovery whichever is earlier. Disabilities commencing on or after the 60th birthday, benefits are paid for fifty-four months; or equal to the seniority prior to the disability or until recovery, whichever is earlier, but not beyond the 70th birthday.

Benefit: Level determined by base hourly rate according to schedule. Weekly payments will be the difference between amounts from legally required programs, such as State Disability or Social Security, and any eligible pay.

At normal retirement age benefits will be reduced by the amount of the normal retirement benefit payable.

| Base Rate ($'s) | Monthly Benefit ($'s) |
|---|---|
| 19.58 | 1790 |
| 19.97 | 1830 |
| 20.06 | 1840 |
| 20.45 | 1870 |
| 20.57 | 1890 |
| 20.98 | 1920 |
| 21.05 | 1930 |
| 21.38 | 1960 |
| 21.40 | 1960 |
| 21.80 | 2000 |
| 22.04 | 2020 |
| 22.38 | 2050 |
| 22.45 | 2060 |
| 22.70 | 2080 |

| Base Rate ($'s) | Monthly Benefit ($'s) |
|---|---|
| 22.82 | 2090 |
| 23.15 | 2120 |
| 23.51 | 2160 |
| 23.77 | 2180 |
| 23.84 | 2190 |
| 24.02 | 2200 |
| 24.25 | 2220 |
| 24.50 | 2250 |
| 24.98 | 2290 |
| 25.17 | 2310 |
| 25.23 | 2310 |
| 25.33 | 2320 |
| 25.68 | 2350 |
| 25.83 | 2370 |
| 26.45 | 2420 |
| 26.57 | 2440 |
| 26.60 | 2440 |
| 26.65 | 2440 |
| 27.10 | 2480 |
| 27.18 | 2490 |
| 27.49 | 2520 |
| 27.74 | 2540 |
| 27.92 | 2560 |
| 27.97 | 2560 |
| 28.00 | 2570 |
| 28.04 | 2570 |
| 28.29 | 2590 |
| 28.53 | 2620 |
| 28.88 | 2650 |
| 29.13 | 2670 |
| 29.39 | 2690 |

## B. HEALTH CARE INSURANCE PROGRAM

### 1. MEDICAL INSURANCE

| Base Rate ($'s) | Monthly Benefit ($'s) |
|---|---|
| 32.34 | 2960 |
| 32.99 | 3020 |
| 33.98 | 3110 |

Eligibility:

First day of the month following seven (7) months of service. Team members will be given the choice of at least two HMO medical plans and must remain in the selected HMO until the first open enrollment period following forty-two (42) months of coverage.

After completion of the applicable HMO participation requirement, team members may enroll in any available health care option during the next open enrollment period except that effective 8/7/05, there shall be no new enrollments in the Blue Shield Plan.

Special consideration will be made for team members with extenuating circumstances. All plans do not apply any pre-existing condition rules to members before paying benefits.

## HEALTH MAINTENANCE ORGANIZATIONS

| | HEALTH NET | KAISER |
|---|---|---|
| **General:** | Open panel HMO; services must be prescribed and administered by private physicians participating in the program. | A closed practice HMO. Services must be rendered at a Kaiser facility by a Kaiser physician. |
| Annual Deductible: | No cost | No cost |

### OUTPATIENT SERVICES:

| | HEALTH NET | KAISER |
|---|---|---|
| ◆ Office Visits: | Plan pays after a $15.00 co-pay | Plan pays after a $15.00 co-pay |
| ◆ Surgery | No additional cost | No additional cost for up to 2 months |
| ◆ Physical Therapy | No additional cost | No additional cost |
| ◆ Diagnostic X-Ray & Lab | No additional cost | No additional cost |
| ◆ Well Baby Care | No additional cost | No additional cost |
| ◆ Pre-School Immunization | No additional cost | No additional cost |
| ◆ Annual Pap Smears | No additional cost | No additional cost |
| ◆ Annual Hearing Exam | No additional cost | No additional cost |
| ◆ Durable Medical Equipment | No additional cost | No additional cost |
| ◆ Hearing Device | No cost for one device every 36 months | |

### HOSPITAL SERVICES:

| | HEALTH NET | KAISER |
|---|---|---|
| ◆ Semi-Private Room | No cost | No cost |
| ◆ Surgery | No cost | No cost |
| ◆ Doctor Visits in Hospital | No cost | No cost |
| ◆ Maternity | No cost | No cost |

106

---

### EXTENDED CARE:

| | HEALTH NET | KAISER |
|---|---|---|
| ◆ Skilled Nursing Facility | No cost up to 100 days per year if 24-hour care necessary | No cost up to 100 days per year if 24-hr care necessary |

### EMERGENCY:

| | HEALTH NET | KAISER |
|---|---|---|
| ◆ In Area | No cost if admitted | No cost; emergency services only, until condition permits transfer to the nearest Kaiser facility. |
| ◆ Out of Area | No cost if admitted | No cost |
| ◆ Ambulance | No cost if medically necessary | No cost if medically necessary |

### PRESCRIPTIONS:

| | HEALTH NET | KAISER |
|---|---|---|
| ◆ Prescriptions | Plan pays after a $10 Rx co-pay for up to a one-month supply. Maintenance prescriptions shall be covered through the mandatory mail order program for maintenance drugs. | Plan pays after a $10 Rx co-pay for up to a one-month supply. Maintenance prescriptions shall be covered through the mandatory mail order program for maintenance drugs |
| ◆ Mandatory Mail Order Program for Maintenance Prescriptions | Plan pays after a $10 Rx co-pay for up to a three-month supply (maintenance drugs) but only through mail order program | Plan pays after a $10 Rx co-pay for up to a three-month supply but only through mail order program |

107

| The plan only pays for generic prescription drugs, unless no generic is available. | | |
|---|---|---|
| ◆ Mandatory Generic Prescription Rx program | | |
| ◆ Mental Health | Covered under stand-alone program (see B.4) | Covered by plan subject to co-pay |

## BLUE SHIELD COMPREHENSIVE PLAN:

**General:** A comprehensive plan. Employee may choose any physician. The amount of your benefit varies depending upon whether services are performed by a member of the Preferred Provider Organization (PPO) or a non-member physician. Second surgical opinion and pre-hospital admission review may be required. Benefit reductions will occur if these procedures are not followed. This plan does not apply any pre-existing condition rules to members before paying benefits. Effective 8/7/05, there shall be no new enrollments in this plan; team members and their eligible dependents may however enroll in one of the other available Company HMO medical plans.

| Benefit: | P.P.O. | NON P.P.O. |
|---|---|---|
| | When services are provided by a referred provider, the benefit is: | When services are provided by a non-preferred provider, the benefit is: |
| **OUTPATIENT SERVICES:** | | |
| ◆ Office Visits | Plan pays 80% of R&C after a $15.00 co-pay | Plan pays 80% of R&C after a $15.00 co-pay |
| Annual Deductible: | No cost | $150 per person, $450 maximum per family |
| Employee Co-Payment For Premium | No cost | No cost |

108

| | PREVENTIVE & DIAGNOSTIC: | |
|---|---|---|
| Surgery | 100% of reasonable and customary charges (R&C) | 80% of reasonable and customary charges (R&C) |
| ◆ Physical Therapy | 100% of R&C (Restricted to 60 treatments per year) | 80% of R&C (Restricted to 60 treatments per year.) |
| ◆ Diagnostic X-Ray & Lab | 100% of R&C | 80% of R&C |
| ◆ Chiropractic Services | Limited to an annual maximum of 15 visits at a maximum of $40 each. | |
| ◆ Preventive care to 16 years | Plan pays 100% of R&C after a $15.00 office visit co-pay for up to age 16 under guidelines of pediatric healthcare | Plan pays 80% of R&C after a $15.00 office visit co-pay for up to age 16 under guidelines of pediatric healthcare |
| ◆ Annual Pap Smear/ Exams | 100% of R&C | 80% of R&C |
| ◆ Hearing Exam and Device Exams | 100% of R&C. Two every 36 months up to a maximum of $500. | 80% of R&C. Two every 36 months up to a maximum of $500. |

109

**HOSPICE:** "Hospice care will be provided if a member has been diagnosed as having a terminal illness with life expectancy of six months or less."

**HOSPITAL SERVICES:** (limited to 365 days per confinement)

| | | |
|---|---|---|
| ◆ | Semi Private Room | 100% of R&C | 80% of R&C Non-emergency services to maximum of $600 per day |
| ◆ | Surgery | 100% of R&C (See General Description) | 80% of R&C (See General Description) |
| ◆ | Doctor Visits in Hospital | 100% of R&C | 80% of R&C |
| ◆ | Maternity | 100% of R&C | 80% of R&C |

**EXTENDED CARE:**

| | | |
|---|---|---|
| ◆ | Skilled Nursing Facility | 100% of R&C up to 730 days per confinement | 80% of R&C up to 730 days per confinement |
| ◆ | Home Health Care | 100% of R&C up to $30,000 annual maximum | 80% of R&C up to $30,000 annual maximum |

**EMERGENCY:**

| | | |
|---|---|---|
| ◆ | In Area | 100% of R&C | 80% of R&C |
| ◆ | Out of Area | 100% of R&C | 80% of R&C |
| ◆ | Ambulance | 100% of R&C if medically necessary | 100% of R&C if medically necessary |

**PRESCRIPTIONS:**

110

| | | |
|---|---|---|
| ◆ | Prescription | Plan pays after a $15 Rx co-pay for up to a one-month supply. Maintenance prescriptions shall be covered through the mandatory mail order program for maintenance drugs. | Plan pays 75% of R&C after a $15 Rx co-pay for up to a one-month supply. Maintenance prescriptions shall be covered through the mandatory mail order program for maintenance drugs. |
| ◆ | Mandatory Mail order Program for Maintenance Prescriptions | Plan pays a $15 Rx co-pay for up to a three-month supply but only through mail order program. | Not available |
| ◆ | Mandatory Generic Prescription Rx Program | The plan only pays for generic prescription drugs, unless no generic is available. | |

**MENTAL HEALTH CARE:**

| | | |
|---|---|---|
| ◆ | Mental Health | Covered under stand-alone program (see B.4) | Covered under stand-alone program (see B.4) |

**CLARIFICATIONS:**

- ◆ Pancreas transplants are a covered benefit when done in conjunction with a kidney transplant.

111

- Mammography screening guidelines will be per American Cancer guidelines.

## 2. DENTAL PROGRAMS

Eligibility: On the first day of the month following seven (7) months of service. Team members must enroll in Delta Care until the first open enrollment period following six (6) months of coverage. At that time, all options will be available.

### DELTA CARE (DMO)

Service is provided by dentist in designated network of providers. Cost of services will be paid only if provided by dentist in network and in accordance with schedule below.

| | |
|---|---|
| Annual Deductible | No deductible |
| Maximum Benefit: | No maximum |
| Diagnostic & Preventive[1] | No cost |
| Basic | No cost |
| Crowns, bridges and dentures | Per fee schedule |
| Orthodontics (Adults & Children) | Team Member pays $1,250 plus start up fees |

(1) Diagnostic and preventative procedures are services such as oral examinations, x-rays, prophylaxis (cleaning, fluoride treatment).
    i) Prophylaxis (cleaning) covered to a maximum of two times per year if documented periodontal disease exists
    ii) Bitewing x-rays are limited to two times per year unless medically necessary
    iii) Full mouth x-rays allowed once every two years unless medically necessary

### DELTA PREFERRED (DPO)

The amount of benefit varies depending upon whether services are performed by a member of the Dental Provider Organization (DPO) or a non-member dentist.

| | Preferred Provider | Non-Preferred Provider |
|---|---|---|
| Annual Deductible | No deductible | No deductible |
| Diagnostic & Preventive[2] | 100% | 100% |
| Basic | 80/20% | 80/20% |
| Crowns and cast restorations | 80/20% | 80/20% |
| Prosthodontics | 50/50% | 50/50% |
| Orthodontics (Adults & Children) | 50/50% | 50/50% |
| Calendar year maximum | $1,500 | $1,400 |
| Orthodontic lifetime maximum | $1,700 | $1,700 |
| Accidental Injury additional lifetime maximum | $1,000 | $1,000 |
| Cosmetic Bonding for Children (8-19) | 90% of reasonable & customary (R&C) for cosmetic bonding of eight front teeth for children if required because of severe fluorosis, hereditary opalescent dentin or amelogenesis imperfecta. To be paid not more than one time in any three (3) consecutive calendar years. | $1,000 |

(2) Diagnostic and preventative procedures are services such as oral examinations, x-rays, prophylaxis (cleaning, fluoride treatment).
    i) Prophylaxis (cleaning) covered to a maximum of three times per year if documented periodontal disease exists
    ii) Bitewing x-rays allowed once per year unless medically necessary
    iii) Full mouth x-rays allowed once every five years unless medically necessary

## 3. VISION PROGRAM

Eligibility: First day of the month following seven (7) months of service.

General Description: The Plan is designed to cover basic visual needs. The program utilizes panel doctors for greatest benefit coverage. If non-panel members are used, benefits may be less than stated.

Premium: No cost to the employee.

Deductible: $15 deductible (includes exam, lens, frame package)

Examination: Once every 12 months from last date of service.

Lenses: One set every 24 months from last date of service unless required due to allowable prescription change, in which case every 12 months.

Frames: One pair every 24 months from last date of service.

Additional: Modest charges for blended lenses, non-prescribed contact lenses, oversize lenses, photo chromic lenses, some tinted lenses, progressive multi-focal lenses, lens coating or laminating, and frames costing greater than plan allowance.

## 4. MENTAL HEALTH-SUBSTANCE ABUSE PROGRAM

Eligibility: On the first day of the month following seven (7) months of service.

General Description: Team members and their eligible dependents are eligible to receive mental health benefits from the mental health and substance abuse stand-alone program except as provided in this paragraph. **Effective 8/7/2005, Kaiser enrollees shall receive mental health benefits directly from the Kaiser medical plan, except that Kaiser enrollees who are currently undergoing treatment under the stand-**

alone program shall be allowed to complete such treatment.

| BENEFITS: | Network Providers | Non-Network Providers |
|---|---|---|
| **INPATIENT** | | |
| ◆ Mental Health | 100% (45 days per episode) | $450 co-pay per admission 50% UCR* (45 days max. per episode) |
| ◆ Sub-stance Abuse | 100% If not completed: No co-pay for 1st course of treatment not completed. No additional co-pay for any subsequent course of treatment not completed. $750 additional co-pay for any subsequent course of treatment not completed. (45 days max. per episode) | $450 co-pay per admit 50% UCR If not completed: No additional co-pay for 1st course of treatment not completed. $750 additional co-pay for any subsequent course of treatment not completed. (45 days max. per episode) |
| *UCR - Usual and Customary Rate | | |
| **OUTPATIENT** | | |
| ◆ Mental Health | Visits 1-20 100%; Visits 21-52 $10 co-pay | $150 annual deductible 50% UCR |

## Page 116

| | | |
|---|---|---|
| ◆ Sub-stance Abuse | 100% 50% if not completed | $150 annual deductible; 70% UCR. If not completed: No additional co-pay for 1st course of treatment not completed. $750 additional co-pay for any subsequent course of treatment not completed. |
| ◆ Day or Night Care | 100% completed 50% if not completed (90 day limit per episode) | 50% UCR If not completed: No additional co-pay for 1st course of treatment not completed. $750 additional co-pay for any subsequent course of treatment not completed. (90 day limit per episode) |
| ◆ Psycho-logical Testing | Covered as a MH visit | Covered as a MH visit |
| **MAXIMUMS ALLOWED:** | | |

116

## Page 117

| | Combined with In-Network. 100 day inpatient care for mental health and substance abuse combined. |
|---|---|
| ◆ Lifetime | 100 day inpatient care for mental health and substance abuse combined. |

5. **PART "B" MEDICARE**

Company will pay the Part B Medicare Premium cost for retirees (retired at age 65 years or over with 10 years of service), and for employees on total and permanent disability (until loss of seniority pursuant to Article XI of the Collective Bargaining Agreement), per the schedule shown below. Effective 10/1/98, the Company will also pay Part "B" Medicare premiums for early retirees that retire after attaining age 62 with 10 years of service and those retirees that participated in the **Company-sponsored early retirement windows held in 1999 and 2002** once they turn 65.

The Company will only provide reimbursement for Medicare Part B if it is not provided through any other employer.

Team Members/Retirees must request reimbursement from the Company Benefits Department in writing. If a Team Member Retiree fails to make a reimbursement request in a timely manner, the maximum retroactive reimbursement will be (3) months Part B premium.

The lesser of the amount required by law, or: $63.60

Effective Dates 8/7/05 – 8/8/09

117

6. **RETIREE SUPPLEMENTAL HEALTH INSURANCE PLAN (S.H.I.P.)**

Effective Date: Restated Effective August 1, 1998

Eligibility: Team Members: Retired on or after 8/1/98 at age 62 or over with 10 years seniority at retirement ("Eligible Retirees") and his/her spouse or surviving spouse.

Company Contributions: For the period 8/7/05 through 8/1/09, the Company will only be required to make a contribution of $1,000,000 to the Retiree Supplemental Health Insurance Plan (S.H.I.P.).

Administration: The Company's Plan Administrator and Joint Committee (3 Company, 3 UAW; and a third party appointed by the Committee to resolve disputes)

Benefits: The Plan Fund will pay for:
- The Kaiser Senior Advantage Medicare Risk Plan ("Base Plan") with benefit levels substantially equivalent to the Company's existing Kaiser HMO Plan for actives; or
- An alternate supplemental Medicare Insurance Plan to a maximum reimbursement of 125% of the Base Plan ("Alternate Plan").
- The Company will offer an alternate HMO Medicare Risk Plan.
- If a person covered under this program resides outside of the service area covered under the Base Plan or the Company's Group Supplemental Plans, the Company will provide payment for another alternate plan selected by the insured person, not to exceed 125% of the cost of the Base Plan.

Coverage Options:

118

| | BASE PLAN | ALTERNATE PLAN 125% OF BASE PLAN | ACTIVE PLAN |
|---|---|---|---|
| Retiree | X | X (same HMO as retiree) | |
| Spouse 65 or over | X | X (same HMO as retiree) | |
| Spouse 60-64 | | | X (same HMO as retiree) |
| Spouse under 60 | | | X (same HMO as retiree) |
| Surviving spouse 65 or over | X | X | |
| Surviving spouse 60-64 | X | X | X |
| Surviving spouse under 60 | | X | X |

- Coverage for Surviving Spouses will cease upon their remarriage.
- No dual coverage will be allowed under the Company's plans for employee/retiree(s) who both work(ed) at the Company.

Limitations:
- **If Plan assets are not adequate to provide full payment of benefits, the Company agrees to contribute to the SHIP Plan up to an additional $1,000,000 during the term of this Collective Bargaining Agreement and the Plan Committee will consider this a mutually satisfactory measure to ensure continuation of benefits.**
- If comparable health coverage is provided by General Motors Corporation, Ford Motor Corporation, or any other employer to the retiree or spouse as subscriber, that individual will not be

119

- eligible for benefits under this Plan.

- In the event a State or National Health Care Plan is enacted, the Company and Union will meet to agree upon the disposition of this Trust Fund.

- **If the Company applies for Medicare Part D subsidy on behalf of eligible SHIP Plan retirees, the full amount of the subsidy will pass through to the SHIP Plan.**

c. **RETIREMENT PLAN**

Effective Date: January 1, 1989

Eligibility: First day of the month following six (6) months of service.

Employee Contributions: None

Company Contributions: Minimum funding requirements under ERISA.

Vesting: 100% vested after five (5) years of service.

Investments: Employee's account credited with long-term treasury bond rate with minimum 4% interest guaranteed.

Benefit Payments: Employee has option of single life annuity, joint and 50% survivor annuity, joint and 100% survivor annuity pay-out methods.

Other Benefits: Annuity based on value of account payable to spouse on employee's death; lump sum to children or other beneficiary if no spouse. **Effective 10/1/01, the plan will provide that any retirement benefit payable under the retirement plan will be unreduced for retirement at**

age 62 or later and will be reduced from age 62 for retirement earlier than age 62 in accordance with the schedule in the retirement plan.

Benefits: The pension benefit will be determined as shown below:

Basic Benefit Rate Per Year of Credited Service for those employees retiring in the Months Commencing:

8/7/05 to 9/30/05 $48.50
10/1/05 to 9/30/06 $49.55
10/1/06 to 9/30/07 $50.60
10/1/07 and after $51.65

(The above benefits may be subject to reductions under the retirement plan.)

For purposes of calculating this benefit allow credit for partial years of service in the final year worked at the rate of 1/12 of one year per month worked. Effective 10/1/01, this benefit may be paid out as a lump sum at the option of the Team Member.

LUMP SUM PAYMENTS: (see side letter Dated December 9, 2005) A lump sum payment will be made to existing retirees (as of 10/1/05) who terminated from the Company at age 55 or later and who are receiving an annuity distribution from the Plan per the table below:

| DATE | RETIREE | SURVIVING SPOUSE |
| --- | --- | --- |
| February 2006 | $625 | $400 |
| February 2007 | $625 | $400 |

Appeals Procedure for the Retirement (Pension) Plan: The last level of the appeals procedure under the Hourly Defined Benefit Plan will be a joint committee with equal representation from the United Auto Workers and the Company with provisions for an impartial chairman to resolve disputes if necessary.

| | | |
|---|---|---|
| February 2008 | $625 | $400 |
| February 2009 | $625 | $400 |

## EARLY RETIREMENT WINDOW 2006:

The Company will modify the provisions of the retirement plan to provide for a one-time-only window for applications from employees for early-unreduced retirement benefits.

The retirement plan will be modified to provide that any employee who attains age 57 on or before February 28, 2006 who also has ten (10) or more years of vested service may submit an application, on or after February 1, 2006 and on or before February 28, 2006, for early unreduced normal retirement benefits. The employee's actual date of retirement must be no earlier than **May 1, 2006 and no later than July 28, 2006.**

**Upon retirement pursuant to the early retirement window, the retiree will be eligible to participate in the SHIP Plan in accordance with its terms.** The Company will support, through its trustees, modifications to the SHIP Plan to conform to these commitments.

## e. SAVINGS PLAN

Eligibility: Eligibility is the first day of the month following three (3) months of service.

Employee Contribution: Up to limits as specified in IRS 401(k) regulations of qualified earnings (base, overtime, and premiums, PIPS and uniformly accrued lump sum payments).

Company Contribution: Effective 10/1/01, the Savings Plan will provide that the Company will make a contribution based on the schedule below applied to up to 6% of the first forty (40) hours worked each week at the straight time base pay rate plus any Lump Sum Payment. Employee contributions over 6% are not eligible for company contributions.

FOR EACH ELIGIBLE $1 CONTRIBUTED, THE COMPANY WILL CONTRIBUTE:

| MONTHS OF PARTICIPATION | COMPANY MATCH |
|---|---|
| ◆ Thru 12 months | $.20 |
| ◆ 12 thru 24 months | $.30 |
| ◆ 25 thru 60 months | $.40 |
| ◆ 61 months & over | $.60 |

Vesting: Employee contributions are always fully vested. Company contributions are 100% vested at five (5) years.

Full vesting also occurs upon approved retirement from active service, total disability, death, or plan termination.

Investment Options: Employee directs investment of all monies in 10% increments into the available range of investment options.

Changes: Team members can make weekly changes to their 401(k) contribution level.

Withdrawal: Only hardship withdrawals are permitted under 401(k) Plan.

TIMING FOR CHANGES TO PARTICIPANT ELECTIONS:

| Contribution Rate | Weekly |
| Investment Changes | Daily |
| Reallocations | Daily |

Rollovers: Rollovers from other qualified 401(k) plans are permitted.

Loans: Loans are available from the account within IRS 401(k) borrowing guidelines.

e. RESERVE FUND PLAN

Eligibility: First day of the month following twelve (12) months of service.

Employee Contribution: None

Company Contribution: $0.10 per hour up to 40 hours per week. Employee receives retroactive contribution for hours worked after completion of evaluation period.

Vesting: Always fully vested.

124

Payment of Benefits: If necessary, plan pays employee the greater of $25 per week or an amount up to 70% of pay when added to any other unemployment aid.

Full payment also made upon separation from service. No benefits paid as a result of work stoppage or disciplinary action.

e. LEGAL PLAN:

Eligibility: First day of the month following twelve (12) months of service.

Funding: The plan will be funded by the Company at the rate of $.07/hour worked. Additionally in the event additional funding is required to pay benefits, the Company will fund up to $.09/hour worked. The plan will be managed by a Company Plan Administrator and Joint Committee (3 Company, 3 UAW; and a third party appointed by the Committee to resolve disputes)

f. SUPPLEMENTAL WORKERS' COMPENSATION PLAN:

Eligibility: Any team member suffering an industrial injury who would otherwise be eligible for TDI benefits.

Benefit Level: The Company will supplement the Statutory Workers' Compensation Benefit Level up to the Temporary Disability Insurance Level for the injured team member.

Benefit Time Limits: Benefits commence after the applicable statutory waiting period.

Benefits cease at the end of the Workers' Compensation Disability Period, but in any event not to exceed 52 weeks.

125

A team member will start a new 52 week entitlement to Workers Compensation Supplement if such team member is placed back on disability for the same injury after having returned to work continuously for six (6) full weeks.

# APPENDIX "C"
## STANDARDIZED WORK

1. **Planning (Designing)**

   A. Elements to be considered:

   * Past data (actual required time on each operation).
   * Required time for each factor of operation, not factor of movement. For instance, a clamping bolt needs two (2) seconds.
   * Target time established by Production Control.
   * Conditions of equipment, tools, layout of parts and other technical information provided by engineering Staff.

   B. Activities:

   * Team Leaders and Group Leaders discuss and develop each suggested standardized work. **Further, team leaders will discuss suggestions with their teams.**
   * The Manager approves the suggested standardized work.
   * Engineering Staff advises Group Leader and Team of technical matters and provides them with necessary engineering information.

2. **Try-out and Check**

   A. Time study on pilot vehicle:

   * Group Leader and Team Leader evaluate each suggested standardized work by having a Team Leader who does not always work on the actual operation, try it out. This evaluation should accumulate actual time data on each factor of an operation.

   B. Amendment and KAIZEN:

   * Standardized Work is changed through a time data evaluation by the Team Leader and Group Leader. KAIZEN is performed to reduce required time for accomplishment of the target.

1 "all employees" as used in the Appendix "C" means bargaining unit and non-bargaining unit employees.

3. Pilot Assembling and Training
   * To find out the difficulty and easiness on each standardized work through repeated training, employees will assemble and disassemble pilot vehicle **during a pilot build and provide input.**
   * All employees do KAIZEN to achieve the target.

4. Commencement of Mass Production
   A. If employees find difficulties in doing actual work at a specified work pace, they are expected to pull the cord or push the button to sound the alarm and ultimately stop the line, alerting a Team/Group Leader of the problem.
   B. All employees do KAIZEN (repeated as required) to attempt to achieve target. If necessary, training will be provided to employees and work assignment will be adjusted.
   C. As a result of KAIZEN by all employees or reassignment of work, standardized work will be approved by the Manager and changed.

5. Repeating Above Process
   * New problems are resolved through the same process mentioned in #4 above.

APPENDIX "D"

TEAM LEADER SELECTION PROCEDURE

OBJECTIVES

In accordance with Article XVI, the parties seek to attract, retain and motivate individuals who contribute to the mutual growth and success of the total team.

The Objectives of the parties are:

• Identify the most capable individuals for Team Leader positions within the Company.

• Establish a fair, objective and equitable selection procedure utilizing the principles of experience, ability and capacity to perform the Team Leader position.

• Provide growth opportunities for Team Members and to assist them in developing to their full potential.

• Establish a Joint Selection Committee composed of equal numbers of Company and Union representatives as agreed by the Chairman of the Bargaining Committee and Managers of Team Member Relations and Human Resources.

• Identify Team Leader opportunities both current and anticipated and the proper communication of the information to interested and qualified employees.

• Identify Team Members' interest and qualifications for promotional job opportunities.

• Coordination of the above and selection of the most capable individual(s) for the position(s) by the Joint Committee.

## PROCEDURE

Team Leader vacancies will be filled on an as needed basis from among those Employees who have expressed interest in the position in the Group where the opening exists. Once selected, Team Leaders will be placed in the group on a shift in accordance with his/her seniority.

## POSTING

Team Leader positions become vacant by promotion, transfer, termination, etc. of incumbent Team Leaders. Before the vacancy can be declared an "opening", the Company shall do the following:

(i) Assess overall manpower requirements within the organization; and

(ii) Explore feasibility of kaizen (e.g., balancing, modification, reassignment of existing Team Leaders within the group, etc.)

When the above steps are completed, the Company will determine whether the vacant position should be filled. If so, the vacancy will be declared to be an "opening" and will be posted within the group where the vacancy occurred. Once an "opening" has been posted, the "opening" will not be cancelled unless mutually agreed upon by the Company and the Union.

Notice of Team Leader openings will be posted on the Company's Bulletin Boards and in the appropriate Team Room for a period of at least ten (10) working days. The Job Posting Notice shall include the following information:

- Number of Openings
- Group
- Date and Time of Closing
- Necessary skills required for the position
- Place to file application

Employees with three (3) attendance rule violations within one year prior to the posting are not eligible to apply.

Employees not filing an application within the specific number of days after the notice is posted shall forfeit any claim to the position.

## SCOPE

Consideration shall be given first to Employees assigned to the "Group" on either shift who have completed the initial Ninety (90) Day Evaluation Period, who receive an acceptable rating on the "Leadership Skills evaluation" and who score 50 or more points in the evaluation procedure.

If the position is not filled from within the "Group", then Employees from within the "Section" will be given an opportunity to file an application for the position based on their overall general ability and competency to do the job, an acceptable rating on the "Leadership Skills evaluation" and a score 50 or more points in the evaluation procedure.

## SELECTION

Applicants for promotion to posted Team Leader vacancies shall be reviewed by the Joint Committee for approval or disapproval. Selection shall be based on the overall Team Leader Qualifications utilizing a Point Factor System a minimum of 50 points are required to be considered.

Where two or more leading candidates are considered equally capable, the employee with the greater seniority will be selected.

# EVALUATION PROCEDURE / CRITERIA FOR TEAM LEADER SELECTION

**I.   HANDS-ON JOB EVALUATION:           25 POINTS**

Hands-on Job Evaluation is used for evaluating the ability/ capacity to perform the jobs of the team.

- All eligible "on-line" applicants are required to demonstrate their capacity to perform their primary and secondary jobs in their teams.

- **Employees must perform their hands-on evaluation on the highest skilled job in the team (as designated by the group leader) which has the team leader opening.** The selected job(s) must be in the group that has the Team Leader opening.

- Division II and "off-line" Employees will be administered a test developed by a joint Union/Management Team from the group with the opening with the approval of the Joint Selection Committee.

Evaluation points are as follows:

- The job can be completed in accordance with the Standardized Work Procedure.

- The job can be completed in accordance with the safety Rules and Regulations.

- The result of work is evaluated in terms of:
  - – Quality
  - – Productivity
  - – Stability/secureness

**A.   Job Performance   16 Points**

Points
9   (primary)   or   7 (secondary)   Excellent
5   (primary)   or   4 (secondary)   Good
0   (primary)   or   0 (secondary)   Poor

132

---

**EVALUATION CRITERIA IS IN ACCORDANCE WITH STANDARDIZED WORK**

**B.   Safety Rules / Regulations   3 Points**

Points
3   Both Primary and Secondary jobs completed in accordance with Safety Rules and Regulations

2   Primary job only completed in accordance with Safety Rules and Regulations.

1   Secondary job only completed in accordance with Safety Rules and Regulations.

0   Neither Primary nor Secondary job completed in accordance with Safety Rules and Regulations

**C.   Quality of the Job   3 Points**

Points
3   No quality concerns with Primary and Secondary Jobs

2   No quality concerns with Primary Job only.

1   No quality concerns with Secondary Job only.

0   Quality concerns with both Primary and Secondary Jobs.

**D.   Productivity / Security of the Job   3 Points**

Points
3   Consistency of performance demonstrated on both Primary and Secondary Jobs.

2   Consistency of performance demonstrated on Primary Job only.

1   Consistency of performance demonstrated on Secondary Job only.

0   Consistency of performance demonstrated on neither Primary nor Secondary Jobs.

133

## II. RECORD EVALUATION 46 Points

### (1) Job Experience 8 Points

**(A) NUMMI & Auto Industry Experience (Max. 4 Points)**

| Points | NUMMI Experience | Other Auto or Related Industry Experience |
|---|---|---|
| 1 | 1 - 2 years | 1 - 5 years |
| 2 | 2 - 3 years | 5 - 10 years |
| 3 | 3 - 4 years | 10 - 15 years |
| 4 | 4 + Years | 15 + years |

In determining job experience, both NUMMI and other Auto related experience will be combined, not to exceed a total of four (4) points.

**B. Experience Within the Same Section (Max. 4 points)**

| Points | Group Experience | Section Experience |
|---|---|---|
| 1 | 1 - 2 years | 2 - 3 years |
| 2 | 2 - 3 years | 3 - 4 years |
| 3 | 3 - 4 years | 4 - 5 years |
| 4 | 4 + years | 5 + years |

Only one (1) box can be used in determining points.

### (2) Attitude and Behavior 33 Points

**(A) Attendance 23 points**

Attendance Record Evaluation for 12-month period (First year) preceding the date the opening was posted.

| Points | Attendance record |
|---|---|
| 20 | Level 3 Attendance |
| 11 | Level 2 Attendance |
| 1 | Level 1 Attendance |

Additional Points for previous years. Consecutive (periods of) Level 3 Attendance.

Points
2   2 Consecutive Years Level 3 Attendance
3   3 Consecutive Years Level 3 Attendance

**B. Behavior 10 points**

NUMMI Disciplinary Record can be used for the purpose of this Behavior Evaluation for 12 month period preceding the date of posting.

Points Disciplinary Record
+10   No Disciplinary Record
-10   Any Written Corrective Notice

### (3) Suggestions 5 points

The Suggestion Record for the last one-year period preceding the date of posting can be used for this evaluation.

| Points | # of Suggestions Adopted |
|---|---|
| 5 | 6 or more |
| 3 | 3 - 5 |
| 1 | 1 - 2 |

## III. INTERVIEW / DISCUSSION    10 Points

A joint Union / Management Team will conduct interviews addressing the following topics:

**(1) Job Assignment    2.5 points**

A case study for Job Assignment Problem Situations is given to applicants:

They are asked what you should do and settle if you were Team Leader of the Team.

At least 2 or 3 scenarios should be prepared with the cooperation of Production Managers / Assistant Managers or Group Leaders and Joint Selection Committee.

Applicants are asked "What is the Role of Team Leader in terms of Job Assignment?"

This evaluation can be done in an individual interview or group discussion evaluation.

**(2) People Handling    2.5 points**

Applicants are asked to discuss the following agendas:

What should Team Leader do to motivate Team Members?
To foster Mutual Trust and Respect?
To have strong leadership?
To have better communication?

The case for the above people-handling are given and applicants are asked to discuss what we have to do to settle the problems.

**(3) Job Knowledge    2.5 points**

Applicants are asked key concept and points of the following in an interview:

What is the most important / necessary knowledge to perform the expected assigned line work?
NUMMI Production System
Standardized Work
Kaizen Concept
Safety Rules and Regulations
Problem Solving

Necessary questions and model answers are prepared for Interviewers.

**(4) Attitude and Behavior    2.5 points**

Applicants are asked these questions in an interview:

If you are promoted to Team Leader, what would you like to do in your daily Team Leader's job?

If you are promoted to Team Leader, what do you think you have to do first to improve your Team?

If you are promoted to Team Leader, what things do you think you should pay the most attention to?

## IV. TRAINING RECORD    17 points

**(1) People Handling Courses:**
Motivation
Mutual Trust & Respect
Leadership
How to Instruct
Communication

(2) Job Experience/Knowledge Courses:

NUMMI Production System     Kaizen Concept
Standardized Work     Problem Solving
Safety Rules

Points will be awarded based on Team Members' demonstrated knowledge in each training area.

## V. WRITTEN TESTS

This written test covers the following areas in terms of job knowledge:
Written Tests will include the following Areas of Job Knowledge: NUMMI Production System
Standardized Work
Safety Rules
Kaizen Concept
Problem Solving

**5 points**

## EVALUATION PERIOD

Newly promoted Team Leaders will have a four-month evaluation period. During this period the Team Leader will be expected to demonstrate his/her ability to perform all aspects of the Team Leader job, including the ability to perform all the jobs in the team.

If a Team Leader is found to be unqualified (as evaluated by the Joint Selection Committee) during this evaluation period, he/she will be returned to his/her former group as a team member.

Newly appointed Team Leaders will be given a reasonable learning period to adjust to their new duties. This period will normally not exceed ninety (90) calendar days. During the learning period, the newly appointed Team Leader will be placed in the Group on a shift in accordance with his/her seniority and not subject to the shift assignment provision contained in the agreement.

## TEAM LEADER BREAKDOWNS

If a Team Leader voluntarily breaks down to Employee, he/she must wait one year before becoming eligible to apply for a new Team Leader opening.

This provision does not apply when the breakdown occurs as a result of a voluntary transfer by the employee to another Group or Section.

## VOLUNTARY PARTICIPATION

Participation in the Team Leader Selection Program is entirely voluntary. Time spent in Pre-Training, Testing, and Joint Interview will be on the candidate's own time.

## APPROVAL AND MODIFICATION OF SELECTION STANDARDS

The Company and Union hereby jointly agree to implement the Team Leader Selection Procedure as outlined.

The Team Leader Selection Procedure may be amended or new provisions added at any time upon mutual agreement of the Company and the Union.

## ADJUSTMENT OF DIFFERENCES

Should any dispute or problem relative to Team Leader Selection arise, or the interpretation or implementation of the Team Leader Selection Procedure, it shall be referred to the Joint Committee for resolution. Problems not resolved by the Committee may become the subject of the Complaint Resolution Procedure under Article X of the Labor Agreement.

Agreed to:     August 6, 2005

For the Company

For the Union

New United Motor Manufacturing, Inc.

International Union, United Automobile, Aerospace and Agricultural Workers of America, UAW, and its Local Union 2244

Exhibit "1"



**SPECIAL OFFICIAL APPLICATION FOR MEMBERSHIP**
**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW)**
DETROIT, MICHIGAN 48214

Name _____

Address _____ Dept. _____ City _____ State _____ Zip _____

Tel. # _____ Local # _____ Unit # _____ Soc. Sec. # _____

I hereby designate, select and empower the said Union exclusively to appear and act for me and in my behalf before any board, court, committee or other instrumentality...

Applicant's Signature _____
Witness _____
Date of Signature _____

**AUTHORIZATION FOR CHECK-OFF OF DUES**

TO THE _____ COMPANY

I hereby assign to Local Union No. _____ International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)...

Type (or) print name of Employee here _____
Signature of Employee _____
Address of Employee _____
City _____ State _____ Zip _____
Date of Delivery to Employer _____
Employee Clock Number _____ Soc. Sec. # _____

CONTRIBUTIONS OR GIFTS TO THE UAW ARE NOT DEDUCTIBLE AS CHARITABLE CONTRIBUTIONS FOR FEDERAL INCOME TAX PURPOSES.

---

140

---

# MEMORANDUM FOR PAYROLL DEDUCTION OF UAW V-CAP

1.1 During the life of the current Agreement, the Company agrees to deduct from the pay of each employee voluntary contributions to UAW V-CAP, provided that each such employee executes or has executed the "Authorization for Assignment and Checkoff of Contributions to UAW V-CAP" form (attached hereto); provided further however, that the Company will continue to deduct the voluntary contributions to UAW V-CAP from the pay of each employee for whom it has on file an unrevoked "Authorization for Assignment and Checkoff of Contributions to UAW V-CAP" form.

1.2 Deductions shall be made only in accordance with the provisions of and in the amounts designated in said "Authorization for Assignment and Checkoff of Contributions to UAW V-CAP" form, together with the provisions of this Memorandum.

1.3 A properly executed copy of the "Authorization for Assignment and Checkoff of Contributions to UAW V-CAP" form for each employee for whom voluntary contributions to UAW V-CAP are to be deducted hereunder, shall be delivered to the Company before any such deductions are made, except as to employees whose authorizations have heretofore been delivered. Deductions shall be made thereafter, only under the applicable "Authorization for Assignment and Checkoff of Contributions to UAW V-CAP" forms which have been properly executed and are in effect.

1.4 Deductions shall be made, pursuant to the forms received by the Company, from the employees' first Union dues period in the first month following receipt of the checkoff authorization card and shall continue until the checkoff authorization is revoked in writing.

1.5 The Company agrees to remit said deductions promptly to UAW V-CAP, care of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW. The Company further agrees to furnish UAW V-CAP with the names and addresses of those employees for whom

---

141

deductions have been made. The Company further agrees to furnish UAW V-CAP with a monthly and year-to-date report of each employee's deductions. **The monthly UAW V-Cap Report provided by the Company will be numbered by employee.** This information shall be furnished along with each remittance.

1.6 The Union shall indemnify and hold the Company harmless against all claims or liabilities that may arise out of actions taken by the Company in complying with any of the provisions of this Memorandum.

1.7 The parties hereby agree that the amount of $600.00 represents a reasonable estimate of the Company's costs of administering the voluntary political contributions checkoff program provided for in this Memorandum over the life of the current Agreement. The parties hereby additionally agree that the Union's obligation to bear the administrative costs of the aforementioned voluntary political checkoff program has been met by the incorporation of the estimated figure stated above into the total economic settlement package negotiated in the current Agreement.

1.8 The Company shall continue to deduct voluntary contributions and furnish the UAW V-CAP with the names and deduction amounts for each team member on a monthly basis as provided in this Memorandum.

1.9 **The Company shall accept from UAW V-CAP a file, to be provided quarterly, which contains a list of employees and uncollected V-CAP amounts from the prior quarter. The Company shall attempt to take the uncollected deductions from the subsequent payroll and include this with the V-CAP reporting.**

This Memorandum will become effective August 6, 2005.

Robert McCullough     Earlie Mays
James W. Potts III     Victor Quesada
Robert Ponsonby     George Nano

---

# MEMORANDUM
## AUTHORIZATION FOR ASSIGNMENT AND CHECKOFF OF
## CONTRIBUTIONS TO UAW V-CAP

To: NEW UNITED MOTOR MANUFACTURING, INC.

I hereby assign to UAW V-CAP, from any wages earned or to be earned by me as your employee, the sum of (check one)

$1.00     $3.00     $5.00     Other

each and every month. I hereby authorize and direct you to deduct such amounts from my pay and to remit same to UAW V-CAP at such times and in such manner as may be agreed upon between you and the Union at any time while this authorization is in effect.

This authorization is voluntarily made. I understand that the signing of this authorization and the making of payments to UAW V-CAP are not conditions of membership in the Union or of employment with the Company, that I have the right to refuse to sign this authorization and contribute to UAW V-CAP without reprisal, that UAW V-CAP will use the money it receives to make political contributions and expenditures in connection federal, state and local elections, that all UAW members may be eligible for V-CAP raffle drawings, regardless of whether they make a contribution to UAW V-CAP, and that monies contributed to UAW V-CAP constitute a voluntary contribution to a joint fund-raising effort by the UAW and the AFL-CIO.

I also understand that the guidelines for contributions to UAW V-CAP set forth above are merely suggestions, that I can contribute more or less than the guidelines suggest, and that the UAW will not favor or disadvantage me based on the amount of my contribution or my decision not to contribute.

Contributions or gifts to UAW V-CAP are not deductible as charitable contributions for federal tax purposes.

| Name (Print) | | | SSN# |
|---|---|---|---|
| Address | | | |
| City | State | | Zip |
| Local | Plant | | Dept. |
| Dated | | Signature | |

UAW V-CAP is an independent political committee created by the UAW. This committee does not ask for or accept authorization from any candidate and no candidate is responsible for its activities.

144

August 6, 2005

Mr. Nate Gooden
UAW Vice President
8000 East Jefferson Ave.
Detroit, MI 48214

Dear Mr. Gooden:

The following sets forth certain matters agreed to by side letters between the Company and the UAW:

A. MATTERS AGREED TO IN 2005 NEGOTIATIONS

During the current negotiations, the parties had detailed and extensive discussions on a number of subjects. During these discussions, the Union expressed concerns in certain areas.

In responding to these concerns, and to ensure more equitable and fair policies, the Company clarified its current policies and practices in those areas. Those clarifications, designed to eliminate any potential for arbitrary actions or misunderstandings, are listed below:

1. JOINT ACTIVITIES/OVERTIME PENALTY FUND
   Effective August 6, 2005, the company and UAW agree to discontinue this fund. Accordingly, any balances in the Fund shall remain with the Company and the Union will have no claim on such funds.

B. MATTERS AGREED TO IN PRIOR NEGOTIATIONS

During the 1988, 1991, 1994, 1998, and 2001 negotiations, the parties agreed to certain items as set forth in the Company's Letters of Understanding to Bruce Lee dated August 1, 1994. The provisions of that letters, re-stated below, will be

145

incorporated into the 2005 Collective Bargaining Agreement, as follows:

1. **Family School Partnership Act**

Employees who are the parent or guardian having custody of a child who is enrolled in kindergarten or grades 1 to 12 are eligible for leave up to 8 hours per month, but not to exceed 40 hours each calendar year, to participate in a school activity. Employees who are the parent or guardian having custody of a child suspended from public school are eligible for leave to appear in the school of the child if the employee has been requested to do so by the school. Employees seeking a family school leave must provide the Company with as much advance notice as possible of the need for the leave. An employee must provide documentation from the school as proof that the employee visited the school on a specific date and at a specific time.

Employees must use existing vacation/PAA when taking a family school leave. If the employee does not have vacation/PAA, then the leave will be unpaid.

2. **FMLA/CFRA**

During these negotiations, the parties discussed the Family and Medical Leave Act (FMLA) of 1993 and the California Family Rights Act (CFRA). The Company assured the Union that it will comply with the provisions of the FMLA/CFRA.

In some instances, FMLA/CFRA leaves will be concurrent with leaves of absence covered by Article XXIII-Leaves of Absence, of the Collective Bargaining Agreement. In those cases where the employee is eligible for leave under the Collective Bargaining Agreement and the leave also qualifies under the FMLA/CFRA, the employee and Company will comply with the requirements of the FMLA/CFRA as well as the provisions of the Collective Bargaining Agreement regarding covered leaves of absence.

146

Pursuant to the Company's present plan for compliance with the FMLA/CFRA:

- An employee will continue to accumulate seniority while on FMLA/CFRA leave;

- Employees will be permitted but not required to use accrued vacation/PAA, for **non-intermittent** FMLA/CFRA except where prohibited by law (e.g. including, but not limited to, the laws and regulations pertaining to Workers' Compensation and state disability benefits). **Employees who take intermittent FMLA/CFRA on a Monday or a Friday will be required to use any accrued vacation/PAA for that day.**

- Where the employee has the option to use accrued vacation/PAA, the vacation/PAA will be applied at the beginning of the leave and integrated with any other benefits the employee is entitled to receive;

- Provide that employees who are married to each other will each be entitled to a maximum of 12 weeks of qualifying leave under the FMLA/CFRA;

- Provide that, when a third opinion is necessary under the medical certification and dispute resolution sections of the FMLA, the neutral provider will be selected jointly by the Company and the Union from a list, provided by the appropriate local or state professional medical association, of board-certified specialists in the field of medicine in which the point of controversy exists;

- Continue Company-paid group life, accidental death and dismemberment, medical and disability insurance during all FMLA/CFRA Leaves;

- All qualifying absence time will be designated and applied against an eligible employee's FMLA/CFRA entitlement as permitted by the FMLA/CFRA.

147

3. Balancing of Overtime—Clarification of Article XX, Section 9 of the Agreement.

Group Leaders will be responsible for filling out the overtime chart and keeping it up to date. Balancing charts will be updated on a weekly basis as far as practical.

Balancing of Overtime. Overtime work requiring specific skills, knowledge or responsibility will be balanced only among those employees who are qualified to perform the work. Team Leaders' work will be balanced only among Team Leaders in the group. Team Members' work will be balanced only among those Team Members who can perform the work in the group.

Amount Charged to the Overtime Chart. Overtime work performed Monday through Friday will be recorded as time and a half on the balancing chart for overtime. Overtime work performed on a Saturday is recorded as time and a half on the balancing chart for overtime. Overtime work performed on a Sunday is recorded as double time on the balancing chart for overtime. Overtime work performed on a NUMMI recognized holiday is recorded as double time.

- Employees will repay the cost of health care coverage provided to them during the leave if they fail to return from FMLA/CFRA Leave, to the extent permitted by law.

The Company may make changes in its compliance plans to reflect subsequent court decisions or changes in the applicable laws or regulations.

Problems related to the implementation of this letter may be discussed by representatives of the UAW and the Company's Team Member Relations Staff.

Distinguishing Hours Worked and Hours Refused. When a Team Member works available overtime hours, actual hours worked will be recorded as W for worked on the overtime equalization chart. When a Team Member refuses available overtime hours, he/she will be coded as R for refused on the overtime equalization chart. When a Team Member is on vacation, absent, excused or on an approved Leave of Absence, those hours that would have been available to the Team Member will be charged in N for not available. (W, R and N are used as examples. The overtime equalization chart will be computerized. Any method to distinguish hours worked from hours refused will be acceptable.)

If a Team Member augments from one group to another group or one section to another section and works overtime hours, the overtime hours worked will be coded as W for worked. If a Team Member is transferred to another group or section, he/she will be given the average hours of the group to which he/she is transferred.

Other Important Information. When overtime work is available, to determine which Team Members are asked first, the Group Leader refers to the overtime chart. Once the number of total hours offered has been determined, the Group Leader then asks the Team Members who are qualified with the lowest amount of hours offered first. If all hours are equal, the Group Leader then asks the Team Members who are qualified with the lowest amount of actual hours worked.

When all Team Members who have equal hours have been asked to work overtime and there are no volunteers and a Team Member must be forced to work overtime, the Team Member(s) who are qualified to perform the work and have the highest number of refused hours will be required to perform the overtime work.

4. V-Cap Payroll Deductions. The Company will establish a payroll deduction for voluntary deductions to the UAW/V-CAP on terms and conditions to be agreed upon by the Company and Union.

5. Union Officials. The Local Union President, the Chairperson of the Bargaining Committee, the District Committeepersons and the General Representatives will be paid forty (40) hours per week at the fully grown-in rate in effect for Division II team member plus COLA, and shift premium, if applicable, for their representational duties. Additionally, when at least three (3) groups of team members in the Union Representative's district are scheduled for overtime, the Union Representative for that district will be required to work and shall be paid for all overtime actually worked by the Union Representative, up to the scheduled production overtime. When the Company schedules production overtime, General Representatives shall be required to work and shall be paid for all such scheduled production overtime actually worked.

It is understood that at the conclusion of serving his/her term(s) of office the President of the Local Union, Chairperson of the Bargaining Committee, the District Committeepersons and the General Representatives will be returned to their previous job(s) in the bargaining unit, including Team Leader status if applicable. It is also understood, that on assuming any of the offices/positions noted above, no employee shall suffer a loss in his/her hourly rate.

6. Recognition. In the event the Company establishes or acquires any further plants or operations, the Union will be recognized as the exclusive bargaining representative pursuant to proof of a majority status among a representative complement of workers in any appropriate units. The proof of majority status is to be established, at the Union's option, via an NLRB election or an authorization card check. The Union will be recognized when a neutral party (selected either by the parties or pursuant to the rules of the American Arbitration Association) certifies that a majority of the workers have signed Union authorization cards.

150

7. Problem Resolution Procedure. The parties acknowledged the desirability of ensuring prompt, fair and final resolution of employee problems. The parties also recognized that the maintenance of stable, effective and dependable problem solving procedure is necessary to implement the foregoing principle to which they both subscribe. Accordingly, the parties view any attempt to reinstate a problem properly disposed of as contrary to the purpose for which the problem solving procedure was established and violative of the fundamental principles of collective bargaining.

However, in those instances where the International Union, UAW, by either its Executive Board, Public Review Board, or Constitutional Convention Appeals Committee has reviewed the disposition of a problem and found that such disposition was improperly effected by the Union or a Union Representative involved, the International Union may inform the Company's Team Member Relations Manager in writing that such problem is reinstated in the Problem Solving Procedure at the step at which the original disposition of the problem occurred.

It is agreed, however, that the Company will not be liable for any claims for damages, including back pay claims, arising out of the problem that either are already barred under the provisions of the agreement at the time of the reinstatement of the problem or that relate to the period between the time of the original disposition and the time of the reinstatement as provided herein. It is further agreed that the reinstatement of any such problem shall be conditioned upon the prior agreement of the Union and the employee or employees involved that none of them will thereafter pursue such claims for damages against the Company in the Problem Solving Procedure, or in any court or before any Federal, State, or Municipal agency. Notwithstanding the foregoing, a decision of the arbitrator on any problem shall continue to be final and binding on the Union and its members, the employee or employees involved and the Company and such problems shall not be subject to reinstatement.

151

This provision is not to be construed as modifying in any way either the rights or obligations of the parties under the terms of the Agreement, except as specifically limited herein, and does not affect sections thereof that cancel financial liability or limit the payment or retro-activity of any claim, including claims for back wages, or that provide for the final and binding nature of any decisions by the Arbitrator or other problem resolutions. It is understood that this provision and parties obligations to reinstate problems as provided herein can be terminated by either party upon thirty (30) days notice in writing to the other.

This understanding will not affect any case settled prior to June 30, 1985.

8. Educational Leave. During the 1988 negotiations, the Company and the Union agreed to, and hereby reaffirm, their implementation of an Educational Leave program. The text of that Agreement is as follows:

**Article XXIII, Section 11**
"Employees with one or more years of seniority may make application for a Leave of Absence for further education."

"One continuous Leave of Absence for education will be granted without pay to eligible employees for a period not to exceed twelve (12) months, subject to Company approval."

In addition, if the parties institute joint education and training projects that would require off-site instruction of representatives of the Union and Management, upon its approval, the Company would pay required lost time and expenses of those employees involved.

9. Union Activity Leave. This will re-confirm our agreement concerning the benefits status of employees on a Union Activity Leave, within the meaning of Article XXIII, Section 10, as originally set forth in the Company's Letter of Understanding to you dated June 30, 1988. The provisions of

that letter, re-stated below, will be incorporated into the 1991-1994 Collective Bargaining Agreement, as follows:

While on a Union Activity Leave, an employee will receive all benefits described in Article XXIV, with the employee being given credit for working a full forty (40) hour week with no absenteeism. However, the Union will reimburse the Company for the cost of providing the Group Insurance and Health Care Insurance Program to the employee.

Any employee presently on a Union Activity Leave will be given credit, within the meaning of this letter, back to his/her original date of placement on such leave of absence.

10. COLA Fold-in. This letter will confirm our understanding that the wages of any employee in progression at the time COLA is folded into base rates will be adjusted in such a way as to ensure that his/her base wage (base rate plus COLA) remains unaffected by such fold-in during the remainder of his/her progression.

11. Project Team Qualifications and Selection Criteria. The Company from time to time establishes Project Teams for the purpose of working on and solving difficult production problems. When such teams are established, any necessary bargaining unit jobs on the team will generally be a temporary addition to normal headcount.

When the Company determines that a Project Team is necessary, it will establish the selection procedure. The Union will be provided the opportunity to participate in advance discussions and provide input to identify qualifications and the selection criteria (such as which Team Members to canvas). All project team applications will include a beginning and an ending date. The ending date may be extended up to forty-five (45) days by the Company. Further extensions may be granted with the mutual consent of the Union.

**In general, upon leaving the project, Team members will return to the group they were assigned to prior to the project.**

Once the qualifications and selection criteria are determined, they will be reviewed by the Team Member Relations Manager. When the qualifications and selection procedure have received the approval of the Team Member Relations Manager, the qualifications will be communicated to affected Team Members.

The Company will select the employee or employees it believes have the capability and knowledge to perform the job. Where the company believes two or more employees have equal capability and knowledge, and production needs permit the selection of any one of them, the employee with greatest seniority will be selected to staff the Project Team.

12. Bargaining Unit Work. The Company desires to reaffirm its commitment to the concept of the principal function of a Group Leader, which is "to direct the activities of workers in a particular area", as set forth in Article XV, Section 1.2 of the Contract, and that Group Leaders are not to perform bargaining unit work except as provided for under Article XV, Section 1.2, and as necessary to avoid interruptions of production because of absenteeism. Accordingly, the Company will remind Group Leaders and Plant Management of the provisions of Article XV, Section 1.2 and instruct them to comply with them.

13. Shift Premium. The parties have reached, and hereby confirm, the following agreement concerning the 10% premium described in Article XVII, Section 3.1(c) of the Agreement. The 10% premium will be waived for the time period between 5:30 a.m. and 6:00 a.m. This waiver will remain in effect so long as the Company is required to comply with government mandates on trip reduction during peak commute hours.

14. Problem Resolution Procedure. The parties hereby reaffirm their commitment to make their best efforts to expedite the handling of problems in accordance with the problem resolution procedures set forth in Article X, Section 4.2 of the Agreement.

Very truly yours,
Patricia S. Pineda, Vice President, Human Resources-NUMMI

154

---

August 6, 2005

Mr. Nate Gooden
UAW Vice President
8000 East Jefferson Ave.
Detroit, MI 48214

Subject: Health, Safety and Ergonomics

Dear Mr. Gooden:

Memorandum of Understanding Health & Safety Planning Review and Audit Process

During the current negotiations, considerable discussion was had relative to the importance of having a strong joint safety program. It was also agreed to that the safety program must adapt and improve during the life of this contract to ensure the safety of all NUMMI employees. To that end it was agreed that there will be an established process to jointly audit and review the safety program:

I. The annual safety plan will be contained in the contract as a yearly-renewed side letter. The duration of the side letter will be for one fiscal year, April 1 through March 31, and will be required to be renewed by the parties through the joint annual review process. Items in the audit will remain consistent to allow for benchmarking and demonstration of progress. New audit items will be developed or adopted as the need arises.

II. It is the goal of the joint annual review to address programs, policies and procedures that NUMMI and the UAW feel will prevent the incidence of industrial injuries, and promote the safety of the TMs. Ultimately the success of the plans developed will be determined by: elimination of serious accidents, reductions in severity of musculoskeletal disorders,

155

reduction of total incidence of injuries, reduction in lost time, and a reduction in Worker's Compensation costs.

Topics that may be considered each year include but are not limited to:

Ergonomics,
Current injury trends,
Company safety policies (SOPs),
Review of serious injuries from NUMMI and other production plants,
Impact and effectiveness of the previous year's plan,
Air and noise sampling plans,
New model preparations,
Ventilation,
Training,
T/M complaints and SCARF system effectiveness,
Changes in regulations and standards,

The Initial Safety Side letter will include the following items that were discussed at Negotiations. Implementation plans, timing and prioritization will be developed at an initial annual review and planning session to start in September of 2005. The planning session will result in an audit process covering the following items:

1. Chemical safety programs. Elements addressed will include air sampling plans, container labeling, and PPE.

2. TM exposure will be reduced below Cal / OSHA Permissible Exposure Limits.

3. Concerns related to Body Shop air quality will be given high priority. August 4, 2001 Joint Research Fund interim results will be reviewed as they become available.

   Particulate maps will guide PEL measurement plans. Representative Body Shop PEL measurements will include SO2, NO, O3, aldehyde scans, and expected metals.

156

Locations to be investigated with regard to design performance, air balance, system testing, particulate mapping and potential follow-up PEL measurements include areas such as: near pillar P-03 (front suspension repair), 6-U, P10-P16 (Zone 3 Car Underbody), M20 (Sideouter, Framing Body), Station KWP24C, area KXU22B (Rear Suspension), S-11.

Company will measure ventilation flow rates in welding hoods on an annual basis. Results will be tracked.

TORIT air handling systems will be tested including capacity, system balance, and filter efficiency by testing exhaust levels.

4. Paint shop solvent exposures and skin absorption will be reviewed, additive effects will be considered and appropriateness of PPE will be evaluated. Develop monitoring plan for Formaldehyde exposures in Paint areas. In addition, Paint shop solvent exposure will be given high priority at the first annual review meeting.

5. Fire evacuation procedures and responsibilities will be reviewed with all members of management. Review will take place concurrent with UAW contract review meetings. Procedures will be posted for team members by December 2005.

6. Preventive Maintenance work on safety-related devices, including overhead traveling cranes will be emphasized. Repair of deficient items will be noted on the check sheet upon completion. Issues related to crane inspections, sight lines and appropriate testing (such as magnaflux, thermographic, or die penetrant testing) will be given high priority at the first annual review meeting.

7. Design of new lift assists will conform to TIMMNA Ergonomic Guidelines wherever possible unless job safety analysis/Task based risk assessment indicates safety hazards. An audit of all existing lift devices will be conducted and every effort will be made to ensure that all

157

controls are within proper ergonomic reach of the operator.

8. Safety / UAW will be notified in advance of planning meetings when design of next generation of returnable totes is being considered. Review of totes may include tools, such as 3DSSP (U of Michigan) and Rapid Entire Body Assessment (REBA) and ErgoTEAM (Human Engineering 2004).

9. Job Safety Analysis and hazard review will be performed on 1B pallet transfer. Relevant lessons learned will be applied to other roller conveyance systems in Stamping.

10. Plastics will continue to study and trial assist devices that will not introduce a new hazard on EKS job.

11. Paint Shops will actively seek out and review best industry practices in solvent reduction and trial new ergonomic enhancements to equipment as they become available.

12. Car Assembly will ensure that lifting and static posture (Trim 5 bumper reinforcement install job) will meet NEBA standards by November 2005.

13. Company & UAW will jointly review the inventory and identify capacities for existing mobile equipment by January 2006. Load and tow capacities will be audited and problems reported back to Joint Safety Committee.

14. Vertical height stacking limits will be established by type of bin and location using industry standards/guidelines. SOP will be developed, subject to audit by Joint Safety Committee.

15. Within 60-90 days of new contract (before Nov. 6, 2005), all members of management will be trained on new safety-related contract requirements. Training materials will be reviewed by the NUMMI UAW Health and Safety Representatives 30 days prior to training.

16. The company and the union agree to develop a checklist to assess the ergonomic condition of new model in the pilot

phase. Special attention will be focused on ensuring ergonomic hazards are controlled by engineering or administrative controls prior to start of production.

17. Production jobs requiring the raising or lowering of hoods will be evaluated. The Company will work to implement countermeasures such as hood lifters and alternative production methods.

18. The Company and Union will jointly audit the green walkways and orange evacuation routes and be afforded the opportunity to work with facilities engineering to correct identified problems.

19. The Company will improve pedestrian walkways, remove blind corners, and eliminate the need to work in aisles in the returnable consolidation area and in intersections near J20 through J26 and H20 through H26.

20. Provide that T/Ms can use payroll deduction to purchase shoes: minimum payroll deduction will be $25.00.

21. The company recognizes the importance of complying with TMMNA guidelines on packaging weight. Efforts will be made to bring packaging weights within these guidelines. Exceptions to the guidelines will be documented and reviewed by the UAW Coordinator for Health, Safety & Ergonomics.

III. The Company and the Union agree that UAW Safety & Health General Representatives and the UAW Coordinator for Health, Safety and Ergonomics will assist the Company in the delivery and implementation, as well as the planning of safety, health and ergonomics projects and programs. Accordingly, the core responsibility of the UAW Safety and Health General Representatives should include the activities listed below:

a) Investigate complaints or questions about specific conditions, as brought by union representatives and members.

b) Conduct periodic inspections of conditions in the facility, document observations, attempt resolutions of hazards identified.

c) Investigate occupational injuries and illnesses, make recommendations for correction and participate in implementation of corrective action.

d) Promote and process Safety Concern Activity Report Form (SCARFs) for unresolved problems.

e) Participate in all OSHA inspections, including attending the opening conference, accompanying the inspector during the physical inspection of the workplace, and attending the closing conference.

f) Accompany and assist International Union health and safety representatives on workplace inspections and other plant entries.

g) Participate in health and safety inspections by OSHA, insurance loss control and boiler inspectors, City of Fremont Fire Department, Alameda County Department of Health officials, and licensed health and safety inspectors required or by health and safety consultants retained by the Corporation and will be afforded an opportunity to accompany such officials or consultants and provide any pertinent information to them.

h) Compile and become familiar with OSHA regulations, state- and local codes, consensus standards and management policies applicable to the facility. Management should be requested to supply such documentation.

160

i) Review the OSHA log at least monthly, evaluate the accuracy of reporting, analyze the data and create reports.

j) Collect and review industrial hygiene (air sampling) data.

k) Pursue skill development by attending technical training beyond jointly provided conferences, and seeking certification as appropriate.

Communication functions of UAW safety representatives can include:

a) Review the health and safety program with union leadership and management.

b) Assist the committee body, and shop chairperson in resolving health and safety issues and provide technical consultation.

c) Attend union meetings and report on health and safety.

d) Write articles regarding health and safety conditions in the facility, and regulatory developments, for local union newspaper.

e) Submit reports to national collective bargaining department as specified.

f) Training of section safety coordinators

g) Participation in the Joint Safety Committee

Specific program areas that may require union participation include:

a) Review and evaluate the facility's lockout program, including presence of written procedures for all equipment and tasks, training and retraining. Additionally, random lockout audits will be performed.

161

b) Review and approve all health and safety training course materials for hourly TMs prior to their use.

c) Administer Local Health and Safety training program.

d) Evaluate the local Noise Abatement Program to ensure that training and noise measurements are conducted according to standard. Additionally, actively assist in administering audiograms.

e) Review and evaluate the Hazard Communication Program, including maintenance of MSDSs, container labeling, and job-specific hazard instructions.

f) Participate in the local Hazardous Materials Review Committee.

g) Participate in the local Ergonomics program. Ensure that the sectional Ergonomics committees meet on schedule, and that timetables are met for job analysis and job correction where available.

h) Review New Equipment Notification and plant rearrangements and participate in new equipment buy-off.

i) Participate in the fall hazard control program, including hazard evaluation and provision of guardrails and other engineering controls where feasible, training and compliance.

j) Review the preventive maintenance program to ensure that appropriate health and safety items are included, and monitor the implementation of the program.

k) Perform job evaluation, hazard analysis and review of new and modified equipment.

162

IV. Information made available to the UAW General Representatives for Safety and the UAW Coordinator for Health, Safety and Ergonomics will be used only to further the program objectives. Further dissemination, beyond the Company and Union of information specifically designated as confidential by the Company, other than that required by law, will not be performed without prior authorization.

V. The Company and Union agree to evaluate jobs to determine the need for and type of personal protective equipment (PPE) that may be required, if any. Every reasonable effort will be made to mutually resolve disagreements that may arise, provided that all applicable laws are complied with.

VI. The Company agrees to evaluate the safety shoe allowance to $110.00 per calendar year.

Very truly yours,

Robert McCullough
Vice President
Human Resources & Legal
New United Motor Manufacturing, Inc.

163

August 6, 2005

Chairman, Bargaining Committee
UAW, Local 2244.
45201 Fremont Boulevard
Fremont, CA 94538

Dear Chairman:

The following sets forth certain matters agreed to by side letters between the Company and the Chairman of the Bargaining Committee, UAW Local 2244.

## A.    MATTERS AGREED TO IN 2005 NEGOTIATIONS

During the recently concluded negotiations, the parties had detailed and extensive discussions on a number of subjects. During these discussions, the Union expressed concerns in certain areas.

In responding to these concerns, and to ensure more equitable and fair policies, the Company clarified its current policies and practices in those areas. Those clarifications, designed to eliminate any potential for arbitrary actions, are listed below:

1. The Company agrees at its option to repair or replace the eight existing Bulletin Boards described in article XXVI.

2. Standardize Work: Both parties recognize that the prompt handling of standardize work concerns is a desirable goal. The parties agree to work together and address these concerns by utilizing Article XXVIII, Section 2. Additionally, the company agrees to emphasize the importance of standardize work during new hire and team leader training classes.

3. Although the Company will not take on the responsibility of delivering a subpoena to an employee in the workplace they will continue to notify the employee when a subpoena is received.

164

---

4. The Company will not knowingly allow abuse (including untimely notification) of overtime break or lunch break scheduling. Instances of alleged abuse shall be directed to the Manager of Team Member Relations by the Chairman of the Bargaining Committee.

## B.    MATTERS AGREED TO IN PRIOR NEGOTIATIONS

During the 1988, 1991, 1994, 1998, and 2001 negotiations, the parties had detailed and extensive discussions on a number of subjects. During these discussions, the Union expressed concerns in certain areas.

In responding to these concerns, and to ensure more equitable and fair policies, the Company clarified its current policies and practices in those areas. Those clarifications, designed to eliminate any potential for arbitrary actions were set forth in the Company's Letters of Understanding to the Chairman of the Bargaining Committee dated June 30, 1988, July 1, 1991, August 1, 1994, and August 4, 2001. The provisions of those letters, re-stated below, will be incorporated into the 2005-2009 Collective Bargaining Agreement, as follows:

1. No repayment of an overpayment made by the Company to the employee will be required if the employee is not provided written notice within forty-five (45) days of the receipt of the overpayment, except where the overpayment exceeds $1,000.00, in which case the Company retains the right to pursue any legal remedies to collect the overpayment.

2. The Company agrees to distribute paychecks on the second shift within the first hour of the shift. If the Company perceives that this distribution is causing problems, this practice may cease. The Company has agreed to make additional improvements in the handling of second shift payroll problems by providing that a

165

payroll representative will be available to address pay problems until 8:30 p.m. on Thursday evenings.

3. Access to the plant. Employees on approved leaves of absence may be allowed to enter the plant during regular working hours for legitimate business purposes. The Human Resources Department is to be notified in advance and an appointment made. Employees on leaves of absence shall be accompanied to the department in question by a member of the Human Resources Department. Such employees, when present at the plant, shall not interfere with plant production or operations during the visit.

4. Union Coordinators. The Company agrees to pay Union Coordinators time and one-half for attending monthly joint conferences, and it agrees to continue the practice of giving Union Coordinators preferential treatment for the purpose of shift reassignment ("super seniority").

5. Vacancies and Openings. In the event a vacancy is caused by termination, promotion, transfer, sick leave, etc., management will assess its manpower needs and requirements and will attempt to eliminate the vacancy by using Kaizen efforts, balancing, reassignment or temporary assignment. If the vacancy is not eliminated, an open job will be identified and it will be filled according to promotion procedures for team leader positions and transfer procedures for employee positions.

6. Transfers.

a. Employees selected through the Transfer provisions of the Agreement will be moved as promptly as possible, production needs and qualifications permitting.

b. In order to facilitate the transfer process, Management would propose the following:

166

1. Team Member Relations Representative and Union Committeeperson teams working with floor supervision will identify openings in their respective sections and groups.

2. Once qualified applicants are identified, the Team Member Relations Representative and Union Committeeperson team will promptly communicate with the affected departments and coordinate the transfer with the hiring process, providing production needs permit.

7. Medical Policies and Procedures. The Company shares the Union's interest in high quality professional medical care for its employees and it is the Company's policy that all employees be treated with dignity and respect.

Further, both the Company and the Union are committed to ensuring that employees will not be required to work when such work will jeopardize an employee's health. Towards that end, when there is a dispute about whether an employee is able to return to work or whether an employee can appropriately take sick leave, the following procedure will be utilized:

a. The employee may select a physician from a panel of three (3) physicians jointly agreed to by the Company and the Union to render an independent medical opinion. The services of this physician will be paid for by the Company.

b. After examining the employee, the physician will render an independent medical opinion addressing three (3) questions: (1) the nature of the employee's condition; (2) the employee's prognosis; and (3) any medical restrictions on the employee's return to work.

c. The independent medical opinion will be heavily weighed by the Company physician when the employee's case is reviewed. However, subject to the arbitration procedure, the

167

final decision as to whether the employee can work, will be made by the Company. Where the Company disagrees with the independent medical opinion, it shall provide a written statement setting forth the basis of its disagreement to the Union.

d. Should the Union dispute the Company decision, the grievance shall be filed to the Third Step provided in Section 4 of the Problem Resolution Procedure, within three (3) working days from the Company's decision.

The case will then be handled through the expedited arbitration procedure in accordance with Article X, Section 6.2 of this Agreement.

e. With regard to other medical-related issues, any changes to medical and therapy appointments established by the Medical Department must be coordinated through the Human Resources Department. Further, the parties agree to continue regular periodic meetings with the Plant Medical Advisor and the Union and Management Representatives in keeping with our mutual commitment to resolve problems through open communication.

f. When available, the Medical Department at NUMMI shall determine the Medical Transportation needs of Team Members.
   • Emergency Services
   • Company
   • Taxi-Cab

Team members with plant sustained occupational injuries who are scheduled by the Company for treatment in the plant medical department during working hours other than their regular shift hours, will be paid for time spent obtaining treatment.

8. **Child Care.**
   The Company and Union will continue to work together to establish a referral system responsive to employee child care needs.

168

9. **Roundtable Communications.**
   During these negotiations, the parties acknowledged their mutual goal of a strong and viable corporation which can provide long term job security for our employees. We agree that our future success in accomplishing this goal depends on our commitment to building and maintaining the most innovative and harmonious labor-management relationship in America, resolving differences or misunderstandings through full and open communications, and to build the highest quality automobile in the world at the lowest possible cost to the consumer.

We jointly recognize that with the intense competition both at home and abroad, there is an unparalleled need to find new ways of doing business.

Our recent past experiences have demonstrated that substantial progress can be achieved when individual and group interests are subordinated to mutual goals and when conflict is replaced by cooperation. Thus, the parties are in accord that we need to expand upon the spirit of cooperation exhibited by the Union, the Company and our Employees which has served as the cornerstone for the success of New United Motor Manufacturing, Inc.

In order to enhance future cooperative efforts and create a framework which will promote understanding, improve relationships and provide for constructive, non-adversarial problem solving, the parties have established the Roundtable Discussion Program.

The establishment of the Roundtable does not replace the collective bargaining process or the Complaint Resolution Procedure. Rather it is intended to provide an opportunity for discussion. The Roundtable shall provide a new structure designed to:

   • Improve communications and the exchange of information among the Union, Management and Employees;

   • Determine approaches for improving operational competitiveness in order to enhance job security;

169

- Identify and recommend new approaches for improving product quality; and

- Discuss general operation and business developments.

In addition to the foregoing responsibilities, the Roundtable will discuss problems associated with the following:

- Special Pilot Project Assignments; and

- Movement of personnel resulting from vacancies or job openings.

10. **Complaint Resolution Procedure.** Both parties recognize that the prompt handling of complaints that arise under the Complaint Resolution Procedure is a desirable goal. The parties agree to work together to address and resolve problems and/or logjams that act to delay the Problem Resolution Procedure.

11. **Written Corrective Notices.** The parties mutually acknowledge the importance of timely correction and counseling of employees who commit infractions of the Rules of the Standards of Conduct and Good Attendance. The Company agrees to make its best efforts to take corrective action on infractions as soon as possible after the time an infraction occurs. In cases where the possibility of undue delay appears to exist, the cognizant Company Team Member Relations Representative and Union Committee person may discuss the case directly with the Manager, Team Member Relations or his/her designee so that the matter can be resolved in a timely manner.

12. **Safety Hold Harmless.** In the event that the Union is named as defendant in a lawsuit alleging a breach of duty on the party of the Union under Article XXV, the Company will defend the lawsuit on behalf of the Union, and hold it harmless to the extent of costs and expenses of defense, but not the cost of any damages which might be assessed against the Union.

170

13. **Second Shift Payroll.** During the current negotiations, the Union raised a number of issues concerning pay problems and/or shortages on the second shift, and requested action by the Company to correct these problems. The parties acknowledge that more improvement is needed and that the Company will continue, in concert with the Union, to work for further improvements in the handling of these problems.

14. **Second Shift Doctor.** The Company agrees to make the Medical Department physician available until 6:00 p.m. two (2) days each work week to address medical care and administration requirements for the second shift.

15. **Company/Union Meeting Minutes.** The parties agreed that the minutes for the weekly Company/Union meetings be accurate and include the Company's position. The Company will continue its long established practice of reviewing the minutes with the Chairman or his designee prior to publication. The Company also advised the Union that it will continue to work with the Chairman in a spirit of cooperation to make the minutes a more useful tool for both parties.

16. **Shift Assignment.** The parties agreed that the Company shall make shift assignments to eligible employees on a timely basis pursuant to the language of Article XIII, Section 1.(20).

17. **Union Appeal to Vice President, Human Resources from review Committee.** The Union and Company agree that after the Review Committee has made its recommendation to the Vice President, Human Resources pursuant to Article X, Section 11.2 of the Agreement, the Union may present any unusual or mitigating conditions and circumstances directly to the Vice President, Human Resources before a final decision is made.

Very truly yours,
Robert Ponsonby, Manager - Team Member Relations

171

# Exhibit "A"

# Performance Pay Plan

## Introduction
The purpose of the Performance Pay Plan is to reward Team Members for accomplishments in areas critical to NUMMI's success. The plan identifies meaningful measurements to drive and quantify accomplishments in product quality, plant efficiency and manpower stabilization. Team Members may earn up to $3,000 per year in additional pay for improvements in those areas.

## Plan Year & Effective Date
The Performance Pay Plan (PPP) is effective for plan years beginning October 1, 2005.

The Plan Year for the Performance Pay Plan is a 12-month period (4 quarters) beginning each October 1st and ending the following September 30th.

## Plan Payouts
The 2005 PIPS plan will terminate on September 30, 2005. The 2005 PIPS payout will be based on the prior collective bargaining agreement and will be comprised only of the first three quarter results for 2005. The PIPS payout earned for the three quarters of that short plan year will be annualized (i.e. multiplied by 4/3rds) so that the December 2005 payout will not be diminished.

Individual Team Member Performance Pay Plan Reward checks (and PIPS checks in 2005) will be made by separate check prior to the December shutdown.

## Annual Performance Reward
Each quarter the Company Performance Criteria will be measured and calculated based upon the latest finalized data available for each measure to determine the Quarterly Performance Reward.

Direct Run + Efficiency + Customer Quality = Quarterly Performance Reward

At the end of each plan year (September 30th), the 4 Quarterly Performance Rewards for that plan year are combined into the Annual Performance Reward.

The minimum Annual Performance Reward is $600.

### Example

| | DirectRun | Efficiency | Customer Quality | Quarterly Performance Reward |
|---|---|---|---|---|
| 1st Quarter | $200 | $150 | $100 | $450 |
| 2nd Quarter | $150 | $125 | $125 | $400 |
| 3rd Quarter | $150 | $100 | $50 | $300 |
| 4th Quarter | $200 | $50 | $100 | $350 |
| Annual Performance Reward | | | | $1,500 |

## Individual Team Member Attendance Level
Each Team Member will earn a Performance Pay Plan Payout Factor based upon his/her Individual Team Member Attendance Level on production Mondays and Fridays.

| Individual Team Member Attendance Level | Performance Pay Plan Payout Factor |
|---|---|
| Platinum | 125% |
| Gold | 100% |
| Silver | 50% |
| Bronze | 25% |
| Ineligible | 0% |

## Individual Team Member Performance Pay Plan Reward
The Individual Team Member Performance Pay Plan Reward is the actual payout that Team Members will receive.

It is determined by applying the Team Member's Performance Pay Plan Payout Factor to the Annual Performance Reward.

**Example**

| Annual Performance Reward | Individual Team Member Attendance Level | Individual Team Member Performance Pay Plan Reward |
|---|---|---|
| $1,500 | Platinum | $1,875 |
| $1,500 | Gold | $1,500 |
| $1,500 | Silver | $750 |
| $1,500 | Bronze | $375 |
| $1,500 | Ineligible | $0 |

## COMPANY PERFORMANCE CRITERIA

There are three categories of Company Performance Criteria – Direct Run, Efficiency and Customer Quality.

### DIRECT RUN

Direct Run measures manufacturing quality as the number of defect-free vehicles coming off the production line divided by the total number of vehicles produced.

Direct Run will continue to be measured consistent with past practice. Results from the car and truck line are combined for the quarter. Actual results are compared to the following targets to determine the Quarterly Performance Reward for this metric.

| Level | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Target | <62% | >2% | >66% | >70% | >3% |
| Quarterly Performance Reward | $0 | $150 | $200 | $250 | $300 |

If the Level 4 target is achieved in all 4 of the 4 quarters of any plan year, the target for all respective levels will increase the following year by 1 percentage point (i.e. 73% would increase to 74%, 70% to 71% and so on).

## EFFICIENCY

Efficiency measures manufacturing productivity by the number of labor hours per vehicle assembled. This is referred to as "Labor Hours per Unit" or LHU. Actual results are compared to an established base to determine the Quarterly Performance Reward for this metric.

Efficiency will continue to be measured consistent with past practice. Average quarterly results from the car and truck line are individually compared to the established base Labor Hours per Unit. The Quarterly Performance Reward is allocated between car and truck based upon their relative quarterly volumes.

| Base Labor Hours per Unit | |
|---|---|
| Car | Truck |
| 21.11 | 22.74 |

If the Level 4 Improvement % is achieved in all 4 of the 4 quarters of any plan year by either the car or truck, the Base Labor Hours per Unit for that vehicle group (i.e. car or truck) will decrease the following year by 1% (i.e. 21.11 would decrease to 20.8989).

| Level | 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Improvement % | 0 | >0<=4 | >4<=7 | >7<=10 | >10 |
| Quarterly Performance Reward | $0 | $75 | $100 | $125 | $150 |

Customer Quality

Customer Quality is measured two ways – JD Power Month of Build (MOB) survey results and JD Power IQS ranking results.

Improvements in the JD Power Month of Build (MOB) surveys (problems per hundred vehicles – pphv) will be measured consistent with past practice for NUMMI vehicles. Actual results

(quarterly averages) are compared to the following targets to determine the Quarterly Performance Reward for this metric.

The JD Power IQS results measure each vehicle's ranking in its comparable vehicle class.

The spring JD Power IQS results[1] will supercede all the quarterly MOB results for the plan year for that particular vehicle if it would result in higher Quarterly Performance Rewards. For example, if the Corolla places number 2 in the JD Power IQS rankings, the Quarterly Performance Reward for each quarter would be the higher of $50 or the Quarterly Performance Reward achieved based on the MOB results.

**Corolla**

| Level | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| JD Power IQS ranking | 4 | 3 | 2 | 1 |
| MOB Target pphv | 110 – 95 | 94 - 81 | 80 - 70 | < 70 |
| Quarterly Performance Reward | $30 | $40 | $50 | $60 |

**Vibe**

| Level | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| JD Power IQS ranking | 4 | 3 | 2 | 1 |
| MOB Target pphv | 145 – 131 | 130 - 116 | 115 - 100 | <100 |
| Quarterly Performance Reward | $15 | $20 | $25 | $30 |

2023:07 PM—

1 The plan will use the higher of the JD Power IQS results based on the entire model or its ranking on a stand-alone basis as a NUMMI vehicle.

**Tacoma**

| Level | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| JD Power IQS ranking | 4 | 3 | 2 | 1 |
| MOB Target pphv | 110 – 95 | 94 - 81 | 80 - 70 | < 70 |
| Quarterly Performance Reward | $30 | $40 | $50 | $60 |

If the Level 4 MOB target is achieved in all 4 of the 4 quarters of any plan year for any vehicle, the MOB pphv target ranges for all respective levels for that vehicle will decrease the following year by 1 pphv (i.e. Level 4 would decrease from 70 to 69, Level 3 from 80 – 70 to 79 – 69, and so on).

Individual Team Member Attendance Level Definition. Attendance, especially on production Mondays and Fridays, is important to a stable work environment (which includes Safety, Quality, Efficiency and Manpower Planning) and is essential to NUMMI's success.

Each Team Member can earn more or less than the Annual Performance Reward based on their Monday and Friday attendance.

A Team Member must work a minimum of 4 hours on a production Monday or Friday to receive credit. If "No Work/No Pay/No Penalty" option is offered by the Company on a Monday or Friday, those hours will count as hours worked.

For purposes of this section, all time spent attending to Union business will be treated as hours worked, per CBA Article 8 Section 11.3 notification.

178

| Full years of seniority at the start of the plan year (as of October 1st) | Credit Points for each production Monday or Friday Worked * |
|---|---|
| 0 – 3 | 1.2195 |
| 4 – 8 | 1.2346 |
| 9 – 13 | 1.2500 |
| 14+ | 1.2670 |

| Total Credit Points Earned (for the plan year) | Individual Team Member Attendance Level | PIPS Payout Factor |
|---|---|---|
| >= 102 | Platinum | 125% |
| >= 95 < 102 | Gold | 100% |
| >= 91 < 95 | Silver | 50% |
| >= 87 < 91 | Bronze | 25% |
| < 87 | Ineligible | 0% |

* Credit Points in this table are calculated based upon 93 production Mondays and Fridays during the Plan Year. This is the number of production Mondays and Fridays anticipated for the first plan year (10/05 – 9/06). If the actual number of production Mondays and Fridays change during the plan year, the Credit Points will be recalculated as soon as possible and communicated to the Local Union and Team Members. All such changes will be reflected in the Credit Point value before Individual Team Member Attendance Levels are established for the Plan Year.

Prior to the start of subsequent plan years, the company will re-evaluate, and revise if necessary, the Credit Points based on the anticipated number of production Mondays and Fridays. The results of this re-evaluation will be communicated as timely as possible to the Local Union and Team Members.

New Hires.
Newly hired Team Members must have completed their probationary period on or before September 30th of the plan year

179

to be eligible. New Team Members hired in the plan year will be eligible based on the following criteria.

| Month of Hire | Credit Points Required | Payout Eligibility |
|---|---|---|
| October – December | 75% of full plan requirements | 100% of Annual Performance Reward |
| January – March | 50% of full plan requirements | 75% of Annual Performance Reward |
| April – June | 25% of full plan requirements | 50% of Annual Performance Reward |
| July – September | Ineligible | Ineligible |

Terminated and Retired Team Members
Team Members must not have had their employment terminated prior to the payment date, except where the employee's termination was due to death or retirement.

Should an otherwise eligible Team Member become deceased prior to the date of payment, his/her designated beneficiary shall be entitled to the Team Member's PPP reward. A Team Member who retires during the plan year or the designated beneficiary of a deceased Team Member shall be entitled to 100% of the Annual Performance Reward pro-rated by the number of weeks worked during the plan year.

Administration and Monitoring
All numbers and percentages in the plan and results are not to be rounded.

PPP will be monitored and reviewed by a Joint Committee consisting of the Human Resources Vice President, Manufacturing Vice President, Q.C. General Manager, Team

Member Relations Manager, Q.A. Manager, UAW Transnational Department Vice President/Director and/or their designee, UAW Bargaining Committee and UAW International Representative. The Joint Committee has the authority to modify the Plan by mutual agreement at any time during the term of the Collective Bargaining Agreement.

The Joint Committee will work to establish a method by which Team Member's are informed of their status with regard to Individual Team Member Attendance Level. It is the intent of the parties that this method is completed during the first plan year.

In addition, the Joint Committee will adjust the data as needed to take into account catastrophic or extraordinary events that would otherwise adversely impact reported values. Adjustments can be made for such events as major parts problems, significant reduction in volume, major model changeovers, Acts of God, other events outside the Company's and/or Team Member's control, etc.

In the event of a major model changeover, the parties will meet in advance and establish interim measures to hold the PPP plan harmless from such disruptions as well as establish new targets for the changed vehicle to the extent necessary. It is anticipated that such measures will be modeled after the 2005 Tacoma model changeover letter of understanding dated 12/2/04. All Company Performance Criteria will be evaluated and communicated within three weeks of the end of each quarter. The Company will furnish the International Union with all quarterly and annual results, plus supporting data including reports and calculations, within 45 days of the end of each quarter and plan year for review and verification.

August 6, 2005

Chairman, Bargaining Committee
UAW, Local 2244
45201 Fremont Boulevard
Fremont, CA 94538

Dear Chairman:
The following sets forth certain matters agreed to by side letters between the Company and the Chairman of the Bargaining Committee, UAW Local 2244.

A. Matters agreed to for Division II Team Members
During the recently concluded meetings with the UAW International Skills trade representative and members of the Bargaining Committee, the parties had detailed and extensive discussions on a number of subject matters pertaining to the skilled trades. During these discussions the Company and Union expressed concerns in certain areas.
In responding to these concerns, and to ensure more equitable and fair policies the Company clarified its current policies and practices in those areas. Those clarifications, designed to eliminate any potential for arbitrary actions, are listed below.

1) "Section" as defined in Article XXIX Paragraph 1 shall not pertain to Division II team members. Rather, for the purpose of Division II, Maintenance shall be organized into the following Sections.
a) Plastics
   i) General Maintenance
   ii) Tool and Die
b) Stamping
   i) General Maintenance
   ii) Tool and Die
c) Truck Body and Weld
d) **Passenger Body and Weld**

e) Truck Paint
f) Passenger Paint (North and South)
g) Truck Assembly
h) **Passenger Assembly**
  i) Facilities

2) "Group" as defined in Article XXIX Paragraph 1 shall remain consistent for Division I and Division II team members. A group is that "area" which is included in a Section and is Group Leader responsible.

3) Overtime - The balancing of overtime shall occur in the following manner: Overtime will be balanced among those team members within a group who possess the skills, knowledge and qualifications to perform the necessary work. If there is more overtime than a Group can accomplish then the corresponding Groups on the opposite shifts will be utilized. In the event that the necessary work needs to be performed on a specific shift then the overtime will be offered to the team members on the shift within the section who are capable of performing the work.

Provisions contained in the Side Letter to the Collective Bargaining Agreement addressed to Mr. Nate Gooden (Paragraph 3 Balancing of Overtime – Clarification of Article XX Section 9 of the Agreement) shall remain in full effect.

4) Vacations – The scheduling of vacations for Division I and Division II team members shall remain consistent with Article XXII Section 2. Vacations shall be scheduled by the Group (i.e. 10% rule).

5) Team Leader Selection – For the purpose of the Team Leader Selection Procedure all groups contained within a section where the opening occurs shall be treated as one Group. As a result, the preference will no longer be given to employees specifically assigned to the group where the opening occurs. All other

182

provisions contained in Appendix D of the Collective Bargaining Agreement will remain in full effect.

6) Shift Preference – For the purpose of shift preferences, all groups contained within a section will be treated as one group.

For Example it would be possible for a team member who works in the South Paint Shop Group (ESM01C) who exercised a shift preference to be reassigned in the North Paint shop Group (ENM21C) provided they have the seniority and qualifications. All other provisions pertaining to shift preferences and transfers between shifts contained in Article XII Section 6 and Article XIII will remain full effect.

7) Transfers – Before an opening is declared and a requisition for manpower is submitted, Team members wishing to move from one group to another group within the same section will be given the opportunity to do so provided they have the seniority and qualifications.

Once the internal moves have been completed and a requisition is submitted the Company shall attempt to fill the opening utilizing the transfer procedure. Selection shall be made in accordance with Article XII Section 4 of the Collective Bargaining Agreement.

8) Manpower permitting, the Company and the Union agree to allow the Stamping Tool and Die team members who are willing to complete the required Plastics Tool and Die training that is offered to the apprentices the opportunity to fill openings within the Plastics Tool and Die. Such opportunity will be given prior to filling the openings with the graduating apprentices. Additionally, manpower permitting the Company agrees to allow Stamping Tool and Die Team Members the opportunity to train in Plastics Tool and Die.

Very truly yours,
Robert Ponsonby, Manager, Team Member Relations

183

DATE: July 28, 2001

TO: Chairman, Bargaining Committee

FROM: Robert Ponsonby, Manager, Team Member Relations

SUBJECT: Plastics Section

In a meeting held on 7/25/01, the NUMMI Plastics Section agreed to the following:

A. Jobs will continue to be standardized with Group Leaders, Team Leaders, and Team Member Involvement.

B. Safety Section members will determine the number of team members required in the paint mix room for safety purposes.

C. Excessive paint on ground clips and jigs will be cleaned on a regular basis.

D. Available Fascia paint work will be equalized between shifts as far as is practical.

E. Repair or remove the rails that bind on dollies in the Truck Conveyance/overfender storage area.

F. Safety Section will Train Team Members in conveyance on safe driving habits.

184

---

DATE: July 28, 2001

TO: Chairman, Bargaining Committee

FROM: Robert Ponsonby, Manager, Team Member Relations

SUBJECT: Stamping Section

In a meeting held on 7/17/01, the NUMMI Stamping Section agreed to the following:

A. Stamping Management will assure that potential transferees into Stamping are shown all operations they will be required to do.

B. A mutually agreeable Stamping transfer interview checklist will be developed.

C. Openings on the Blanker will be filled first by the highest seniority employee within stamping requesting the position prior to any other team member being chosen. The team member selected will be given adequate training and a reasonable opportunity to perform the job successfully. Should a question arise as to the ability of the team member to perform the job, the Union and Company will meet to discuss an appropriate resolution.

D. Stamping Management and the UAW will meet quarterly to review the Stamping Training schedule.

E. Stamping Management will provide two (2) team rooms for stamping employees with tables and chairs.

185



Movement to/from Specific Groups, Paint, Body, Plastics & QC for both trucks and passengers

**Paint Hospital**
Hospital → Off-Line Repair → Inspection Line → Any Openings in Paint

**Body Shop Repair / Metal Finish**
Metal Finish Repair (Soft touch) → Paint Repair → Slit line Metal Repair → Body Shop Production

**Plastics**
Mold To Paint → Paint To Mold → Service Parts → Out of Plastics

**Quality Control off line**
M.A.G. Mar pass test → Audit Lab → Quality Assurance → Material Lab → Receiving Inspection → On Line Quality Control

These charts show the flow Team Members follow when moving in to these specific groups or when a reduction in force of 15% requires that Team Members move out of these specific groups.

Chairman, Bargaining Committee
UAW, Local 2244
45201 Fremont Boulevard
Fremont, CA 94538

Dear Chairman:

This letter is to advise you of the procedures that NUMMI intends to follow regarding:

1. Representation by Alternate District Committeepersons: When a Committeeperson calls in an absence, the TMR Representative shall be responsible for notifying the floor to release the Alternate Committeeperson. When a Committeeperson is scheduled to be absent for vacation or Union Business, the TMR Manager shall ensure that the floor is notified to release the Alternate Committeeperson, usually by e-mail.

2. Daily Overtime: NUMMI will continue its current practice of announcing daily OT as early in the shift as possible, currently about one to one and one-half hours before the end of the shift in the Assembly shops. NUMMI commits to making reasonable efforts to expand this practice to the other shops (e.g. the Paint and Body shops).

3. Notice to the Union of Production Saturdays: NUMMI shall, whenever possible, give a two-week notice of Production Saturdays to the Chairman of the Bargaining Committee of his/her designee.

4. EAP Office: Company will provide an office appropriately furnished.

Very truly yours,

Robert Ponsonby
Manager, Team Member Relations

Chairman, Bargaining Committee
UAW, Local 2244
45201 Fremont Boulevard
Fremont, CA 94538

Dear Chairman:

During the recently concluded negotiations, certain matters were agreed to between the Company and the Union concerning Division II Team Members.

1.   It was agreed that monthly meetings between the skilled Trades Representative, the Manager of Training and the Vice President of Engineering will be held to ensure that the Division II Training schedule is being achieved. In addition, quarterly meetings between the Skilled Trade Representative, the Manager of Training, the Vice President of engineering, the sectional Maintenance Managers and District Committee persons will be held to review training for the next quarter.

2.   The following example relates to article XXIX, Paragraph 4.1.

Targeted Head Count minus Actual Head Count plus Retirements plus Attrition plus or minus Business needs plus New Model Project minus Actual New Model Head Count minus New Hire equals Apprentice Requirement

| EXAMPLE | | |
|---|---|---|
| Targeted head Count for 2005 | = 350 | |
| Actual Head Count for 2005 (Projected) | = 375 | 25 over head count |
| Retirements for 2005 | = 10 | 15 over head count |
| Attrition for 2005 | = 20 | 5 under head count |
| Business Needs | = +10 | |
| New Model Project (required) | = 40 | 15 under head count |
| Actual New Model project head count (in place) | = -50 | 55 under head count |
| Apprentice Requirements | 5 required for apprenticeship program | 5 under head count |

The above example is intended for illustration purposes and is meant to portray a method for predicting the long range needs of the Company for division II Team members. The number of team members identified will be placed in the following year's apprenticeship class as long as Company training capacity allows. The Company retains the right to hire Division II personnel on an as needed basis.

The Company and the Union mutually agree to select General Maintenance Apprenticeship candidates from the currently established Apprenticeship Selection Process List as of 8/1/05.

The top Twelve (12) plus two (2) alternates of these applicants will remain eligible for future apprenticeship program position for the term of the Collective Bargaining Agreement. There will be twelve (12) apprentices added to the Apprentice – Training Program during the life of this agreement.

Very truly yours,

Robert Ponsonby
Manager, Team Member Relations

August 6, 2005

Mr. Nate Gooden
UAW Vice President
800 East Jefferson Avenue
Detroit, Michigan 48214

Dear Mr. Gooden:

Re: Expanded Work Force Agreement

During the course of the 2005 negotiations, considerable time was spent regarding the evaluation period. In an effort to address the ever changing automobile industry and the fluctuation of manpower requirements, the parties have agreed that Section XX, Paragraph 8, Work Force Requirements, can be extended from 90 calendar days to 180 calendar days. It is understood and agreed that this extension is in no way intended to create a permanent supplemental work force.

The Company may hire up to two hundred (200) Expanded Work Force Members per shift at any given time. Prior to hiring Expanded Work Force Members, the Local Union will be notified of:

1.  The number of Expanded Work Force Members management is anticipating hiring,
2.  Anticipated start and end dates,
3.  Amount of permanent and attritional openings, and
4.  The number of permanent hires management is anticipating.

If an Expanded Work Force Member is subsequently rehired, he will be considered a seniority employee, and his seniority adjusted to include his previous employment as an Expanded Work Force Member.

The Company agrees to give special consideration for relatives of current full-time employees when hiring Expanded Work Force employees. Expanded Work Force Members will be given priority for open New Hire positions. These Expanded Work Force Members will not be utilized in Quality Control or Production Control unless through mutual agreement with the Union.

Very truly yours,

Robert McCullough
Vice President, Human Resources & Legal
New United Motor Manufacturing, Inc.

190

191

Downloaded from ... document id ...

August 6, 2005

Mr. Nate Ggoden
UAW Vice President
800 E. Jefferson Ave.
Detroit, Michigan 48314

Dear Mr. Gooden:

The Company and the Union agree that the prompt, fair and final resolution of employee problems is desirable to both parties. To further this goal, the Company and Union agree to a trial modification of Article X, 11.5 "Suspension and Discharges". The trial modification will be in effect until December 31, 2006 at which time the parties may agree to continue using the language as a permanent part of the Problem Resolution Procedure, make changes to the trial modification language by mutual agreement or either party may decide to discontinue the trial modification.

The trial modification language is as follows:

"Any problem regarding suspension and discharge will be resolved as follows: The Team Member Relations Representative will notify the District Committeeperson regarding any suspension or discharge. If the parties are unable to reach consensus and the Team Member is suspended or discharged, the District Committeeperson has three (3) working days from the date of suspension or discharge to submit a written Problem Notice to the Assistant Manager of Team Member Relations.

The Assistant Manager of Team Member Relations and the District Committeeperson will attempt to find a resolution to the problem. If there is no resolution, the District Committeeperson will have ten (10) working days from the date the Problem Notice was filed to submit the written

192

Problem Notice to the Manager of Team Member Relations and the Chairman of the Bargaining Committee.

Once the problem has been submitted to the Manager of Team Member Relations and the Chairman of the Bargaining Committee, they will attempt to find a resolution. If there is no resolution, the Chairman of the Bargaining Committee will have an additional ten (10) working days from the date the Problem Notice was filed to submit the written Problem Notice to the Vice President of Human Resources, or a designee, and the UAW International Representative.

The Vice President of Human Resources and the UAW International Representative will have thirty (30) calendar days after the written Problem Notice is submitted to them, to resolve the problem. If there is no resolution or the Problem Notice is not moved to arbitration within this 30-day period, the Problem Notice will be submitted to the UAW International Vice President.

If a problem regarding discharge is not resolved or moved to Arbitration by the UAW International Vice President within thirty (30) days from the date the Problem Notice was submitted to the UAW International Vice President, it may be dispositioned by the Company.

Discharges moved to Arbitration take precedence over all other problems.

All other Problem Resolution Procedures apply in accordance with Article X."

Very truly yours,
Robert McCullough
Vice President, Human Resources & Legal
New United Motor Manufacturing, Inc.

193

August 6, 2005

Mr. Nate Gooden
UAW Vice President
8000 East Jefferson Ave.
Detroit, MI 48214

Re:  Benchmarking Trips

Dear Mr. Gooden:

The purpose of this letter is to confirm that the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW Local 2244 ("UAW") and New United Motor Manufacturing, Inc. (NUMMI) agree that it is important to the mutual goals of the UAW and NUMMI to, among other things, maintain harmonious labor-management relations and a prosperous business operation, promote economy of operation, quality and quantity of output, build the highest quality automobile at the lowest possible cost, and to maintain a safe workplace by using new and innovative programs. To further these goals, the UAW agrees that the Bargaining Committee will accompany NUMMI representatives on at least one benchmarking trip per year, if requested by NUMMI, to another automotive plant. The time and place of these trips shall be scheduled by NUMMI at a time that is mutually convenient for NUMMI and the UAW.

The parties agree that such annual trips as described above are important to the goals set forth in this letter and that such annual trips will be required, when requested by NUMMI, effective August 7, 2005.

Very truly yours,

Robert McCullough
Vice President, Human Resources and Legal

---

NUMMI
New United Motor Manufacturing, Inc.

45000 Fremont Boulevard    Fremont, CA 94538 USA    (510) 498-5500

December 9, 2005

Tim Bressler
Assistant Director, Transactional Department
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America (UAW)
8000 East Jefferson Avenue
Detroit, Michigan 48214

Re:    Retiree Annual Lump Sum Payments

Dear Mr. Bressler:

For the terms of the 2005 Collective Bargaining Agreement, NUMMI agrees to make lump sum payments, in accordance with the schedule below, to existing retirees who terminated from the Company at age 55 or later and who received a single sum distribution from the NUMMI/UAW Hourly Defined Benefit Plan (the "Plan") prior to December 9, 2005 and who are no longer eligible for any payments from the Plan.

The amount and time of the lump sum payments shall be as follows:

| | | |
|---|---|---|
| February 2006 | $625 | $400 |
| February 2007 | $625 | $400 |
| February 2008 | $625 | $400 |
| February 2009 | $625 | $400 |

Team members who retire on or after December 9, 2005, and repay Plan eligibility requirements for a distribution, will be required to acknowledge in writing their understanding that they are ineligible for any future payments (lump sum or otherwise) from the Plan if they elect the single sum payment option as the distribution method.

The language in the Collective Bargaining Agreement dated August 6, 2005, in Appendix B, section NUMMI on or after December 9, 2005.

Sincerely,

Robert McCullough
Vice President
Human Resources & Legal
New United Motor Manufacturing, Inc.

Acknowledged and agreed by:



www.nummi.com

# INDEX

*A*

Access to the plant. .................................. 166
Acting Chairperson Of The Bargaining Committee. ......... 12
Alternate District Committeeperson ..................... 14
Americans with Disabilities Act .......................... 6
Arbitration ................................ 21,22,23,24,26,152,193
Attendance ............................................. 4
Level of Attendance .................................... 56

*B*

Bargaining Committee ............ 12,14,15,16,20,4,13,17,31,45,83,84,71,86
Bargaining Unit ............................ 129,150,164,165,180
Bargaining Unit Work .................................. 7,68
Benefits. ............................................. 34,54
Effective Date. ......................................... 93
Accidental Death & Dismemberment Insurance. ............. 97
Dental .............................................. 112
Dependent Eligibility. ................................. 94
Dependent Life Insurance. .............................. 99
Early Retirement. ..................................... 122
Effective Date. ......................................... 93
Legal Plan ........................................... 125
Life Insurance. ........................................ 95
Long Term Disability ................................. 102
Medical Insurance. ................................... 105
Mental Health. ....................................... 114
Optional Supplemental Insurance ....................... 98
Part "B" Medicare .................................... 117
Reserve Fund. ........................................ 124
Retiree Medical. ..................................... 118
Retirement ........................................... 120
Retirement Life Insurance. ............................ 99
Savings Plan ........................................ 122
Supplemental Workers Compensation ................... 100
Temporary Disability. ................................ 113
Vision. ............................................. 113

196

Breaks. ............................................... 45
Bulletin Boards. ...................................... 80

*C*

Chairperson of the Bargaining Committee 11,12,13,14,15,16,17,18,20,21,28,
    31,45,84,86
Child Care. .......................................... 168
COLA ..................... 36,37,38,40,41,42,43,44,54,62,63,153
Commitments And Responsibilities. ....................... 1
Committeepersons ....................... 12,13,14,15,16,17
Cost Of Living Allowance. ............................. 43

*D*

Definitions ........................................... 84
Discipline. ...................................... 3,24,83
Dues 8,94,197
Dues Checkoff. ......................................... 8

*E*

Effective Date ..................... See Term of Agreement
Employee Responsibilities. .............................. 5
Entire Agreement And Waiver. .......................... 88
Equal Opportunity ...................................... 6

*F*

Family School Partnership Act. ..................... 54,146
FMLA/CFRA .......................... 40,56,57,146,147,148

*G*

General Provisions .................................... 84
General Representatives. ....................... 15,68,85,159

*H*

Health Care. ..................................... See Benefits
Health, Safety and Ergonomics. .......................... 67
Annual Review ........................................ 77
Contractor Safety ..................................... 79
Hazardous Material Review .............................. 78

197

Job Evaluation ............................................................ 72
Joint Safety Committee .............................................. 68
Medical Management .................................................. 76
New Equipment .......................................................... 80
Noise .......................................................................... 77
Problem Resolution ................................................... 71
Professional Development .......................................... 70
Safety Coordinators ................................................... 81
Side Letter .... 145,155,164,181,184,185,187,188,190,192,194
Task Based Risk Assessment ...................................... 79
Training ...................................................................... 79
Holidays ..................................................................... 51
Eligibility for Pay ...................................................... 54
Holiday Schedule ....................................................... 51
Pay for Holidays ........................................................ 54
Personal Holiday .......................................... 53,54,55
Hours Of Work ........................................................... 45

I
Initiation Fees ............................................................ 77
Insurance Program ........................................ See Benefits
Introduction .................................................................. 1

J
Job Security ................................................................. 6
Joint Conference ......................................................... 17

K
Kaizen ....................................................... 3,5,34,82,130

L
Leaves of Absence ...................................................... 60
Application for ............................................................ 60
Bereavement ......................................................... 66,152
Educational ........................................................... 66,152
Eligibility ................................................................... 60
Jury Duty .................................................................... 60
Long Term Military .................................................... 60

Personal Leave ........................................................... 64
Public Office .............................................................. 64
Return from Leave ..................................................... 66
Short Term Military ................................................... 63
Sick ............................................................................ 65
Union Activity ............................................................ 66
Lump Sum Payment .................................... See Wages
Lunch Break ................................................. 16,18,45,92
Lunch Period Agreement ............................................ 91

M
Management Responsibilities ....................................... 3
Medical Department ................................. 167,168,171
Medical Examinations ................................................ 84
Membership, Union .................................................... 73

N
Non-Discrimination Against Union Activities ............... 88

O
Overtime ..................................................... 45,47,48,148
Balancing ......................................................... 51,148
Continuous Operations .............................................. 48
Critical Operations .................................................... 49
Double Time ............................................................... 46
Maintenance ............................................................... 49
Mandatory Overtime .................................................. 48
Premium Pay .............................................................. 48
Requirement to Work Overtime .................................. 45
Saturday Overtime ..................................................... 47
Sunday Overtime ........................................................ 48
Time and One Half ..................................................... 46
Voluntary ................................................................... 48

P
Payroll
Second Shift Coverage ............................................ 171
Performance Pay Plan .............................................. 172

**PPP**

President, UAW ............... 172,173,174,175,176,177,178,179,180
Problem Resolution Procedure ............... 11,15,16,17,68,69,150
1st Step ............... 18,19,20,21,22,23,24,25,151,152,154
2nd Step ...............
3rd Step ...............
4th Step ...............
Prohibition Of Strikes And Lockouts ...............
Project Team ...............

**R**

Rate Of Pay ...............
Recognition ...............
Reduction in Force ...............
Representation ...............
Roundable Communications ...............

**S**

S.H.I.P. ............... See Benefits; Retiree Medical
Seniority ...............
  Definition ...............
  Evaluation Period ...............
  Loss of Seniority ............... 26,27
  Seniority List ...............
Separability ............... 88,89
Shift Assignment ...............
Skilled Trades And Apprenticeship Training ...............
Standardized Work ............... 81,82,83,128,132,133

**T**

Team Concept ...............
Team Leader ...............
  Breakdowns ...............
  Premium ............... 38,109
  Selection Procedure ............... 35,109
  Standardized Work ...............
  Evaluation Procedure/selection,criteria ...............
Team Definition ...............

Team Leader Selection Procedure
  Posting ............... 130
  Procedure ............... 130
  Selection ............... 131
Term Of Agreement ............... 89
Tool Allowance ............... See Wages
Transfer ............... 28,29,31,166
  ADA ............... 6
  Application for Transfer ............... 28
  Consideration on Return ............... 31
  Vacancies and Openings ............... 166
  Movement to/from specific Groups, Paint, Body, and Plastics ............... 186

**U**

Union Coordinator ............... 15,16,166
Union Dues ............... 7,8,9,10,11
Union Responsibilities ............... 4

**V**

Vacation
  Allowance ............... 55,57
  Hours and Allowance ............... 55
  Pay at Separation ............... 60
  Pay in Lieu of Vacation ............... 60
  Schedule of Hours ............... 56
  Scheduling Time Off ............... 58,59
  Vacation Pay ............... 60,61
  Vacation used as PAA ............... 60

**W**

V-CAP ............... 141,142,143,144

Wages ............... 11
  Back Pay ............... 11
  Back Wages ............... 24,152
  Base Rate Increase ............... 40,42
  Base Wage Rate ............... 36,91
  General Wage Increase ............... 40
  Lump Sum Payment ............... 39,40,60,121

Overpayment ...................................................................................... 160
Report Pay and Call in Pay ........................................................... 88
Shift Premium ................................................................ 39,62,63,156
Straight Time .................................................................................. 48
Union Officials ............................................................................... 156
Written Corrective Notices ............................................................ 170

202

# EXHIBIT B

1   CHARLES A. ASKIN
    31 LOMA VISTA
2   WALNUT CREEK, CA 94597

3

4

5

6

7

8                  **IN ARBITRATION PROCEEDINGS**

9       **PURSUANT TO AGREEMENT BETWEEN THE PARTIES**

10

11   In the Matter of a Controversy

12       Between

13   NEW UNITED MOTOR
     MANUFACTURING , INC.,

14          Company              **OPINION AND AWARD**

15       and

16   INTERNATIONAL UNION, UNITED
     AUTO WORKERS UNION, LOCAL 2244,

17

18         Union

19   Involving the "time for time" policy grievance.

20

21       This dispute involves the application and interpretation of a Collective Bargaining Agreement

22   between the above-named Company and Union.  Pursuant to the provisions of the Agreement, the

23   parties selected the undersigned Arbitrator to hear and resolve the matter.

24       A hearing was held in Fremont, California on August 14-15, 2006.  During the course of the

25   hearing, the parties were given full opportunity to examine and cross-examine witnesses and to

26   introduce relevant exhibits.  Both parties submitted post-hearing briefs and reply briefs.  The matter

27   was deemed submitted upon receipt of the reply briefs on October 21, 2006.

28

1  APPEARANCES:

2       On Behalf of the Union:

3            Peter D. Nussbaum, Esq. and Linda Lye, Esq.
             Altshuler, Berzon, Nussbaum, Rubin & Demain
4            177 Post Street, Suite 300
             San Francisco, CA 94108
5
        On Behalf of the Company:
6
             Nick C. Geannacopulos, Esq.
7            Seyfarth Shaw LLP
             560 Mission Street, Suite 3100
8            San Francisco, CA 94105

9                              **ISSUES**

10      The parties signed the following written statement of submitted issues:

11   1.      Is the Company's policy regarding long-term leaves of absence consistent with
             Article XI, Section 3 and Article XXIII Sections 9.3 and 9.4 of the collective
12           bargaining agreement as interpreted by, among other things, the Staudohar
             arbitration decision; and if it is not consistent, what is the proper remedy?
13
14   2.      Are the people on the attached list eligible to participate in the Company's
             2006 Early Retirement Program?
15

16                 **Relevant Provisions of the Agreement**

17   **XI.    SENIORITY**

18   **3.    Loss of Seniority**

19           Seniority will be broken and lost, and employment shall cease for the
             following reasons:
20
             .....
21
             e.    Failure to return to work within four (4) consecutive working days
22                 (excluding Saturday and Sunday) after the expiration of a leave of
                   absence unless unusual conditions or circumstances exist;
23
24           .....

             g.    Being on sick leave beyond the period set forth in Paragraph 9.3 and
25                 9.4, Article XXIII of this Agreement.

26   ///

27   ///

28   ///

**XXIII.     LEAVES OF ABSENCE**

**1.     Definition**

A leave of absence means approved time off from work with or without pay for a specified period of time for serious or compelling reasons as described below.

.....

**9.     Sick Leave**

**9.1**     Employees who become ill or disabled are eligible for an unpaid leave of absence after an absence of five (5) consecutive working days...

.....

**9.3**     A sick leave of absence may not exceed the employee's length of seniority as of the date of the illness or disability, or eighteen (18) months for an employee with less than one (1) year of seniority, or thirty-six (36) months for an employee with more than one (1) year of seniority, whichever is greater.

**9.4**     In compensable injury and legal occupational disease cases, sick leave will be granted automatically and seniority will accumulate for the full period of legal temporary disability.   Employees disabled during evaluation period by compensable injury or legal occupational disease shall be given credit for the period of such disability toward acquiring seniority.

## FINDINGS OF FACT

The Arbitrator has carefully reviewed the transcript record of the testimony of all witnesses who testified at the hearing, as well as all documentary evidence adduced.  The Arbitrator has also considered the parties' written arguments.  Based upon this review, the Arbitrator makes the following Findings of Fact:

1.     The Company is engaged in the manufacture of automobiles at its facility in Fremont, California.  At the time of the hearing, it is the last-surviving automobile manufacturer in the western United States.  The Company commenced operations in the mid-1980's, following the closure of the General Motors operation at the same plant facility.  The Union, which previously represented the General Motors employees, represents the production and maintenance employees at the Company's facility.   The Company and the Union have been parties to successive collective bargaining agreements since the re-opening of the plant by the Company in the mid-1980's.

2.     This controversy arose as a result of the Company's implementation of a policy that the Union claims violates Article XXIII, Section 9.3 (herein called "Section 9.3") of the Agreement.

- 3 -

1   Section 9.3 addresses the length of an employee's sick leave of absence. The clause provides, with

2   certain exceptions for less senior employees, that a "sick leave absence may not exceed the

3   employee's length of seniority as of the date of the illness or disability..." This clause if often referred

4   to by the parties, certainly by the Union, as the "time for time provision" based on the notion that the

5   amount of sick leave, for most employees, is equivalent to the employee's work "time" (seniority).

6       3.   At all times material herein, and specifically since 1989, the content of Section 9.3 has

7   not changed. At all times material herein, the content of Section 9.4, with one possible exception,

8   has not changed.[1] At all times material herein, the language in Article XI, Section 3(g) has not

9   changed. In 1989, the language in Article XI, Section 3(e) referenced returning to work "within three

10  (3) days" after a leave expires, without reference to whether weekend days counted as "days." The

11  current language states "within four (4) consecutive working days (excluding Saturday and Sunday)"

12  after a leave expires. Except for the changes described in the preceding sentences, the remaining

13  language in Article XI, Section 3(e) has remained the same at all times material herein.

14      4.   On April 6, 1989, the Employer terminated four production employees who were on sick

15  or medical leave following determinations that each of them had permanent medical restrictions that

16  would not enable them to return to their jobs. The four employees were Renee Adeola (Morrison),

17  Loreli Tiwana, Rafael Gutierrez, and Janet DeSnoo McCarthy. Individual grievances were filed on

18  behalf of each of these employees as follows:

19      •   *Renee Adeola*: A grievance was filed claiming that her termination violated Article
20         XI of the Agreement ("and any and all other provisions of the agreement"). The
            grievance did not cite a violation of Section 9.3 specifically. The Union's Statement
21         of Unresolved Problem in that grievance cited violations of Article XI and Section 9.4
            of the Agreement; no violation of Section 9.3 was expressly cited.

22      •   *Lorelei Tiwana*: A grievance was filed claiming that her termination violated Article
            XI of the Agreement ("and any and all other provisions..."). The Union's Statement
23         of Unadjusted Problem cites violations of Article XI and Section 9.4 of the contract.
            No violation of Section 9.3 was expressly cited therein.

24

---

25      [1] The quotation of Article XXIII, Section 9.4 in Arbitrator Staudohar's 1990 arbitration decision is

26  identical to the current language, except that the word "legal" is omitted in the first sentence from the phrase
    "...legal occupational disease cases..." The last sentence of the clause quoted by Arbitrator Staudohar includes

27  the word "legal" in the phrase "legal occupational disease." It is not clear whether Staudohar neglected to
    include the word "legal" in the first sentence, or whether the parties later added that word in the first sentence.

28  The language of Section 9.4 as quoted by Arbitrator Staudohar is identical to the current Agreement.

1    •    _Rafael Gutierrez_: The Notice of Unresolved Problem filed by Gutierrez claimed that
          his termination violated Article X, Section 11.2 and Article XXIII, Sections 9.3 and
2         9.4.

3    •    _Janet DeSnoo McCarthy_: A grievance was filed protesting her termination, but it did
          not proceed to resolution by an arbitrator because she resigned from her job with the
4         Company before the arbitration matter was decided..

5        5.    None of the individual grievances described in Factual Finding #4 were submitted to

6    arbitration.  The Union filed a "policy" grievance concerning the issues common to the individual

7    grievances, and the Union's policy grievance was pursued to arbitration.   The Union's policy

8    grievance asserted a violation of Article XI of the Agreement ("and any and all other provisions...")

9    (UX #24).  The Union's notice of appeal to arbitration cited the following alleged violations: Articles

10   IV; XI – Section 3g; Article XXII – Section 4.3; and Article XXIII – Section 9.4.   Neither the

11   Union's grievance, nor the notice of appeal to arbitration, expressly cited a violation of Section 9.3

12   as a basis for the policy grievance that was submitted to arbitration.

13       6.    A hearing concerning the Union's policy grievance was conducted before Arbitrator Paul

14   D. Staudohar on October 11, 1990, and an Opinion and Decision was issued on December 17, 1990.

15   A summary of pertinent parts of Arbitrator Staudohar Opinion ("_Staudohar_") is set forth below.

16       A.    Issues.  There were three stipulated issues in _Staudohar_:

17            1.    Did the Company violate Article XI, Section 3 of the Contract when it
                   terminated the employees?
18
              2.    Did the Company violate Article XXIII, Section 9, of the Contract when it
19                 terminated the employees?

20            3.    Were the employees, under the circumstances of this case, subjected to
                   disparate treatment due to unequal application of the Contract by the
21                 Company?

22            If so, what is the remedy?

23       B.    Facts.  _Staudohar_ contains the following factual findings in Case Background:

24            •    _Renee Adeola_ was hired on October 14, 1985.  She injured her wrist on
                   November 1, 1985, and last worked May 29, 1986.  Her injury was deemed
25                 permanent on February 7, 1987, and she was terminated on April 6, 1989.

26            •    _Lorelei Tiwana_ was hired on February 18, 1985.  She had various injuries
                   and last worked for the Company on July 6, 1986.  It was determined in
27                 early 1987 that her injury was permanent and stationary, and it was further
                   determined on September 14, 1988 that she could not return to her job.  She
28                 was terminated on April 6, 1989.

- 5 -

1         •    *Rafael Gutierrez* was hired in October, 1985. He injured his rotator cuff on
                April 1, 1986, which was his last day of work. On February 15, 1988 and

2                 again on March 24, 1988, two physicians determined that he was not able to
                return to his job, or other work, on the assembly line. He was terminated on

3                 April 6, 1989.

4 All three employees continued their leave status until April 6, 1989 (*Staudohar*, p. 12).

5     C.    Pertinent Sections of the Contract.

6     Arbitrator Staudohar quoted sections from the following provisions of the Contract in effect

7 at the time of his Decision: Article II, Section 4, Management Responsibilities (with specific reference

8 to the "meet and confer" provision); Article XI, Section 3, Loss of Seniority (listing all seven reasons

9 seniority could be broken under the contract, including a) discharge for just cause, e) failure to return

10 to work after expiration of a leave, and g) being on sick leave beyond the leave period set forth in

11 Sections 9.3 and 9.4 of Article XXIII); and the content of both Sections 9.3 and 9.4 of Article XXIII.

12     D.    Arbitrator's Summary of the Parties' Contentions in *Staudohar*:

13                         *Position of the Union*

14     " In its post-hearing brief, the Union emphasizes that the real issue in this case is... whether
the Company had the right under the contract to terminate [the employees'] employment. The

15 Union contends that Article II, Section 1.4, requires that the Company meet and confer prior
to changing its policies contrary to the agreement. Because the Company admitted that it did

16 not meet and confer on the issue, this provision is said to be violated.

17     Regarding seniority loss under Article XI, the Union points out that the only ways an
employee can lose seniority are spelled out in the agreement. These ways do not include the

18 situations that occurred in the instant case. Moreover, the Company's argument that it has
the right to terminate employment under Article XXIII, Section 9.4, is said to be invalid

19 because sick leave is granted automatically, not at the discretion of the Company. There is
no mention of termination in this section of the agreement.....The contract language protects

20 the seniority of an injured person or a person who is disabled from occupational disease."

21                       *Position of the Company*

22     "Reference is made by the Company to Article XXIII, Section 9.4, which allows sick leave
to accumulate for the full period of legal temporary disability. Each of the employees was

23 granted sick leave following industrial injury. Each was kept on leave until it was determined
that he or she was permanently unable to work within restrictions imposed by injuries. It was

24 not until long after they had completed vocational rehabilitation that they were finally
discharged. In this situation, contends the Company, there is no right to permanent sick leave

25 of absence.

26     It there follows, argues the Company, that when the industrial leaves were extinguished
the seniority of the employees was properly broken under Article XI, Section 3. That section

27 allows loss of seniority if an employee fails to return to work within three days after the
expiration of a leave of absence."

28

E.    Pertinent Extracts of Arbitrator's Opinion in *Staudohar*:

"Based on the stipulated facts we know that the employees all sustained work injuries that prevented them from performing their old jobs. Competent and thorough medial opinion substantiates that each employee's injuries involve physical restrictions that were considered permanent. In each case the employee was on sick leave for a long period of time. During this leave they were given an opportunity to pursue vocational rehabilitation. Two of the employees – Ms. Adeola and Mr. Gutierrez – completed training programs to acquire new skills for use in other jobs. Although Ms. Tiwana did not complete a vocational rehabilitation program, she had an extended time frame in which to do so...

What this case boils down to, as the Parties have indicated, is the interpretation of contract language. The Union contended that Article XI, Section 3, does not contemplate loss of seniority under the conditions of this case. Article XI, Section 3 has to be read and construed in light of the entire agreement, including Article XXIII, Section 9. It is true that sick leave is granted automatically in cases of industrial injury, as the Union noted. But seniority is to accumulate for the full period of the temporary disability. It does not seem correct to conclude that a "legal temporary disability" period should last into perpetuity.

This case involves employees who were (1) unable to perform work in their job classifications, and (2) whose injuries were medically determined to cause permanent restriction. It is logical to suppose that once such an employee completes vocational rehabilitation, and other employee assistance requirements have been carried out in good faith by the Company, there would not be a continuing obligation to extend seniority indefinitely. The words "full period" and "temporary" do not imply "forever."

Nor does the agreement appear to contemplate that a leave of absence lasts indefinitely. It seems appropriate to conclude that a leave of absence could be ended in cases like those we are considering here."

Arbitrator Staudohar did find a separate violation not directly material to this controversy – that employees were not given notice that their leaves had expired, and accordingly they had no chance to attempt a return to work within three days of "the expiration" of their leave.

F.    The *Staudohar* Award

The Award contained three conclusions: 1) the Company violated Article XI, Section 3 (the "technical" violation of no notice of leave expiration and a chance to return to work), 2) the Company "did not violate Article XXIII, Section 9 of the Agreement," and 3) the employees were not subject to unequal application of the contract.

7.    In this arbitration proceeding, the Company has cited various statements made by the Union in the *Staudohar* arbitration for the proposition that the Union "argued" the time-for-time issue in that proceeding. It is true that the subject of Section 9.3 was discussed in various contexts at different times in *Staudohar*. For example, during the hearing, the Union representative posed a question to a Company official soliciting whether the Company's policy at issue in 1990 would allow

- 7 -

1    the termination of a six-year employee (i.e., an employee with six years of time-for-time leave) within

2    just a four-month period if the employee was rated permanent and stationary. (Curiously, the witness

3    did not directly answer the implicit inquiry as to whether Section 9.3 time-for-time rights could be

4    superceded by the Employer's interpretation, and instead answered that "all I can say" is that once

5    an employee was permanently disabled he/she was no longer entitled to leave under Section 9.4) (CX

6    #1, p. 86). In another example cited by the Company, during a colloquy with Arbitrator Staudohar

7    the Union representative stated that "one of the issues" he wanted Staudohar to understand was that

8    "one of these individuals had not been off work for an equal amount of time with respect to his time

9    worked...the time for time..." (CX #1, p. 116). The Union repeated this representation in its brief

10   to Arbitrator Staudohar, stating "As a matter of fact, grievant Gutierrez was terminated short of time

11   for time and was, thereby, denied the right to accumulate seniority under...Section 9.3" (CX 15, p.

12   4).

13        Although it is clear that there were various references by the Union before Mr. Staudohar

14   about time for time and/or Section 9.3, as well as claims that at least one of the employee-grievants

15   was deprived of time for time sick leave, it does not appear that either the Union (or the Employer)

16   ever expressly told Arbitrator Staudohar that the parties were seeking an interpretation of Section

17   9.3. For example, in its brief to Arbitrator Staudohar, the Union focused at the outset on "the

18   question before the Arbitrator," and summarized its position as follows:

19        The question before the Arbitrator...is not "at what time can the Employer terminate
         the employment of the grievants?"[2]...the salient question is, "Under the terms of the
20       Agreement, does the Employer have the right to terminate the employment of the
         grievants?" The Union says "No" for the following reasons...
21                                                              (CX #15, p. 2)

22   The "reasons" cited by the Union are 1) Article II, Section 1.4, and 2) Article XI, Section 3, and

23   included a specific attack upon the Employer's reliance upon Section 9.4 consistent with the Union's

24   claim that Section 9.4 "only speaks to the seniority issue, not the termination issue" (CX 15, pp. 2-5).

25

26   _____

27        [2] The question of "when" employees could be terminated, if posed to Arbitrator Staudohar, may have
     have necessarily required an analysis of the relationship between the length of "automatic" sick leave provided
28   in Section 9.4 and the different, time for time length of sick leave asserted by the Union in Section 9.3.

1    8.    The recitation of pertinent Facts (Case Background) in *Staudohar* is devoid of any

2    reference to "time for time" sick leave or Section 9.3 for any of the employee grievants.   The

3    Arbitrator's summary of the parties' Contentions is devoid of any reference to "time for time" sick

4    leave entitlements; nor is Section 9.3 of the Agreement cited by Mr. Staudohar in the parties'

5    positions as a contract article in dispute and/or which was the subject of conflicting interpretations.

6    As discussed more fully below, the Opinion section of *Staudohar* makes three separate findings

7    related to the interpretation of the words and language contained in Section 9.4.  The Opinion section

8    does not make a single reference to time for time sick leave, does not expressly reference Section 9.3,

9    and there is not a single interpretation of any word, phrase, or language contained in Section 9.3.

10    9.    In its opening argument in this arbitration, the Company asserted that all four [sic]

11    employee-grievants in *Staudohar* were deprived of their time for time leave (Tr. 50-52; 52: 2-3).

12    Based on the factual findings in *Staudohar* and the parties' stipulation in this proceeding with regard

13    to the practice of computing time for time leave (see Factual Finding #10), this claim appears to be

14    mistaken in multiple respects.  First, as noted in Factual Finding #4, there were three employee-

15    grievants, not four.  Arbitrator Staudohar specifically noted that Janet McCarthy resigned her job;

16    accordingly, he made no findings with respect to her employment and her status was not addressed

17    in the decision.  Second, based on the historical method used to calculate employees' time for time

18    leave (seniority measured from the date of hire to last day worked), it appears that two of the three

19    employee-grievants did *not* have a meritorious claim for time for time leave because they received

20    their full allotment of time for time leave before their April 6, 1989 termination:

21    •    *Renee Adeola* worked less than one year (hired on October 14, 1985, last day worked
         on May 29, 1986).  With time for time seniority of less than one year, she was entitled

22    to a maximum of 18 months of time for time, Section 9.3 leave.  She was
         terminated on April 6, 1989, almost three years after her last day worked.  She had

23    no time for time entitlement, as confirmed by the Company (Factual Finding #10).

24    •    *Rafael Gutierrez* worked about six months (hired in October, 1985, last day worked
         on April 1, 1986)(*Staudohar*, p. 4).  With time for time seniority of less than one

25    year, he was entitled to a maximum of 18 months of time for time, Section 9.3 leave.
         He was terminated on April 6, 1989, more than three years after his last day worked;

26    accordingly, he had no further entitlement to time for time leave when discharged.

27    Ms. *Tiwana* worked more than one year and thus had up to 36 months of time for time.  It appears

28    that she received 33 months.  However, she never grieved that issue (Factual Finding #4).

10.     The evidence is undisputed that immediately after the *Staudohar* decision, and at all times until mid-2005, the Company applied Article XXIII, Section 9 in a manner that granted employees time for time sick leave pursuant to Section 9.3 independent of leave that expired under Section 9.4 pursuant to *Staudohar*.  This evidence is summarized as follows:

- Following the issuance of the Opinion in *Staudohar*, there was continued litigation between the Union and the Company concerning the employment status of the three employee grievants.  In processing Adeola's grievance, the Company advised the Union that Ms. Adeola had not been terminated (subsequent to the arbitration decision) solely because her medical condition was permanent and stationary, i.e., upon the expiration of her leave under Section 9.4 pursuant to *Staudohar*.  Rather, the Company stated that it was "obligated to continue a leave not to exceed the employee's length of seniority," i.e., to grant her "time for time" sick leave as well.  The Company stated that "because Ms. Adeola has a) been on a sick leave exceeding her seniority; b) has been deemed permanently disabled, the Company is no longer obligated to Ms. Adeola *after her...time for time date*" (emphasis added).

- The parties stipulated that after the *Staudohar* decision until the fall of 2005, the leave of employees who had personal or industrial injuries was not terminated at the time the medical condition became permanent, but rather employees remained on a leave of absence for the full period set forth in Article XXIII, Section 9.3, with seniority measured from the date of hire to last day worked (Tr. 66-69).

11.     After the ruling in *Staudohar* regarding the "technical" violations of Article XI, Section 3, the Company sent letters to each of the three employee-grievants advising that their leaves had expired.  Thereafter, none of the employee-grievants was placed in a job, and the Company again terminated their employment.  Grievances challenging each of those terminations were filed and pursed to arbitration before three different arbitrators (Wilma Rader, Barry Winograd, and Alexander Cohn).  No claim of time for time entitlement was asserted or addressed by those arbitrators.

12.     In 2004, the Company and the Union held discussions about the Company's need and desire to cut costs.  The Company estimated the cost of benefits for employees on leave at about $12,000 per year per employee, which amounted to a total cost in excess of millions of dollars.  The Company also advised the Union, for the first time, of its belief that under *Staudohar*, the Company had the right to terminate employees with *industrial* injuries whose leave expired under Section 9.4 because injuries had been classified as permanent and stationary, and that the Company was not required to defer termination until leave rights under Section 9.3 expired.  These discussions did not result in any modifications of the benefit costs, or any immediate change in the Company's practice

- 10 -

1   of granting time for time leave even after employees with personal or industrial injuries were deemed

2   to be permanent and stationary.

3        13.   In July of 2005, the parties commenced negotiations for a new collective bargaining

4   agreement. The Employer renewed its efforts to achieve cost savings for employee benefits, and

5   proposed the reduction and/or elimination of various benefits (including benefits for employees on

6   leave). The Company was not successful in achieving these cost savings at the bargaining table. The

7   Company also reiterated to the Union by letter dated July 19, 2005, at the outset of the negotiations,

8   the Company's new interpretation of *Staudohar* that an employee's seniority could be broken once

9   the employee's condition was determined to be permanent and stationary. In the same letter, the

10  Company notified the Union that it intended to comply with its interpretation effective August 7,

11  2005, the first day after the then-existing contract expired.

12       14.   The Union did not agree with the Company's new interpretation of *Staudohar*.

13  However, neither party sought to negotiate about their conflicting interpretations of the contract

14  language and/or as it was applied in light of *Staudohar*; accordingly, there was no change in Sections

15  9.4, 9.3, or Article XI, Section 3 in light of the Company's newly-asserted interpretation.

16       15.   In September of 2005, the Company met with the Union and presented a written

17  proposal concerning its plan to implement the new interpretation of *Staudohar*. It appears that the

18  Union then first learned that the Company's interpretation of *Staudohar* applied to all employees

19  whose injuries were deemed permanent and stationary, i.e., both industrial and non-industrial injuries

20  or conditions.

21       16.   Since the implementation of its new interpretation of *Staudohar*, the Employer has

22  terminated 301 employees whose Section 9.4 leave expired because they have permanent and

23  stationary injuries or conditions, without regard to such employee's claimed time for time leave under

24  Section 9.3. The Union grieved the Company's interpretation of *Staudohaar* on the basis that the

25  employees could not be terminated until their time for time leave expired. The Union further took

26  the position that employees are entitled to time for time leave beginning after the employee is deemed

27  permanent and stationary, which is not the way the parties calculated time for time historically. The

28  Union's grievance was not resolved through the grievance procedure, and this arbitration ensued.

1                   **CONTENTIONS OF THE PARTIES**

2  **The Union**

3        This dispute concerns the Company's unilateral implementation of a sick leave policy that

4 conflicts with the language of the parties' Collective Bargaining Agreement and the parties' mutual

5 understanding of that language based on the Company's own statements and past practice.

6        The Agreement provides sick leave to employees who become "ill or disabled." Section 9.3,

7 also known as the time for time provision, describes the length of a sick leave and allows an employee

8 to remain on sick leave for a period of time equal to his or her seniority, except for employees with

9 less than three years of seniority. The Company now contends for the first time that the time for time

10 clause does not grant a *right* to remain on sick leave, but instead merely describes an "allowable

11 maximum" length of sick leave. The Company also contends that it has the right to terminate sick

12 leave as soon as an employee's medical condition becomes permanent, regardless of whether the team

13 member's condition is industrial or personal and regardless of the team member's accrued seniority.

14        The Company's position is contrary to the contract language and longstanding practice of the

15 parties. The sole basis of the Company's interpretation of Section 9.3 is a 1989 arbitration decision

16 by Paul Staudohar involving the termination of three injured employees whose injuries had been

17 deemed permanent and stationary. The Union took the position in that arbitration that employees

18 with industrial injuries could *never* be terminated. The Union relied upon various contract clauses

19 for this position, including Article XI (seniority) and Article XXIII, Section 9.4 a provision on sick

20 leave that addressed sick leave for industrially injured employees. Neither the Union's grievance nor

21 the Union's appeal to arbitration cited Section 9.3, the clause at issue in this dispute.

22        The Company contended in *Staudohar* that "when the work injuries of the employees were

23 deemed to be permanent, their rights to industrial leaves of absence were extinguished under the

24 terms of Article XXIII, *Section 9.4*" (emphasis added). Mr. Staudohar agreed with the Company's

25 argument; he held that sick leave for industrial injured employees does not last "into perpetuity"

26 because, although Section 9.4 grants sick leave automatically, it expressly states that "seniority is to

27 accumulate for the full period of the legal temporary disability." *Staudohar* did not hold that when

28 an employee's condition becomes permanent that his/her separate Section 9.3 rights are extinguished.

1    *Staudohar* did not so hold because the grievance at issue therein did not submit any issue of

2    employee rights to Section 9.3 leave for resolution by that arbitrator. Mr. Staudohar's opinion did

3    not interpret Section 9.3 as setting forth only an "allowable" maximum, as the Company now

4    contends, because Mr. Staudohar never interpreted Section 9.3 at all. In fact, the Company itself

5    acknowledged, right after *Staudohar* in reference to one of the grievants in that arbitration, that it

6    remained contractually obligated to continue the sick leave of team members with permanent

7    industrial injuries until their time on leave exceeds their time for time clock. In the decade and a half

8    after *Staudohar*, the Company continued to apply the contact in the same manner.

9          In 2004, the Company advised the Union that, despite the longstanding and mutually accepted

10   interpretation of Section 9.3, it suddenly believed it had the authority under *Staudohar* to terminate

11   the sick leave of industrially injured team members once their conditions became permanent, even if

12   their time for time clock had not expired. The Company's announcement of its interpretation came

13   at the same time management was tasked with achieving costs savings of $110 million annually. In

14   2005, the Company sought costs savings by eliminating health benefits for team members on sick

15   leave, but the Union did not agree to the proposal. Thereafter, the Company sought to expand its

16   policy to include team members with permanent *personal* medical conditions. However, *Staudohar*

17   analyzed only the sick leave rights of team members with *industrial* injuries; the rights of employees

18   with *personal* medical conditions to remain on leave was not before that arbitrator.

19          The Company has not tendered an explanation as to why it waited a decade and a half to

20   implement an interpretation of the contract that it now contends to be clear and unambiguous, or why

21   it has offered two separate interpretations (one for employees with industrial injuries, the other for

22   all team members) that are at odds with each other *and* its own prior, longstanding interpretation. But

23   the reason is clear. The Company failed to obtain during bargaining an agreement to terminate

24   benefits of employees on sick leave, so the Company decided to end their employment entirely,

25   thereby ending their benefits and achieving the cost savings it failed to obtain at the bargaining table.

26          The grievance should be sustained. Team members who have been terminated pursuant to

27   the policy should be reinstated, made whole, and allowed to take their time for time sick leave. In

28   addition, the 21 employees listed in JX #7 should be deemed eligible for the early retirement program.

**The Company**

It is well-established that the power of an arbitrator is limited by the issue submitted by the parties, especially when the issue is set forth in writing prior to the hearing. Here, the parties have defined the issue in a non-traditional way. The parties are not seeking a *de novo* interpretation of the contract. Rather, they elected to define the issue as whether the Company's current policy is consistent with two particular provisions in the Agreement "as interpreted" by an earlier arbitration decision "among other things." In the past, when the parties wanted a *de novo* interpretation of a contract provision, they specifically agreed to the issue before the arbitrator, e.g., the issue statements in the post-*Staudohar* arbitrations involving grievants Tiwana and Adeola ("Was the grievant properly terminated pursuant to Article XI Section 3 of the...agreement; and if not, what is the appropriate remedy?"). Thus, it seems clear that the issue for the Arbitrator in this case is not to make a *de novo* interpretation of the Agreement.

The parties have litigated the key issue in this case before in a prior arbitration proceeding. The *Staudohar* decision adopted the Company's interpretation of Article XXIII, Section 9, and three subsequent arbitrators upheld the holding in *Staudohar*. More specifically, the key issue in this case is whether the Company has the right to break the seniority of a team member on leave once that team member's medical condition becomes permanent and stationary (provided NUMMI gives the team member the proper notice and accommodations). The Company chiefly relies upon the hearing transcript and briefs in *Staudohar*, plus the three subsequent arbitration decisions to show that the Company's interpretation is not only "consistent" with *Staudohar*, but that the legal doctrine of claims preclusion and/or *res judicata* apply to the present case. This follows since Mr. Staudohar addressed and refuted the same arguments that the Union attempted to make herein. Indeed, the policy reviewed in *Staudohar* and found to be permissible under the Agreement and the policy adopted in 2005 and at issue here are essentially the same expect for the extra procedural and notice protections that Mr. Staudohar recommended in his opinion.

The Union wants to argue that *Staudohar* did not address the issue of whether the Company could break the seniority of team members once they became permanent and stationary and before they receive the maximum amount of leave allowed by the Agreement (so-called time for time leave).

1  However, a fair review of the record before Arbitrator *Staudohar* refutes that argument. Both at the

2  hearing and in its post-hearing brief, the Union specifically put Arbitrator Staudohar on notice that

3  by finding the Company's leave policy permissible under the Agreement, it would allow the Company

4  to terminate a team member prior to their alleged time for time being extinguished under Section 9.3

5  of the Agreement. Although being on notice of these arguments, Arbitrator Staudohar (and three

6  subsequent arbitrators applying his decision) made it clear that seniority "could" in fact be "broken"

7  if a team member became permanent and stationary and no jobs were open. The result should be the

8  same in this case.

9        Past practice is not an issue in this arbitration. To the extent past practice has been raised as

10  an issue here, it is not controlling. Past practice should not be examined in a case like the present one

11  where the doctrine of claims preclusion applies, or alternatively the terms of the Agreement are clear.

12  In any event, the record clearly establishes that any alleged past practice was extinguished prior to

13  the 2005 negotiations. There is no dispute that the Company made its intentions clear, both before

14  and at the start of the 2005 negotiations, that it would apply its interpretation as soon as the 2005

15  Agreement expired. The Union was put on notice and elected not to negotiate any changes in the

16  leave provisions in the Agreement. Whatever took place prior to that time is irrelevant. Accordingly,

17  under well-established arbitral authority, any alleged past practice terminated with the 2005

18  negotiations.

19        The Arbitrator requested that the parties address the issue of remedy. The Company does so

20  reluctantly in view of the arguments above. As noted, the sole issue before this Arbitrator is whether

21  the Company's new policy is consistent with two contract provisions as previously interpreted by

22  *Staudohar*, "among other things." If the Arbitrator finds that the policy is consistent with *Staudohar*

23  then the policy is valid under the Collective Bargaining Agreement based on arbitration decisions that

24  are binding on the parties. If the Arbitrator finds that the policy is neither "consistent" nor

25  "inconsistent" with *Staudohar*, then there is likely no remedy. In that case, the parties would have

26  to arbitrate the issue *de novo* to determine if the policy violated the Agreement.

27        Based on the foregoing, the Arbitrator should find that the Company's policy is consistent

28  with the Agreement, as interpreted by *Staudohar*, and deny the Union's grievance.

## OPINION

*The Scope of the Issue*

Counsel for the Company notes, correctly, that the stipulated issue before the Arbitrator is a non-traditional issue statement. In most contract interpretation cases, the submitted issue is "whether a party's action/policy violated the parties' contract," or more helpfully, "whether the party's action/policy violated Article/Section 'x' and/or 'y' of the contract." This Arbitrator, in his cursory reading of the issue statement at the outset of the hearing, had the impression that the parties were submitting the same kind of issue in this proceeding, with specific reference to a prior binding decision by Arbitrator Staudohar. It is clear from the Union's presentation and arguments, both at hearing and in its post-hearing brief, that the Union had the same understanding of the issue – specifically, that the parties were seeking a ruling with regard to whether the policy implemented by the Employer *violated the Agreement*, in view of the contract language, *Staudohar*, and "other things" normally considered in a traditional contract interpretation dispute.[3]

It is now clear to the Arbitrator that the Company had a very different understanding of the scope of the stipulated issue. The Company twice interrupted the Union's opening argument at this hearing to lodge an objection to the Union's discussion of possible remedies in this case (Tr. 36-37, 42). In its post-hearing and reply briefs, the Company has stated more directly – and repeatedly – its position that the issue statement does *not* authorize this Arbitrator to make a *de novo* interpretation of the contract (Co. Closing Brief at pp. 17 n.3, 19, 30, 32; Reply Brief at pp. 2-3). Like the Union's broader interpretation of the issue statement, the Company's understanding of the non-traditional statement of the issue is a plausible interpretation of the language used by the parties. Since it appears that there was not a mutual understanding of the scope of authority granted to the Arbitrator, this Opinion will be limited to what both parties understood the issue encompassed.

---

[3] The Arbitrator's impression of his "traditional" charge in this matter as set forth in the stipulation was reinforced by the parties' delegation of authority to determine an "appropriate remedy" and a second issue related to the eligibility of employees affected by the Company's policy to participate in the early retirement program. The latter issue is only "ripe" for resolution if it is determined that the Company's policy violated the parties' Agreement, as opposed to a ruling limited to whether or not the policy is "consistent" with the prior arbitration decision.

- 16 -

For purpose of clarification, it appears that both parties have argued extensively their conflicting claims as to whether *Staudohar* constitutes a binding precedent that governs the outcome of the subject grievance – more specifically, that *Staudohar* is a binding decision between these parties with respect to employees' entitlement to sick leave pursuant to Article XXIII, Section 9.3, if any, when team members' Section 9.4 leave expires because their injuries or medical conditions have been deemed permanent and stationary. Based on these arguments, it is concluded that both parties contemplated, and understood, that in determining whether the Company's policy was "consistent" with "the...agreement as interpreted by...*Staudohar*," this Arbitrator's authority requires a threshold determination as to whether the Section 9.3 claim herein was previously ruled upon and is barred by principles of claims preclusion, *res judicata*, and/or common labor arbitration principles related to binding precedents involving parties to a collective bargaining agreement.

***The Scope of the Staudohar Decision***

Both parties agree that *Staudohar* held that an injured team member who is found to have a permanent and stationary disability "can" have his seniority broken. In reaching that decision, Arbitrator Staudohar interpreted Article XXIII, Section 9.4 to mean that industrially injured employees on Section 9.4 leave were not entitled to indefinite or "permanent" leave status within the meaning of Section 9.4. This holding was based upon a specific analysis of three parts of Section 9.4, as summarized below:

- In contrast to the Union's argument that industrially injured employees were entitled to Section 9.4 leave indefinitely, *Staudohar* stated "seniority accumulates for the full period of temporary disability." This phrase is from Section 9.4.

- The next sentence states, "It does not seem correct to conclude that a 'legal temporary disability' period would last into perpetuity." The phrase that was interpreted, "legal temporary disability," is from Section 9.4.

- In the last sentence of the succeeding paragraph, the *Staudohar* Opinion states that the words "full period" and "temporary" do not imply "forever." Both of these words he interpreted, contrary to the Union's grievance therein, are from Section 9.4.

Obviously, *Staudohar* constitutes a binding interpretation of Section 9.4. The decision further held that since Section 9.4 leave "expires" for employees when they are found to have permanent and stationary disabilities, seniority can be broken pursuant to Article XI, Section 3(e) if the employee fails to return to work after a specified number of days *after the leave expires*, as Section 3(e) states.

1          The key issue in this grievance is not "whether" the Company can break seniority of team

2    members with permanent disabilities, but "when" it can do so.  Specifically, the issue is, when a team

3    member's Section 9.4 leave expires pursuant to *Staudohar*, is the employee subject to immediate

4    termination (upon compliance with *Staudohar* procedural requirements ) even if the employee has

5    accrued time for time sick leave under the separate clause in Section 9.3?  Or, more specifically, did

6    *Staudohar* constitute a binding arbitral ruling concerning of the entitlement of permanently disabled

7    employees who may have accrued separate leave entitlement under Section 9.3?

8          *Staudohar* did not specifically address employee entitlement to Section 9.3, or time for time

9    leave.   The decision contains no factual findings as to whether any of the employee-grievants had

10    accrued time for time leave at the time of their terminations, or not.[4]  Mr. Staudohar's summary of

11    parties' contentions is silent with regard to any claim of Section 9.3 entitlement, or any claim that,

12    notwithstanding the dispute as to whether Section 9.4 leave could be "terminated" upon a

13    determination of permanent and stationary status, the Company was first required to determine

14    whether employees had other leave entitlement, such as time for time in Section 9.3, before

15    proceeding with discharge of the employee.  Finally, neither the Opinion nor the Award expressly

16    addresses the latter issue, or specifically cites Section 9.3 at all.

17          *Staudohar* does state, "It seems appropriate to conclude that *a leave of absence* could be

18    ended by the Company *in cases like those we are considering here*" (emphasis added).  In view of

19    the focus in the preceding section of the opinion upon Section 9.4, as summarized above, arguably

20    the preceding sentence, in referring to "a" leave of absence, was directed to *the* leave of absence he

21    addressed and analyzed in the decision.  The sentence does not read, "all leaves of absence can be

22    ended...in cases like these..."  Moreover, in view of Mr. Staudohar's reference to "cases like those

23    we are considering" it is appropriate to examine more closely what cases were before him with

24    respect to the time for time leave issue.  As noted in Factual Finding #9, *Renee Adeola* did not have

25    accrued time for time at the time of her termination, a fact the Company confirmed shortly after the

26    decision in *Staudohar* (and which the Union did not dispute in Adeola's subsequent arbitration).

27    

28        [4] In fact, *Staudohar* does not even once use the parties' commonly used phrase, "time for time."

1   Moreover, as discussed in Factual Finding #10, based on the findings of Arbitrator Staudohar as to
2   *Rafael Gutierrez'* hire date and last day worked, it appears that *Gutierrez* likewise had exhausted his
3   maximum allowable time for time leave before he was discharged on April 6, 1989. Finally, while it
4   appears that *Lorelei Tiwana* may have had a colorable claim to three months of time for time leave
5   when she was discharged, she did not assert that claim in her individual grievance – and the Union
6   did not assert a violation of time for time leave for *any* of the grievants in *Staudohar*. Based on the
7   complete absence of any findings, discussion, or rulings with regard to the grievants' entitlement to
8   Section 9.3 leave in *Staudohar*, there is a serious question as to whether he was even aware of the
9   employees' time for time accrual. Alternatively, if he was aware, in view of the evidence that two
10  of the three employee-grievants before him had no colorable claim to time for time leave, the third
11  grievant never asserted that claim, and in further view of his silence on this subject in his decision, it
12  appears that Mr. Staudohar did not find it necessary, or appropriate, to rule on their possible Section
13  9.3 leave entitlement. Based on this record, the Arbitrator finds that *Staudohar* did not contain any
14  factual findings or "rulings" with regard to the entitlement of those employee-grievants to Section
15  9.3 leave, or any rulings as to whether or not the Company was obligated under the Agreement to
16  grant unused, accrued time for time leave *before* effectuating the discharge of team members whose
17  leave under Section 9.4 was subject to expiration based on the express ruling of *Staudohar*.

18      The Arbitrator recognizes that *Staudohar* recites the content of Section 9.3 in a section of the
19  pertinent contract clauses in that proceeding. It is noted that he also quoted the contractual language
20  in Article XI, Section 3(a) allowing seniority to be broken for the reason "Discharge for just cause."
21  However, Mr. Staudohar's inclusion of that contact language does not mean that he was authorized
22  to issue a "binding" arbitral ruling with respect to the interpretation of the just cause clause – nor did
23  he. In this case, the very first contract section cited by the Union in its opening statement was Article
24  XXIII, Section 9.1. The fact that this Arbitrator "considered" this statement does not mean that this
25  Arbitrator was authorized to interpret and issue a binding ruling with respect to the meaning of that
26  clause. Closer to the point, the stipulated issue statement herein references both Section 9.3 and 9.4.
27  Both parties made extensive arguments about Section 9.4. The Arbitrator has discussed that section,
28  but it is clear that he was not asked to interpret Section 9.4 – and no such "ruling" has been made.

1       Since *Staudohar* itself does not expressly address the time for time entitlement, if any, of

2 employees whose Section 9.4 leave expires, the Company relies extensively upon statements of party

3 representatives at the hearing and in written arguments before Arbitrator Staudohar. This reliance is

4 misplaced. As this Arbitrator is well aware after 21 years of service, the record in most arbitrations

5 contains statements, evidence, and arguments which are not material to the decision reached. This

6 Arbitrator routinely disregards many statements and arguments, and avoids reaching facts and issues

7 that are not material or necessary to address. It is self-evident that the binding affect of arbitral

8 rulings is derived from arbitral "rulings" – that is, a "ruling" on a specific issue, by the arbitrator – and

9 not what arguments, evidence, or statements are proffered by either, or both, parties which are not

10 addressed by the arbitrator. Accordingly, the Company's reliance upon stray statements and

11 assertions by the Union before Mr. Staudohar is outweighed by a review of the actual rulings and

12 analysis in *Staudohar* that constitute "rulings" on specific issues which that arbitrator chose to address

13 in his Opinion.

14       In summary, this Arbitrator finds that the issue decided in *Staudohar* – whether a team

15 member on Section 9.4 disability leave can be discharged under the Agreement upon a finding that

16 the employee's disability or condition is permanent and stationary – is different than the issue herein:

17 if a team member's Section 9.4 leave expires pursuant to *Staudohar*, is the employee subject to

18 immediate termination (upon compliance with *Staudohar* procedural requirements ) even if the

19 employee has accrued time for time sick leave under the separate clause in Section 9.3? *Staudohar*

20 did not make any findings about employees' time for time accrual, did not address their time for time

21 rights, if any, and did not make any "rulings" with respect to team members' Section 9.3 rights in the

22 circumstances of the expiration of Section 9.4 rights that were addressed therein. Accordingly, it is

23 concluded that *Staudohar* did *not* constitute a binding arbitral ruling concerning of the entitlement

24 of permanently disabled employees who may have accrued separate leave entitlement under Section

25 9.3. It is further concluded that the Employer's implemented policy of terminating employees whose

26 Section 9.4 leave rights have expired because they have permanent and stationary injuries or medical

27 conditions, without granting such employees accrued rights to sick leave as provided in Section 9.3,

28 is not consistent with the actual rulings in *Staudohar*.

1

## AWARD

2    1.    The Company's policy regarding long-term leaves of absence is not consistent
3          with Article XI, Section and Article XXIII, Section 9.3 of the Collective
Bargaining Agreement, as interpreted by the Staudohar decision. This ruling
is limited to the scope of the Arbitrator's authority as discussed in the
4          Opinion, and does not constitute a *de novo* ruling on the contract language.

5    2.    The parties authorized the Arbitrator the authority to fashion a "proper"
remedy, and further authorized the Arbitrator to retain jurisdiction of the
6          remedy (JT. X #7; Tr. 14-15). In view of the Company's limitation of the
scope of the Arbitrator's authority as discussed above, and in further view of
7          the outstanding issues contained in the stipulated issue statement, the proper
remedy is to direct a *de novo* hearing on the merits of the Union's grievance.

8

9    3.    The Arbitrator will retain jurisdiction of the remedy for a reasonable period,
or unless the parties mutually agree to proceed to a *de novo* hearing before
another arbitrator mutually agreed to by the parties. In the event either or
10          both parties request that this Arbitrator assert his jurisdiction and proceed to
a hearing on the merits of this grievance, the Arbitrator will work with the
11          parties to schedule future proceedings or a schedule for further argument.

12

13    DATED:    November 24, 2006

14                                     CHARLES A. ASKIN,
Arbitrator

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

1   CHARLES A. ASKIN
    31 LOMA VISTA
2   WALNUT CREEK, CA 94597

3

4

5

6

7               IN ARBITRATION PROCEEDINGS

8       PURSUANT TO AGREEMENT BETWEEN THE PARTIES

9

10

11  In the Matter of a Controversy

12      Between

13  NEW UNITED MOTOR                          SUPPLEMENTAL
    MANUFACTURING, INC.,                   OPINION AND AWARD
14
                        Employer
15      and

16  INTERNATIONAL UNIION, UNITED
    AUTO WORKERS UNION, LOCAL 2244,
17
                        Union
18
    Involving the interpretation of Article XXIII,
19  Section 9.3 ("time for time" provision).

20

21          This dispute involves the application and interpretation of a Collective Bargaining Agreement

22  between the above-named Employer and Union.  Pursuant to the provisions of the Agreement, the

23  parties selected the undersigned Arbitrator to issue a final and binding decision.

24          A hearing was held in Fremont, California on June 6 and June 18, 2007.  During the course

25  of the hearing, the parties were given full opportunity to examine and cross-examine witnesses and

26  to introduce relevant exhibits.  Counsel for both parties submitted post-hearing briefs and reply

27  briefs.  The matter was deemed submitted upon the Arbitrator's receipt of the reply briefs on October

28  20, 2007.

1  APPEARANCES:

2       On Behalf of the Union:

3            Jonathan Weissglass, Esq. and Linda Lye, Esq.
             Altshuler, Berzon, Nussbaum, Rubin & Demain
4            177 Post Street, Suite 300
             San Francisco, CA 94108
5
        On Behalf of the Company:
6
             Nick C. Geannacopulos, Esq. and Christian J. Rowley, Esq.
7            Seyfarth Shaw LLP
             560 Mission Street, Suite 3100
8            San Francisco, CA 94105

9                              **ISSUES**

10  Did the Employer violate the Collective Bargaining Agreement by implementing a
    new policy regarding long-term leaves of absence and terminating certain employees
11  on leave before the expiration of "time-for-time" leave under Article XXIII, Section
    9.3 of the Collective Bargaining Agreement? If so, what is the appropriate remedy?[1]
12

13               **Relevant Provisions of the Agreement**

14  **XI.    SENIORITY**

15  **3.     Loss of Seniority**

16       Seniority will be broken and lost, and employment shall cease for the
         following reasons:
17
         .....
18
         e.   Failure to return to work within four (4) consecutive working days
19            (excluding Saturday and Sunday) after the expiration of a leave of
              absence unless unusual conditions or circumstances exist;
20
         .....
21
         g.   Being on sick leave beyond the period set forth in Paragraph 9.3 and
22            9.4, Article XXIII of this Agreement.

23  ///

24  ///

25

26  _____

27       [1] The parties were unable to reach agreement upon a joint statement of the issue to be submitted for
    resolution, but authorized the Arbitrator to frame the issue. The foregoing issue statement was framed by
28  the Arbitrator and read to the parties at hearing.

                                  - 2 -

1    **XXIII.    LEAVES OF ABSENCE**

2    **1.    Definition**

3    A leave of absence means approved time off from work with or without pay
     for a specified period of time for serious or compelling reasons as described
4    below.

5    **2.    Eligibility**

6    2.1    Employees who have not completed their initial evaluation period are not
            eligible for a leave of absence, except where such leave is legally required.
7            .....

8    **9.    Sick Leave**

9    Employees who become ill or disabled are eligible for an unpaid leave of
     absence after an absence of five (5) consecutive working days.  Requests for
10   such leave will be submitted within this five (5) day period and will include
     medical documentation from their attending physician indicating they are
11   unable to work and the estimated duration of their absence.  The Company
     may, at its expense, request an impartial medical opinion from a mutually
12   agreed upon medical examiner.

13   **9.3**   A sick leave of absence may not exceed the employee's length of seniority as
            of the date of the illness or disability, or eighteen (18) months for an
14          employee with less than one (1) year of seniority, or thirty-six (36) months
            for an employee with more than one (1) year of seniority, whichever is
15          greater.

16   **9.4**   In compensable injury and legal occupational disease cases, sick leave will
            be granted automatically and seniority will accumulate for the full period of
17          legal temporary disability.  Employees disabled during evaluation period by
            compensable injury or legal occupational disease shall be given credit for the
18          period of such disability toward acquiring seniority.

19                              **Pertinent Facts**

20        This is the second arbitration proceeding before this Arbitrator arising from a grievance filed

21   by the Union on November 10, 2005.  Generally, the Union's grievance challenges the propriety of

22   the Employer's decisions to implement a policy terminating employees' leaves of absence before the

23   expiration of employees' so-called "time for time" leave pursuant to Article XXIII, Section 9.3 of

24   the Agreement.  The grievance also challenges the termination of employees affected by adoption

25   of the foregoing policy.  The pertinent facts in this stage of the controversy are summarized below.

26        1.  The Employer and the Union have been parties to successive collective bargaining

27   agreements since the plant re-opened as a joint venture in the mid-1980's.  Since at least 1989, and

28   possibly since the parties' first contract, the pertinent language quoted above (Article XI, Section 3

1   and Article XXII, Section 9) has been identical, or identical in all material respects.

2       2. As stated in Section 9.3 of the Agreement, the amount of leave provided to ill or disabled

3   employees with more than 36 months of seniority may not exceed the employee's length of seniority

4   as of the date of an illness or disability.   Because of its linkage of leave "time" to seniority "time,"

5   the  parties refer to the leave in Section 9.3 as "time for time" leave.  Time for time leave is an

6   unpaid leave. However, employees on a time for time leave of absence are eligible to return to work

7   if and when their medical condition permits them to do so.  In addition, employees on a time for time

8   leave of absence receive company-paid health care and other benefits while on the medical leave of

9   absence (Tr. 184-185, 413), which cost about $12,000 annually for each employee.  Historically,

10   some employees have been on a medical leave of absence for years, even as long as a decade.

11       3.  On April 6, 1989, the Employer terminated four employee who were on sick leave or

12   medical after determinations that each of them had medical restrictions that would not enable them

13   to return to their jobs. The Union filed a policy grievance challenging the four terminations that was

14   heard by Arbitrator Paul Staudohar. On December 17, 1990, Arbitrator Staudohar issued an Opinion

15   in that matter wherein he sustained the Company's right to terminate a leave of absence "in cases

16   like we have here," subject to certain procedural/technical issues not material herein.   More

17   specifically, Arbitrator Staudohar ruled that an employee on leave who 1) was unable to perform

18   work in their classifications, and 2) whose injuries were medically determined to cause permanent

19   restriction, could have his or her leave of absence terminated.   Stated another way, it is undisputed

20   that the Staudohar Decision authorized the Employer to terminate an employee's leave of absence

21   under Section 9.4 (compensable injury and legal occupational disease cases, or "industrial injuries")

22   when the employee's medical condition becomes "permanent."

23       4.   After the Staudohar Decision was issued in late 1990, and until August 6, 2005,

24   employees whose medical condition was deemed permanent, and whose Section 9.4 leave was

25   accordingly terminated, were not automatically discharged from employment.  Rather, during the

26   15 years from December 17, 1990 until August 6, 2005, employees whose Section 9.4 leave of

27   absence rights were terminated were deemed "entitled" to their maximum allowance of time for time

28   leave pursuant to Section 9.3 of the Agreement.  For example:

- Following the issuance of the Opinion in *Staudohar*, there was continued litigation between the Union and the Company concerning the employment status of the three employee grievants. In processing Ms. Adeola's grievance, the Company advised the Union that Ms. Adeola had not been terminated (subsequent to the Staudohar Decision) solely because her medical condition was permanent and stationary, i.e., upon the expiration of her leave under Section 9.4 pursuant to *Staudohar*. Rather, the Company stated that it was "*obligated* to continue a leave not to exceed the employee's length of seniority," i.e., to grant her "time for time" sick leave. The Company stated that "because Ms. Adeola has a) been on a sick leave exceeding her seniority; b) has been deemed permanently disabled, the Company is no longer *obligated* to Ms. Adeola *after her...time for time date*" (emphasis added).

- The parties stipulated that after the Staudohar Decision and until the fall of 2005, the leave of employees who had personal or industrial injuries was not terminated at the time the medical condition became permanent; rather such employees remained on a leave of absence "for the maximum period set forth under Article XXIII, Section 9.3, with seniority measured from the date of hire to last day worked."

5.   The Employer has repeatedly stated in writing, as late as October 30, 2004, that employees are "entitled" under Section 9.3 of the contract to time for time leave no longer than the length of the employee's seniority, and that such employees are subject to termination when their Section 9.3 leave of absence "entitlement" is exhausted. (Union Exh, C, D, and E). The Union's position in this grievance, and at all times material herein, is consistent with the Employer's written statements that employees are "entitled" to time for time leave, and are subject to separation from employment upon the exhaustion of their maximum leave "entitlement."

6.   Article XXIII, entitled "Leaves of Absence," provides for multiple kinds of leave.  In addition to sick leave (also referred to as medical leave) provided in Section 9 at issue herein, Article XXIII provides separate leaves for bereavement, jury duty, short and long-term military service, service in public office, personal reasons, and further education.  The Agreement expressly states that personal leave and education leave are subject to the Company's approval and/or the Company's discretion.  The leave provisions for bereavement, jury duty, short and long-term military service, service in public office – and the sick leave provided in Section 9 of Article IIXXX – each contain "definitions" specifying the conditions for which an employee is "eligible" for that leave, but there is no comparable language stating those leaves are subject to company discretion or approval. Prior to the policy implemented on August 7, 2005 at issue herein, there is no evidence in this record that the Employer denied a sick leave of absence to any employee who satisfied the two qualifying

- 5 -

1   criteria for sick leave "eligibility" in Section 9 (completion of the initial evaluation period and

2   submission of unchallenged medical documentation by a physician that the employee is unable to

3   work, with an estimated duration of absence) on the asserted basis of the Employer's "discretion."

4        7.  The payment of benefits to employees on medical leaves of absence has been costly, in

5   excess of millions of dollars.  In 2004, the Employer sought to reduce costs and advised the Union,

6   for the first time, of its belief that under the Staudohar Decision it had the right to terminate

7   employees with "industrial" injuries whose leave expired under Section 9.4 because their injuries

8   had been classified as permanent and stationary, i.e., that it was not required to defer separation from

9   employment of such employees until after the expiration of the "maximum period" of time for time

10  leave.  The Employer's disclosure of its new interpretation of the Staudohar Decision was made

11  during the term of the predecessor contact.    The Employer took no action to implement its

12  interpretation of the Staudohar Decision during the term of the predecessor contract.

13       8.  In July of 2005, the parties commenced negotiations for the current Collective Bargaining

14  Agreement.   At the outset of negotiations, by letter dated July 19, 2005, the Employer reiterated its

15  new interpretation of the Staudohar Decision that an employee's seniority could be broken (and the

16  employee terminated) once the employee's condition was determined to be permanent and stationary.

17  In the same letter, the Employer notified the Union that it intended to comply with its interpretation

18  effective August 7, 2005, the first day after the then-existing contract expired.

19       9.    The Union did not agree with the Employer's new interpretation of the Staudohar

20  Decision.  However, neither party sought to negotiate about their conflicting interpretations of the

21  contract language and/or how it was applied in light of that Decision.  There was no change made

22  in the language in Sections 9.3, 9.4, or Article XI, Section 3 of the new, current Agreement.

23       10.  In September of 2005, the Employer met with the Union and presented a written proposal

24  concerning its plan to implement its new interpretation of the Staudohar Decision.  It appears that

25  the Union then first learned that the Employer's interpretation of the Staudohar Decision applied to

26  all employees whose injuries were deemed permanent and stationary, i.e., both industrial and non-

27  industrial injuries or conditions.

28       11.   The Employer implemented its new interpretation of the Staudohar Decision by

- 6 -

1   contacting about 301 employees who had been on medical leave for extended periods and who had

2   "permanent" medical conditions. The affected employees were contacted in a series of five

3   successive "waves." The employees were invited to participate in an interview with company

4   representatives to discuss the nature of their permanent restrictions, and whether the employee was

5   able to perform available work at the Employer's facility. In the course of these interviews, the

6   Employer learned that some of the employees who had been identified did *not* have permanent

7   restrictions; those employees were removed from the "program," i.e., returned to their time for time

8   leave due to their temporary disability. Some of the affected employees retired, resigned their

9   employment, or failed to appear for the requested interviews. The Employer terminated employees

10   whose medical condition were permanent and stationary, and who could not be placed in a position,

11   without regard to those employees' continued eligibility for time for time leave under Section 9.3

12   as it had been applied at least from 1990 until August, 2005. About 99 employees whose maximum

13   time for time leave had not expired were terminated, some after many years of absence.

14       12. On November 10, 2005, the Union grieved the Company's interpretation of the

15   Staudohaar Decision and the employment separations that resulted on the basis that the employees'

16   employment could not be terminated until their time for time leave expired.

17       13. The Union also contends that the current method of calculating the maximum time for

18   time leave violates the parties' contract. Specifically, the Union asserts that employees are entitled

19   to an amount of "seniority" time based on the full period of temporary disability up to the point the

20   injury is deemed "permanent and stationary," rather than up to the last date worked as time for time

21   has been applied historically.

22       14. On November 24, 2006, in the prior proceeding arising from this grievance, this

23   Arbitrator issued an Opinion and Award wherein it was held that the Employer's policy regarding

24   time for time leaves of absence is not consistent with Article XI, Section 3 and Article XXIII,

25   Section 9.3 of the Collective Bargaining Agreement, as interpreted by the Staudohar Decision. The

26   subject hearing was convened to hear evidence and to issue an arbitral ruling concerning the issue

27   of whether the Employer's implementation of its new time for time policy, and its consequent

28   termination of affected employees, violated the parties' Collective Bargaining Agreement.

1                       **<u>CONTENTIONS OF THE PARTIES</u>**

2  **<u>The Union</u>**

3        The Union contends that the Employer's implementation of its new interpretation of the

4 Staudohar decision constitutes a unilateral repudiation of its longstanding contractual obligations.

5 The Employer sought to obtain the change it implemented during contract negotiations, but the

6 parties did not agree to a change in the contract language. No arbitral authority allows the Employer

7 to obtain through unilateral action what it failed to obtain through negotiation.

8        Under the plain language of the contract, employees who are ill or disabled and satisfy the

9 procedural prerequisites set forth in the contract of submitting time medical documentation have a

10 right to a sick leave of absence. The Employer has no discretion to deny sick leave to which

11 employees are entitled. Without a provision setting forth the amount of sick leave to which

12 employees are contractually entitled, the contractual right to sick leave would be meaningless; the

13 Employer could terminate sick leave at its discretion. The provision on sick leave accrual rights is

14 known as the "time for time" provision and generally provides that employees have a right to remain

15 on sick leave for a period of time equal to their seniority (except in certain cases for less senior

16 employees). The contract explicitly provides that employees have a right to remain on sick leave,

17 and that they have a right to do so for the full period of time set forth in the time for time provision.

18 The Employer complied with this requirement for years.

19        In the fall of 2005, the Employer suddenly implemented a new sick leave policy. The

20 Employer now believes that it has the right to terminate the sick leave of absence of any employee

21 whose medical condition has become permanent, even if the employee has not yet been on leave for

22 the full length of her time for time clock. The new policy was based on the Employer's

23 interpretation of a 1990 decision by Arbitrator Staudohar, but this Arbitrator has rejected that

24 argument. Now that the Employer's new policy cannot rely upon the Staudohar Decision, the

25 express language of the contract compels the conclusion that the grievance must be sustained. Under

26 the plain language of the contract, employees have the right to remain on a sick leave of absence for

27 the full period of their time for time clocks, and the Employer cannot unilaterally repudiate that

28 written contract obligation.

1    Because employees' right to time for time leave is evident from the plain language of the

2  contract, no resort to extrinsic evidence is necessary to interpret the contract. But even if the contract

3  could be construed as ambiguous, the parties' past practice unequivocally supports the Union's

4  interpretation. The parties themselves – as evidenced through their longstanding conduct – have

5  always interpreted the contract to provide employees a *right* to remain on sick leave for up to the full

6  length of their time for time clocks and to deny the Company discretion to terminate a sick leave

7  before that point. Pursuant to the parties' undisputed and longstanding practice, the Employer has

8  continued the sick leave of employees, past the point at which their conditions became "permanent"

9  and past the point when no work was available in the plant that matched the employees' restrictions.

10  Pursuant to the parties' undisputed and longstanding practice, and in light of the Employer's repeated

11  and express acknowledgment that employees have a "right" to time for time leave, the Employer

12  only terminated sick leave once the employees exceeded their time for time clocks, not before.

13    The past practice of treating time for time leave as a right sheds light on the meaning of the

14  contract language governing sick leave. Unlike a past practice that lacks any basis in the language

15  in the contract, this past practice may *not* be unilaterally repudiated by a party. This is so because

16  the type of practice at issue here – one that is grounded in the language of the contract – reflects the

17  parties' mutual understanding of the meaning of the contract language itself. This principle was

18  recognized by Arbitrator Mittenthal in his "classic" treatise on Past Practice, when he wrote that

19  "because [an "interpretative"] practice "is essential to an understanding of the ambiguous provisions,

20  it becomes in effect a part of that provision." Mittenthal, "Past Practice in Contract Administration,"

21  59 Mich L. Rev. 1017, at 1041 (1961). Thus, unilateral repudiation cannot "eliminate" the type of

22  past practice at issue in this case any more than unilateral repudiation would allow a party to

23  eliminate a contract term. Quoting Arbitrator Mittenthal again,

24      ...this kind of practice can be terminated only by mutual agreement, that is, by the
        parties rewriting their the ambiguous provision to supersede the practice, by
25      eliminating the provisions entirely, etc.

26  Id. Because the Union has never agreed to change the contractual right of employees to time for time

27  leave, the Employer's so-called Staudohar Program violates the Agreement.

28    For the foregoing reasons, the Union's grievance should be sustained.

- 9 -

**The Employer**

The Employer contends that its implementation of the so-called Staudohar Program is fully consistent with the Collective Bargaining Agreement. The language, intent and structure of hte parties' contract demonstrate that the Employer is not required to give sick leave for the full length of an employee's seniority, or "time for time." The parties did not intend to create a potentially two-decades-long disability benefit or early retirement option when they created a "leave of absence" for illness in Article IIXXX, Section 9. The commonly understood meaning of "leave of absence" is a *"temporary absence* from employment or duty with the intention to return." (emphasis added) *Pollett v. Rinker Materials Corp.,* 477 F.3d 376, 380 (6th Cir. 2007).

Consistent with this common meaning, Article XXIII, Section 9.1 creates one "leave of absence" for illness, which leave, per Section 9.3, "may not exceed" the time for time period. In other words, it provides an absolute upper limit on sick leave. Nothing in Section 9.3 automatically requires NUMMI to grant sick leave for the full time for time period. The parties clearly knew how to require sick leave "automatically" if they wanted to do so, because they did so in Section 9.4 for industrial injuries (for the period of temporary disability). Indeed, the Section 9.4 requirement – that sick leave automatically granted for the period of temporary disability for industrial injuries – would be superfluous if Section 9.3 mandated sick leave for the time for time period in all circumstances.

The Arbitrator should construe any ambiguity in the contract language against the Union. The Employer advised the Union of the meaning of Article XXIII, Section 9 in 2005, and the Union accepted that language without proposing an alternate meaning. It is axiomatic that a contract is an agreement between two or more parties. The ultimate goal of an arbitrator is always to determine what the parties intended by an ambiguous term, and to give effect to that intent. The Union is basically arguing, based on pre-contract behavior, that the parties mutually intended Section 9 to be interpreted in a way that is expressly contrary to NUMMI's stated intent in 2005. There cannot possibly be a "meeting of the minds" as to the interpretation proposed by the Union in view of the Employer's stated interpretation at the bargaining table. The foregoing conclusion is especially forceful in view of the inclusion in this contract of a zipper clause. See *Grand Haven,* 107 LA 131 (1996) at 137. Under black letter law, the Union is bound by the Employer's interpretation.

1    The Agreement does not require NUMMI to provide sick leave for the full length of an

2    employee's seniority. Rather, the Employer is only required to provide sick leave for a temporary

3    period until such time as the employee is permanently disabled and unable to return to work despite

4    the best efforts of NUMMI and the Union. The Agreement grants NUMMI the discretion to provide

5    a leave of absence beyond that period, but not to exceed the length of an employee's seniority.

6        There is no dispute that prior to August 7, 2005, the Employer allowed most employees to

7    take sick leave for the full length of their seniority (and in some cases more) regardless of whether

8    there was any reasonable chance that the employees would ever return to work. Nevertheless, the

9    Employer terminated that practice prior to the new contract term by providing notice to the Union

10   and by incorporating a zipper clause in the new Contract. The Employer also had the right to end

11   the practice to preclude fraud and waste, and it did so.

12       Richard Mittenthal, in a rarely-cited passage, suggested that an amorphous category of past

13   practices involving interpretation issues cannot be terminated at the end of a contract term, contrary

14   to the rule that applies to all other past practices. His opinion is basically ignored in the case law and

15   does not comport with black-letter contract law. "Interpretative" past practice is merely an aid to

16   glean the parties' intent where ambiguous language exists. Where one party has clearly stated what

17   is meant by the certain language, and the other party has agreed to that language, pre-contractual past

18   practice is not relevant to determining what the parties intended. To argue that an alleged past

19   practice, which one party has clearly disavowed, continues on into a new contract despite the party's

20   intent (and a zipper clause) eviscerates the core contractual concept of mutual consent and the rules

21   generally applicable to past practice. Arbitrators agree that one party can terminate a past practice

22   at the end of the agreement by giving notice to the other party. As has been often stated:

23           If either side should, during negotiations of later agreement, object to the continuance of this
             practice, it could not be inferred from the signing of a new agreement that the parties
24           intended the practice to remain in force. Without their acquiescence, the practice would not
             longer be a binding condition of employment. In the face of a timely repudiation of a
25           practice by one party the other must have the practice written into the agreement is it is to
             continue to be binding.
26

27   *Grand Haven Stamped Products Co.,* 107 LA 131 (Daniel, 1996) at 137 (quoting Mittenthal, NAA,

28   14th Proceedings).

1    Even if Arbitrator Mittenthal's interpretative had merit, which it does not, this is not an

2    "interpretation" case. Rather, in this case, the Union is arguing that the scope of a right that the

3    employees clearly have under the Agreement – sick leave – has been *expanded* by an alleged past

4    practice. Specifically, the Union claims that past practice created the benefit of full time for time

5    leave in all sick leave cases, a benefit that is *not* provided for in the Agreement. Unlike a purely

6    contract interpretation situation, the issue in this arbitration is not what is meant by some vague word

7    or phrase, such as "reasonable notice" or "agreed medical examination." Here, the words of Section

8    9 are clear: "A sick leave of absence <u>may not exceed</u> the employee's length of seniority..." What the

9    Union is really claiming is that NUMMI has a contractual obligation based on past practice to

10    provide benefits to people who are totally disabled for potentially more than 20 years, even when

11    there is virtually no chance that they will ever return to work. This case is squarely within the group

12    of "contractual benefit" cases that even Mittenthal agrees can be terminated by proper notice.

13    In summary, the Employer does not dispute that the Agreement provides for sick leave. But

14    it also gives NUMMI the discretion to determine the maximum amount of time that an employee

15    may be on sick leave, up to the length of an employee's seniority, after his or her condition becomes

16    permanent. The Agreement does not require the Employer to provide sick leave for the length of

17    seniority, which could be 23 years for an employee, even if the employee is totally disabled and not

18    getting better. The Employer's notice to the Union during contract negotiations in 2005 extinguished

19    any and all past practice that gave team members the benefit of sick leave for the full length of their

20    seniority. Accordingly, the Employer respectfully asks the Arbitrator to deny the Union's grievance.

21                                            **OPINION**

22    **I.    *Overview***

23    In contract interpretation disputes, the fundamental role of an arbitrator is to discern the

24    mutual intent of the parties and enforce the bargain which was struck. To satisfy that obligation, the

25    arbitrator must first review the pertinent language and determine whether it is clear and

26    unambiguous. If so, the plain meaning of the words used by the parties must be strictly enforced.

27    However, an ambiguity exists where plausible arguments can be advanced for conflicting

28    interpretations of the disputed language. In such cases, it is appropriate and proper for an arbitrator

1  to look beyond the four corners of the contract to ascertain the parties' true intent by reviewing

2  extrinsic evidence such as bargaining history and/or past practice.

3          In this case, Article XXIII, Leaves of Absence, provides for various kinds of employee leaves

4  of absence.  Section 9, entitled "Sick Leave," provides two discrete circumstances for the use of sick

5  leave in Section 9.3 and Section 9.4, and two different periods of time for the leaves in each section.

6  Thus, Section 9.4 grants "automatic" sick leave in cases involving injury and legal occupational

7  disease, i.e., "industrial" injures.  Based on the contract language, as interpreted by the Staudohar

8  Decision, Section 9.4 sick leave is granted "for the full period of legal disability," and that sick leave

9  is subject to termination when an employee's condition is deemed to be permanent and stationary.

10  Section 9.3 sick is authorized for a broader class of medical conditions than in Section 9.4, e.g., also

11  for "personal" (non-industrial) injuries or illnesses that preclude an employee's ability to work.  The

12  leave provided in Section 9.3 is also for a different duration of time – namely, a period "not to

13  exceed the employee's length of seniority...", or as it is referred to by the parties, "time for time."

14  Based on the evidence presented and the arguments submitted, there is no dispute that the Agreement

15  provides a sick leave benefit to employees.  This controversy involves a dispute over the meaning

16  of Section 9.3 with respect to the length of that leave – specifically, whether Section 9.3 means that

17  employees are entitled to the "full" amount of time for time leave before they can be terminated.

18          The Employer notes, correctly, that Section 9.4 provides for an "automatic" grant of sick

19  leave for industrial injuries, but the parties did not use the word "automatic" in describing the sick

20  leave provided in Section 9.3.  It is further noted that Section 9.3 does not expressly identify a

21  specific minimum period of time for time entitlement; rather, the only language addressing the length

22  of time for time leave ("may not exceed") appears to represent a "maximum" ceiling, or upper limit,

23  without regard to any mandatory "minimum" time period.  In the Arbitrator's view, the contention

24  that Section 9.3 does not "automatically" require the Employer to grant each "eligible" employee the

25  maximum period of time for time leave, but only an amount "not to exceed" the maximum allowed,

26  constitutes a plausible interpretation of the "time for time" provision in Section 9.3.

27          The Union notes, correctly, that two of the leave provisions in Section 9 (personal leave and

28  education leave) specifically condition entitlement to those leaves upon the Employer's "discretion"

- 13 -

1   or "approval." Eight other leave benefits in Section 9 – bereavement, jury duty and witness

2   subpoenas, short-term and long-term military service, service in public office, union activity, and

3   sick leave – do not contain comparable language that those leaves are subject to Employer

4   "discretion" or "approval." There is no evidence that the Employer has ever exercised "discretion"

5   to deny employees who meet the respective eligibility or definitions of bereavement leave, jury duty

6   leave, military service (either short-term or long-term), or the any of the other cited eight leave

7   benefits – including sick leave – except the policy adopted in September of 2005 at issue here. In

8   these circumstances, the Union's claim that employees who satisfy the eligibility requirement for

9   leave (completing the initial evaluation period) and the documentary requirements for sick leave

10  (submission of medical documentation by an attending physician stating the employee is unable to

11  work, and the estimated duration of the absence) have the contractual right to the full amount of

12  leave described in Section 9.3, so long as the employee is unable to work, is also a plausible

13  interpretation of the Agreement. The latter interpretation is reinforced by the language in Article XI,

14  Section 3, which provides that seniority "will be broken and lost, and employment shall cease

15  for...Being on sick leave *beyond* the period set forth in Paragraphs 9.3 *and* 9.4, Article XXIII..."

16  (emphasis added). The word "beyond" in Section 3 suggests that employees are not subject to

17  separation from employment until the employee has exhausted the *entire* amount of sick leave

18  entitlement; moreover, the inclusion of the word "and" in the same section indicates, contrary to the

19  Employer's interpretation, that employees are entitled to exhaust both Section 9.3 sick leave *and*

20  Section 9.4 sick leave before their seniority may be broken and the employee can be terminated.

21       Based on the foregoing, the Arbitrator finds that there are plausible arguments for conflicting

22  interpretations of the meaning of Section 9.3 with respect to whether employees have a contractual

23  right to the full amount of sick leave before they can be terminated. Since an ambiguity exists, it is

24  appropriate to consider external evidence in the form of the parties' bargaining history and past

25  practice to discern the meaning of contract language. Neither party adduced evidence of the parties'

26  discussions of the meaning of Section 9.3 at the bargaining table when that language was negotiated,

27  which would be pertinent in considering what the parties intended, and meant, *when they agreed to*

28  *the language*.

1    The parties stipulated that for 15 years from 1991 until August 7, 2005, employees whose

2  medical conditions were deemed permanent and stationary were not terminated, but instead remained

3  on a leave "for the maximum period" in Section 9.3.    This stipulation, and the entire record,

4  supports a finding that there was a past practice reflecting the parties' mutual acceptance and

5  understanding that the language of Section 9.3 meant that employees whose Section 9.4 leave had

6  expired were not subject to separation of employment, and were "entitled" to remain on a leave of

7  absence until the full amount of their time for time leave was exhausted.  There is evidence that the

8  Employer sought to terminate that practice in 2005, before the implementation of the new policy at

9  issue herein.  Ultimately, the issue submitted herein turns upon a legal analysis of the status and

10 significance of this past practice.

11 **II.    *Past Practices***

12      **A.    <u>Different Types of Past Practice</u>**

13      The "bible" of labor arbitration, *How Arbitration Works* by Elkouri and Elkorui, identifies

14 three "major purposes" of past practices in American labor-management arbitration:

15      1.    To provide the basis of rules not included in the written contract;

16      2.    To support proper interpretation of written contract language; and

17      3.    To resolve claims that the "clear language" of a written contract has been amended
            by mutual agreement of the parties, i.e., to make the written contract consistent with
18            the parties regularly administer their contract.

19 *How Arbitration Works* (Sixth Ed.), at 605.  There are fundamental differences in the character and

20 significance of past practices.  Two of the above "purposes" of past practice are premised upon extra-

21 contractual *conduct* by the parties: the "addition" of rules (or implied contract terms) based on the

22 parties' mutual behavior, or a "change" in the written contract consistent with the parties' mutual

23 conduct and thus acceptance of a modification of the written agreement.  These extra-contractual

24 practices, when proven, are deemed by law to constitute binding, unwritten Implied Terms of the

25 Contract because the practices are not contained in the written contract (either by omission or

26 because the parties' practice changes the written language of their contract).

27      The third purpose of "past practice" – interpretation of a written contract – has an entirely

28 different origin.  It is based upon a  document that is memorialized and executed by the parties as

- 15 -

the written codification of their specific rights and obligations. When contract language is clear and unambiguous, there is no need to "interpret" that language; both parties are bound by the plain meaning of clear and unambiguous language of a written contract. When the contract language is ambiguous, the parties' custom and practice is "the most widely used standard to interpret" the *meaning* of that ambiguous language. *How Arbitration Works,* at 623.

Apart from the issues of how different customs and practices may be terminated, the different origins of Extra-Contractual Past Practices and Interpretative Past Practices lead to different facts when a practice has been "terminated." When an Extra-Contractual Practice is properly terminated, it ceases to exist; the very basis of its existence – the mutual conduct and mutual acceptance of the parties – is destroyed by its termination by one of the two parties. However, when an Interpretative Practice of the parties is "terminated," *the written language of the contract remains.* If that written language is ambiguous – the rationale for examining the Interpretive Practice – the *same words* must still be "interpreted" because the written language/rights/obligations remain enforceable. If the meaning of those ambiguous words has been resolved, or interpreted, relying upon Interpretative Past Practice, i.e., the parties' own mutual past conduct revealing their mutual understanding of the meaning of the ambiguous words they previously used in the contract, the meaning of *the same words* does not "change" simply because one party suddenly claims that the words mean something different. Stated another way, once ambiguous contract language is interpreted, its meaning becomes just as clear and enforceable as contract language that is clear and unambiguous on its face. The parties may agree to change patently clear contract language, or ambiguous language that has been clarified by Interpretative Past Practice. However, if the patently clear *language* is not changed by the parties, or the formerly ambiguous *language* that has been clarified by interpretation is not changed, *the meaning of the same words* in the written contract does not change either.

The Employer argues that the distinctions between past practices made by commentators such as Arbitrator Richard Mittenthal are "amorphous," rarely cited, and contrary to black-letter law. A review of case law and accepted authorities supports a different conclusion. The foregoing overview provides a contextual background of the distinct, different origins of Extra-Contractual Past Practices (Implied Contract Terms added to a written contract) in comparison with Interpretative Past Practices

- 16 -

1   (use of the parties' own conduct to discern the *meaning* of existing written language that is

2   ambiguous).  In addition to the different character and origin of Interpretative Past Practices in

3   contrast to Implied Contract Terms, the law recognizes at least three significant, substantive

4   differences in the legal treatment of these different types of past practice.

**B.    Different Levels of Proof for Different Practices**

6           In a section in *How Arbitration Works* entitled "Evidence Required to Establish a Binding

7   Past Practice," the authors noted, "When it is asserted that a practice constitutes an implied term of

8   a contract, strong proof of its existence ordinarily will be required." Id. at 607.  It also cites the well-

9   established standard for proving a practice sufficient to be deemed an implied contract term; the

10  asserted practice must be 1) unequivocal, 2) clearly enunciated and acted upon, and 3) readily

11  ascertainable over a reasonable period of time as a fixed and established practice accepted by both

12  parties. Id. at 608.  In a separate section addressing the role of custom and practice in interpreting

13  ambiguous contract language, Elkouri and Elkouri noted that Interpretative Past Practices require

14  less evidence than the "strong proof" needed to establish practice as an implied contract term:

> As it has been noted, to establish a binding past practice as an implied term of the contract, "the way of operating must be so frequent and regular and repetitious so as to establish a mutual understanding that the way of operating will continue in the future." Put somewhat differently, "the practice must be of sufficient generality and duration to imply acceptance of it as an authentic construction of the contract." Accordingly, a "single incident" has been held insufficient to establish a "practice."
>
> *In contrast,* for purposes of interpreting ambiguous language, relatively few past instances have been required to establish a binding practice.

20  *How Arbitration Works*, at 625 (emphasis added).

21          The rationale for these different levels of proof is self-evident in view of their different

22  origins and character, as discussed above.  Thus, when parties add a new benefit in their written

23  contract, and the Employer's implementation of that new benefit is not challenged by the Union,  it

24  is reasonable to conclude that the "practice" is consistent with the parties' mutual understanding of

25  the new contact clause they negotiated.  However, where an entirely new condition of employment

26  arises in the workplace, without any express contractual basis, it is necessary to consider more

27  instances of the practice, over a longer period of time, before concluding that both parties, by their

28  conduct, have mutually accepted that wholly new practice as a binding Implied Contract Term.

C. **Different Applications of Zipper Clauses to Different Practices**

Some parties include language in their written contract that limits the enforcement of unwritten practices as Implied Contract Terms, which are often referred to as "zipper clauses." Commonly, zipper clauses contain language to the effect that the parties' written contract reflects the parties' "entire agreement" and/or specific contract language stating that any prior practices not memorialized in the written contract are null and void. Where such "zipper clauses" or other contract language is explicit, the binding effect of prior Implied Contract Terms established by past practice may be eliminated. *How Arbitration Works*, at 621. However, a zipper clause does *not* eliminate an Interpretative Past Practice:

> Of course, zipper clauses do not negate practices that are relied on for the purpose of casting light on ambiguous contract language.
>                                                                                                        Id.

The fact that the existence of a zipper clause has completely opposite legal consequences for past practices in support of Implied Contract Terms (the practice is eliminated) than for Interpretative Past Practices (the zipper clause does not eliminate the practice/interpretation of the contract) shows that there are, in fact, very significant differences in the legal treatment of these different practices.

D. **Different Rules for Terminating Past Practices**

A third example of completely different legal consequences for different past practices is the difference in what is required to "terminate" these distinct practices. The Employer cites the widely-accepted principle that a binding practice that cannot be terminated during the term of a contract is subject to termination after the contact expires with due notice to the other party. In such cases, it is widely-held that if the other party wants to retain the practice that is the subject of the termination notice, the other party must incorporate the practice into the next written contract. *How Arbitration Works*, at 619. This is an accurate statement of the applicable law with respect to terminating unwritten, Implied Contract Terms. The Employer's brief states, "As has been often stated:

> If either side should, during negotiations of later agreement, object to the continuance of this practice, it could not be inferred from the signing of a new agreement that the parties intended the practice to remain in force. Without their acquiescence, the practice would not longer be a binding condition of employment. In the face of a timely repudiation of a practice by one party the other must have the practice written into the agreement is it is to continue to be binding."

1   The foregoing summary of the law cites Arbitrator Daniel's decision in *Grand Haven Stamped*

2   *Products Co.*, 107 LA 131 137 (1996), quoting "Mittenthal." The language is quoted accurately;

3   however, it omits the context of the stated rule, which is set forth in the first sentence of the same

4   source: "*Consider first a practice which is, apart from any basis in the agreement...*"[2] The stated

5   rule, and the practice at issue in *Grand Haven*,[3] involve conditions of employment not expressly

6   addressed in a written contract, i.e., asserted new or modified Implied Terms of Contract.

7       The "Mittenthal" cited by Arbitrator Daniel and quoted by Elkouri and Elkouri as cited in

8   the Employer's brief is Arbitrator Richard Mittenthal, the author of what has been called a "classic"

9   law review article on past practice back in 1961. The article states pertinently:

10       Consider next a well-established practice which serves to clarify some ambiguity in the
    agreement. Because the practice is essential to an understanding of the ambiguous provision,

11       it becomes in effect a part of that provision. As such it will be binding for the life of the
    agreement. And *the mere repudiation of the practice by one side* during the negotiations of

12       a new agreement, *unless accompanied by a revision of the ambiguous language, would not
    be significant. For the repudiation alone would not change the meaning of the ambiguous*

13       *provision...*this kind of practice can be *terminated only by* mutual agreement, that is, by the
    parties *rewriting the ambiguous provision* to supersede the practice, by eliminating the

14       provision entirely, etc.

15   59 Mich. L. Rev. 1017, at 1041 (1961). Arbitrator Mittenthal reiterated this distinction when he was

16   invited to address the National Academy of Arbitrators in 1998 on the subject of past practices.[4]

17   Finally, is noted that in the most recent edition of *How Arbitration Works* (Sixth Ed.), the authors

18

19       [2] Elkouri and Elkouri, *How Arbitration Works* (Sixth Ed.), at 619, quoting Mittenthal, NAA 14th Proceedings, at 56.

20

21       [3] *Grand Haven*, like the current case, involves a dispute about leave usage. The pertinent contract language provided that leave requests for up to 30 days "may be granted." The company therein adopted a

22   practice that employees had to exhaust any unused vacation time before unpaid leave would commence; the practice was not applied to leaves for personal illness or injury. This practice was not authorized or

23   addressed in the parties' contract; accordingly, it was not an Interpretive Past Practice seeking clarification of language in the written contract. The Union objected to the practice during the parties' negotiations, and

24   the practice was not included in the new agreement. The arbitrator ruled that the prior unwritten practice had been terminated and that the written contract language was not subject to any established practice.

25       [4] Thirty-seven years after his classic article, Mittenthal repeated that there were different methods

26   for terminating a practice lacking "any basis in the agreement" from practices used to interpret ambiguous language in a written contract. Specifically, Arbitrator Mittenthal that noted an Interpretative Past Practice

27   "becomes the definitive interpretation *of that term*" until the contract is re-written and that Interpretive Practice "cannot be repudiated unilaterally." NAA, The Common Law of Arbitrators at 83-84 (BNA,

28   1998)(emphasis added).

1    quote Mittenthal's description of how unwritten practices which become Implied Contract Terms

2    can be terminated (p. 18 above, as modified by the phrase quoted on p. 19: 2-4).  The Mittenthal

3    language quoted by the Elkouri's therein concludes with a footnote, which states in pertinent part:

> In contrast, repudiation of a practice that gives meaning to ambiguous language in the
> written agreement would not be significant – the effect of *this kind of practice can
> be terminated only by rewriting the language.*

6    *How Arbitration Works*, at 619, n. 71.  The foregoing "rule" with respect to terminating Interpretive

7    Past Practices is not described in *How Arbitration Works* as a "rarely-cited" rule, as a minority view,

8    or even as a majority view.  It is the *only* rule cited for termination of Interpretative Practices.  It is

9    submitted that this rule is fully consistent with both the rationale and the other legal treatment of

10   Interpretive Practices (different standards of proof, different applications of zipper clauses) as

11   summarized above.

12       **E.    Illustrative Example of Different Types of Past Practices**

13          The Arbitrator believes that the foregoing summary of the applicable legal principles is

14   accurate and persuasive.  However, in view of the significant conflict in the parties' briefs in this

15   matter, and in further view of the understandable confusion that arises in this context due to the use

16   of the term "past practice" to describe different concepts (and different legal obligations and

17   consequences), the following example of the different applications of past practice is submitted for

18   the parties' consideration in recognizing the differences discussed above.  Consider these facts:

19   •    *Scenario A.* ER and U executed a contract effective December 17, 1990 with a new
          contract clause, stating: "The Employer shall provide to all employees, at the
20        conclusion of each work day, a choice of company-paid beverages."  *Scenario B.*
          The contract contained no such benefit.

21
     •    *Stipulation*: The parties stipulate that from December 17, 1990, until August 6,
22        2005, the Employer provided to employees, at the conclusion of each work day, a
          choice of two beverages: commercially-prepared coffee served in a provided paper
23        cup, and individual bottles of water served in separate sealed plastic containers.

24   •    In July of 2005, during contract negotiations for the current contract, ER gave
          notice to the U that the ER had determined that the practice described in the
25        preceding stipulation was too costly.  ER gave further notice that as of August 7,
          2005, ER would provide employees with a daily option of two beverages: tap water
26        available from a kitchen sink in the employee lounge and refrigerated tap water
          available from a communal drinking fountain located adjacent to the rest rooms.
27        ER noted that the water provided was paid by ER in form of water utility fees.  U
          objected to ER's change, but neither party proposed changes in the content of the
28        pertinent contract language, which was retained without change in Scenario A.

- 20 -

1 It is respectfully submitted that if the factual issues set forth above were pursued to

2 arbitration, there would be completely different outcomes in the two scenarios. In Scenario B, the

3 past practice that evolved had no express basis in the parties' contract. The ER provided timely and

4 proper notice that the practice was terminated, and in fact, it had no obligation to "explain" why

5 there were two beverage options, or who paid for the tap water. The Union's grievance would be

6 denied. In Scenario A, the ER's purported termination of the beverage benefit provided for 15 years

7 does not remove its written contractual obligation to provide "a choice of company-paid beverages."

8 In the second arbitration, the 15 ½ year practice of providing individual cups of commercial coffee

9 and individual bottles of water would be considered an Interpretative Past Practice with respect to

10 the meaning of the terms "choice" and "company-paid beverages." The longstanding past practice

11 would be deemed definitive of the parties' mutual understanding and agreement of the meaning of

12 the ambiguous contract language pertaining to the ER's still-written contractual obligation to provide

13 "a choice of company-paid beverages." The Union's grievance in Scenario A would be sustained.

14 **III.** *The Interpretation of Section 9.3*

15 Article XXIII, Section 9 of the Agreement states that employees who are ill or disabled are

16 eligible for an unpaid leave of absence after their first five days of consecutive absences. The same

17 section provides for two kinds of sick leave, including one in Section 9.3: "A sick leave of absence

18 may not exceed the employee's length of seniority as of the date of illness or disability..." The

19 critical issue in this case is whether the language specifying the duration of the sick leave provided

20 in Section 9.3 means that an employee is entitled to the full amount of the "time for time" leave, as

21 argued by the Union, or whether that language means the Employer retains discretion to deny the full

22 amount of time for time leave and break seniority before such leave is exhausted. In interpreting the

23 meaning of this language, the Arbitrator has given particular weight to the following salient facts:

24 • Two of the leave articles in Article XXIII expressly condition granting leave upon
the Employer's "discretion" or "approval." There is no comparable language in
25 Section 9.3 restricting time for time leave based upon the Employer's discretion.

26 • Each of the leave entitlement sections in Article XXIII, contain specific periods of
eligibility and duration. Section 9.3 likewise contains a single specific period of
27 duration and the specific eligibility requirements for receiving such leave.

28

- It appears that the Employer contends that employees are entitled to sick leave under the Agreement, including time for time sick leave in most circumstances, but that the Employer retains the discretionary right to terminate such leave in one specific circumstance – namely, when an employee's medical condition is deemed to be permanent and stationary. There is no contract language about the partial entitlement claimed herein, or any partial entitlement, of time for time leave.

- The parties' own conduct in routinely describing Section 9.3 leave as "time for time" leave succinctly captures the essence of the parties' own understanding of that leave – a one-to-one "equivalence" (seniority time equals leave time), a concept wholly at odds with a "partial" entitlement to "time for time."

- Article XI, Section 3 of the Agreement provides that seniority can be broken (and employment will cease) "for...Being on sick leave beyond the period set forth in Paragraphs 9.3 and 9.4, Article XXIII..." This language supports the Union's interpretation of Section 9.3 that employees are not subject to separation from employment until their maximum Section 9.3 leave (and 9.4 leave) is exhausted.

- Most significantly, the parties stipulated that from December of 1990 until the fall of 2005, the leave of employees whose medical condition became permanent was not terminated and such employees continued to receive sick leave "for the maximum period set forth" in Section 9.3, with seniority measured from the date of hire to last day worked. This conduct by the parties constituted an Interpretative Past Practice reflecting the parties' mutual understanding and acceptance that the language in Section 9.3 provides an entitlement to the "full" amount of time for time sick leave, with seniority measured form the date of hire to the last day worked, before such leave can be terminated and before seniority can be broken.

- During the parties' negotiations that resulted in the current Agreement, the Employer gave notice to the Union that it intended to terminate the practice set forth in the preceding "stipulation" and implement a different interpretation of the time for time provision. The Union did not agree with the Employer's interpretation. Neither party made proposals to modify the language in Section 9.3, and the same language was carried over into the current agreement. These facts warrant the finding that the Employer's unilateral repudiation of the parties' Interpretative Past Practice with respect to the meaning of Section 9.3 was of no legal consequence because that mutual interpretation could be terminated only by mutual agreement.

Based on the foregoing, the language of the contract, the 15-year Interpretive Past Practice, and the entire record, the Arbitrator finds and concludes that the language in Section 9.3 means that employees, including employees whose medical condition is permanent, who satisfy the contractual eligibility and documentary requirements for sick leaves of absence, are entitled to the full amount of time for time sick leave set forth in Section 9.3, with seniority measured from the date of hire to last day worked, before such leave can be terminated and before an employee can be separated from employment. Accordingly, the Employer's implementation of its new policy known as the Staudohar Program, and the consequent termination of employees who had not exhausted their full time for time entitlement under Section 9.3, violated the Collective Bargaining Agreement.

**SUPPLEMENTAL AWARD**

1.     The language in Article XXIII, Section 9.3 means that employees are entitled to the full amount of time for time sick leave set forth therein, with seniority measured from the date of hire to the last day worked, before such leave can be terminated and before an employee's seniority can be broken. Accordingly, the Employer violated the Collective Bargaining Agreement by implementing a new policy regarding long-term leaves of absence that terminated "time for time" sick leave entitlement before the "maximum period set forth" in Section 9.3, and by terminating employees whose entitlement to time for time leave had not been exhausted.[5]

2.     The determination of the appropriate remedy, and all other outstanding issues[6] arising from the subject grievance, are remanded to the parties for appropriate mutual resolution. Both parties shall retain the right to seek arbitral resolution of any outstanding remedial issues arising from the subject grievance before a different arbitrator, who shall be selected by mutual agreement or selected in accordance with the parties' customary method of selecting an arbitrator.[7]

DATED:   November 20, 2007

CHARLES A. ASKIN,
Arbitrator

---

[5] In the first hearing involving this grievance, extensive arguments were advanced about Arbitrator Staudohar's 1990 decision in light of evidence and arguments presented to Arbitrator Staudohar. In this matter, evidence was presented showing that on July 19, 2005, the date that the Employer gave notice to the Union of its intent to comply with its new interpretation of Section 9.3 and the Staudohar Decision, the Employer gave separate notice to the Union of its position that the Employer's practice of providing benefits to employees on leave was "not required by the collective bargaining agreement" and that the Employer likewise intended to terminate Group Benefits to employees except those on an FMLA/CFRA leave. The latter issue was not litigated by the parties in this proceeding. Nothing in this Supplemental Opinion and Award should be construed as a finding or conclusion with respect to whether the Employer terminated any benefits pursuant to its July 19, 2005 letter, and if so, the legal significance of any such action in light of the findings, analysis, and conclusions herein.

[6] The issue statement authorized the Arbitrator to determine the "appropriate remedy" for any violation. However, at the hearing herein, the Employer expressly declined to submit the "liability" issue of the Union's claim that the current method of calculating time for time leave is improper. Based on the Employer's position concerning the scope of the issue at this stage of the dispute and the Arbitrator's statements to the parties about his authority in light of the Employer's position, there was an implied understanding that any determination of an appropriate remedy, including the Union's calculation claim, would be deferred to a later proceeding on "liability" issues.

[7] The parties authorized this Arbitrator to retain jurisdiction of the remedy, if any, arising from this dispute. This Arbitrator respectfully declines that delegation of authority. The parties are encouraged to negotiate a resolution of this dispute. Alternatively, the parties have the opportunity to select a different arbitrator to resolve any and all outstanding issues arising from this grievance.