# EXHIBIT G

AMERICAN ARBITRATION ASSOCIATION

BEFORE ARBITRATOR CHARLES A. ASKIN

| | | |
|---|---|---|
| UAW Local 2244 (Policy Grievance), | ) ) ) | |
| Complainants, | ) ) ) | |
| vs. | ) ) ) | File No. 10277 |
| New United Motor Manufacturing, Inc., | ) ) ) | |
| Respondent (or Company). | ) ) ) ) | |

---

## NEW UNITED MOTOR MANUFACTURING, INC.'S
## POST-HEARING REPLY BRIEF

---

Dated: October 20, 2006

Nick C. Geannacopulos
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Counsel for Respondent New United
Motor Manufacturing, Inc.

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................1

I.  The Key Issue in this Case is Whether the Policy being Challenged is "Consistent" with Staudohar ...........................................................2

II.  The Policy is "Consistent" with Staudohar ...........................................3

A.  Staudohar Applies Regardless of Whether His Award Specifically Analyzed 9.3 ...........................................................4

III.  The Agreement Supports NUMMI's Position .........................................8

A.  The Union's Contract Interpretation Argument Ignores the Binding Effect of the Staudohar Decision ...................................8

B.  Irrespective of the Binding Effect of the Staudohar Decision the Language in the Agreement Supports NUMMI's Position ......10

IV.  Past Practice Does Not Apply ..........................................................12

V.  Circumstances Have Not Changed .....................................................14

VI.  Remedy .....................................................................................14

As noted in New United Motor Manufacturing, Inc.'s ("NUMMI") opening brief, the arbitrator requested and the parties agreed to submit post-hearing reply briefs in this matter. This is NUMMI's post-hearing reply brief. Throughout this reply brief, NUMMI refers to the record as follows: (Er. Ex. ___) for NUMMI's exhibits; (Union Ex. ___) for the Union's exhibits; and (Jt. Ex. ___) for joint exhibits. In addition, NUMMI will refer to its opening brief as (NUMMI Op. Br. at p. ___) and the Union's opening brief as (Union Br. at p. ___).

## INTRODUCTION

The Staudohar decision governs this case. The Policy (and the interpretation of the Policy) being challenged in this case is essentially the same policy (and Company interpretation) that was unsuccessfully challenged by the Union in Staudohar. (Er. Ex. 2 pp. 16-17, 20, 86.) Under both policies a team member's senority may be "broken" irrespective of his length of service. (Er. Ex. 1 p. 86) Under both policies a team member may be terminated under Article XI, Section 3(e) as opposed to having his leave exceed his seniority under Article XI, Section 3(g). The Union challenge to the policy in Staudohar was rejected. It should not be able to re-litigate an issue it lost. Moreover, the remedy sought by the Union would turn a leave of absence system into a de-facto retirement system.

In its opening brief the Union essentially makes two flawed arguments: (1) Section 9.3 (time for time) was not even an issue in Staudohar and is therefore not relevant to this case; and (2) NUMMI's interpretation of the Agreement is "flatly at odds with the language of the contract." (Union Br. at p. 14.) More specifically, the Union argues the Company does not have the right to "break" the seniority of employees on sick leave. Rather, they must be allowed to exhaust their leaves under Article XI, Section 3(g). (Union Br. at p. 17.) That the Union's argument, however, is directly "inconsistent" with Staudohar, which held: (1) that seniority may in fact be "broken" or "extinguished," and (2) employees may in fact be

1

"terminated" not only under 3(g) (for leave exceeding their seniority) but also under Article XI, Section 3(e) (for failing to return to work because they cannot work due to their permanent restrictions).

## ARGUMENT

I.  ### The Key Issue in this Case is Whether the Policy being Challenged is "Consistent" with Staudohar

The Union incorrectly argues that the arbitrator's task in this case is similar to any other contract interpretation case, and thus a de-novo review of the Agreement should be undertaken. (Union Br. at p. 14 fn. 3.) This is an important issue and one in which the two sides have different views.

It is well established that the power of an arbitrator derives from and is limited by the submission of the issue. *See, League of Voluntary Hospitals*, 67 LA 293 (Goodnick, 1976) (parties' stipulation limited issues to be decided); *Delta Lines Inc v. Int. Brotherhood of Teamsters*, 66 Cal. App. 3d 960, 966 (1977); *California Faculty Ass'n. v. Superior Court*, 63 Cal. App. 4th 935, 944-945 (1998) (citing case law). Here, the parties signed a submission of the issues to be decided weeks before the hearing. (Jt. Ex. 7.) The submission refers to the issues as the "sole" issues to be decided. The key issue is framed as follows: "Is the Company's policy regarding long term leaves of absence consistent with Article XI, Section 3 and Article XXIII, Sections 9.3 and 9.4 of the collective bargaining agreement as <u>interpreted by</u>, among other things, the Staudohar decision." (Jt. Ex. 7) (emphasis added).

The Staudohar decision is the only specifically identified interpreting factor in the submission of the issues. While the parties may have recognized that other "things" could be looked at, these things are not to take precedence over the Staudohar decision. Otherwise, the other "things" would have been specifically

identified in the issue. For example, if the Union desired a de-novo review it should have stated so.

Under the Agreement, the Staudohar decision is binding on the parties. The phrase "among other things" does not stand alone. It is also modified and limited by the phrase "as interpreted by." The only "other things" that could have "interpreted" the provisions at issue in the past are court decisions, other arbitration decisions, or conceivably the "parties" to the Agreement. Of course, the parties' interpretations differ – that is why they are in arbitration. Thus, whether the Policy is "consistent" with Staudohar's interpretation of Article XXIII, Sections 9.3 and 9.4 is really at the heart of this case.

## II.   The Policy is "Consistent" with Staudohar

The Union does not directly address the issue of whether the Policy is "consistent" with Staudohar. According to the Union, Section 9.3 (time for time) was simply a non-issue in Staudohar. A reading of the Staudohar record and transcript clearly establishes otherwise. (See NUMMI Op. Br. at pp. 24-25.) For example:

- In its opening argument in Staudohar, the Union argued, "the position of the Union is that the employees should not have their seniority 'broken' by the company under the language in the contract, and further that there is language contained within the contract that spells out some particulars with respect to limitations and 'time based on seniority' where there's a sick leave provision for industrial purposes or personal purposes involved there." (Er. Ex. 2 p. 20) (emphasis added). The reference to "time based on seniority" is a clear reference to Section 9.3. The use of the word "broken" means just that – a cutoff of seniority before it exhausts. The Arbitrator understood the parties' respective positions with respect to the breaking of seniority

3

and the Company's "game over" position. (Er. Ex. 2 p. 115; see also
Er. Ex. 2 pp. 16, 82.).

- The Union told Arbitrator Staudohar during the hearing that time for
  time was an issue ("you know the provision you state time for time"
  and "he still gets dropped out before time [for time]" and then
  reinforced this to the Arbitrator in its post hearing brief by arguing
  that Grievant Gutierrez was denied time for time. (Er. Ex. 2 p. 116;
  Er. Ex. 15 p. 4.)

- The Arbitrator, the Company, and the Union were all well aware that
  under the policy being challenged in Staudohar, employees could be
  terminated irrespective of seniority if they became permanent and
  stationary. The Union itself noted that under the Company's
  interpretation of the policy, someone with six years of seniority (the
  maximum seniority at the time) could be terminated if that person
  became permanent and stationary, and no work could be found for
  him. (Er. Ex. 1 p. 86.) In its opening argument the Company argued
  that once an employee was permanent and stationary "the basis for the
  leave of absence, whichever leave of absence provision you look to in
  the contract was no longer appropriate" as the leave issue was "moot."
  (Er. Ex. 2 pp. 16-17.)

These facts establish that the issue of "time for time," and the breaking of
seniority upon reaching permanent and stationary status, were indeed, issues in
Staudohar.

A.    Staudohar Applies Regardless of Whether His Award Specifically
      Analyzed 9.3

In light of the evidence that establishes that time for time was an "issue," in
the Staudohar arbitration, the Union is left to argue that "nowhere in the text of his

decision did Arbitrator Staudohar discuss or analyze Section 9.3 (Union Br. at p. 28.), and Staudohar limited his holding to extinguishing seniority solely under Section 9.4.  This argument failed in Staudohar and it should fail here. (Er. Ex. 15, Union's post hearing brief in Staudohar at p. 4 (Section 9.4 " speaks to the seniority issue, not the termination issue, as the Employer would have you believe").

The doctrine of claim preclusion applies to this case irrespective of whether Staudohar specifically analyzed Section 9.3 in his award.  It is the award or judgment that determines claim preclusion, not the opinion explaining the judgment.  *Yamaha Corp. Of America v. U.S.*, 961 F.2d 245, 254 (D.C. Cir. 1992); *cert. den.* 508 U.S. 1078 (1993) (attached to Appendix); *Kamilche Co. v. U.S.*, 53 F.3d 1059, 1063 (9th Cir. 1995).  Moreover, simply because the Union may not have made Section 9.3 their main argument or failed to make the same argument it does in the present case does not make claim preclusion inapplicable. *Yamaha Corp.*, 961 F.2d at 257 (new arguments or re-takes on old arguments do not prevent claim preclusion).

Consistent with the foregoing, Arbitrator Staudohar was aware of all the following facts (which are not in dispute) when he made his decision:

- In its opening argument the Company argued it could "break" seniority; the Union argued the Company could not "break" seniority. (Er. Ex. 2 pp. 16-17, 20.).

- The Union and the Company both agreed that under the Company's interpretation of the leave policy and termination provisions at issue (all of Article Xl, Section 3 and Article XXIII, Section 9) employees could be terminated irrespective of their seniority.  (Er. Ex. 2 pp. 16, 17, 20, 186.)

- The Union argued the "time for time" provision prevented termination at the hearing and in its post-hearing brief.

- Under the Company's view, the policy being challenged in Staudohar allowed for termination under Article XI, Section 3(e). The Union argued none of the reasons set forth in Article XI, Section 3 were applicable to the case. (Er. Ex. 15 p. 4.)

- The arbitrator knew that at least one of the grievants was being terminated prior to his time for time, and the Company policy did not take into consideration time for time.

Knowing these undisputed facts, and after noting Sections 9.3 and 9.4 and Article XI, Sections 3(e) and 3(g) were "especially relevant" to his decision,[1] Arbitrator Staudohar ruled that once the grievants' injuries became permanent their seniority was "extinguished" and they could be terminated. This was true for all the Grievants, including Grievant Gutierrez. He was terminated irrespective of his seniority and so-called time for time.

Arbitrator Staudohar found termination was permissible and final under Article XI, Section 3(e) (failure to return to work after expiration of a leave). As he stated, "If there is no work available (after 3 days), the Company could conclude there was a failure to return to work after expiration of a leave of absence, and the employee is therefore terminated." (Staudohar Decision at p. 14.) Article XI, Section 3 provides seniority is "broken" and employment shall cease if any of the reasons set forth in Section 3(a) through (g) occurred. Thus, the

---

[1]     The Union in its brief mentions that in its notice of appeal in the Staudohar case it did not identify Section 9.3. (Union Br. at p. 26, Union Ex. 25.) The Union, however, in the submission of the issues to Staudohar, made it clear all of Section 9 was in play. (Jt. Ex. 7.) Moreover, the notice of appeal the Union wants to rely on did cite Article XI, Section 3(g), the provision which according to the Union provides that seniority can never be broken and can only be exhausted.

Grievants could be terminated since (as NUMMI argued in its opening argument) they were never coming back to work under "whichever leave of absence provision you look to." (Er. Ex. 2 p. 16.) Contrary to the Union's argument, the Arbitrator was not partially terminating seniority solely under Section 9.4 or telling them an exception may exist for their "final final" termination under Section 9.3. He said the entire "leave of absence" was over for purposes of Article XI, Section 3 "termination" purposes. He clearly meant "game over."

Moreover, the Union argues in the present case (just like in Staudohar) that the only way an employee can have his seniority terminate is pursuant to Article XI, Section 3(g). (Compare Union Br. at p. 17 with the Union's Staudohar post-hearing brief at p. 4 ["This language spells out the <u>only</u> ways that seniority can be broken and cessation of employment can occur"] [emphasis in original].) If that were true, Staudohar and all the cases that came after it would have no reason to even recognize 3(e) as a basis for "breaking" seniority. Why would they since all employees would be allowed to exceed their time for time under Section 9.3 before they could be terminated (the union's current argument)? Staudohar would have simply adopted the view that terminations can only take place if the terms of Section 3(g) are met. Seniority could never "break" or be "extinguished" – it could only be exhausted. By recognizing that seniority could be "broken" under Section 3(e) when someone is permanent and stationary, Staudohar once again necessarily rejected the Union's argument in his award.

The Union simply cannot side-step the obvious by claiming that since the Staudohar decision did not specifically analyze Section 9.3 it is not binding or relevant. Staudohar knew the grievants were not getting time for time. He knew the Company was arguing seniority could be broken for termination purposes (and the Union was arguing the opposite). He heard testimony concerning the history behind Sections 9.3 and 9.4 of the Agreement. He found the key provisions at

7

issue in this case especially important to his decision. He then ruled the employees could be terminated short of time for time. Even if claims preclusion does not apply, it is evident that the Policy is "consistent" with Staudohar's interpretation of the Agreement.

## III.   The Agreement Supports NUMMI's Position

### A.   The Union's Contract Interpretation Argument Ignores the Binding Effect of the Staudohar Decision

The Union argues that time for time is automatic since unlike other leaves in Article 9 they are granted without discretion and not subject to approval. (Union Br. at p. 16.) The Union then incorrectly argues that because Article XI, Section 3(g) provides that seniority can be broken and employment terminated only when the leave periods in Sections 9.3 and 9.4 are exceeded, the Policy at issue violates the Agreement. (Union Br. at p. 17.) Accordingly, the Union argues any other conclusion would defeat the meaning of Article XI, Section 3(g) – effectively rewriting the provision to read the Company may "break" the seniority and terminate employment when a team member is on a sick leave period for less than the leave period set forth in Sections 9.3 and 9.4. (Union Br. at p. 17.)

As a general rule, an interpretation of a contract by an arbitrator is incorporated into the contract itself and becomes part of the contract. (See NUMMI's Op. Br. p. 23.) The Union may not agree on how (or if) Staudohar interpreted Section 9.3, but the Union cannot ignore what Staudohar and its progeny held with respect to "breaking" seniority. Whether or not seniority could be "broken" was an issue in Staudohar.[2] (Compare Er. Ex. 2 pp. 16-17 with Er.

---

[2]     The Union, quoting its own post-hearing brief in Staudohar, argues that the issue in Staudohar was not when seniority may be broken. (Union Br. at p. 26.) A review of the Union's post-hearing brief in Staudohar reveals that the Union argued many issues were "not" questions for Arbitrator Staudohar ("the question is not did the Employer make a good faith effort to find work for the grievants"; the "question is not whether the disability was permanent or temporary.") (Er. Ex. 15

Ex. 2 p. 20: "the Company believes it has the right to break the seniority"; "the position of the Union is that the employees should not have had their seniority broken"). Staudohar and its progeny agreed with the Company – seniority could be broken. (Staudohar Decision at p. 13.) By doing so, Staudohar and its progeny rejected the Union's argument that Section 3(g) was the only way to terminate employees on leave. Arbitrator Staudohar held if there was no work available the grievant could be "terminated" under Article XI, Section 3(e). (Er. Ex. 23 p. 2.) Simply put, by recognizing Section 3(e) as a basis for termination and not Section 3(g), and that seniority can be broken under 3(e) – not 3(g), Staudohar directly rejected the Union's current contractual arguments. The Union's arguments and Staudohar's award are directly at odds with each other. Thus, to apply the Union's arguments in light of Staudohar's ruling leads to an illogical construction of the contract under the Agreement since prior decisions are binding on the parties. (Jt. Ex. 1 p. 23 ["All decisions within the defined authority of the arbitrator shall be final and binding"].)

The Union argues that Staudohar was of the view that leaves could not last in "perpetuity" and all they are asking for is the time until an employee becomes permanent and stationary, and then his "seniority" kicks in – meaning another 10 to 15 years of receiving, on average, $12,000 in benefits per year. (Tr. 217.) Common sense should not be left at the door. Seniority on average lasts 10 to 15 years (and growing) at the plant. Combine the 10 to 15 years with the time it may take to become permanent and stationary and the result is a short lifetime. Moreover, if the Union's argument is accepted, then anytime a person comes back to work even for a day, the clock runs again. This is true perpetuity. As a practical

---

p. 2.) As it turned out, Arbitrator Staudohar disagreed with these assertions, and found they were all issues.

matter and stepping back, the Union's argument would create a retirement system out of a leave system.

B.   Irrespective of the Binding Effect of the Staudohar Decision the Language in the Agreement Supports NUMMI's Position

There is also a significant difference in terms of how the Union and the Company view the underlying purpose behind the leave provisions. (Union Br. at p. 18) The Union's view is that the purpose of the leave provisions is to provide time off irrespective of whether an employee will or will not return to work. The Company contends the purpose of the leave provisions in the Agreement is not to create the equivalent of a retirement policy or disability insurance program. There is an expectation of coming back to work when the leave is over. If someone becomes permanent and stationary, realistically that expectation is over absent the creation of a new job. As NUMMI argued in Staudohar, once an employee cannot come back to work the basis for any leave is over. (Er. Ex. 2 pp. 16-17.) The employee can either get well enough to return to work or he becomes permanently disabled and can never return to work. "In the latter case, the employees' right to a leave of absence comes to an end." (Er. Ex. 16 – NUMMI post-hearing brief in Staudohar at p. 6.) Once again, it is important to note that Arbitrator Staudohar necessarily adopted this argument when he found that the employees could be "terminated" under Section 3 (e) short of their time for time, and that the NUMMI Agreement, unlike the UAW/GM contract, did not allow for modified work.

This view is consistent with statutory leave laws as well. Under the Americans With Disabilities Act, employees are not entitled to indefinite leave. Indeed, courts have held a leave of two months was "unreasonable." *Oestringer v. Dillard Store Services*, 92 Fed. Appx. 2004 U.S. App. Lexis 2375 (7th Cir. 2004) (attached to Appendix). Here, NUMMI allows extended leaves for months and years. The 30-day period is simply the final attempt to place someone.

10

This policy argument is supported by the language in the Agreement. All the various leaves in the Agreement contemplate a leave duration and a return to work. In the 1988 Agreement that Staudohar was interpreting, the longest leave other than sick leave was Union leave, and even that was limited to a one-year duration. A leave of absence is defined as being out for a "specific period of time." (Jt. Ex. 1 p. 65, Section 9.1.) While out on sick leave the employee needs medical documentation and he must be unable "to return to work." If he cannot return to work, he must show an "estimated duration" of his leave. (Jt. Ex. 1 p. 65.) In other words, sick leave in this Agreement is about getting back to work; it is not "automatic" like the UAW/GM Agreement. Moreover, the Agreement specifically recognizes leave is only "automatic" while on "temporary" disability and Section 9.4. When the parties intended to grant "automatic" without discretion leave they expressed that intent in straightforward contract language as in Section 9.4.

Section 9.4 seeks to eliminate disputes about the need for a leave in the case of those injured at work by having the workers' compensation system handle such injuries.[3] However, as Staudohar determined (and as NUMMI argued in Staudohar), seniority ends when the individual is no longer temporary disabled. At this point the injury will not get better. The worker can either come back to work or he cannot. This is the essence of the Staudohar decision. As Staudohar recognized (and as NUMMI argued) in both cases, there are no modified positions

---

[3]     The Union's argument that the contract should be interpreted to give the employees more than workers' compensation provides (Union Br. at pp. 24-25) fails to recognize that the Company raised this issue in Staudohar as well. In Staudohar, the Company was of the view that once they became permanent and stationary the need for the leave ended, and the workers' compensation system in effect took over. (Er. Ex. 2 pp. 16-17, 81-82.)

at NUMMI and there is no provision in the NUMMI Agreement similar to the UAW/Contract disregarding senority for placement purposes.

Section 9.3 does not change this. That Section does not specify a particular length of sick leave for employees. Rather, it puts a limit on the maximum length of sick leave that an employee can take by stating that sick leave "may not exceed" certain terms. Contrary to the Union's arguments, seniority comes into play in that if the employee does not become permanent and stationary, then he has time to time to recover and get better. Industrially injured employees are treated better than non-industrial injured employees since so long as they are getting better and not permanent and stationary their seniority cannot be broken.[4]

IV.   Past Practice Does Not Apply

Past practice is not at issue in this case. The Union argues that the phrase "among other things" in the submission of issues conceivably includes anything, including past practice. That phrase, however, is so broad as to be meaningless. If the Union wanted to argue past practice was an issue they should have said so in the submission of issues, To the extent past practice is at-issue, it must take a back seat to Staudohar.

Past practice may be utilized when the contract language is unclear. As noted above, Staudohar determined that the policy at issue was permissible under the Agreement. Moreover, his interpretation of the Agreement is directly "inconsistent" with the two arguments the Union bases its contractual arguments on : (1) seniority cannot be "broken"; and (2) Article XI, Section 3(g) is the only

---

[4]      In addition, the Union argues that the Company's interpretation would lead to harsh results since the longer someone is allowed to stay out the greater the chance that a job could someday open up (placement of these team members occurred anywhere up to several years after becoming permanent). (Union Br. at p. 19.) Staudohar understood that and rejected that argument as well. He cited the differences between the GM contract and the NUMMI Agreement and the element of timing in finding an open position.

way that a worker on leave can have his seniority end.   Under Staudohar and the cases that followed it, NUMMI always had the right to implement the Policy.  It thus informed the Union of its contractual rights before the 2005 negotiations started by "stating its position."  Once it did so, any past practice obligation ceased.

The Union's argument that an employee is entitled to leave until he becomes permanent and stationary and then leave for the duration of his seniority, has no past practice to support it.  See Elkouri and Elkouri, *How Arbitration Works*, at p. 608 (6th Ed. 2003) (past practice needs to be unequivocal, clearly stated and acted upon, and fixed over time).  The Union is not arguing that the Company must provide time for time benefits.  Instead, the Union is arguing that employees are contractually entitled to leave until they become permanent, and then they are entitled to an additional leave for the length of their seniority after they became permanent and stationary (the "extra innings" argument).  (Union Br. at p. 37.) Not even the Union has interpreted the language in the Agreement this way.  This "interpretation" did not arise until NUMMI informed the Union it intended to enforce Staudohar.  (Union Br. at p. 37.)  No arbitrator has ever interpreted the Agreement this way.  The Company has certainly never interpreted the Agreement this way.

The Union argues that a Company pre-hearing statement in the Adeola case lends support to the argument that a past practice exists to support the "extra innings" argument.  This "evidence" is hardly past practice; none of the Staudohar grievants, including Grievant Adeola, received their time for time.  (Tr. 168.)  All of the Staudohar grievants including Adeola were sent a letter explaining the reason for their termination – "seniority was to be broken and their employment would cease under Section 3(e)."  (Er. Exs. 17, 18 and 19.)  There is no evidence of anyone in the history of NUMMI ever receiving the "extra innings" benefits. Finally, the Company has taken the position that the Company could provide time

for time leave under Section 3(g). Under the Company's interpretation of Staudohar, that was the maximum leave permitted. (Tr. 266.)

V.   Circumstances Have Not Changed

The Policy at issue was blessed by Staudohar and many if not most of the Union's current arguments were raised in Staudohar and rejected either expressly or implicitly. Thus, the Union is left with the argument that things have changed since Staudohar with respect to the number of modified and light duty jobs available at the plant. The Company strongly disagrees with this assertion. (NUMMI Op. Br. at pp. 14-15.) Union testimony on this issue lacks credibility and depends on the forum. When testifying before a workers compensation judge the same Union witness who testified at the arbitration was of the view that virtually all jobs at NUMMI are arduous and repetitive, and to the extent "light duty" job exist they are limited to quality control. (Er. Ex. 29, p. 5.)

VI.   Remedy

The Union seeks a monetary remedy for individuals who were terminated as a result of the Policy. However, there is no evidence that any terminated individuals have any out of pocket monetary loses. In any event, at the end of the day, the Union seeks what neither Staudohar, nor past practice, nor the Agreement supports, and what common sense dictates against – leave benefits that on average will last between 10 and 20 years, based on the hope that someday a job may open up or be created that is within a member's permanent restrictions and senority. This proposed remedy is not about a "reasonable" accommodation or returning someone to a former job. It is about allowing employees to retain expensive benefits for years without any realistic chance of coming back to work. Indeed, even a casual reading of Union Exhibit 47, which purports to list employees who were placed into jobs after becoming permanent, reveals that the vast majority of

these individuals were placed well within six months of becoming permanent, and not years after becoming permanent and stationary.

No one disputes that NUMMI wants workers to return to work. No one disputes that NUMMI works with the Union to try to find jobs for workers as soon as possible. It is unreasonable, however, to expect any employer, including NUMMI, to have people sit out an average of 10 to 20 years collecting benefits without any chance of returning to their former position. As Staudohar made clear, NUMMI's Agreement is not equivalent to the UAW/GM contract. Indeed, NUMMI deserves a better fate than GM.

Dated: October 20, 2006                    Respectfully submitted,


_____
Nick C. Geannacopulos
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Counsel for Respondent New United
Motor Manufacturing, Inc.

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Seyfarth Shaw LLP, 560 Mission Street, Suite 3100, San Francisco, California 94105. On October 20, 2006, I served the within documents:

## NEW UNITED MOTOR MANUFACTURING, INC.'S POST-HEARING REPLY BRIEF

☐ I sent such document from facsimile machine (415) 397-8549. I certify that said transmission was completed and that all pages were received and that a report was generated by facsimile machine (415) 397-8549 which confirms said transmission and receipt. I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed Federal Express envelope with postage paid on account and deposited with Federal Express at San Francisco, California, addressed as set forth below.

Counsel to UAW Local 2244
Linda Lye
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, California 94108

Arbitrator
Charles A. Askin
31 Loma Vista
Walnut Creek, California 94596

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than on day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 20, 2006, at San Francisco, California.

*Shante R. Stitt*

Shante Stitt

# Appendix

tion itself if the FLRA finds that the SSA has violated the NTEU's statutory rights. The NTEU in fact has advised us that it has already petitioned the FLRA to extend the deadline for the election for an additional period of time equal to that for which it has been denied access to the Woodlawn grounds. The NTEU has also filed a motion to expedite the unfair labor practice proceeding; furthermore, as of now there is no indication that the FLRA has failed to employ all due diligence in resolving this dispute in a time and manner calculated to alleviate or remedy the NTEU's alleged injuries.

On the other hand, to affirm the district court's dismissal of the NTEU's complaint could leave the union with no remedy but to refile its lawsuit if the FLRA does not decide its claim in the immediate future or postpone the time for filing its election petition. If the NTEU continues to face a November 1992 deadline without access to the Woodlawn grounds throughout the summer, and assuming it has a legitimate claim to access to the complex, its ability to organize a campaign will be irreparably damaged. There appears to be merit in the NTEU's argument that its loss of organizing time on the front end cannot be made up by doubled or tripled efforts in the period immediately preceding the election. At the time of the district court's original decision, the election was still more than a year away; as of now it is only seven and a half months away. That convergence of a definite deadline for the union and no comparable deadline for the FLRA's action compels us to direct that the complaint be held in abeyance by the district court until one of several events occurs.

### III. Conclusion

We reverse the district court's order dismissing the NTEU's complaint; and order that the action be maintained on its docket, for a period of three months from the date this opinion issues, *i.e.*, until June 30, 1992, or until the FLRA reaches a final decision in the NTEU's unfair labor practice proceeding at an earlier date. If by the June date the FLRA has not acted on the unfair labor practice, the union may renew its motions for injunctive relief in the district court. In considering any such future motions, the district court should also take account of whether the union's petition to extend the deadline for filing the election petition has been granted, denied or is still pending. Finally, if the FLRA acts to deny the union access to the Woodlawn complex, the district court should entertain its constitutional claim.

This compromise reflects our keen interest in balancing the need for the administrative proceeding to complete its course, against the possibly irreparable loss that the NTEU will suffer if its constitutional claim is ultimately vindicated but the proceeding has taken so long that the purpose for its free speech exercise has been practically eradicated. Maintaining the case in abeyance on the district court's docket for three months should protect the interests of judicial economy embodied in the exhaustion doctrine at the same time it avoids irreparable injury to the NTEU's alleged First Amendment rights.

*It is so ordered.*



**YAMAHA CORPORATION OF AMERICA, Appellant,**

v.

**UNITED STATES of America, et al.**

No. 90–5318.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1992.

Decided April 14, 1992.

Rehearing Denied July 16, 1992.

United States distributor and trademark holder filed challenge to legality of regulations permitting Customs Service to deny "genuine goods" exclusion order to holder of United States trademark that is

also wholly owned subsidiary of foreign-trademark holder. The United States District Court for the District of Columbia, Harold H. Greene, J., 745 F.Supp. 730, granted motion to dismiss in part, and 745 F.Supp. 734, dismissed remainder of suit on collateral estoppel grounds. United States trademark holder appealed. The Court of Appeals, Wald, Circuit Judge, held that: (1) trademark holder was precluded from relitigating issue that regulations were invalid under Tariff Act of 1930 and Lanham Act by resolution of identical issues in earlier suit against gray-market importer; (2) United States trademark holder's failure to properly introduce evidence of "physical differences" between gray-market goods and "genuine" goods precluded it from relitigating issue of its rights under Lanham Act based on allegedly new evidence; (3) regulation did not violate Treaty of Friendship or Paris Convention; (4) Customs Service's refusal to grant genuine goods exclusion order did not constitute "taking" without just compensation; and (5) regulation did not exceed Secretary's authority.

Affirmed.

**1. Federal Courts ⊜776**

Court of Appeals' review of district court's dismissal of plaintiff's claims for failure to state claim upon which relief could be granted or under summary judgment is de novo.

**2. Judgment ⊜634**

Under standards for establishing preclusive effect of prior holding, same issue must have been contested by parties and submitted for judicial determination in prior case, issue must have been actually and necessarily determined by court of competent jurisdiction, and preclusion in second case must not work basic unfairness to party bound by first determination.

**3. Judgment ⊜634**

In issue preclusion, it is prior judgment that matters, not court's opinion explicating judgment.

**4. Judgment ⊜720**

For purposes of issue preclusion, once issue is raised and determined, it is entire issue that is precluded, not just particular arguments raised in support of it in first case.

**5. Judgment ⊜713(2)**

Issue preclusion cannot be avoided simply by offering evidence in second proceeding that could have been admitted, but was not, in first.

**6. Judgment ⊜724**

United States trademark holder that was owned by foreign manufacturer was collaterally estopped from relitigating issue of whether it had rights under Tariff Act to exclusion of gray-market goods manufactured under foreign manufacturer's trademark in suit against government agency, where issue was necessarily decided in earlier suit against gray-market importer of genuine goods of foreign manufacturer; also, since it had been determined that United States trademark holder had no basic rights under Tariff Act that were being unfairly denied or discriminatorily withheld, trademark holder had no basis for arguing that regulation promulgated under Tariff Act violated its due process and equal protection rights. U.S.C.A. Const.Amend. 14; Tariff Act of 1930, § 526, as amended, 19 U.S.C.A. § 1526.

**7. Judgment ⊜713(2)**

United States trademark holder was collaterally estopped from introducing evidence of "physical differences" between goods of gray-market importer and "authorized goods" in suit seeking declaratory judgment that Lanham Act protected it from gray-market importation of goods where evidence could have been submitted in earlier suit brought directly against gray-market importer; issue of United States trademark holder's rights under Lanham Act was actually and necessarily determined where Court of Appeals noted on appeal in earlier case that federal trademark law afforded no protection for wholly owned United States subsidiary of foreign manufacturer against rival company that imported and sold goods made by foreign

parent company, and trademark holder failed properly to introduce evidence to support its argument that § 42 of Lanham Act was to be interpreted differently in the case of physically different goods. Lanham Trade-Mark Act, § 42, 15 U.S.C.A. § 1124.

**8. Judgment ⟳713(1)**

Fact that substantive law may be different in two jurisdictions does not affect application of issue preclusion.

**9. Customs Duties ⟳22**

Domestic trademark owner had no cause of action under either Treaty of Friendship or Paris Convention to challenge regulation withholding protections of section of Tariff Act, which prohibits importation of foreign-manufactured goods without permission of United States trademark holder, in instances in which trademark holder is subsidiary of foreign manufacturer; there was no violation of either treaty in form of discriminatory treatment where domestic trademark holder was treated like every other domestic trademark owner that shared common ownership or control with owner of foreign trademark.

**10. Eminent Domain ⟳2(1.1)**

Customs Service's refusal to grant genuine goods exclusion order, thereby permitting gray-market importer to bring foreign manufacturer's brand goods into United States market without permission of United States trademark holder, did not constitute "taking" without just compensation in violation of Fifth Amendment; any underselling of United States trademark holder resulted from its own parent/manufacturer's choice of selling same goods abroad at lower cost, which were then purchased for importation and resale in United States. U.S.C.A. Const.Amend. 5; Tariff Act of 1930, § 526, as amended, 19 U.S.C.A. § 1526.

**11. Customs Duties ⟳22**

Regulation, under which section of Tariff Act making it unlawful to import foreign manufactured goods without permission of United States trademark holder was inapplicable in instances in which United States trademark holder was subsidiary of foreign manufacturer, did not exceed Secretary's authority under Treaty of Friendship and Paris Convention; regulation did not deprive foreign corporations of "national treatment" under United States customs and trademark laws, but applied equally to any domestic trademark owners that shared common ownership or control with owner of foreign trademark. Tariff Act of 1930, § 526, as amended, 19 U.S.C.A. § 1526.

Appeal from the United States District Court for the District of Columbia.

Robert E. Wagner, with whom Linda A. Kuczma and James J. Jagoda, Chicago, Ill., were on the brief, for appellant. William T. Bullinger, Washington, D.C., also entered an appearance for appellant.

Daniel J. Standish, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees.

Before WALD, SENTELLE, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Yamaha Corporation of America ("Yamaha–America") appeals from two orders of the district court dismissing its complaint against appellees the United States of America, the Secretary of the Treasury ("Secretary"), and the Commissioner of Customs. Appellant challenged the legality of certain regulations of the United States Customs Service ("Customs") that permit Customs to deny a "genuine goods" exclusion order to the holder of a U.S. trademark that is also a wholly owned subsidiary of the foreign trademark holder. The district court concluded that appellant was precluded from relitigating the issue that the regulations are invalid under the Tariff Act of 1930, 19 U.S.C. §§ 1202–1677k (1988) ("Tariff Act"),

and under the Trademark Act of 1946, 15 U.S.C. §§ 1051–1127 (1988) ("Lanham Act"), because these identical issues had already been litigated and resolved by the district court of the Central District of California in a different case. The district court below also dismissed appellant's claims that its rights under certain treaties guaranteeing non-discriminatory "national treatment" to foreign corporations had been violated.

Because we conclude that the district court properly determined that the doctrine of issue preclusion prevents appellant from relitigating its claims under the Tariff and Lanham Acts and that appellant has no cause of action under the treaties, we affirm.

## I. BACKGROUND

Yamaha–America is a California corporation. It is a wholly owned subsidiary of Yamaha Corporation, a Japanese company ("Yamaha–Japan"). Since 1960, Yamaha–America has been the exclusive authorized U.S. distributor of "Yamaha" brand music and sound equipment products manufactured by Yamaha–Japan. Yamaha–America is the registered owner by assignment from Yamaha–Japan of 18 separate U.S. trademarks.

Yamaha–America claims to have been unlawfully injured by so-called "gray-market," or parallel, imports. Gray-market goods are foreign-manufactured products bearing a valid U.S. trademark that are imported without the consent of the American trademark holder.[1] Gray-market goods are distinguished from counterfeit goods in that the use of the United States trademark is authorized by the holder of the foreign trademark.

### A. *The ABC Litigation*

In December 1986, Yamaha–America filed an action in the Central District of California seeking damages and injunctive relief against ABC International Traders Corporation ("ABC"), for trademark infringement and unfair competition under the Lanham Act and the laws of California. ABC is a corporation engaged in the importation, distribution, sale, and warranty of various goods including genuine Yamaha brand electronic sound equipment.[2] In November 1987, Yamaha amended its complaint to include claims under section 526 of the Tariff Act, 19 U.S.C. § 1526 (1988) ("section 526"), and section 42 of the Lanham Act, 15 U.S.C. § 1124 (1988) ("section 42"). In its five-count amended complaint, Yamaha–America alleged the following:

Count I—ABC has violated section 32(a) of the Lanham Act, 15 U.S.C. § 1114(a) (1988), by advertising and selling products made by Yamaha–Japan and bearing marks identical to marks owned by Yamaha–America in such a way that their use is likely to cause customer confusion or mistake and to deceive the public.

Count II—ABC has violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), by falsely representing or creating the impression that Yamaha–America is associated or affiliated with ABC and that it warrants the quality or guarantees repair of such products.

Count III—ABC has violated California law by intentionally promoting its products so as to confuse and deceive and unlawfully to exploit and appropriate the valuable property rights and good will of Yamaha–America.

Count IV—ABC has violated California law by using Yamaha–America's

---

1. Gray-market imports typically increase during periods when the dollar is strong relative to other currencies. The goods are generally bought overseas by discounters, who then import and market the products in the United States at reduced prices relative to the authorized domestic retailer. *See* Comment, *Applying Grecian Formula to International Trade:* K Mart Corp. v. Cartier, Inc. *and the Legality of Gray Market Imports,* 74 Va. L. Rev. 1397, 1398 (1989).

2. "Genuine" goods are goods that are in fact manufactured by the same manufacturer that supplies the U.S. trademark holder. In other words, they are to be distinguished from goods that "copy or simulate" the genuine article; they *are* the genuine article, although they may not have been intended for distribution in the U.S. market. *See Lever Bros. Co. v. United States,* 877 F.2d 101, 105 (D.C.Cir.1989).

marks without authorization in such a way that it is likely to injure Yamaha-America's reputation and to dilute the distinctiveness of Yamaha-America's trademarks.

Count V—ABC has violated section 526 of the Tariff Act and section 42 of the Lanham Act by unlawfully importing and dealing in goods bearing the trademarks owned by Yamaha–America without its consent.

ABC counterclaimed against both Yamaha–America and Yamaha–Japan, alleging violations of the Clayton Act, 15 U.S.C. § 13 (1988), the Wilson Tariff Act, 15 U.S.C. § 8 (1988), and the Sherman Act, 15 U.S.C. §§ 1–2 (1988). ABC also alleged violations of California law, including interference with business relations, defamation, and unfair competition.

1. The District Court's Decision

On November 9, 1987, Judge Lew of the Central District of California granted ABC's motion for partial summary judgment as to Counts I and II. He made the following conclusions of law:

    4. There is and can be no likelihood of confusion, or confusion as to source, origin or sponsorship, between [Yamaha–Japan]-manufactured goods sold by [Yamaha–America] and [Yamaha–Japan]-manufactured goods sold by ABC, which bear trademarks identical to the assigned trademarks.

    5. As a matter of law there is and can be no violation of Lanham Act Sections 32 or 43(a) by ABC ... by virtue of the acts of ABC in importing and selling "YAMAHA" brand goods manufactured by [Yamaha–Japan].

Statement of Uncontroverted Facts and Conclusions of Law (dated Oct. 19, 1987) (citations omitted) (incorporated by reference in Judge Lew's oral ruling granting summary judgment as to Counts I and II (Nov. 9, 1987).

3. Judge Lew found that Yamaha failed to meet its burden of establishing a genuine issue of fact as to consumer confusion over the source and sponsorship of the goods or as to injury to Yamaha–America's reputation. With every genuine product it sells, ABC provides both its own warranty and a statement that the goods were

On December 23, 1988, Judge Lew granted ABC's motion for summary judgment as to the remaining counts of Yamaha–America's Amended Complaint. *See Yamaha Corp. of Am. v. ABC Int'l Traders Corp.,* 703 F.Supp. 1398 (C.D.Cal.1988), *aff'd in part, rev'd in part on other grounds,* 1991 WL 144474, 1991 U.S.App. LEXIS 17882 (9th Cir. July 30, 1991) [940 F.2d 1537 (table) ], *cert. denied,* — U.S. —, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). As to Count III, Judge Lew concluded that Yamaha–America failed to sustain its burden of documenting a genuine issue of fact concerning customer confusion under California's unfair competition law. *Id.* at 1402. As to Count IV, Judge Lew concluded that no legally recognizable injury to reputation or dilution of the trademark "can possibly come to Yamaha–America if ABC limits its activities to the sale of genuine Yamaha products." *Id.*[3]

a. *Count V—Tariff Act*

It is Judge Lew's treatment of Count V that is most relevant to the question of issue preclusion in this case. Yamaha–America alleged in Count V that ABC's importation of genuine Yamaha products violated its rights under the Tariff Act and the Lanham Act. The relevant portion of section 526 of the Tariff Act provides that

    it shall be unlawful to import in the United States any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States ... unless written consent of the owner of such trademark is produced at the time of making entry.

19 U.S.C. § 1526(a) (1988). Judge Lew recognized that the protection provided by section 526 "has been consistently interpreted by U.S. Customs for more than fifty years not to be available to American subsidiaries

imported by ABC and not by Yamaha–America. *ABC,* 703 F.Supp. at 1402 ("While the goods are made by Yamaha–Japan, the services provided with those goods are ABC's and thus any fallout from the lack of quality of those services reflects poorly upon ABC and not Yamaha.").

of foreign corporations." *ABC*, 703 F.Supp. at 1403.[4] After quoting directly from 19 C.F.R. § 133.21(c)(2) (the "Regulation"), Judge Lew added that the Supreme Court had recently upheld the Regulation in *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), as a permissible interpretation of section 526. *ABC*, 703 F.Supp. at 1403.

Yamaha-America had argued in the *ABC* court that it had rights under section 526 to seek damages and an injunction against a private gray-market importer even if Customs would not have issued a genuine-goods exclusion order under the Regulation. In other words, Yamaha-America had argued that the Regulation does not define the full scope of the protection provided by section 526, even if the Regulation is valid, ABC's actions violated Yamaha-America's rights under section 526. *See* Transcript of Oral Argument (D.C.Cir. filed Mar. 11, 1992) ("Transcript") at 31 (discussing argument made to *ABC* court and on appeal to Ninth Circuit). Judge Lew rejected Yamaha-America's argument, however, declining "to interpret § 526 any differently than does the Customs Service." *ABC*, 703 F.Supp. at 1403. He added that

even if this Court were to review the statute *de novo*, it would conclude that Yamaha is not entitled to relief under § 526. To allow Yamaha-America and firms like it such protection would allow any foreign manufacturer to use a wholly owned American subsidiary as a means to secure the help of American tariff law in enforcing worldwide price discrimination. This can not be seen to

have been the intent of Congress in passing § 526.

*Id.* Judge Lew's grant of summary judgment to ABC on Yamaha-America's Tariff Act claim was basically based on two reasons: First, the Regulation—which the Supreme Court recognized to be a reasonable interpretation of section 526—withholds the protections of section 526 from a U.S. trademark holder that is a subsidiary of the foreign trademark holder; and second, section 526 itself excludes from its general protected class those U.S. trademark holders that are wholly owned American subsidiaries of the foreign trademark holders.

### b. *Count V—Lanham Act*

Yamaha-America also claimed in Count V that its rights under section 42 of the Lanham Act were being violated by ABC's gray-market importation. The relevant portion of section 42 provides that

no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States ... shall be admitted to entry at any customhouse of the United States...,

15 U.S.C. § 1124 (1988). According to Judge Lew, however, Yamaha-America had already admitted that the goods imported by ABC were genuine Yamaha items. Relying on *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506 (9th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987), and *Olympus Corp. v. United States*, 792 F.2d 315 (2d Cir.1986), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2033,

---

**4.** This is not technically true. In 1936, Customs adopted a regulation exempting merchandise manufactured in a foreign country under a foreign trademark from section 526 coverage "if such foreign trade-mark or trade name and such United States trade-mark or trade name *are owned by the same person, partnership, association, or corporation.*" T.D. 48,537, 70 Treas. Dec. 336, 337 (1936) (emphasis added). In 1953, the regulations expanded that "same company" exception to include situations where the domestic trademark holder and the foreign trademark holder exercised legitimate control over one another with respect to the nature and

quality of the goods in question. *See* T.D. 53,-399, 88 Treas.Dec. 376, 384 (1953). Finally, in 1972, Customs reissued the regulations in their current form, expanding the "same company" exception to encompass situations where the foreign and domestic trademark holders are "parent and subsidiary companies or are otherwise subject to common ownership or control." 19 C.F.R. § 133.21(c)(2) (1991). *See generally Vivitar Corp. v. United States*, 761 F.2d 1552, 1566–67 (Fed.Cir.1985) (recounting history of Customs's regulation), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986).

100 L.Ed.2d 618 (1988), Judge Lew concluded that "the importation of genuine goods is not actionable under the Lanham Act." *ABC*, 703 F.Supp. at 1404. Judge Lew interpreted *NEC Electronics* as holding that "no cause of action arose under the Lanham Act when an American importer imported *genuine* trademarked items that had been sold overseas by the parent of the American trademark holder." *Id.* (emphasis in original). Judge Lew found this interpretation of the Lanham Act to be a reasonable one because the decision to sell goods at a lower price abroad (thereby creating conditions for a gray market) is made by the same people who control the American subsidiary; allowing that subsidiary to claim a trademark violation would effectively provide the foreign company with a means of insulating the American economy from the effects of international competition. Accordingly, he granted summary judgment against Yamaha–America on its Lanham–Act claim.

Yamaha–America moved under Rule 54(b) of the Federal Rules of Civil Procedure for the entry of final judgment as to all claims for the purposes of expediting appeal. Judge Lew denied the motion, and Yamaha–America moved for reconsideration. In its memorandum in support of its motion for reconsideration, Yamaha–America argued that the goods imported by ABC were physically different from those imported by Yamaha–America and therefore did not legitimately fall under the genuine-goods exception to Lanham Act protection. In a one-page order, Judge Lew wrote:

[H]aving read and considered the papers filed in support of and in opposition to the motion, the Court hereby removes the motion from the Court's law and motion calendar ... and issues the following order:

Plaintiffs' motion for reconsideration is DENIED. IT IS SO ORDERED.

Order (filed Mar. 28, 1989).

**2. The Ninth Circuit's Opinion**

After ABC's counterclaims were later dismissed, both Yamaha–America and ABC appealed to the Ninth Circuit. In July 1991, the Court of Appeals affirmed the

granting of summary judgment against Yamaha–America. *See Yamaha Corp. of Am. v. ABC Int'l Traders, Inc.*, Nos. 90–55036, –55120, 1991 WL 144474, 1991 U.S.App. LEXIS 17882 (9th Cir. July 30, 1991) [940 F.2d 1537 (table)] (9th Cir.1991) ("*Ninth Circuit Opinion*"). In an unpublished opinion, the court determined that, with respect to its Lanham Act claims, although Yamaha–America had belatedly attempted to distinguish *NEC Electronics* by suggesting that the products imported by ABC were physically different in material ways from those imported by Yamaha–America, this argument was untimely raised in the motion for reconsideration and proffered only in the form of a lawyer's affidavit. Judge Lew "did not err in granting summary judgment against Yamaha on the trademark claims." *Id.* 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *4.

With respect to Yamaha–America's Tariff Act claims, the Court of Appeals concluded that

[t]he district court also correctly granted summary judgment in favor of ABC on Yamaha's claims under the Tariff Act, 19 U.S.C. § 526, which prohibits the importation of foreign made goods bearing a trademark owned by a United States corporation.... We affirm the district court's determination that the regulation leaves no room for Yamaha's Tariff Act claim.

*Id.*[5]

**B. *Procedural History of this Case***

On May 17, 1989 (almost five months *after* Judge Lew's decision in *ABC*), Yamaha–America filed suit against the United States, the Secretary, and the Commissioner of Customs. In its two-count complaint, Yamaha–America alleged the following:

Count I—Yamaha–America is entitled to a declaratory judgment that Customs should issue an exclusion order prohibiting importation of genuine goods manufactured by Yamaha–Japan.

Count II—Yamaha–America is entitled to a declaratory judgment that Customs

---

5. The Court of Appeals reversed Judge Lew's dismissal of ABC's antitrust counterclaims and remanded for further development of the record.

regulation 19 C.F.R. § 133.21(c)(2) is invalid for the following reasons:

(1) it exceeds the authority granted to the Secretary, for he has power to promulgate only those regulations consistent with law;

(2) it discriminates against Yamaha–America by denying it rights under the Lanham Act and the Tariff Act to which other domestic corporations are entitled, merely on the basis of its Japanese ownership;

(3) it deprives Yamaha–America of its constitutional rights to due process and equal protection by denying it the protections of the Tariff Act and the Lanham Act;

(4) it directly conflicts with Article 2 of the Paris Convention for the Protection of Industrial Property which provides that all members will accord to other member owners of trademarks the same rights as enjoyed by domestic citizens;

(5) it directly conflicts with Article X of the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan, which provides for "national treatment" of corporations owned by the other party.

*See* Complaint (filed May 17, 1989) at 8–11.

**1. Yamaha I**

Appellees moved to dismiss the complaint, arguing that the doctrine of issue preclusion prevented Yamaha–America from relitigating claims under the Tariff and Lanham Acts it had previously raised and lost in *ABC.* The district court agreed:

> The issues regarding the Lanham and Tariff Acts in the instant case are identical to those actually litigated and neces-

sarily decided in *ABC International Traders.* Moreover, the issues here— whether the Lanham and Tariff Acts provide plaintiff a basis to block the goods manufactured by Yamaha Japan—were actually and necessarily determined in *ABC.*

*Yamaha Corp. of Am. v. United States,* 745 F.Supp. 730, 731–32 (D.D.C.1990) ("*Yamaha I*").

Although the district court concluded that Yamaha–America's arguments as to the validity of the Regulation under the Tariff and Lanham Acts must be dismissed, it concluded that the parties had not adequately briefed the matter of whether Yamaha–America was precluded from arguing that the gray-market goods in this case were "physically different" from the authorized goods and, therefore, fell into the exception recognized in *Lever Brothers Co. v. United States,* 877 F.2d 101 (D.C.Cir. 1989).[6] It therefore denied defendants' motion to dismiss as to the physical-differences argument.

Yamaha–America's claims under the Treaty of Friendship, Commerce and Navigation, Apr. 2, 1953, U.S.–Japan, 4 U.S.T. 2063 ("Treaty of Friendship"), and under the Paris Convention for the Protection of Industrial Property of March 20, 1883, *as revised* July 14, 1967, 21 U.S.T. 1583, 1629 ("Paris Convention"), were not addressed by the court in *ABC.*[7]  Article X of the Treaty of Friendship provides that nationals and companies of either party shall be accorded "national treatment and most favored nation treatment with respect to obtaining and maintaining patents of invention and with respect to rights in trade

---

6. In *Lever Brothers,* we concluded that "the natural, virtually inevitable reading of § 42 is that it bars foreign goods bearing a trademark identical to a valid US trademark *but physically different,* regardless of the trademarks' genuine character abroad or affiliation between the producing firms." *Lever Bros.,* 877 F.2d at 111 (emphasis added). To the extent that the physical differences of the gray-market good are not readily detectable, there is a risk that consumers will be confused into thinking that the gray-market good and the authorized good are identical.

7. Yamaha–America did, in fact, raise the issue of its rights under both the Paris Convention and the Treaty of Friendship in its memorandum in support of its motion for reconsideration in *ABC.* However, appellees never argued to the district court below that these issues were also precluded, and they do not make that argument on appeal. *See* Transcript at 27. The district court ruled on the merits of Yamaha–America's treaty claims, and we review the decision on the merits as well.

marks...." *Id.* art. X, 4 U.S.T. at 2071.[8] The district court concluded, however, that Yamaha-America was neither a national nor a company of Japan and that it lacked standing, as an American company in the United States, to invoke the terms of Article X. *Yamaha I,* 745 F.Supp. at 733.

Article 2(1) of the Paris Convention extends to the nationals of all countries of the "Union"—of which both the United States and Japan are part—all the advantages pertaining to the protection of industrial property that each member of the Union extends to its own nationals.[9] Furthermore, Article 2(2) prohibits the establishment of domicile requirements.[10] The district court determined that, as in the case of the Treaty of Friendship, Yamaha-America was attempting to invoke a provision of a treaty intended to protect foreign nationals doing business in the United States. The district court dismissed Yamaha-America's claim under the Paris Convention for failure to state a claim upon which relief could be granted.

### 2. Yamaha II

Additional briefing was provided on whether Yamaha-America was precluded from raising its claim under section 42 that it was entitled to a *Lever Brothers* exception to the non-applicability of the Lanham Act to the importation of genuine goods. According to Yamaha-America, the gray-market products have the following physical differences: They lack the Underwriters Laboratory Approval and electromagnetic shielding required by the FCC; they have dual voltage switches and different plugs; they are not covered by the same warranties; and they do not include the same training and educational services as those provided by Yamaha-America. Yam-

aha-America argued that these physical differences between the gray-market and authorized products mean that Yamaha-America may avail itself of the protections provided by section 42 of the Lanham Act. *See Lever Bros.,* 877 F.2d at 111.

Appellees argued that Yamaha-America had made the identical argument to the *ABC* court and that Judge Lew had rejected it. The district court agreed: "The *ABC* court could not have denied Yamaha America's motion [for reconsideration] without rejecting the contention that it failed to consider Yamaha America's arguments concerning physical differences." *Yamaha Corp. of Am. v. United States,* 745 F.Supp. 734, 736 (D.D.C.1990) ("*Yamaha II*"). According to the district court, "*ABC* resolved the legal question of whether physical differences in gray market products place them within the umbrella of the federal trademark laws, and that is the issue Yamaha America is estopped from rearguing." *Id.* at 737. The fact that the district court might have reached a different conclusion on the merits under the law of this Circuit is irrelevant, for the doctrine of issue preclusion prevents reaching the merits, even where a different view would prevail. *Id.* at 738. Concluding that Yamaha-America's efforts to relitigate the relevance of physical differences "represents nothing more than garden variety forum shopping," *id.,* the district court dismissed the complaint and entered judgment against appellant.

## II. DISCUSSION

### A. *Standard of Review*

[1] In *Yamaha I,* the district court dismissed the majority of Yamaha-America's claims under Rule 12(b)(6) of the Federal

---

8. The Treaty of Friendship defines "companies" as follows: "Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party." Treaty of Friendship, art. XXII(3), 4 U.S.T. at 2080.

9. "Nationals of any country of the Union shall, as regards the protection of industrial property,

enjoy in all the other countries of the Union the advantages that their respective laws now grant, or may hereafter grant, to nationals...." Paris Convention, art. 2, 21 U.S.T. at 1631.

10. "[N]o requirement as to domicile or establishment in the country where protection is claimed may be imposed upon nationals of countries of the Union for the enjoyment of any industrial property rights." *Id.* art. 2(2).

Rules of Civil Procedure, and our review of that order is *de novo*. The same is true of the decision in *Yamaha II*, in which the district court disposed of the remaining claims under Rule 56. *Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1466 (D.C.Cir.1990) ("Since pretrial summary judgment decisions are rendered exclusively on the basis of a 'paper' record, an appellate court is equally well-positioned as a trial judge to assess the evidence at issue.").

## B. *Issue Preclusion*

The objective of the doctrine of issue preclusion (also known as collateral estoppel) is judicial finality; it fulfills "the purpose for which civil courts had been established, the conclusive resolution of disputes within their jurisdiction.", *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 n. 6, 102 S.Ct. 1883, 1890 n. 6, 72 L.Ed.2d 262 (1982). The Supreme Court has defined issue preclusion to mean that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980).

[2] The standards for establishing the preclusive effect of a prior holding are: First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. *See McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C.Cir. 1986); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) ("[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent

action between the parties").[11] Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination. An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude. *See Otherson v. Department of Justice*, 711 F.2d 267, 273, (D.C.Cir.1983); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979) (unfairness concern is heightened when plaintiff seeks to use collateral estoppel "offensively" against defendant when plaintiff was not party to prior suit); *Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (fairness is implicated whenever there is risk that "prior proceedings were seriously defective").

[3-5] In issue preclusion, it is the prior *judgment* that matters, not the court's opinion explicating the judgment. "Even in the absence of *any* opinion a judgment bars relitigation of an issue necessary to the judgment." *American Iron & Steel Inst. v. EPA*, 886 F.2d 390, 397 (D.C.Cir. 1989) (emphasis in original), *cert. denied*, —— U.S. ——, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990). Furthermore, once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case. *See Securities Indus. Ass'n v. Board of Governors*, 900 F.2d 360, 364 (D.C.Cir.1990) (plaintiff may not raise new argument in second proceeding even though it was never made in first proceeding; so long as argument could have been made, it is precluded); RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c at 253 (if previously litigated "issue was one of law, new arguments may not be presented to obtain a different determination of that issue"). Preclusion cannot be avoided sim-

---

11. Although sections 27 (the rule itself) and 28 (exceptions to the rule) of the RESTATEMENT (SECOND) apply only where the second action is between the same persons who were parties to the first action, section 29 reads as follows:

A party precluded from relitigating an issue with an opposing party, in accordance with

§§ 27 and 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify according him an opportunity to relitigate the issue.

RESTATEMENT (SECOND) OF JUDGMENTS § 29 (1982).

ply by offering evidence in the second proceeding that could have been admitted, but was not, in the first. CHARLES. ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4426 at 141 (1981).

### 1. Section 526

[6] With respect to section 526 of the Tariff Act, Yamaha-America argues that the Regulation violates both due process and equal protection by denying it rights provided by the customs laws that are enjoyed by other domestic U.S. trademark holders. The district court concluded that Yamaha-America was precluded from litigating these issues. The court in *ABC* had held that Yamaha-America had no rights conferred upon it by section 526. The district court below reasoned that in light of this finding, "there can be no discrimination and no violation of equal protection or due process" involved in their denial. *Yamaha I*, 745 F.Supp. at 732 n. 6.

Yamaha-America argues that the validity of the Regulation was not an issue in *ABC*; indeed, its validity could not have been raised in a private action against a gray-market importer. "In fact, the *ABC* district court based it[s] grant of summary judgment against Yamaha America's § 526 claims on the Regulation. The *ABC* district court thereby simply assumed, without deciding, the Regulation's validity and applicability in denying Yamaha America's claim under the Tariff Act." Brief of Appellant (filed Dec. 18, 1991) ("Yamaha-America's Brief") at 12. This is, unfortunately for Yamaha-America's sake, not an accurate account of Judge Lew's decision. Judge Lew based his conclusion that Yamaha-America has no enforceable rights under section 526 on two separate and independent grounds: One was the Regulation, reflecting Customs's interpretation of section 526 that was held to be reasonable by the Supreme Court; the other, however, was the text of section 526 itself. *See ABC*, 703 F.Supp. at 1403. *See generally* JAMES WM. MOORE, JO DESHA LUCAS & THOMAS S. CURRIER, 1B MOORE'S FEDERAL PRACTICE ¶ 0.441[2] at 729 (1988) ("a judgment based alternatively upon two determinations, either of which alone would be sufficient to sustain it, is an effective adjudication as to both grounds, and is collaterally conclusive as to both").

The issue that was litigated and necessarily determined by the court in *ABC* was whether or not Yamaha-America had any rights under section 526, inside or outside of the Regulation, that are violated by the gray-market importation of genuine Yamaha goods. It is precisely this issue that Yamaha-America now seeks to relitigate in this case. The district court was correct in concluding that Yamaha-America was precluded from doing so.

Yamaha-America now argues, however, that even if Judge Lew based his ruling that Yamaha-America had no rights under section 526 on grounds other than the Regulation, the unpublished Ninth Circuit opinion affirming *ABC*, which was released over ten months after *Yamaha II*, relied exclusively on the Regulation. *See* Yamaha-America's Brief at 12–13. Yamaha-America relies on *Stebbins v. Keystone Insurance Co.*, 481 F.2d 501, 507 n. 13 (D.C.Cir.1973) (Leventhal, J.), and *Martin v. Henley*, 452 F.2d 295, 300 (9th Cir.1971), for the proposition that when an appellate court affirms on only one of several grounds that served as alternative bases for the lower court decision, collateral estoppel attaches only to the issue expressly considered by the appellate court. *See also* MOORE, LUCAS & CURRIER, *supra*, ¶ 0.443[5.—2] at 790 n. 2 ("Where a case is decided alternatively by a trial court on several issues, but is disposed of on appeal on only one of these issues, only the issue considered by the appellate court is concluded.") (citing both *Stebbins* and *Martin*). While it is clear that the district court below properly relied on the *ABC* judgment, *Southern Pac. Communications Co. v. American Tel. & Tel. Co.*, 740 F.2d 1011, 1018 (D.C.Cir.1984) ("collateral estoppel may be applied to a trial court finding even while the judgment is pending on appeal"), in reviewing its orders, we must take into consideration the effect of the intervening *Ninth Circuit Opinion* on the matter of issue preclusion.

Yamaha-America argued on appeal to the Ninth Circuit that section 526 gave it certain rights to pursue remedies against a gray-market importer that were independent of Customs' Regulation. *See, e.g., Olympus Corp. v. United States,* 792 F.2d 315, 320 (2d Cir.1986) ("Customs' interpretation of the statute does not limit the reach of protection of section 526; it only limits Customs' obligations to enforce the section by excluding goods."), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *Vivitar Corp. v. United States,* 761 F.2d 1552, 1568–70 (Fed.Cir.1985) (rejecting argument that section 526 must be interpreted as limited by Regulation), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). The Ninth Circuit Court of Appeals concluded, however, that the district court "correctly granted summary judgment in favor of ABC on Yamaha's claims under the Tariff Act." *Ninth Circuit Opinion,* 1991 WL 144474, at *2, 1991 U.S.App. LEXIS 17882, at *4. In order to reach this conclusion, the Court of Appeals must necessarily, albeit implicitly, have rejected Yamaha-America's explicit argument that it had private rights under section 526 to exclude the gray-market goods that were greater than those encompassed by the Regulation.

The Court of Appeals did, of course, prominently mention that the Regulation, which was promulgated pursuant to section 526, states that the prohibitions against the importation of gray-market goods do not apply when the domestic trademark owner is a subsidiary of the foreign manufacturer. But notwithstanding Yamaha-America's arguments to the contrary, the appellate decision went further: The Court of Appeals explicitly affirmed the "district court's determination that the regulation leaves no room for Yamaha's Tariff Act claim." *Id.* In other words, Yamaha-America's claim that, despite the Regulation, it has independent rights under sec-

tion 526 to exclude gray-market goods manufactured under Yamaha-Japan's trademark was actually and necessarily rejected by the Ninth Circuit.

Yamaha-America's allegations in this case that the Regulation is invalid because it violates the due process and equal protection rights of an American subsidiary of a foreign parent must be predicated on the assumption that Yamaha-America has some basic rights under section 526 that are being unfairly denied or discriminatorily withheld. But since the *ABC* courts have already determined that Yamaha-America has no rights under section 526 to bar the importation of the gray-market goods in this case, it is precluded from challenging the validity of the Regulation on the grounds that it violates any such rights.[12]

## 2. Section 42

Yamaha-America raises the same claims under the Lanham Act that it raises under the Tariff Act: namely, that the Regulation unconstitutionally deprives it of certain rights under the statute. Judge Lew in *ABC* concluded that section 42 does not protect Yamaha-America from the importation of goods manufactured by Yamaha-Japan. *ABC,* 703 F.Supp. at 1404. Furthermore, Judge Lew resolved the additional question of whether physical differences in these gray-market products "place them within the umbrella of the federal trademark laws" when he denied Yamaha-America's motion for reconsideration. *Yamaha II,* 745 F.Supp. at 737.

In *Yamaha II,* the district court below concluded that Yamaha-America was precluded from pursuing its "physical differences" argument in the D.C. forum because the *ABC* court rejected this argument in denying the motion for reconsideration. *Id.* at 736. At the time of its ruling, however, our district court did not have the benefit of the *Ninth Circuit Opinion.*

---

12. We agree with appellant that this case is not entirely controlled by *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). In *K Mart,* the issue was whether the Regulation was a reasonable agency interpretation of certain ambiguous phrases con-

tained in section 526. Although the Court concluded that the Regulation was "valid," it did not address the scope of a U.S. trademark holder's rights under section 526, nor did it consider any constitutional challenges to the Regulation.

We, of course, must look to that ruling to ascertain the scope of issue preclusion.

The Ninth Circuit's opinion with respect to section 42 was straightforward: "Under *NEC*, there can be no successful trademark claim here, where the 'Yamaha' mark appearing on goods distributed by ABC was affixed by Yamaha-Japan, the manufacturer from whom ABC acquired the goods." *Ninth Circuit Opinion*, 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *2. With respect to the "physical-differences" argument, the Ninth Circuit stated only that Yamaha-America "failed to preserve this issue on appeal ... by not timely raising it in response to ABC's summary judgment motion." *Id.* 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *3.

[7] The Ninth Circuit did not rule on the merits of the "physical-differences" argument. Therefore, Judge Lew's implicit rejection of that argument in denying the motion for reconsideration no longer precludes a second suit on the merits because although the Court of Appeals affirmed the *ABC* court, it did so solely on the grounds of procedural insufficiency. *See* MOORE, LUCAS & CURRIER, *supra*, ¶ 0.416[2] at 519 (trial court's dismissal of a complaint on both procedural grounds and on the merits will not preclude second suit on the merits if appellate court affirms only on the procedural ground). However, Yamaha-America may nonetheless be precluded from pursuing its Lanham Act claims if the evidence of "physical differences" could have been submitted in the *ABC* case but, for whatever reason, was not properly presented.

In *Jones v. United States*, 466 F.2d 131 (10th Cir.1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 257 (1973), the court considered whether a previous judgment that certain payments from an insurance agency to the taxpayers constituted "ordinary income" rather than "capital gains" would have preclusive effect on a second suit as to different tax years. The taxpayers sought to introduce evidence in the second trial that would "be submitted in admissible fashion ... so as to present more clearly the issues to be determined and allow them to be more fully litigated,

thus creating the distinct possibility of a different verdict." *Id.* at 136. The taxpayers argued that this "new" evidence would show that the payments received were actually deferred payments on the total purchase price of the insurance agency they had sold and were, therefore, taxable as long-term capital gains rather than as ordinary income. The court determined that the taxpayers were precluded from litigating their second suit, despite their intention to introduce evidence that was not presented in the prior trial:

> Evidence of this type is not the result of a different factual situation or changed circumstances. It is, instead, historical in nature and could have been admitted at the first trial if properly submitted. If the taxpayers' case was not effectively presented at the first trial it was their fault; affording them a second opportunity in which to litigate the matter, with the benefit of hindsight, would contravene the very principles upon which collateral estoppel is based and should not be allowed.

*Id.*

The evidence of "physical differences" between the gray-market and authorized goods was, according to the Ninth Circuit, only raised in Yamaha-America's motion for reconsideration. "There was no need for the district court to consider Yamaha's proffered evidence at the time of the reconsideration motion, particularly given that Yamaha sought to introduce it in the form of a lawyer affidavit." *Ninth Circuit Opinion*, 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *3. Yamaha-America seeks to introduce the evidence of "physical differences" in this case to support its argument that section 42 of the Lanham Act protects it from the gray-market importation of these goods. But this evidence could have been submitted to the district court in *ABC*. The doctrine of issue preclusion prohibits the relitigation of an issue actually determined and necessary to the judgment.

A new contention is not .... necessarily a new issue. If a new legal theory or factual assertion put forward in the sec-

ond action is related to the subject-matter and relevant to the issues that were litigated and adjudicated previously, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.

MOORE, LUCAS & CURRIER, *supra*, ¶ 0.443[2] at 760-61 (internal quotation marks omitted) (emphasis in original).

In the *ABC* case, the issue of Yamaha-America's rights under section 42 was actually and necessarily determined. The Court of Appeals noted that, under Ninth Circuit precedent, "federal trademark law affords no protection for a wholly owned United States subsidiary of a foreign manufacturer against a rival company that imports and sells goods made by the foreign parent company." *Ninth Circuit Opinion*, 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *2. Yamaha-America failed properly to introduce evidence of "physical differences" in the *ABC* litigation, and it is precluded from relitigating the issue of its rights under section 42 based on this "new" evidence.

**[8]** This is so despite the fact that this Circuit has arguably interpreted section 42 differently from the Ninth Circuit to permit its application to physically-different goods. *See Lever Bros.*, 877 F.2d at 111 ("On its face [section 42] appears to aim at deceit and consumer confusion; when identical trademarks have acquired different meanings in different countries, one who imports the foreign version to sell it under that trademark will (in the absence of some specially differentiating feature) cause the confusion Congress sought to avoid."). As the district court correctly recognized in *Yamaha II*, however, the fact that the substantive law may be different in the two jurisdictions does not affect the application of issue preclusion. "The doctrine of issue preclusion counsels us against reaching the merits in this case, ... regardless of whether we would reject or accept our sister circuit's position." *National Post Office Mail Handlers v. American Postal Workers Union*, 907 F.2d 190, 194 (D.C.Cir.1990); *Yamaha II*, 745 F.Supp. at 737-38.

## C. *International Treaties*

**[9]** Yamaha-America's claims under Article X of the Treaty of Friendship and Article 2 of the Paris Convention are based on a common assumption: that in permitting the importation of gray-market goods, appellees are unlawfully discriminating against Yamaha-America because it is owned by a foreign corporation. Yamaha-America readily concedes that it is *not*, itself, a foreign corporation and that it is not invoking either treaty as a foreign corporation. Yamaha-America's Brief at 19. Instead, Yamaha-America argues that the Regulation violates the treaties by treating it differently from other domestic companies. As the Supreme Court has stated, "national treatment" means that local subsidiaries of foreign corporations "are considered for the purposes of the Treaty [of Friendship] to be companies of the country in which they are incorporated; they are entitled to the rights, and subject to the responsibilities of other domestic corporations." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 188, 102 S.Ct. 2374, 2381, 72 L.Ed.2d 765 (1982).

The crucial question for purposes of both the Treaty of Friendship and the Paris Convention is whether appellees have treated Yamaha-America differently under the Regulation solely because it is a wholly owned subsidiary of a foreign corporation. We think not. The Regulation would apply equally to the counterpart of Yamaha-America, *i.e.*, a domestic, wholly owned subsidiary of an American corporation which produces goods abroad both for sale and for import into the United States. The Supreme Court itself has recognized just such a variation on the typical gray-market situation:

Two other variations on this theme occur when an American-based firm establishes abroad a manufacturing subsidiary corporation (case 2b) or its own unincorporated manufacturing division (case 2c) to produce its United States trademarked goods, and then imports them for domestic distribution. If the trademark holder or its foreign subsidiary sells the trademarked goods abroad, the parallel impor-

tation of the goods competes on the gray market with the holder's domestic sales. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 286–87, 108 S.Ct. 1811, 1815, 100 L.Ed.2d 313 (1988).[13] The only relevant fact for the purposes of the Regulation is that the domestic trademark owner is subject to common ownership or control with the company which authorizes the distribution of the gray-market goods abroad.[14]

Yamaha–America has no cause of action under either the Treaty of Friendship or the Paris Convention to challenge the Regulation for discriminatory treatment. There is no violation of either treaty when Yamaha–America is treated like every other domestic trademark owner that shares common ownership or control with the owner of the foreign trademark.

### D. Remaining Issues

Yamaha–America has raised two additional issues: First, that appellees have violated the Fifth Amendment by taking its property rights without just compensation; second, that the Secretary exceeded his authority by promulgating a Regulation that is not consistent with law in violation of 19 U.S.C. § 66.[15]

#### 1. The "Takings" Claim

[10] Yamaha–America argues that Customs's refusal to grant a genuine goods

exclusion order, thereby permitting gray marketers to bring genuine "Yamaha" brand goods into the U.S. market, constitutes a "taking" without just compensation in violation of the Fifth Amendment. Yamaha–America's Brief at 13–14 & n. 11. Appellees respond to this argument by asserting that "Yamaha America's cryptic 'taking' argument appears to assume that the trademark laws give it rights that *ABC* determined it did not have." Brief for Appellees (filed Jan. 15, 1992) at 23 n. 12 (citation omitted). The property rights that presumably have been "taken" without just compensation are Yamaha–America's rights to be the sole distributor of "Yamaha" brand products in the United States. But if Yamaha–America is undersold by the gray market, it is because its own parent has chosen to sell the same goods abroad at a lower cost. It is true that the decision not to issue a genuine goods exclusion order has an impact on Yamaha–America's ability completely to control the market, but *ABC* determined that Yamaha–America has no right to such control. Yamaha–America is precluded from rearguing this same issue in the guise of a takings claim.[16]

#### 2. Consistency with Law

[11] Finally, Yamaha–America argues that the decision in *ABC* nowhere ad-

---

**13.** The Supreme Court held that the Regulation as applied to the two variations described in the text was a permissible construction of the ambiguous "merchandise of foreign manufacture" language contained in section 526 of the Tariff Act. *K Mart Corp.*, 486 U.S. at 292, 108 S.Ct. at 1818.

**14.** Yamaha–America's reliance on *Model Rectifier Corp. v. Takachiho International, Inc.*, 709 F.2d 1517 (9th Cir.1983), *aff'g* 220 U.S.P.Q. (BNA) 508 (C.D.Cal.1982), is to no avail. Yamaha–America asserts that the facts of *Model Rectifier* "are foursquare with the facts here with a single exception: Model Rectifier's shareholders were U.S. citizens." Reply Brief of Appellants (filed Jan. 31, 1992) at 15. *Model Rectifier*, however, involved the "classic" gray-market situation: A domestic U.S. company enters into an arms-length agreement with a foreign trademark holder to be its exclusive United States distributor; third parties buy the product abroad, import it into the United States, and undersell the domestic company. The district court granted Model Rectifier's motion for a

preliminary injunction enjoining the sale of the gray-market goods in the United States. The important distinction between Model Rectifier and Yamaha–America was not the nationality of its shareholders but the fact that it was an independent company that had bargained with the foreign trademark holder for exclusive rights to distribute the product in the United States.

**15.** "The Secretary of the Treasury shall prescribe ... rules and regulations not inconsistent with law ... and shall give such directions to customs officers and prescribe such rules and forms to observed by them as may be necessary for the proper execution of the law." 19 U.S.C. § 66 (1988).

**16.** Although it is not necessary to reach the merits of appellant's takings claim, we note that Yamaha–America has failed to cite to us a single case in which a court has recognized a takings claim when the right allegedly being deprived by governmental regulation is, itself, a right provided by statute.

dressed the scope of the Secretary's power to promulgate the Regulation. Yamaha-America's Brief at 11–12. Yamaha-America argues in its reply brief that the focus of its "exceeding authority claim here is that the Regulation is inconsistent with the Friendship Treaty and the Paris Convention which have the force of a statute and are the law of the land." Reply Brief of Appellant (filed Jan. 31, 1992) ("Reply Brief") at 7 (citation omitted). But the Regulation would exceed the Secretary's authority under the treaties only to the extent that it deprives foreign corporations of "national treatment" under United States customs and trademark laws; as we have seen, the Regulation does nothing of the kind.

To the extent that Yamaha-America's claim that the Secretary exceeded his authority in promulgating the Regulation depends on the conclusion that section 526 prohibits such an interpretation, *see* Brief of Appellant at 11–12, that issue has been definitively settled by *K Mart Corp.* Yamaha-America relies on a passing reference in *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163 (S.D.N.Y.1984), to the effect that there exists a "substantial question" about whether Customs exceeded its authority under section 526 in promulgating the Regulation, *see* Reply Brief at 7 n. 4.[17] However, not only was this dicta, but *Osawa* was decided four years before *K Mart Corp.* If the Supreme Court's opinion in *K Mart Corp.* stands for anything, it is that the Secretary's Regulation was a permissible construction of section 526.

## III. CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

*It is so ordered.*



---

**17.** The *Osawa* court noted that the "substantial question, which need not be decided here in view of Customs' grant of an exclusion order to plaintiff, is whether Customs exceeded its authority in promulgating the regulations in question." After quoting from section 526, the court

concluded that "[i]t contains no suggestion that the right of the U.S. markholder to receive its benefits depends on subtle variations in its relationship with the foreign markholder." *Osawa,* 589 F.Supp. at 1177.

---

**UNITED STATES of America**

v.

**Marion S. BARRY, Jr., Appellant.**

No. 91–3258.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1992.

Decided April 17, 1992.

Defendant, the mayor of Washington, D.C., was convicted by jury in the United States District Court for the District of Columbia, Thomas Penfield Jackson, J., of one count of possession of cocaine, and he appealed. The Court of Appeals, Wald, Circuit Judge, 938 F.2d 1327, affirmed conviction and remanded for resentencing. On remand, the District Court resentenced defendant to six months' imprisonment. Defendant appealed. The Court of Appeals, Buckley, Circuit Judge, held that: (1) judge was not required to recuse himself on resentencing based on remarks he gave at law school forum; (2) defendant was not entitled to requested supplemental presentence report or two-level reduction in base offense level under Sentencing Guidelines for acceptance of responsibility; and (3) judge did not vindictively resentence defendant in response to his successful appeal of initial sentence.

Affirmed.

**1. Judges ⬗49(2)**

Judge's remarks reflecting even strong views about defendant will not call for judge's recusal so long as those views are based on his own observations during

Service: Get by LEXSEE®
Citation: 2004 U.S. APP LEXIS 2375

*92 Fed. Appx. 339, \*; 2004 U.S. App. LEXIS 2375, \*\**

KARLA OESTRINGER, Plaintiff-Appellant, v. DILLARD STORE SERVICES, INCORPORATED, Defendant-Appellee.

No. 03-1587

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

92 Fed. Appx. 339; 2004 U.S. App. LEXIS 2375

February 9, 2004 \*, Submitted

\* The court granted appellant's motion to waive oral argument in an order dated November 18, 2003. Thus, the appeal is submitted on the briefs and the record.
February 9, 2004, Decided

**NOTICE:** [\*\*1] RULES OF THE SEVENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of Illinois. No. 01-CV-1206. William D. Stiehl, Judge.

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes** ♦ Show Headnotes

**COUNSEL:** For KARLA OESTRINGER, Plaintiff - Appellant: James W. Schottel, Jr., SCHOTTEL & ASSOCIATES, St. Louis, MO USA.

For DILLARD STORE SERVICES, INCORPORATED, Defendant - Appellee: Daniel M. O'Keefe, BRYAN CAVE, St. Louis, MO USA.

**JUDGES:** Before Hon. RICHARD A POSNER, Circuit Judge, Hon. FRANK H. EASTERBROOK, Circuit Judge, Hon. ANN CLAIRE WILLIAMS, Circuit Judge.

**OPINION:** [\*340] ORDER

Karla Oestringer, a former sales associate with Dillard Store Services who suffers from Ehlers-Danlos Syndrome (EDS), filed this lawsuit alleging that Dillard failed to accommodate her disability and wrongfully terminated her employment in violation of the Americans with Disabilities Act (ADA). The district court entered summary judgment for Dillard because Oestringer failed to establish that she could perform the duties of her employment with or without accommodation. Oestringer appeals, and we affirm. [\*\*2]

Oestringer was diagnosed with EDS in 1998 after suffering from hip, wrist, and ankle pain for several years. EDS is an inherited disorder characterized by "hyperelasticity and fragility of the skin, hypermobility of the joints, and fragility of the cutaneous blood vessels." *Stedman's Medical Dictionary* 1753 (27th ed. 2000). Oestringer began working for Dillard in April 2000 as a sales associate--a job that required her to take merchandise off carts, fold and move

merchandise, and walk through the department greeting and servicing customers. At the time Oestringer joined Dillard, the company had an attendance policy that allowed employees who had worked less than six months to be absent for up to one week in case of an emergency.

On June 7, 2000, Oestringer visited her doctor after dislocating her ankle at work. **[*341]** Oestringer's doctor filled out a work-release form for her stating that she could not work from June 7 to June 14. Oestringer then returned to work, but soon thereafter reinjured her ankle. After this incident, Oestringer's doctor told her not to work until July 3. By that date, however, Oestringer's ankle had not healed, so her doctor filled our another work-release form **[**3]** stating that she should not work until July 18. When Oestringer did not return to work by July 27, the secretary for Dillard's Operations Manager, Suzanne Tassello, called her to find out if she was going to come in and work her scheduled shift that day. Oestringer told Tassello that she could not return to work and would need additional leave time. Tassello reminded Oestringer that she had already used her one-week emergency leave, and told her that if she did not return to work she would be discharged. Oestringer did not return to work, and she soon received a "Notice of Resignation" form from the store with the box "Due to Health" checked as the reason for voluntary resignation. Oestringer did not return the form, so Dillard administratively terminated her, effective July 31.

Upon receiving a right-to-sue letter from the EEOC, Oestringer filed this lawsuit alleging discrimination under the ADA. Oestringer claimed that she could have performed her job as a sales associate if Dillard had reasonably accommodated her disability by allowing her to take short leaves of absence, sit on a stool at work, or gradually return to her full work schedule.

The district court granted summary **[**4]** judgment to Dillard, holding that Oestringer did not establish that her request for continuous absences was reasonable or that she could have performed the essential duties of her position if she had been permitted to gradually return to work. The court also rejected Oestringer's claim that she could have performed the essential duties had she been permitted to sit on a stool because the only evidence she provided came from her own affidavit, which was contradicted by her prior deposition testimony.

On appeal Oestringer argues that the district court erred in finding there was no genuine issue as to any material fact establishing that she could have performed the duties of a sales associate with her requested accommodations. Performing the essential functions of the job with or without reasonable accommodation from the employer is one of the elements that a plaintiff must show in order to establish a claim under the ADA. 42 U.S.C. § 12111(8).

Oestringer first challenges the district court's finding that her request for continuous absences was not a reasonable accommodation. She argues that she could have returned to work had Dillard allowed her sufficient **[**5]** time off work to allow her ankle to heal. It is true that an employer's failure to accommodate reasonable requests for medical leave violates the ADA, see *Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998) (finding leave request of two to four weeks reasonable), but a request for medical leave is reasonable only if it is for a short amount of time, see *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (two-month leave request not reasonable), and cannot be indefinite, see *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998) (18-month absence not reasonable). While Oestringer's doctor had authorized several short absences-- one or two weeks in length--at the time she was terminated on July 31, she had been absent from work continually for six weeks. When Oestringer spoke to Suzanne Tassello on July 27, she did not request a specific amount of time off, but rather informed Dillard simply that she continued to suffer **[*342]** from her ankle injury and could not come to work. Oestringer's extended absence--which had no definite endpoint--shows that she was not a "qualified individual" when Dillard terminated **[**6]** her employment because she could not attend work. See *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (en banc)

(ADA does not require employers to accommodate "unreliable attendance").

Oestringer also makes undeveloped challenges that the district court erred in finding that her requests to work while sitting on a stool or work a limited schedule was not a reasonable accommodation. In her opening brief, Oestringer claims that she requested the accommodations and repeatedly maintained that she could have performed her job if allowed these two accommodations; however, she points to no authority or relevant evidence in the record to support her argument, nor does she specify particular errors in the district court's decision. Prefunctory and undeveloped arguments are waived, especially when a litigant such as Oestringer is represented by counsel. See _330 West Hubbard Rest. Corp. v. United States, 203 F.3d 990, 997 (7th Cir. 2000)_.

Finally, by failing to present it first to the district court, Oestringer has also waived her argument that the district court erred in granting summary judgment to Dillard on the issue of its liability **[**7]** for failure to engage in the interactive process.

Accordingly, we AFFIRM the decision of the district court granting summary judgment for Dillard.

Service: **Get by LEXSEE®**
Citation: **2004 U.S. APP LEXIS 2375**
View: **Full**
Date/Time: Wednesday, October 18, 2006 - 2:08 PM EDT

\* Signal Legend:

- Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
\* Click on any _Shepard's_ signal to _Shepardize®_ that case.

**LexisNexis®**   About LexisNexis  | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT H

IN ARBITRATION PROCEEDINGS

BEFORE CHARLES ASKIN, ARBITRATOR

|  |  |  |
|---|---|---|
| In the Matter of an Arbitration | ) | |
| | ) | |
| between | ) | |
| | ) | |
| UNITED AUTO WORKERS UNION, | ) | **UNION'S OPENING BRIEF** |
| LOCAL 2244, AFL-CIO, | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | |
| | ) | |
| NEW UNITED MOTOR | ) | |
| MANUFACTURING, INC. | ) | |
| | ) | |
| | ) | |
| (Policy grievance, No. 10277) | ) | |
| ("Time for Time" - Arbitration Phase Two | ) | |

JONATHAN WEISSGLASS (#185008)
LINDA LYE (#215584)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Facsimile:     (415) 362-8064

Attorneys for the Union

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.    Contract Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    The Company Has Acknowledged That Team Members Are *Entitled*
              To "Time For Time" Leave . . . . . . . . . . . . . . . . . . . . . . . . . 4

        C.    Relying On The Staudohar Decision, The Company Suddenly Sought To
              Repudiate The Parties' Longstanding Mutual Interpretation . . . . . . . . . . . . 7

        D.    The Company's Implementation Of The "Staudohar Program" . . . . . . . . . . 10

        E.    The Company's Only Justification For Its Current Interpretation
              Until Now Has Been The Staudohar Decision . . . . . . . . . . . . . . . . . . 11

IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.    The Company's So-Called "Staudohar Program" Violates The Plain
              Language Of The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . 12

              1.    All Employees Have a Right to Sick Leave When They
                    Become "Ill or Disabled" . . . . . . . . . . . . . . . . . . . . . . . 13

              2.    Employees Have The Right To Remain On Sick Leave Until
                    They Exceed Their "Time for Time" Clock . . . . . . . . . . . . . . . . 19

              3.    The Time For Time Provision Applies To All Employees Who
                    Are "Ill Or Disabled" . . . . . . . . . . . . . . . . . . . . . . . . . 24

              4.    The Company's Remaining Arguments Are Unavailing . . . . . . . . . . . 24

        B.    The Company Cannot Repudiate Its Contractual Obligations . . . . . . . . . . . 29

        C.    The Company Has Waived Any Argument That Its New Sick Leave
              Policy Is Permissible Under The Contract . . . . . . . . . . . . . . . . . . . 36

        CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# I. **INTRODUCTION**

This is the second phase of arbitration on the Union's grievance challenging a new sick leave policy the Company implemented in Fall 2005. The Company seeks to repudiate unilaterally its longstanding contractual obligations, but failed to obtain in collective bargaining negotiations a change in the contract language that would enable it to do so. No arbitral authority allows the Company to obtain through unilateral action what it failed to obtain through negotiation.

Under the plain language of the contract, employees who are ill or disabled and satisfy the procedural prerequisites set forth in the contract of submitting timely medical documentation have a right to a sick leave of absence, and the Company has no discretion to deny sick leave to such employees. The contract also contains a provision regarding the amount of sick leave to which employees are entitled. Without a provision setting forth the amount of sick leave to which employees are contractually entitled, the contractual right to sick leave would be meaningless because the Company could terminate sick leave at its discretion. The provision on sick leave accrual rights is known as the "time for time" provision and generally provides that employees have a right to remain on a sick leave for up to a period of time equal to their seniority (except in cases of employees with less than three years of seniority, in which case the contract sets forth a different formula). Thus, the contract explicitly provides that employees have a right to remain on sick leave, and that they have a right to do so for up to the full period of time set forth in the "time for time" provision. The Company complied with this requirement for years.

In Fall 2005, however, the Company suddenly implemented a new sick leave policy – its so-called "Staudohar Program," named after an arbitration decision by Arbitrator Paul Staudohar.

Pursuant to the Company's so-called "Staudohar Program," the Company now believes it has the right to terminate the sick leave of absence of any employee whose medical condition has become permanent, even if the employee has not yet been on leave for the full length of her time for time clock. The Company purported to justify its sick leave policy on the decision by Arbitrator Staudohar, but this Arbitrator has already rejected that argument. *See* Jt. Ex. A.

Now that the Company can no longer rest on Arbitrator Staudohar's decision, the express contract language compels the conclusion that the Union's grievance must be sustained. Under the plain language of the contract, employees have the right to remain on a sick leave of absence for up to the full length of their time for time clocks. And the Company cannot unilaterally repudiate its contractual obligations.

Because employees' right to time for time leave is evident from the plain language of the contract, no resort to extrinsic evidence is necessary to interpret the contract. But even if the contract could be construed as ambiguous, the parties' past practice unequivocally supports the Union's interpretation. The parties themselves – as evidenced through their longstanding conduct – have always interpreted the contract to provide employees a *right* to remain on sick leave for up to the full length of their time for time clocks and to deny the Company discretion to terminate a sick leave before that point. Pursuant to the parties' undisputed and longstanding practice, the Company has continued the sick leave of employees, past the point at which their conditions became "permanent" and past the point when no work was available in the plant that matched the employees' restrictions. Pursuant to the parties' undisputed and longstanding practice, and in light of NUMMI's repeated and express acknowledgment that employees have a

2

"right" to time for time leave, the Company only terminated sick leave once the employees exceeded their time for time clocks, and not before.

The past practice of treating time for time leave as a right sheds light on the meaning of the contract's language governing sick leave. Unlike a past practice that lacks any basis in the language of the contract, past practice may *not* be unilaterally repudiated by a party. This is so because the type of past practice at issue here – one that is grounded in the language of the contract – reflects the parties' mutual understanding of the meaning of the contract language itself. Thus, unilateral repudiation cannot "eliminate" the type of past practice at issue in this case any more than unilateral repudiation would allow a party to eliminate a contract term. The type of past practice at issue here can only be terminated by mutual agreement. Because the Union has never agreed to change the contractual right of employees to time for time leave, the Company's so-called "Staudohar Program" violates the contract.

## II. ISSUES

The Arbitrator framed the question in these proceedings as follows:

> Did the Employer violate the Collective Bargaining Agreement by implementing a new policy regarding long-term leaves of absence in terminating certain employees on leave before the expiration of time for time leave under Section 9.3 of the Collective Bargaining Agreement? If so, what is the appropriate remedy?

Tr. at 498:17-23. The parties stipulated that the Arbitrator should retain jurisdiction over the remedy. Tr. at 14:24-15:3, 294:25-295:8.

3

## III. BACKGROUND

A.    **Contract Provisions**

Article XXIII of the contract governs leaves of absence, including sick leave. The

contract provides that "employees who become ill or disabled are eligible for" sick leave. Jt.

Exh. 1 (2005 CBA), Art. XXIII, Sec. 9.1 at p. 65. Section 9.3 of Article XXIII, known as the

"time for time" provision, defines the length of a sick leave as follows:

> A sick leave of absence may not exceed the employee's length of seniority as of
> the date of the illness or disability, or eighteen (18) months for an employee with
> less than one (1) year of seniority, or thirty-six (36) months for an employee with
> more than one (1) year of seniority, whichever is greater.

The next section, Section 9.4, provides a special rule applicable to team members with

industrial injuries:

> In compensable injury and legal occupational disease cases, sick leave will be
> granted automatically and seniority will accumulate for the full period of legal
> temporary disability. Employees disabled during evaluation period by
> compensable injury or legal occupational disease shall be given credit for the
> period of such disability toward acquiring seniority.

The language of Sections 9.3 and 9.4 was negotiated in the parties' first collective

bargaining agreement in 1985, and has remained unchanged since. Jt. Exh. 2 (2001 CBA) at p.

69-70; Jt. Exh. 3 (1988 CBA) at p. 42; Company Exhibit ("Co. Exh.") 1 at 102:4-12.

B.    **The Company Has Acknowledged That Team Members Are *Entitled* To
      "Time For Time" Leave**

The parties have stipulated that from 1990 "until negotiations ended in 2005, the leave of

absence of team members who had personal or industrial injuries . . . was not terminated at the

time the medical condition became permanent, but rather team members remained on leave of

absence for the maximum period of time set forth under Article XXIII, Section 9.3, with seniority

4

measured from date of hire to last day worked." Tr. at 67:23-68:11.

Pursuant to the parties' longstanding practice, the Company has consistently, expressly acknowledged that employees are *entitled* under the contract to remain on sick leave for up to the full period set forth in Section 9.3, and that their sick leave may be terminated only when they have exceeded their Section 9.3 leave entitlement. *See, e.g.,* Un. Exh. 20 at 1 ("Based on [Section 9.3], TM Perez was *entitled* to remain on one continuous Leave of Absence for up to 18 consecutive months") (emphasis added); Un. Exh. C at 2 ("Based on the contract, TM Gullette was *entitled* to remain on one continuous Leave of Absence no longer than the length of her seniority" and justifying termination on the ground that "As of September 24, 2003, TM Gullette['s] continuous Leave of absence *entitlement* was exhausted.") (emphasis added); Un. Exh. D at 1 ("Based on the contract, TM McLemore was *entitled* to remain on one continuous Leave of Absence for up to 18 consecutive months") (emphasis added); Un. Exh. E ("Based on the contract, TM Nguyen was *entitled* to remain on one continuous Leave of Absence for up to 18 consecutive months. On 10/30/04, TM Nguyen's 18-month *entitlement* was exhausted.") (emphasis added).

Pursuant to the parties' longstanding practice, the Company has also consistently acknowledged that even employees with *permanent* medical conditions are *entitled* to remain on sick leave for up to the full period of time set forth in Section 9.3. For example, in defending the 1989 termination of one team member, Renee Adeola-Morrison, NUMMI acknowledged that even though her condition was *already* permanent and stationary, it remained "obligated" to allow her to remain on leave until she exceeded her time for time clock. Un. Exh. 26 at 2 ("Following the normal procedure of applying the language of Article XX[]III, Section 9, the

5

Company is obligated to continue a leave not to exceed the employee's length of seniority.").
Because, NUMMI explained, Ms. Adeola-Morrison had "been on a sick leave exceeding her
seniority" *and* "been deemed permanently disabled," the Company "is no longer *obligated* to Ms.
Adeola after her contractual time for time date." *Id.* (emphasis added).[1]

     In case after case, the Company terminated employees with permanent medical conditions
only when they exceeded their Section 9.3 leave entitlement. But as long as the employee had
not yet exhausted his or her Section 9.3 leave entitlement, the Company continued the leave of
absence even after the team member's condition became permanent and even though no modified
work was available in the plant that was compatible with those permanent restrictions:

- Claudia Escamilla began a leave of absence on March 6, 2002. She was classified by her
  physician as having permanent restrictions as of August 21, 2002. But the Company did
  not terminate her until September 19, 2003, over one year after her restrictions became
  permanent. Throughout this period – after her restrictions became permanent and before
  the Company terminated her leave – no work was available in the plant that was
  compatible with her restrictions. In justifying the termination, the Company
  acknowledged that: "In accordance with the Collective Bargaining Agreement, Section
  9.3, a T/M with less than one-year seniority is *entitled* to remain on LOA for 18 months."
  When the Company ultimately terminated Ms. Escamilla, its reason for the termination
  was that her "leave of absence ha[d] exceeded [her] seniority *rights*" pursuant to Section
  9.3. Un. Exh. A at 2 and Exh. B at 1-2 (emphases added).

- Kimberly Yamaguchi began a leave of absence on December 14, 2002. She was
  classified by her physician as having permanent restrictions as of March 18, 2003. But
  the Company did not terminate her until July 19, 2004, over one year after her restrictions
  became permanent. Throughout this period – after her restrictions became permanent and
  before the Company terminated her leave – no work was available in the plant that was
  compatible with her restrictions. In justifying the termination, the Company
  acknowledged that: "In accordance with the Collective Bargaining Agreement, Section
  9.3, a TM with less than one-year seniority is *entitled* to remain on LOA for 18 months."
  When the Company ultimately terminated Ms. Yamaguchi, its reason for the termination

---

[1] The Company acknowledges that it has an obligation pursuant to Section 9.4 to provide
sick leave for industrially injured employees while their conditions are "temporary," *i.e.*, before
the industrial condition/injury becomes permanent. Tr. 263:10-20.

was that her "leave of absence ha[d] exceeded [her] seniority *rights*" pursuant to Section 9.3.  Un. Exh. A at 7 & Exh. F (emphases added).

- Richard Maners began a leave of absence on April 3, 2002.  He was classified by his physician as having permanent restrictions as of February 28, 2003.  But the Company did not terminate him until February 3, 2004, almost a year after his restrictions became permanent.  Throughout this period – after his restrictions became permanent and before the Company terminated his leave – no work was available in the plant that was compatible with his restrictions.  In justifying the termination, the Company acknowledged that:  "In accordance with the Collective Bargaining Agreement, Section 9.3, a T/M with less than one-year seniority is *entitled* to remain on LOA for 18 months." When the Company ultimately terminated Mr. Maners, its reason for the termination was that his "leave of absence ha[d] exceeded [his] seniority *rights*" pursuant to Section 9.3. Exh. A at 5 & Exh. G (emphases added).

In all of these cases, the reason offered by the Company for the termination was not that

the employee's condition had become permanent and no work was available in the plant that was

compatible with those permanent restrictions.  Instead, because the Company expressly

acknowledged that employees are *entitled* to remain on leave for up to the full length of time set

forth in Section 9.3, the Company terminated these employees only when they had exhausted

their Section 9.3 leave entitlement – and notwithstanding that, at a much earlier date, their

conditions had become permanent and no modified work was available.

## C.   Relying On The Staudohar Decision, The Company Suddenly Sought To Repudiate The Parties' Longstanding Mutual Interpretation

Despite the parties' longstanding practice and the Company's consistent, express

acknowledgment that employees are entitled under the contract to remain on leave for the full

length of their Section 9.3 leave, the Company suddenly articulated its belief in 2004 that, at least

as to employees with industrial injuries, it had the right to terminate leave once the condition

became permanent, and even if the employee had not yet exceeded his or her full "time for time"

leave.  The Company contended that it had a right to do so under a 1990 decision issued by

7

Arbitrator Paul Staudohar.  Tr. at 56:23-57:4, 153:18-154:7, 257:21-258:9.

Thereafter, the Company again shifted its interpretation and took the position – the one it

now advances – that the Staudohar decision gave it the right, as to both employees with industrial

*and* with personal medical conditions, to terminate leave once the condition became permanent.

Tr. at 258:10-24.  Tr. at 154:1-7, 258:4-9.

In the many discussions between the parties over sick leave since the Company first

raised its purported rights under the Staudohar decision, the Union expressed its disagreement

with the Company's interpretation of that decision, emphasizing that team members with

permanent injuries have a right to remain on leave pursuant to the "time for time" provision of

the contract.  Tr. at 152:2-6,153:18-154:7, 155:18-156:4.  In the course of discussions over the

meaning of the Staudohar decision, the Union asked the Company why, if it believed that the

Staudohar decision gave it the right to terminate team members as soon as their medical

restrictions became permanent, it "waited so long to implement it."  Tr. at 152:10.  The response

offered by Bob McCullough, Vice-President of NUMMI's Legal and Human Resource

Departments, was "I don't know why we didn't."  Tr. at 152:12, 207:16-17.

The parties' current collective bargaining agreement was negotiated in Summer 2005.  Tr.

at 140:12-14.  In the year and a half leading up to negotiations, and during the same period when

the Company first raised its new interpretation of the Staudohar decision, NUMMI repeatedly

drew to the Union's attention its growing concern with rising workers' compensation costs and

the increasing cost of providing health care for team members on a leave of absence.  Tr. at

140:14-25, 142:13-143:5; Un. Exh. 46 at 12-15.  (Employees on a leave of absence receive the

same benefits as those not on leave; benefits terminate, however, at midnight on the date of

8

termination.  Tr. at 184:23-185:7.)  NUMMI management had been tasked with reducing costs by

$110 million annually – cost reductions that the Company claims were necessary for it to remain

competitive.  Tr. at 212:11-214:8.

During the 2005 negotiations, the Company reiterated its cost concerns virtually every

day and proposed, among other things, to eliminate health care for team members on a leave of

absence.  Tr. at 143:6-8, 22-24.  This proposal took the form of a proposed side letter to the

contract and was presented to the Union in a package of proposals at negotiations by Company

Vice-President McCullough.  Un. Exh. 21 at 5; Tr. at 144:6-18.  Unlike other proposed side

letters, which were agreed to by the Union and incorporated into the collective bargaining

agreement, Un. Exhs. 47, 48; Tr. at 145:23-149:19, the Company's proposal to eliminate health

care benefits for employees on a leave of absence was not agreed to by the Union or incorporated

into the current contract.  Un. Exh. 21 at 5; Tr. at 149:21-150:11, 150:12-15; 219:17-21.  The

Company continues under the current contract to provide health care benefits to all team

members on leave.  Tr. at 184:23-25.

At bargaining, the Company also included in the package of proposals it presented to the

Union a proposed side letter stating the Company's view that it had the authority under the CBA

"as interpreted by Arbitrator Paul Staudohar" to terminate a team member's leave once the

medical condition became permanent and stationary.  Un. Exh. 21 at 4.[2]  The proposed side letter

---

[2] Although James Potts, the head of NUMMI Human Resources and the individual who
was second in charge for the Company during the 2005 negotiations, Tr. at 207:18-20, 217:21-
23, initially testified that this document was not "meant to be a proposal or a side letter," Tr. at
219:22-24, he subsequently acknowledged that the Company "read this letter at the big table"
during negotiations and the document "went across the table with a number of documents,
[including] documents [that] were proposals that contained changes to the language in the
(continued...)

9

also purported to give the Union notice that NUMMI would implement the interpretation of the contract that it set forth in the letter effective August 7, 2005. *Id.* The Union did not agree to this proposed side letter, and it was never incorporated into the collective bargaining agreement. Tr. at 150:16-151:8.

During the 2005 negotiations, no change was made to the language of the contract governing sick leave. Tr. at 152:14-153:17; Un. Exh. 49 (only changes to Article XXIII (leaves of absence) pertained to educational leave and return from leave). It is undisputed that the Union never agreed in bargaining to any Company proposal that would allow the Company to terminate sick leave as soon as an employee's medical condition becomes permanent.

**D.    The Company's Implementation Of The "Staudohar Program"**

After negotiations, the Company began implementing its current sick leave policy, which it refers to as the "Staudohar Program." Tr. 426:6-8. The Company has instructed employees who are on sick leave and who have permanent restrictions to return to the Company for an interview and bring updated medical information. At the meeting, NUMMI informs the employees that it will look for any available work that fits their seniority and physical restrictions over the 30-day period following the interview. If no such work is available, then NUMMI reserves the right to terminate employment, even if the employee has not yet used up her full time for time leave. Tr. at 88:20-90:22, 228:5-229:5, 426:10-427:9. The Company is applying this policy to *all* team members with permanent restrictions, regardless of whether the medical condition is industrial or non-industrial. Tr. at 94:14-25, 258:10-13. The Company has thus far

---

[2] (...continued)
Collective Bargaining Agreement" and "proposed side letters to be incorporated into the Collective Bargaining Agreement." Tr. at 233:18-19, 235:5-8, 235:24-236:12.

implemented the so-called "Staudohar Program" in five "waves," affecting 301 employees.  Un.

Exhs. 1-6; Tr. 431:5-7.

**E.    The Company's Only Justification For Its Current Interpretation Until Now Has Been The Staudohar Decision**

Until now, the Company has relied *exclusively* on the Staudohar decision to justify its

current position that it is not contractually obligated to allow employees to remain on leave for up

to the full length of their time for time clock:

- The proposed side-letter it sent to the Union on July 19, 2005, notifying the Union of its new interpretation regarding leaves of absence, asserted that the contract "*as interpreted by Arbitrator Paul Staudohar*" authorizes "NUMMI [to] terminate a team member's leave of absence once the condition becomes permanent and stationary" and stated that the Company "intends to comply with this interpretation . . . effective August 7, 2005." Un. Exh. 21 at 4 (emphasis added).

- The Company's first level response to the instant grievance stated: "It is the Company's position that under the collective bargaining agreement (CBA) *as determined by Arbitrator Paul Staudohar* . . ., the Company has the right to terminate a team member on leave due to injury or illness when the team member's condition becomes permanent and stationary and therefore prevents him or her from returning to work, provided certain notice and accommodation requirements are met." The Company even contended that "[p]ast practice is not relevant to the issue as *the Staudohar Decision is clear and unambiguous*." Jt. Exh. 5 at Exh B (emphases added).

- The Company's response at the next stage of the grievance process also relied exclusively on the Staudohar decision.  In justifying the sick leave policy challenged by the instant grievance, the Company repeatedly asserted that it was merely "following" or "complying" with the Staudohar decision. Jt. Exh. 6 at 2 ("plan to follow the Staudohar Decisions"), 3 ("the Company's intent to comply with the Staudohar Decisions"; "the Company presented . . . its plan to follow the Staudohar Decisions as explained in the July 19, 2005 letter"; "The Company met with the Union and its attorneys . . . to further discuss these arbitration decisions and the Company's intent to comply with them"), 4 (multiple references to Company's "intent to comply with these arbitration decisions").

In the prior phase of this arbitration, the Company made the strategic decision to focus its

arguments on the Staudohar decision and took the position that its so-called "Staudohar

Program" was "consistent with" the Staudohar decision. *See generally* Company's Post-Hearing Brief & Post-Hearing Reply Brief.

As this Arbitrator has already concluded, however, the Company's so-called "Staudohar Program" "is not consistent with the actual rulings in *Staudohar*" because the question at issue in this grievance is different than the question decided by Arbitrator Staudohar:

> the issue decided in *Staudohar* – whether a team member on Section 9.4 disability leave can be discharged under the Agreement upon a finding that the employee's disability or condition is permanent and stationary – is different than the issue herein: if a team member's Section 9.4 leave expires pursuant to *Staudohar,* is the employee subject to immediate termination (upon compliance with *Staudohar* procedural requirements) even if the employee has accrued time for time sick leave under the separate clause in Section 9.3?

Jt. Exh. A at 20.

## IV. ARGUMENT

**A.    The Company's So-Called "Staudohar Program" Violates The Plain Language Of The Contract**

The Company is contractually obligated to allow all employees to remain on sick leave for up to the full length of their "time for time" clock, regardless of whether their medical condition is permanent or temporary. This conclusion is compelled by the plain language of the contract. First, all employees have a *right* to sick leave when they become "ill or disabled" as long as they satisfy the procedural requirements of submitting timely documentation. NUMMI does not have discretion to deny sick leave to an employee who meets the contractual eligibility requirements. Second, the period of time during which employees have a *right* to remain on sick leave is governed by the "time for time" provision, and the time for time provision applies to all employees who are "ill or disabled," regardless of whether the medical condition is personal or

12

industrial.  Third, there is no basis for cutting off sick leave once a medical condition becomes "permanent and stationary."

1.    **All Employees Have a Right to Sick Leave When They Become "Ill or Disabled"**

Employees have a *right* to sick leave as long as they are "ill or disabled" and satisfy the procedural prerequisites of submitting timely documentation.  The contract grants the Company no discretion to deny sick leave to employees who satisfy the eligibility requirements for sick leave set forth in the contract, and this right applies to all employees, regardless of whether their medical condition is personal or industrial.

(a)    *The Company lacks discretion to deny sick leave to employees who satisfy contractual eligibility requirements.*  Article XXIII of the contract addresses leaves of absence.  To be eligible for any type of a leave of absence, an employee must have completed her 90-day initial evaluation period.  Art. XXIII, Sec. 2.1; *see also* Art. XI, Sec. 2.1.

Article XXIII then provides for various types of leave, with sick leave addressed in Section 9.  Section 9 establishes two contractual eligibility requirements for sick leave: The employee must be "ill or disabled" and satisfy the procedural prerequisite of providing timely, appropriate medical documentation.  Employees who satisfy these two contractual eligibility requirements have a *right* to sick leave.  Section 9.1 states: "Employees who become ill or disabled are eligible for an unpaid leave of absence after an absence of five (5) consecutive working days."[3]  Section 9.1 also describes the required medical documentation that a team member must provide to the Company and specifies when it must be provided.

---

[3] The *first* five days may be taken as *paid* leave.  Art. XXII, Sec. 2.7.

13

Although Section 9.1 uses the language of "eligibility," under Article XXIII, when a team member meets the eligibility requirements for a particular type of leave, she is *entitled* to the leave at issue. For instance, the contract provides for other types of leave, such as bereavement leave (Section 3), jury duty leave (Section 4), military leave (Sections 5 and 6), and public office leave (Section 7). Like the section on sick leave, each of these other sections also contains an "eligibility" requirement. Art. XXIII, Sec. 3.1 ("eligible" for bereavement leave "[i]n case of a death in the immediate family"), Sec. 4.1 ("eligible" for jury duty leave if "legally summoned for jury duty" and "upon providing the Company with a copy of the[] summons"), Sec. 5.1 ("eligible" for short-term military leave if member of U.S. Armed Forces Reserve or National Guard and "called to short-term military duty"), Sec. 6.1 ("eligible" for long-term military leave if employee "leave[s] work to enter the U.S. Armed Forces"), Sec. 7.1 ("eligible" for public office leave if evaluation period completed and employee is "elected or appointed to full-time public office"). But there is no dispute that employees have a *right* to leave for bereavement, jury duty, military service, and public office once they satisfy the eligibility requirements for such leave. The contract provisions dealing with these leaves would be illusory if NUMMI could deny leave to team members who meet their eligibility requirements.

In contrast, where the parties intended that the Company retain discretion over whether to grant a particular type of leave, they expressly accorded the Company such authority. Thus, unlike sick leave and the other types of leave discussed above, there is no absolute right to personal leave or educational leave and the contract expressly grants the Company discretion to deny such leave. *See* Art. XXIII, Secs. 8.1-8.2 ("Employees who have completed the evaluation period are eligible *to request* an unpaid leave of absence for legitimate personal reasons . . . .

14

Personal leaves are granted *at the discretion of the Company* and are not intended to be used for vacation purposes.") (emphases added), Secs. 11.1-11.2 ("Employees with one or more years of seniority *may make application* for a leave of absence for any full-time further education. . . . [L]eave of absence of such education will be granted without pay to eligible employees . . . *subject to Company approval*.") (emphases added).  Section 9 contains no similar language granting the Company discretion to deny sick leave to employees who satisfy contractual eligibility requirements for such leave.

The undisputed evidence shows that, consistent with the plain language of the contract, the parties have treated sick leave as a right.  The Company consistently grants sick leave to ill or disabled employees who satisfy the contractual eligibility requirements of submitting timely medical documentation.  Tr. 355:7-13; *see also* Tr. at 349:25-355:6 (describing procedure for submitting doctor's notes and obtaining approval for sick leave).  The Company has not attempted to assert that sick leave is "discretionary" by denying sick leave to an employee who has followed the procedural prerequisites of submitting timely medical documentation.  *See* Tr. at 356:9-17.

(b)    *All employees have a right to sick leave, regardless of whether the medical condition is personal or industrial.*  Furthermore, this *right* to sick leave upon satisfaction of contractual eligibility requirements applies to *all* employees, regardless of whether the medical condition is personal or industrial.  Section 9.1, which sets forth the eligibility requirements for sick leave, applies on its face to "[e]mployees."  It is not limited to a subset of employees.

The Company may argue that the only employees with a guaranteed right to sick leave are those with a temporary industrial medical condition – and that as to all other employees, the

15

Company has the discretion to deny sick leave. Section 9.4 provides: "In compensable injury and legal occupation disease cases, sick leave will be granted automatically and seniority will accumulate for the full period of legal temporary disability." That the contract affirmatively uses the term "automatically" with respect to employees with temporary industrial conditions does not, however, negate the right of all other employees to sick leave. NUMMI's argument "by implication" cannot defeat the parties' intent – as evidenced by the overall structure of Article XXIII – that all employees have a right to sick leave. *Capital District Transit System*, 88 LA 353, 356 (1986) ("The Employer 'argument by implication' which suggests that to include two leave items in the Contract is to exclude all others is the opposite of the arbitral standard of 'expressio unius est exclusio alterius' (to express one exception of a class indicates there are no other such exceptions). The Employer argument does not apply because here the Contract does not express exclusion but inclusions for consideration."). As discussed above, *see supra* Part IV-A-1-(a), when an employee meets the contractual "eligibility" requirements set forth in the contract for a particular type of leave, the employee has a *right* to such leave. And where the parties intended the Company to retain discretion over the decision to deny a particular type of leave, they expressly did so. *See, e.g.,* Art. XXIII, Secs. 8.1-8.2, Secs. 11.1-11.2.

Moreover, there are at least two logical reasons why the parties would have chosen to use the word "automatically" specifically in reference to sick leave for industrial injuries. First, the contract provides that "[e]mployees who become ill or disabled are eligible for an unpaid leave of absence," but only *after* an absence of five (5) consecutive working days." Art. XXIII, Sec. 9.1 (emphasis added). As a general rule, the contract provides that "before any employee takes a day off without pay," the employee must first use her Personal Absence Allowance ("PAA")

16

(which provides for time off with pay).  Art. XXII, Sec. 2.7.[4]  Section 9.4, however, supersedes

that general rule, and allows an employee with an industrial condition to apply for sick leave

immediately, even if she is ill or disabled for less than 5 days, without having first to use up her

limited PAA allowance.

Second, Section 9.4's use of the term "automatically" means that no employee will be

denied sick leave during the often lengthy period when the Company's liability under the state's

worker's compensation scheme is being contested.  Under California law, an employee filing a

workers' compensation claim must provide the employer with notice of the injury within 30 days

of the injury.  Lab. Code §5400.  The employer's receipt of notice that an employee has suffered

a work-related injury triggers various employer obligations under the state workers'

compensation scheme, such as providing the employee with "a claim form and a notice of

potential eligibility for benefits."  Lab. Code §5401(a).  The employer has the right to contest

liability, but must do so within 90 days or "the injury shall be presumed compensable" under the

workers' compensation system.  Lab. Code §5402(b).  While preserving the right of the employer

to contest liability, the state workers' compensation scheme also seeks to ensure that employees

are not denied necessary care and benefits during the sometimes years-long period when the

employer's liability is contested.  Thus, for example, once an employee files a claim form, she

automatically has a right under state law to employer-provided treatment for the injury, even

though the employer's liability has not yet been established.  Lab. Code §5402(c).  Similarly, the

---

[4] As clarified in a side-letter appended to the current contract, subject to certain
exceptions, where the employee is qualified for leave under the federal Family Medical Leave
Act or the California Family Rights Act, the employee is "permitted but not required to use
accrued vacation/PAA."  Jt. Exh. 1 at 147.

collective bargaining agreement provides that an employee automatically has a right to sick leave for industrial medical conditions, even if NUMMI's liability for workers' compensation purposes has not yet been established. Art. XXIII, Sec. 9.4. The contract's use of the term "automatically" specifically in reference to industrial sick leave thus serves the important function of ensuring that an employee is not denied the right to sick leave if NUMMI chooses to contest, for workers' compensation purposes, liability for the injury.

And also consistent with the plain language of the contract, the parties as demonstrated through their practice have interpreted the contract to mean precisely what it says, that all "employees" have this same right to sick leave, regardless of whether their medical condition is personal or industrial. For many years, the parties' practice has been to use the same procedure to apply for sick leave, regardless of whether the employee's medical condition is personal or industrial. Tr. 354:21-355:6. And as discussed above, the record demonstrates that the Company automatically grants sick leave to employees who satisfy the contractual eligibility requirement of submitting timely medical documentation pursuant to that procedure. The undisputed evidence further shows that the practice of automatically granting sick leave to employees who have submitted timely medical documentation applies equally to employees with personal and those with industrial medical conditions. Tr. at 355:7-355:22. Any effort by the Company to distinguish between the sick leave rights of employees, based on their nature of their medical condition, is contrary to the language of the contract and the parties' consistent interpretation of the language as evidenced through their practice.

(c)     In short, once an employee satisfies the eligibility requirements for sick leave by becoming ill or disabled and meeting the procedural prerequisites of submitting timely

documentation, she has a *right* to sick leave and this right extends to all employees, regardless of whether the condition is personal or industrial.

### 2.    Employees Have The Right To Remain On Sick Leave Until They Exceed Their "Time for Time" Clock

Section 9.3 describes the period during which team members have a right to remain on sick leave:

> A sick leave of absence may not exceed the employee's length of seniority as of the date of the illness or disability, or eighteen (18) months for an employee with less than one (1) year of seniority, or thirty-six (36) months for an employee with more than one (1) year of seniority, whichever is greater.

Thus, the length of the sick leave is measured by the employee's seniority for employees with three or more years of seniority; is three years for employees with between one and three years of seniority; and is 18 months for employees with less than one year of seniority.

(a)    The contract language makes plain that employees have a *right* to remain on sick leave for up to the full length of time set forth in Section 9.3. Section 9.1 sets forth the right to sick leave of employees who are ill or disabled and who have satisfied procedural eligibility requirements. Section 9.3 then unexceptionally sets forth the amount of sick leave to which those eligible team members have a right. In other words, Section 9.3 is a provision on sick leave accrual. If the contract did not provide employees with the right to a guaranteed amount of sick leave, then the contract's initial guarantee of a right to sick leave would be utterly meaningless.

Article XI, Section 3(g) of the contract enumerates the circumstances under which seniority can be broken and employment terminated, including "[b]eing on a sick leave *beyond* the leave period set forth in Paragraphs 9.3 and 9.4, Article XXIII, of this Agreement."

19

(Emphasis added.) Thus, Article XXIII, Section 9.3 and Article XI, Section 3(g) together authorize the Company to terminate an employee's sick leave and employment after the team member's leave has *exceeded* the time for time clock (and the leave provided in Section 9.4).[5] Because the contract expressly provides that seniority can be broken and employment terminated when these leave periods are exceeded, the Company does not have the right to terminate an employee's sick leave or employment before they are exceeded. Any other conclusion would require construing Article XI, Section 3(g) to mean the opposite of its plain language, effectively rewriting the provision to read that the Company may break seniority and terminate employment when a team member has been "on a sick leave ~~beyond~~ *for less than* the leave period set forth in Paragraphs 9.3 and 9.4, Article XXIII, of this Agreement."

Relying on the phrase "may not exceed" in Section 9.3, the Company now contends that the time for time provision does not establish any right on the part of team members to remain on sick leave for a specified period of time, but instead merely "sets the allowable maximum" leave period that the Company retains the discretion to terminate, even before that maximum period is reached. Tr. at 49:20-21, 266:3-4. The significance of the phrase "may not exceed" is *not* that NUMMI has discretion to terminate the sick leave *before* the period set forth in Section 9.3 – discretion which is *foreclosed* by Article XI, Section 3(g) – but that an employee faces potential termination of employment for remaining on leave *beyond* that period and does not face termination prior to that point. This interpretation provides a harmonious, logical construction of

---

[5] Arbitrator Staudohar held that the Company must follow certain procedural prerequisites after termination of sick leave and before termination of employment. Staudohar decision at 12-13. Discussion in this brief of NUMMI's right to terminate employment after a team member has exceeded her time for time clock assumes that NUMMI complies with these procedural requirements.

Article XXIII, Section 9.3 and Article XI, Section 3(g).  *See* Elkouri & Elkouri, How Arbitration Works at 462 (6th ed. 2003) ("disputed portions 'must be read in light of the entire agreement'").

NUMMI's construction, by contrast, is at odds with basic principles of contract interpretation.  First, provisions are to be construed in light of their purpose.  Elkouri & Elkouri at 461 ("an interpretation in tune with the purpose of a provision is to be favored over one that conflicts with it").  The purpose of Section 9, as discussed above, is to grant team members the right to sick leave, not to grant management discretion to deny or terminate leave.  When the parties intended to grant the Company discretion with respect to team members' leave rights, they expressed that intent in straightforward contract language.  *See, e.g.,* Art. XXIII, Secs. 8.1-8.2, 11.1-11.2.  For the contractual right to sick leave to have any meaning, there must also be a right to a contractually specified amount of sick leave.  Section 9.3 – a provision regarding accrual of sick leave rights – specifies that amount.  That NUMMI now wishes it had negotiated a less generous provision for accrual of sick leave does not justify reading the provision out of the contract.  If, as the Company contends, Section 9.3 does *not* represent the amount of time up to which employees have a right to remain on sick leave, then the contract nowhere sets forth a minimum amount of sick leave to which employees with industrial and personal medical conditions have a right.[6]  Without a contractually guaranteed amount of sick leave, the Company could defeat sick leave rights entirely by exercising its discretion to terminate a sick leave at any

---

[6] The Company may contend that employees do have a minimum guarantee of sick leave, *viz.,* for as long as their medical condition is "temporary."  The only potential basis for such an interpretation is Section 9.4, which provides that "sick leave will be granted automatically . . . for the full period of legal temporary disability."  This provision, however, applies only to "compensable injury and legal occupational disease cases," – that is, it applies only to industrial, but not personal medical conditions.  Thus, the Company's interpretation provides employees with personal medical conditions no minimum amount of sick leave.

21

point.

Second, the Company's reading of Section 9.3 would render the clause meaningless. *See* Elkouri & Elkouri at 463 (given alternative interpretations of clause, reading that renders provision "meaningless or ineffective" must be rejected over "interpretation that would give effect to all provisions"). To serve some purpose, the clause must either grant rights to employees or discretion to management. The Company's reading does neither. It certainly does not grant employees rights. But absent a contractual clause guaranteeing employees a minimum leave period, management would retain the discretion to terminate sick leave, thus rendering an upper limit on sick leave entirely unnecessary. In any event, no purpose is served whatsoever by setting an upper limit on sick leave if, as the Company contends, it also retains full discretion to terminate leave before that limit is reached.

Moreover, the section on its face looks to seniority and thus was intended to tailor the length of sick leave to seniority. But the Company concedes that under its interpretation, a team member's seniority has no bearing on the minimum amount of leave to which she is entitled. Tr. at 266:11-22. The Company's interpretation gives a team member with 20 years of seniority no greater leave rights than a team member with six months of seniority.

(b)    Because the language of the contract is unambiguous, and the Company's interpretation simply cannot give meaning to Section 9.3, no resort to external interpretive aids is necessary. *See, e.g., Town of Provincetown*, 123 LA 1671, 1672 (2007). Even if the contract could be construed as ambiguous on this issue, however, the parties' past practice – "one of the most useful and hence once of the most commonly used aids in resolving grievance disputes," Richard Mittenthal, "Past Practice and the Administration of the Collective Bargaining

22

Agreement," 59 <u>Mich. L. Rev.</u> 1017, 1017 (1961), attached as Appendix A – unequivocally shows that the parties themselves have always interpreted Section 9.3 as setting forth the amount of sick leave up to which team members have a right to remain on leave. This practice has been "unequivocal, clearly enunciated and acted upon, and readily ascertainable over a reasonable period of time and accepted by both parties." *Provincetown*, 123 LA at 1674.

As discussed above, *see supra* at Part III-B, the parties have stipulated that from 1990 "until negotiations ended in 2005, the leave of absence of Team Members who had personal or industrial injuries . . . was not terminated at the time the medical condition became permanent, but rather Team Members remained on leave of absence for the maximum period of time set forth under Article XXIII, Section 9.3, with seniority measured from date of hire to last day worked." Tr. at 67:23-68:11. In addition, pursuant to the parties' longstanding practice, the Company has consistently acknowledged that employees – including those with *permanent* medical conditions – are *entitled* under the contract to remain on sick leave for up to the full period set forth in Section 9.3, and that their sick leave may be terminated only when they have *exceeded* their Section 9.3 leave entitlement. And because of the Company's express acknowledgment that employees are *entitled* to time for time leave, the parties' longstanding practice has been to continue an employee's sick leave of absence – even after the medical condition became permanent and even where no modified work was available in the plant – as long as the employee had not yet exhausted her time for time entitlement. *See, e.g.,* Un. Exhs. B, F, G, discussed *supra* at Part III-B. And this understanding of the time for time clause has been entirely mutual, the Union never having articulated a contrary view.

23

(c)     The plain language of the contract, as well as the interpretation the parties have given the contract through their consistent conduct over many years, demonstrates that Section 9.3 sets forth the amount of time up to which employees have a *right* to remain on sick leave and that the Company has no discretion to terminate the leave before an employee has exhausted her time for time allotment.

### 3.     The Time For Time Provision Applies To All Employees Who Are "Ill Or Disabled"

Finally, the time for time provision applies to all employees, regardless of the nature of their medical condition.  On its face, the provision applies to "a sick leave of absence," and is not limited to a subset of employees on sick leave.  Where the parties intended to limit a provision of Section 9 to a subset of employees on sick leave, they expressly said so.  *See, e.g.,* Art. XXIII, Sec. 9.2 (applies to pregnancy leave); Sec. 9.4 (applies to industrial sick leave).  The Company concedes that the time for time provision applies to all employees, regardless of whether the condition is personal or industrial.  Tr. 265:23-25.

Thus, all employees have a right to remain on sick leave for up to the full length of their time for time clock, even if their medical condition has become permanent, and even if there is no modified work in the plant.  Because time for time leave is a right, the Company can only terminate the sick leave of absence when the employee has exhausted her time for time entitlement.

### 4.     The Company's Remaining Arguments Are Unavailing

The Company makes various meritless arguments.

24

First, it contends that Section 9.3 merely represents an "allowable maximum," but as discussed above, such a reading renders the language of the contract meaningless.

Second, the Company contends that time for time leave is inconsistent with the contract's definition of a leave of absence as "approved time off from work . . . for a specific period of time." Art. XXIII, Sec. 1. There is nothing inconsistent, however, with treating the time for time provision as a right and the contract's definition of a leave of absence. Under the parties' longstanding practice of giving effect to employees' time for time rights, employees were always placed on sick leave for a "specific period of time." When NUMMI approves sick leaves, it always designates an "expected return date." Tr. 357:3-358:5, Un. Exhs. J, K, L. Under the parties' longstanding practice, if the employee was still unable to work as of the return date, then the employee returned to NUMMI and submitted another doctor's note. NUMMI continued the leave of absence as long the total amount of time had not yet exceeded the employee's time for time clock, and the employee had satisfied the contractual eligibility requirements of submitting timely documentation. Tr. at 358:6-360:23. In some cases, NUMMI simply used the employee's time for time date as the "return date." *See, e.g.,* Un. Exh. K (specifying leave start date of 7/21/2003 and leave end date of 5/21/2013). In other cases, NUMMI used shorter intervals and required employees to return to the plant for more regular "check-ins." *See, e.g.,* Un. Exh. L (specifying leave start date of 5/20/2002 and leave end date of 7/1/2002); *see also* Tr. 416:15-19. But because some end period for the leave was always specified, Tr. 360:14-23, leaves – even when NUMMI gave effect to employees' time for time rights – have always been, consistent with the language of the contract, "approved time off . . . for a specific period of time." Art. XXIII, Sec. 1.

25

NUMMI makes the further policy argument that if an employee is unable to come back to work, then "that is no longer a leave of absence," and that a leave of absence "clearly" "means at some point in time you have to come back to work." Tr. 328:13-21.  But the language of the contract defines a leave of absence as "approved time off from work with or without pay for a specific period of time for serious or compelling reasons *as described below*." *See* Art. XXIII, Sec. 1 (emphasis added).  The contract's definition nowhere includes the Company's additional caveat.  Instead, as discussed above, giving effect to employees' time for time rights is entirely consistent with the contract's definition of a "leave of absence."  By specifying an end date to the sick leave, the approved leave is for a "specific period of time."  Moreover, the contract's definition of a "leave of absence" also expressly incorporates by reference the other provisions of Article XXIII ("as described below"), including Sections 9.1 and 9.3, and thus reflects the parties' intent that an employee's illness or disability is a "serious or compelling reason" for which they are entitled to remain on sick leave, in the manner prescribed by Section 9.3, that is, for up to the full length of the time for time clock.

In any event, even if the Company were correct that the contract actually defines a "leave of absence" to mean that the employee must be able to return to work at some point – which this contract plainly does not – this definition would not justify NUMMI's current view that it may terminate sick leave once an employee's condition becomes "permanent."  That an employee's condition is "permanent" is *not* a proxy for whether the employee may one day return to work.  Many employees with permanent medical conditions have returned to work – in some cases, years after their injury became permanent.  Un. Exh. 45 at 7; Tr. at 109:1-16.  This is because the placement process involves a certain amount of luck – an opening that matches the employee's

26

restrictions and seniority must arise. Tr. at 101:24-102:12, 441:20-24. The longer an employee

is allowed to remain on sick leave, the higher the likelihood a suitable opening will occur. Just

because there is no suitable opening at the point in time that an employee's injury becomes

permanent does not mean a suitable opening will not arise in the future (and while the employee

remains on time for time leave). Indeed, Company witness Carolyn Perez, Manager of Safety

and Disability Management, acknowledged that it would have been "possible . . . at some point

in the future" to place at least half of the employees whom the Company terminated pursuant to

its so-called Staudohar Program. Tr. 441:15-24. Moreover, the record shows that some

employees' medical conditions have improved and conditions that were once classified as

"permanent" have healed, thus rendering a placement more likely. *See, e.g.,* Un. Exh. N & O and

Tr. 361:1-9, 366:17-368:13 (describing cases where permanent restrictions lifted and employee

subsequently returned to work in plant). Because of the luck involved in the return to work

placement process and the possibility that medical conditions improve, an employee whose

medical condition is "permanent" may actually be able to return to work in the future. Thus,

even if the Company were correct that a leave of absence by definition requires the employee to

be able to return to work – which it does not – there is no basis for terminating sick leave simply

because the employee's medical condition has become permanent.[7]

---

[7] There is a tremendous range in the severity of medical conditions that are labeled "permanent." The severity of a restriction necessarily affects the likelihood that an employee will be matched with a job opening. Tr. at 440:25-441:24. Some employees have been classified by their doctors as completely unable to work. The Company does not contend that it may terminate sick leave of only this subset of employees but instead seeks overbroadly to terminate sick leave of all employees' whose conditions are "permanent," regardless of how moderate or severe the restriction.

Furthermore, consistent with the notion that employees should receive benefits based on seniority, and that they should continue to receive benefits even if they are unable to return to work, the contract provides for long-term disability benefits for a period of time at least equal to seniority or until the employee is eligible to retire. The contract provides that, for disabilities "commencing prior to age 60," long-term disability "[b]enefits are paid while the team member remains totally disabled, *up to their length of service*, or until their 65th birthday, whichever is earlier." Jt. Ex. 1, App. B at 102-03 (emphasis added).[8] For "[d]isabilities commencing on or after the 60th birthday, benefits are paid for fifty-four months, or *equal to the seniority* prior to the disability or until recovery, whichever is earlier, but not beyond the 70th birthday." *Id.* at 103 (emphasis added). The parties intended that disabled employees receive benefits up until retirement – and indeed, even after retirement – because the contract provides that "[a]t normal retirement age benefits will be reduced by the amount of the normal retirement benefit payable." *Id.*[9] Thus, the contract unequivocally expresses the parties' intent that employees receive Company-provided benefits even when they are completely unable to work and might never return to work at NUMMI. The primary significance of an employee being able to remain on a

---

[8] For "[d]isabilities commencing after the age of 50 for team members with 10 or more years of service," the contract provides for long-term disability benefits for a period of time potentially longer than the employee's seniority: "until age 65 or until recovery whichever is earlier." *Id.* at 103. Long-term disability generally commences after one year of total disability. *Id.* at 102. Thus, an employee with 10 years of seniority who became disabled at age 50 *and who never recovers* has a right to long-term disability benefits until age 65, i.e., for 14 years (one year of temporary disability benefits followed by 14 years of long-term disability benefits), even though under the general rule for disabilities commencing prior to age 60, the employee would only be eligible for such benefits for 10 years ("up to their length of service").

[9] The normal retirement age under the contract is 62, with ten years of service. Tr. 185:19-22.

28

sick leave of absence is that the employee continues to receive Company-provided health care benefits. Tr. 217:6-12.[10] The Company essentially argues that there is no reason it should continue to provide such benefits to employees who may never return to work at NUMMI. But the parties unequivocally expressed their intent to provide long-term disability benefits, for a period of time commensurate with seniority, to employees who might never return to work. Similarly, the contract provides for sick leave rights, including the attendant right to health care benefits, for a period of time commensurate with seniority, to employees who might never return to work. There is simply no basis in the contract itself for limiting sick leave rights only to those employees whom the Company believes (whether correctly or not) will return to work.

Unmoored to any contract language, NUMMI is left to make the policy argument that a leave of absence *should* in its view mean that the employee is ultimately able to return to work. But the Company cannot now escape its contractual obligations simply because it wishes it had entered into a different contract.

**B.    The Company Cannot Repudiate Its Contractual Obligations**

During the most recent collective bargaining negotiations that occurred during Summer 2005, the Company informed the Union that commencing August 7, 2005 – the day after the old contract expired – it would implement its new policy of terminating the sick leave of employees whose injuries had become permanent. Un. Exh. 21 at 4. Although this announcement came in the form of a proposed side-letter, the Union did not agree to the Company's proposal on this

---

[10] Indeed, NUMMI's cost-cutting efforts drove it to propose during 2005 negotiations that benefits for employees on a leave of absence be eliminated. The Union did not agree to that proposal and employees on a leave of absence continue to receive benefits. Un. Exh. 21 at 5; Tr. at 144:6-18, 149:21-150:11, 150:12-15; 219:17-21, 184:23-25.

29

issue. Nor did the Company secure a change in the relevant contract language of Article XXIII. *See supra* at Part III-C.

The Company contends that it may unilaterally repudiate the "past practice" of providing employees with time for time leave by providing notice to the Union, and that unless the Union secures a language change in the contract language, the Company is free to implement its new interpretation once the old collective bargaining agreement expires. This argument is misplaced for at least two reasons. First, for the reasons discussed above, the contract expressly states that employees have a right to remain on sick leave for up to the full length of their time for time clocks. As a result, the Company cannot now repudiate its unambiguous contractual obligation to provide time for time leave where, as here, the relevant contract language remains in effect. The Company had the opportunity at bargaining "to negotiate a change to this clause. . . . It is now seeking to gain at arbitration what was not gained at negotiations." *Provincetown*, 123 LA at 1674. Second, even if the contract language could be construed as ambiguous, and resort to past practice necessary to elucidate the meaning of the contract language, the Company is not free to repudiate unilaterally an "interpretive" past practice. Its effort to do so fundamentally misunderstands the nature of the past practice at issue here.

The overwhelming weight of authority shows that a party may not unilaterally repudiate a "past practice" that sheds light on an ambiguous contract provision. This is so because the past practice merely serves as an aid to understanding the parties' intent. As such, it cannot be unilaterally repudiated any more than a term of the contract itself.

As Arbitrator Mittenthal explains in his seminal article "Past Practice in Contract Administration," it is critical to distinguish between a past practice which lacks "any basis in the

30

agreement," and a past practice which "serves to clarify some ambiguity in the agreement." 59

Mich. L. Rev. at 1040.  Although even a past practice which lacks a basis in the language of the

contract may nevertheless be "an enforceable condition of employment," this type of past

practice may be unilaterally repudiated with the proper notice.  *Id.* at 1040-41.  Because such a

practice becomes binding "by implication" from the parties' mutual acquiescence in the conduct

at issue, *id.* at 1034 (emphasis omitted), a timely and unilateral repudiation suffices to terminate

the practice.  *Id.* at 1041 ("Without their acquiescence, the practice would no longer be a binding

condition of employment.  In face of a timely repudiation of a practice by one party, the other

[party] must have the practice written into the agreement if it is to continue to be binding.").

Arbitrator Mittenthal contrasts on the other hand "a well-established practice which

serves to clarify some ambiguity in the agreement." *Id.* at 1041.  The rationale for the binding

nature of this type of practice is fundamentally different from a practice that lacks any basis in

the contract language.  Accordingly, the method for terminating these two types of practices are

also fundamentally different.  Because, as Arbitrator Mittenthal explains, a past practice that

sheds light on contract language

> is essential to an understanding of the ambiguous provision, it becomes in effect a
> part of that provision.  As such it will be binding for the life of the agreement.
> And the mere repudiation of the practice by one side during the negotiation of a
> new agreement, unless accompanied by a revision of the ambiguous language,
> would not be significant.  *For repudiation alone would not change the meaning of
> the ambiguous provision and hence would not detract from the effectiveness of the
> practice.*  It is a well-settled principle that where past practice has established a
> meaning for language that is subsequently used in an agreement, the language will
> be presumed to have the meaning given it by practice.  Thus, *this kind of practice
> can be terminated only by mutual agreement*, that is, by the parties rewriting the
> ambiguous provision to supersede the practice, by eliminating the provision
> entirely, etc.

*Id.* at 1041 (emphasis added);[11] *accord* National Academy of Arbitrators, The Common Law of the Workplace at 83-84 (BNA 1998) (distinguishing methods for altering a past practice that lacks "any basis in the agreement" from one that "serves to clarify an ambiguous provision in a contract"; the latter "becomes the definitive interpretation of that term until there is mutual agreement on rewriting the contract. The practice cannot be repudiated unilaterally."); Elkouri & Elkouri at 619 n.71 ("Repudiation of a practice that gives meaning to ambiguous language in the written agreement would not be significant – the effect of this kind of practice can be terminated only by rewriting the language.").

Thus, arbitrators consistently reject a party's unilateral effort to repudiate a past practice, where the practice sheds light on an ambiguous contract provision. In *School District No. 25*, 121 LA 316 (2005), for example, Arbitrator Calhoun rejected a school district's effort to repudiate unilaterally an ambiguous provision governing early retirement. Pursuant to the parties' practice, the District consistently approved all applications for early retirement grants that met eligibility criteria. *Id.* at 318. The District suddenly contended that it had the discretion to limit the number of grants and raised the issue at the bargaining table, but did not secure a

---

[11] More than thirty years after his seminal article on the issue, Arbitrator Mittenthal reaffirmed this position – distinguishing between the methods by which a past practice not grounded in the contract, as distinct from one that clarifies an ambiguous contract term, is terminated. While the former may be unilaterally repudiated during contract negotiations, the latter may not. Richard Mittenthal, "The Ever-Present Past," 47th Annual Meeting of the National Academy of Arbitrators, at 192 (BNA 1994) ("The employer's rejection of" "a practice that merely clarifies an ambiguous provision of the agreement" "in the course of contract negotiations will not make it any less effective under the new agreement. To escape, *the employer must negate the practice by changing the underlying contract provision or by securing the union's consent to amend or eliminate the practice.* Should this approach fail, the practice will continue to provide the necessary clarification of the ambiguous clause.") (emphasis added), attached as Appendix B.

32

language change to this effect. *Id.* Arbitrator Kaufman held that the parties' practice over 17 years revealed what "[t]he early retirement provision came to mean": "The District's obligation to amend the contract by negotiating a change in its language remained intact. Its practice could not be repudiated unilaterally." *Id.* at 320.

Similarly, in *Hydro Conduit Corp.*, 105 LA 964 (1995), Arbitrator Kaufman addressed a contractual provision that set forth a formula for calculating vacation pay based on a "week's pay" for the employee. The term "week's pay" was susceptible of being interpreted to mean either 40 hours or the average number of hours actually worked per week by the employee. *Id.* at 965. The parties' longstanding practice was to use the 40-hour approach; the Union sought to repudiate that practice during negotiations, but did not obtain a language change setting forth its average-hours-worked method. *Id.* at 965-66. Even though the arbitrator found the union's interpretation "reasonable," *id.* at 966, he denied the grievance: Absent a change in the relevant contract language, the union was not free to repudiate unilaterally a past practice that was grounded in the contract language. *Id.* at 967 (where "twenty years of a consistent practice" is grounded in contract language and that language "was not changed in the current agreement," the practice is "not 'somehow eliminated' by the Union's merely 'raising the issue at the table'"). By seeking to repudiate unilaterally a past practice grounded in the contract language, Arbitrator Kaufman explained, "the Union has sought to give new meaning to old contract language. But that approach is essentially no different from proposing a change in the language of the contract in order to effect a change in the terms of the contract. However, . . . it is well established that a party may not gain through arbitration what it was unable to achieve in negotiations." *Id.* (internal quotation marks, citations omitted).

33

And in *Standard Furniture Manufacturing*, 122 LA 986 (2006), Arbitrator Howell also rejected a union's effort to repudiate the parties' longstanding interpretation of an ambiguous provision regarding the performance of bargaining unit work by supervisors. Under that undisputed practice, foremen regularly filled in on the line. *Id.* at 988. The union articulated a new interpretation of the contract provision which did not allow foremen to do so, raising the issue during contract negotiations, but failing to obtain a language change. The union filed a grievance under the new contract seeking to enforce its new interpretation. *Id.* at 989. Arbitrator Howell rejected the union's new interpretation because he could not eliminate the parties' past practice without exceeding his authority as an arbitrator:

> The Union is concerned about eliminating the past practice of the Company under Article 13 of permitting foremen or supervisors to do bargaining unit work. Under the circumstances of this case, the Arbitrator has no authority within the framework of accepted arbitral practice to do so. . . . Arbitrator Mittenthal stated: "And the mere repudiation o[f] the practice by one side during the negotiation of a new agreement, unless accompanied by a revision of the ambiguous language, would not be significant." . . . This position represents the better weight of authority among arbitrators. If the past practice in this case is to be changed, the Parties need to negotiate a change in the language of Article 13 to reflect their mutual wishes and/or agreement in clear and unambiguous language. This is a matter for the Parties to decide, not a third party arbitrator.

*Id.* at 993.

This is not a case where the parties' undisputed practice lacks "any basis in the agreement." Mittenthal, 59 Mich. L. Rev. at 1040. Rather, the parties' longstanding practice sheds light on the parties' intent when they negotiated Article XXIII, Section 9.3. *Id.* ("The real significance of practice as an interpretative aid lies in the fact that the arbitrator is responsive to the values and standards of the parties."). And the undisputed evidence shows that pursuant to that practice, the Company continued the leave of absence of employees – past the point at which

34

their medical conditions became permanent, and even though no modified work was available for such employees – until these employees exceeded their time for time clocks. This consistent practice was premised on the Company's express acknowledgment that team members are *entitled* to time for time leave, and that their leaves of absence may *only* be terminated once they have exceeded their time for time allotment. *See supra* at Part III-B, IV-A-2-(b).

The Company's current sick leave policy is simply an effort "to give new meaning to old contract language. But that approach is essentially no different from proposing a change in the language of the contract in order to effect a change in the terms of the contract." *Hydro Conduit,* 105 LA at 967. It is irrelevant whether NUMMI's interpretation of the contract is "reasonable." *Id.* at 966. NUMMI cannot "somehow eliminate[]" the parties' practice and, moreover, the contract language that it clarifies, "merely [by] 'raising the issue at the table.'" *Id.* at 967. If the practice is to be changed, and to allow the Company suddenly to terminate sick leave once an employee's medical condition becomes permanent, notwithstanding her time for time clock, "the Parties need to negotiate a change in the language" of the contract . . . This is a matter for the Parties to decide, not a third party arbitrator." *Standard Furniture*, 122 LA 993. Any other approach would be well outside "the framework of accepted arbitral practice." *Id.*; *see also* Mittenthal, 59 Mich. L. Rev. at 1024 ("A decision based on past practice emphasizes not the personal viewpoint of the arbitrator but rather the parties' own history, what they have found to be proper and agreeable over the years.").

**C.    The Company Has Waived Any Argument That Its New Sick Leave Policy Is Permissible Under The Contract**

Finally, throughout the pre-arbitration stages of the grievance procedure, and even during the first phase of the arbitration on the Union's grievance, the Company relied *entirely* on the argument that the Union's grievance was barred by an earlier arbitration decision by Arbitrator Staudohar. *See supra* at Part III-E. In the earlier stages of the grievance procedure and indeed the first phase of this arbitration, the Company never made any arguments about bargaining history. Instead, the Company made the strategic decision to focus entirely on the Staudohar decision. Indeed, that the Company itself relied entirely on the Staudohar decision to justify its current sick leave policy is demonstrated by the name of its current sick leave policy: the "Staudohar Program." Only now, having lost the single argument on which it sought to rest its entire case does the Company seek to made additional arguments. To allow the Company to present a wholly new argument would undermine the grievance procedure. Moreover, the Company itself has sought to bar the Union from raising new arguments for the first time at arbitration, and is therefore equitably estopped from doing so now. *See, e.g.,* Company's Brf. in Problem Notice No. 7483 at 21, attached as Appendix C; Company's Brf. re: Willie Cowan at 43-45, attached as Appendix D. Notably, this is not a situation in which a party seeks to add new evidence to buttress an argument that was timely raised – this is an entirely new argument. Although there are limited circumstances in which a new argument may be appropriate, there is no such justification here.

## **CONCLUSION**

For the foregoing reasons, the Union's grievance should be sustained.

Dated:   September 14, 2007

Respectfully submitted,

Jonathan Weissglass
Linda Lye
ALTSHULER BERZON LLP

by: _____
Linda Lye

Attorneys for the Union

37

# EXHIBIT I

IN ARBITRATION PROCEEDINGS

BEFORE CHARLES ASKIN, ARBITRATOR

| | |
|---|---|
| In the Matter of an Arbitration )<br><br>between )<br><br>UNITED AUTO WORKERS UNION,<br>LOCAL 2244, AFL-CIO, )<br><br><br>and )<br><br><br>NEW UNITED MOTOR<br>MANUFACTURING, INC. )<br><br><br>(Policy grievance, No. 10277)<br>("Time for Time" - Arbitration Phase Two ) | **UNION'S REPLY BRIEF** |

JONATHAN WEISSGLASS (#185008)
LINDA LYE (#215584)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:    (415) 421-7151
Facsimile:    (415) 362-8064

Attorneys for the Union

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   I.    CONTRACTUAL OBLIGATIONS MAY ONLY BE REPUDIATED
       THROUGH MUTUAL AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   II.   BECAUSE THE PAST PRACTICE IN THIS CASE PROVIDES
       EVIDENCE OF THE PARTIES' MUTUALLY AGREED UPON
       INTERPRETATION OF THE CONTRACT LANGUAGE, ANY
       ALTERATION OF THAT INTERPRETATION REQUIRES A
       MUTUALLY AGREED UPON CHANGE IN LANGUAGE . . . . . . . . . . . . . . 12

       A.    THE PARTIES' LONGSTANDING PAST PRACTICE SHEDS
            LIGHT ON THEIR INTENT WHEN THEY ORIGINALLY
            ADOPTED THE LANGUAGE OF ARTICLES XI AND XXIII . . . . . . 12

       B.    NUMMI CANNOT UNILATERALLY REPUDIATE THE
            PARTIES' MUTUALLY ADOPTED INTERPRETATION OF
            THE CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   III.  NUMMI'S REMAINING ARGUMENTS ARE ALL MERITLESS . . . . . . . . 23

       A.    NEITHER ALLEGED "ABUSE" NOR "CHANGED
            CIRCUMSTANCES RELIEVE NUMMI OF ITS
            CONTRACTUAL OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       B.    THE UNION DOES NOT CONTEND THAT THE CONTRACT
            PROVIDES FOR MULTIPLE SICK LEAVES . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES

## CASES

*A.O. Smith Corp.,*
23 LA 27, 32 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

*Adjutant General of Michigan,*
77 LA 203 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

*Albertson's, Inc.,*
106 LA 897 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

*Cemex,*
120 LA 809 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Cerro Metal Prods. Co.,*
98 LA 867, 872 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*City of Indian Harbour Beach,*
103 LA 634 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*City of Anaheim,*
91 LA 579 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Community Mental Health Center of Linn County,*
76 LA 1236 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

*Crane Plumbing,*
95 LA 942 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Del Monte Foods,*
121 LA 835 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Denver Public Schools,*
98 LA 1163 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

*Flathead Valley Community College,*
116 LA 1659 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Furniture Mfg.,*
122 LA 986 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grand Haven Stamped Prods. Co.*,
    107 LA 131 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Hydro Conduit Corp.*,
    105 LA 964 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Inland Empire Paper Co.*,
    88 LA 1096 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Martin Marietta Materials Co.*,
    115 LA 1327 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mason and Hangersilas Mason Co., Inc.*,
    75 LA 106 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

*Matanuska-Susitna School Dist.*,
    123 LA 97 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Mechanical Products*,
    91 LA 977 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Motor Wheel Corp.*,
    102 LA 922 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ohio Dept. of Transp.*,
    103 LA 225 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Penn Emblem Co.*,
    101 LA 884 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*School Dist. No. 25*,
    121 LA 316 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Smith v. Hartford Ins. Group*,
    6 F.3d 131 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Standard Furniture Manufacturing*,
    122 LA 986 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Standard Oil Co.,*
    79 LA 1333 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Teledyne Monarch Rubber,*
    89 LA 565 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*US Airways,*
    122 LA 815 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25

*United Salt Corp.,*
    72 LA 534 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United Steelworkers of America v. Warrior & Gulf Navig. Co.,*
    363 U.S. 574 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Webster Tobacco Co.,*
    5 LA 164 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20

## MISCELLANEOUS

Elkouri & Elkouri, <u>How Arbitration Works</u> (6th ed. 2003) . . . . . . . . . . . . . . . . . . . . 4, 5, 11

National Academy of Arbitrators, *The Common Law of the Workplace* (BNA 1998) . . . . . . . 11

Richard Mittenthal, "Past Practice in Contract Administration,"
    59 Mich. L. Rev. 1017 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## INTRODUCTION

Seventy years ago, Congress enacted the National Labor Relations Act and established "the federal policy [of] promot[ing] industrial stabilization through the collective bargaining agreement." *United Steelworkers of America v. Warrior & Gulf Navig. Co.*, 363 U.S. 574, 578 (1960). Without acknowledging this fundamental principle, NUMMI now proposes a radical new theory of contract interpretation that would allow a party to repudiate unilaterally its contractual obligations – years after the parties had mutually agreed upon those obligations – simply by uttering self-serving statements later. It is axiomatic that *mutually* agreed upon contractual obligations can only be amended or terminated through *mutual* agreement. NUMMI's theory – that mutual agreements may be altered unilaterally – violates not only basic principles of contract interpretation and well-established arbitral authority, but the congressional policies underlying modern labor management relations. By rendering a nullity the contractual obligations set forth in a collective bargaining agreement, NUMMI's theory would undermine the stability and predictability in collective bargaining relationships that Congress sought to achieve decades ago.

NUMMI simplistically contends that all "past practices" may be unilaterally repudiated simply by providing notice. This argument conflates the widely-recognized distinction between a past practice that is entirely freestanding and not grounded in any written contractual agreement between the parties, and a past practice that sheds light on the parties' mutual intent in adopting contract language. Because the rationale for finding each of these kinds of "past practices" to be binding is fundamentally different, the method by which each such practice may be terminated is also fundamentally different. A freestanding past practice becomes binding based on an

1

*inference* that the parties through their silence have agreed to be bound, and unilateral repudiation with advance notice therefore suffices to free the parties of any contractual obligation in the future. This is so because a party's express statements that it does not wish to be bound negate the inference – based on that party's silence – that it intended to be bound. But where a past practice sheds light on what the parties actually intended when they agreed to contract language, it is the *actual contract language* that is significant, and which sets forth the parties' agreement to be bound. Because actions speak louder than words, the parties' past practice demonstrates what the parties actually intended when they adopted the contract language and the mutual interpretation of that language to which they subscribed.

The latter past practice is at issue in this case. Because this kind of practice is significant as evidence of what the parties agreed to when they originally adopted the contract language, arbitral authority holds that such a practice cannot be unilaterally repudiated and that the party seeking to implement a change bears the burden of securing the other party's agreement to a change in the contract language. Indeed, it does not even make sense to say that such a practice can be "repudiated," any more than it makes sense to say that a party could repudiate evidence. The evidence exists, and the evidence – including a stipulation – in this case demonstrates that NUMMI and the UAW have long interpreted the language of their collective bargaining agreement to mean that employees have a right to remain on sick leave for up to the full length of their time for time clocks, and that their sick leave may not be terminated before that point – as long as they continue to satisfy the contractual eligibility requirements for sick leave of being ill or disabled and providing timely medical documentation. Accordingly, the contract has that meaning – a meaning that can only be changed by mutual consent.

2

Equally mistaken is the Company's reliance on its statements at the bargaining table *in 2005*. The parties first entered into a collective bargaining agreement 20 years earlier. NUMMI's post-hoc, self-serving articulation of its interpretation of language – long ago adopted and with a well-settled interpretation – is completely irrelevant. Any other approach would completely undermine stability and predictability in the collective bargaining relationship and vitiate the very purpose of collective bargaining agreements, by effectively allowing either party to revise unilaterally well-established contractual obligations.

## ARGUMENT

### I.    CONTRACTUAL OBLIGATIONS MAY ONLY BE REPUDIATED THROUGH MUTUAL AGREEMENT

NUMMI contends that the parties' well-established past practice of treating time for time leave as a right may be terminated by the Company's unilateral repudiation of that practice at the bargaining table. Co. Opening Brf. at 28-31. This argument completely misconstrues the significance of past practice in this case and violates the core contract principle of mutuality.

It is well established that the generic term "past practice" is used to describe entirely distinct concepts, notwithstanding NUMMI's effort to blur the widely recognized and easily discerned distinction. As this Arbitrator explained at the conclusion of the hearing, and consistent with the article to which he referred the parties by Arbitrator Richard Mittenthal,

> [p]ast practice in the labor relations context is a term which unfortunately describes different things in different circumstances. One kind of past practice describes the situation where both parties by their conduct have created a term or condition of employment which is not expressly addressed in the Collective Bargaining Agreement, or which in some cases is contrary to what is expressed in the Collective Bargaining Agreement . . . . The term "past practice" is also used in an entirely different context . . . as external evidence . . . to determine the parties' intent with regard to language which is ambiguous.

3

Tr. at 499-500; *see also* Richard Mittenthal, "Past Practice in Contract Administration," 59 Mich. L. Rev. 1017, 1022-1040 (1961) (describing distinct functions that past practice can serve, including, *inter alia*, "Clarifying Ambiguous Language," and "As a Separate, Enforceable Condition of Employment"); Elkouri & Elkouri, <u>How Arbitration Works</u> at 605 (6th ed. 2003) (describing distinct purposes for which evidence of custom and past practice may be introduced, including "to provide the basis of rules governing matters not included in the written contract" and "to indicate the proper interpretation of contract language"). For ease of terminology, we will use the term "freestanding past practice" to refer to practices that are not grounded in the contract language and "interpretive past practice" to refer to practices that provide evidence of what the parties intended when they adopted ambiguous contract language.

Although both types of past practice can be binding on the parties, the rationale for finding them to be so is fundamentally different. As Arbitrator Mittenthal explains, freestanding past practices become binding "*by implication*." Mittenthal, "Past Practice in Contract Administration," at 1034 (emphasis in original); *see also id.* ("By their silence, the parties have given assent to 'existing modes of procedure.'"). In other words, freestanding past practices become binding because the parties through their acquiescence in the practice are deemed to have agreed to the practice. *Id.* at 1040 ("The inference [of agreement] is based largely on the parties' acquiescence in the practice.").

An interpretive past practice, by contrast, serves a fundamentally different purpose. Because the parties' actual conduct is one of the most reliable indicators of their intent, arbitrators use past practice as evidence, that is, as an interpretive guide to shed light on ambiguous contract language. As Arbitrator Mittenthal explained: "To borrow a well-known

4

adage, 'actions speak louder than words.' . . . A practice, once developed, is the best evidence of what the language meant to those who wrote it." *Id.* at 1024; *see also* Elkouri & Elkouri at 623 ("The custom and past practice of the parties is the mostly widely used standard to interpret ambiguous and unclear contract language" because "the parties' intent is most often manifested in their actions."). Thus, the significance of an interpretive past practice is the evidence it provides of what the parties actually intended when they adopted particular contract language. That being so, "[b]ecause the practice is essential to an understanding of the ambiguous provision, it becomes in effect a part of that provision." Mittenthal, "Past Practice in Contract Administration," at 1041.[1]

In short, freestanding and interpretive past practices concern fundamentally different questions. A freestanding past practice bears on the question whether – in the absence of any contract language – the parties can nevertheless be bound by the practice, *i.e.*, whether the parties intended rights and obligations to obtain at all. An interpretive past practice, by contrast, comes into play when the parties intended there to be *some* kind of right or obligation – as evidenced by the fact that they chose to adopt contract language; but because the language at issue is ambiguous, the interpretive past practice is used as evidence to flesh out the contours of the rights or obligations set forth in that contract language.

Given the fundamental conceptual differences in these two types of past practice, the method by which each type of practice is terminated or altered is also fundamentally different. A

---

[1]Although the Company attempts to dismiss Arbitrator Mittenthal's seminal paper and the principles he articulated therein as obscure and rarely cited, even the cases cited by the Company acknowledge that his paper is "now regarded as a 'classic'" and "an often cited paper analyzing the uses of past practice in arbitration." *Albertson's, Inc.*, 106 LA 897, 900 (1996).

5

freestanding past practice, as Arbitrator Mittenthal explains, can be terminated by notice and

unilateral repudiation. This makes sense because the binding nature of a freestanding past

practice derives entirely from an *inference* that the parties have agreed to be bound by the

practice – an inference that is negated once one party expressly states that it does not agree to be

bound. Mittenthal, "Past Practice in Contract Administration" at 1040 ("The inference [of

agreement] is based largely on the parties' acquiescence in the practice. If either side should,

during the negotiation of a later agreement, object to the continuance of this practice, it could not

be inferred from the signing of a new agreement that the parties intended the practice to remain

in force. Without their acquiescence, the practice would no longer be a binding condition of

employment.").

An interpretive past practice, by contrast, is evidence of the parties' mutual intent in

adopting particular contract language. *See Denver Public Schools*, 98 LA 1163, 1169 (1992)

("Paramount, of course, is the objective of effectuating the parties' intent underlying the

language."). That being so, Arbitrator Mittenthal and the overwhelming weight of arbitral

authority agree that the interpretation the parties have given a particular contract provision – as

evidenced through their practice over many years – can be changed only when both parties agree

to change the language itself:

> Consider next a well-established practice which serves to clarify some ambiguity
> in the agreement. *Because the practice is essential to an understanding of the
> ambiguous provision, it becomes in effect a part of that provision.* As such it will
> be binding for the life of the agreement. And the mere repudiation of the practice
> by one side during the negotiation of a new agreement, unless accompanied by a
> revision of the ambiguous language, would not be significant. *For repudiation
> alone would not change the meaning of the ambiguous provision and hence would
> not detract from the effectiveness of the practice.* It is a well-settled principle that
> where past practice has established a meaning for language that is subsequently

used in an agreement, the language will be presumed to have the meaning given it by practice. Thus, *this kind of practice can be terminated only by mutual agreement*, that is, by the parties rewriting the ambiguous provision to supersede the practice, by eliminating the provision entirely, etc.

Mittenthal's "Past Practice in Contract Administration" at 1041 (emphasis added).

Arbitrators consistently embrace this principle. *E.g., Adjutant General of Michigan*, 77 LA 203, 207 (1981) (finding employer to have violated contract by enforcing new interpretation of provision after new contract became effective: "After thoroughly discussing a controversial position [at the bargaining table], and understanding the divergent positions on same, the parties readopted the prior language. Such behavior can only be construed as a ratification of the status quo ante, and an agreement that the provision as previously applied would continue."); *Community Mental Health Center of Linn County*, 76 LA 1236, 1240-41 (1981) (where both parties familiar with well-established "interpretation and practice . . . with respect to payment of longevity pay to part-time employees," "[i]n the absence of there then resulting some *negotiated* provision that would specifically address and serve to change the then understood practice and procedure, such practice and procedure is deemed to be that accepted by the parties and one that is intended to continue") (emphasis added); *Mason and Hangersilas Mason Co., Inc.*, 75 LA 106, 109 (1980) (Because the "practice for many years [regarding interpretation of provision governing 'on-call period'] supported the Company's position, it was the Union's responsibility during the subsequent new contract negotiations to see that the wording of the provision was changed to make the Union's intent clear as to future assignments of this nature."); *A.O. Smith Corp.*, 23 LA 27, 32 (1954) (where each party at negotiations articulated "a different concept of how the vacation provision would be administered," but union failed to obtain language change,

7

employer's interpretation of pre-existing language prevailed because it was consistent with past practice: "In view of the fact that the practice prior to 1950 favored the Company's plant-wide interpretation, the responsibility was on the Union to change the language of the clause to make the Union's intent clear . . . . Any party desiring a change in the application or meaning must assume the responsibility of seeing to it that the wording of the provision involved is qualified or modified to make explicit the changed intent."); *Webster Tobacco Co.*, 5 LA 164, 166 (1946) ("[F]or an arbitrator to change the practice by which [a] contract provision has been interpreted in a plant over a period of several years and several contracts," "[t]here would have to be a clear and unambiguous direction in the language used to effect such a change.").

Nor is it any surprise that this principle is so universally recognized because it derives from the basic contract principle of mutuality. Where the parties have *mutually* agreed upon an interpretation of contract language – as evidenced through their past practice – that interpretation can only be changed through *mutual* agreement. *See Matanuska-Susitna School Dist.*, 123 LA 97, 100, 102 (2006) (finding agreement ambiguous but concluding "that the parties had a *mutual* understanding and established past practice" regarding interpretation of provision; where "nothing in the parties' negotiations for the current Agreement was *mutually* intended to change the previous understanding or past practice of the parties," employer "violated Article VII of the current Agreement when it *unilaterally*" implemented new interpretation once new contract period commenced) (emphasis added); *Cerro Metal Prods. Co.*, 98 LA 867, 872 (1992) ("where a plant rule is bargained between an employer and a union, the terms of the negotiated rule may not be unilaterally changed by the employer without bargaining with the union").

"Considerations of stability and certitude demand that the parties' legitimate expectations

8

regarding their rights and duties be given effect." *Denver Public Schools*, 98 LA at 1170

(employer demonstrated its interpretation of provision borne out by past practice; "Should the

Union wish to change the existing scope of this part of the agreement, it can negotiate language

[doing so.]").

It would not even make sense to say that such a practice could be "repudiated," because

the practice is evidence of what the parties intended.  Although one could dispute that a practice

existed, the parties in this case have stipulated that the practice of providing time for time leave

existed for over a decade and a half.  Tr. at 67:23-68:11.

NUMMI does not cite a single case that holds that an interpretive past practice may be

unilaterally "repudiated" – without a corresponding change in contract language – simply by

providing notice of the new interpretation at the bargaining table and waiting for the new

collective bargaining agreement to go into effect.  Indeed, arbitrators have rejected employer

efforts to conflate interpretive with freestanding past practices in precisely the fashion that

NUMMI does here.  In *Inland Empire Paper Co.*, 88 LA 1096 (1987), the parties' practice of the

employer absorbing all health insurance premium increases shed light on an ambiguous provision

relating to premium costs.  *Id.* at 1102.  Arbitrator Levak unequivocally rejected the employer's

argument that it could unilaterally revoke its longstanding contractual obligation simply "through

pronouncements during negotiations":

> the Employer's notice to the Union at the conclusion of the 1984 negotiations of
> its construction of the Agreement is self-serving and non-probative.  Long before
> that belated and after-the-fact notice, the Employer's obligation to assume
> premium cost increases had become an established obligation under the then-
> existing, and thereafter continued, language.  Any change in obligation could, by
> then, only have come about through an Employer-initiated negotiated change in
> the HSM language.  With regard to that 1984 Employer announcement, the

9

> Employer may have been confusing its right to unilaterally revoke past practices not covered by the agreement through pronouncements during negotiations, with the instant situation.

*Id.* at 1103.

None of the past practice termination cases on which NUMMI relies (Co. Opening Brf. at 24-26) involved a past practice that was used as evidence of the parties' intent in adopting contract language. *See Cemex*, 120 LA 809, 810 (2004) ("The Company 'inducement policy' was never formally incorporated into the Collective Bargaining Agreement."); *Albertson's Inc.*, 106 LA 897, 899 (1996) (where contract provided detailed table of hourly wage rates for each classification of employee during the term of the contract, union sought to enforce practice of paying "across-the-board-wage increases" to janitors who were receiving wages "above-scale" set forth in wage table); *Penn Emblem Co.*, 101 LA 884, 886 (1993) ("[A] written contractual provision may be *amended by* a clear and unequivocal practice demonstrating the parties' mutual intent to modify the contractual language. Clearly, the parties [d]id just that during the previous contract period.") (emphasis in original); *Grand Haven Stamped Prods. Co.*, 107 LA 131, 137 (1996) (turning to past practice because of "absence of written agreement" on issue); *City of Anaheim*, 91 LA 579, 583 (1988) ("This is not a case in which we appeal to past practice to help us interpret ambiguous language."); *Standard Oil Co.*, 79 LA 1333, 1335 (1982) (past practice at issue "has no basis in the contract").[2]

---

[2] Although NUMMI attempts to describe *Grand Haven* as a case in which the employer had a past practice of "interpreting a leave provision" to allow the employer to require employees to exhaust vacation prior to taking leave (Co. Opening Brf. at 25), a review of the decision reveals that the past practice at issue in that case was freestanding and not used to interpret ambiguous contract language. Neither the vacation nor the leave provision even remotely addressed the issue of exhaustion. *Id.* at 134. Although the Union invoked the contract language

(continued...)

NUMMI is thus reduced to asserting that the cases and the commentators – other than

Mittenthal – do not distinguish between different types of past practice when discussing the

requisites for terminating a past practice. Co. Opening Brf. at 23-24. This point is irrelevant and

incorrect. First, there would be no reason for an arbitrator faced with one type of past practice to

opine hypothetically on the method of termination required for an entirely different type of past

practice not at issue in the pending case. The absence of dictum in the cases NUMMI selectively

cites proves nothing. Second, cases and commentators in addition to Mittenthal do indeed

recognize and discuss the distinction in types of past practice and the corresponding distinction in

method of termination for each such practice. *See* Un. Opening Brf. at 30-34 (citing National

Academy of Arbitrators, *The Common Law of the Workplace* at 83-84 (BNA 1998); Elkouri &

Elkouri, at 619 n.71; *Furniture Mfg.*, 122 LA 986 (2006); *School Dist. No. 25*, 121 LA 316

(2005); *Hydro Conduit Corp.*, 105 LA 964 (1995)); *see also Inland Empire Paper Co.*, 88 LA at

1103.

---

(...continued)
in support of its argument, *id.*, the employer – which was relying on the practice – did not even
attempt to argue that contract language, ambiguous or otherwise, supported its position. *Id.* at
135 (position of employer: "The employer, for many years, has followed a policy and practice of
requiring employees to exhaust accrued vacation benefits for certain leaves . . . .").

    *Grand Haven* and *Cemex* are even further distinguishable because the collective
bargaining agreements at issue contained a clause that expressly required past practices to be
reduced to writing to be binding. *Grand Haven*, 107 LA at 134; *Cemex*, 120 LA at 811. No such
comparable provision exists in the contract between NUMMI and the Union. In addition, *United
Salt Corp.*, 72 LA 534 (1979), also cited by the Company, does not support its contention that
one party may unilaterally extinguish a past practice. Co. Opening Brf. at 25. The arbitrator in
that case held: "Absent *mutual agreement* to change this custom and practice, it must be adhered
to under the current contract just as it was under earlier contracts." *United Salt*, 72 LA at 536
(emphasis added).

II.    **BECAUSE THE PAST PRACTICE IN THIS CASE PROVIDES EVIDENCE OF THE PARTIES' MUTUALLY AGREED UPON INTERPRETATION OF THE CONTRACT LANGUAGE, ANY ALTERATION OF THAT INTERPRETATION REQUIRES A MUTUALLY AGREED UPON CHANGE IN LANGUAGE**

The past practice at issue in this case is a critical piece – though not the only piece – of evidence that sheds lights on the parties' mutually agreed upon interpretation of the contract to provide ill or disabled team members the right to remain on sick leave for up to the full length of their time for time clock. That being so, NUMMI cannot unilaterally repudiate the parties' mutually agreed upon interpretation.

A.    **THE PARTIES' LONGSTANDING PAST PRACTICE SHEDS LIGHT ON THEIR INTENT WHEN THEY ORIGINALLY ADOPTED THE LANGUAGE OF ARTICLES XI AND XXIII**

1.    As set forth in the Union's opening brief, the contract language plainly states that ill or disabled employees have a right to remain on sick leave for up to the full length of their time for time clocks. Un. Opening Brf. at 12-29. NUMMI's incorrect argument regarding repudiation of the past practice in this case is therefore moot. *See, e.g., Inland Empire*, 88 LA at 1102 ("well-established rule that where a collective bargaining agreement is clear and unambiguous on its face, it will be *enforced* as written"; past practice and other extrinsic evidence irrelevant).

2.    Even if the contract could be construed as ambiguous, the parties' actions speak louder than words. The parties have stipulated that for at least a decade and a half, the practice was to terminate a leave of absence for ill or disabled employees only when they had exhausted their time for time clocks – and not when their medical conditions became permanent. Tr. at 67:23-68:11. The practice is consistent with a harmonious reading of Article XXIII, Sections 9.1

12

and 9.3 and Article XI, Section 3(g), and provides important evidence of the parties' mutual interpretation of these provisions over many years.

Section 9.1 provides employees who are "ill or disabled" and who have satisfied the procedural eligibility requirements of providing timely medical documentation a *right* to sick leave. Un. Opening Brf. at 13-19. Section 9.3, the time for time provision, then sets forth the amount of time up to which employees have a right – as provided for in Section 9.1 – to remain on sick leave. If Section 9.3 did not appear in the contract at all, then there would be no limit on the amount of sick leave to which employees have a right, and employees would continue to have a right, pursuant to Section 9.1, to remain on sick leave as long as they satisfied the contractual eligibility requirements for such leave, *i.e.*, as long as they remained "ill or disabled" and continued to provide timely medical documentation. Section 9.3 thus provides important protections to *both* employees and the Company: It provides to all employees sick leave for a guaranteed and contractually defined period of time (so long as they continue to satisfy section 9.1's contractual eligibility requirements during this period), and it provides to the Company an upper limit beyond which it is no longer obligated to provide sick leave – even if the employee continues to satisfy Section 9.1's contractual eligibility requirements.

This parallels the structure of other leave provisions in Article XXIII, which set forth a right to a particular type of leave and then also the duration of the leave. *See, e.g.*, Art. XXIII, Sec. 3.1 (right to bereavement leave, for up to 3 or 5 consecutive working days, depending on employee's relationship to decedent); Art. XXIII, Sec. 5.1 (right to short-term military leave, "for the length of call-up to a maximum of thirty (30) calendar days").

Further, Article XI, Section 3(g) provides that one of the circumstances under which the Company may terminate employment and break seniority is if an employee has "been on a sick leave *beyond* the leave period set forth in Paragraphs 9.3 and 9.4. Article XXIII, of this Agreement." (Emphasis added.)  To allow NUMMI to terminate a sick leave for an ill or disabled employee *before* she has "been on a sick leave beyond the leave period set forth in Paragraph 9.3 and 9.4" would negate an express provision of the contract.

NUMMI's contract interpretation arguments merely reinforce the conclusion that the past practice at issue here is interpretive – or there would be nothing to construe.  In any event, the Company's arguments are incorrect.

The Company contends that the contract's use of the term "automatically" in Section 9.4 (regarding sick leave for employees with temporary industrial medical conditions) means that the parties did not intend employees to have the right to remain on sick leave for up to the full length of their time for time clocks, as provided for in Section 9.3. Co. Opening Brf. at 14, 21.  First, as we explained in our opening brief, there are logical reasons for the parties to have specifically chosen to use the word "automatically" in Section 9.4, and recognizing a right of employees to remain on sick leave for up to the full length of their time for time clocks does not render Section 9.4 "superfluous."  Un. Opening Brf. at 16-18.  Second, the Company's argument goes too far. Article XXIII does not use the term "automatically" with respect to the other kinds of leave, and yet it would be absurd to argue, nor does NUMMI even attempt to, that employees who are called to jury duty do not have a *right* to jury duty leave for up to the full period set forth in the contract, if they satisfy contractual eligibility requirements for such leave, and notwithstanding that the

14

parties did not use the term "automatically" in connection with jury duty leave. Un. Opening Brf. at 14.

NUMMI's arguments about the meaning of the phrase "leave of absence" are also unavailing. *See* Co. Opening Brf. at 15-17.

First, NUMMI creates a straw man by mischaracterizing the Union as advocating for an indefinite leave. The Union does not argue that employees have a right to sick leave in perpetuity. Instead, the Union contends that employees have a right to remain on sick leave for up to the full length of the period set forth in Section 9.3. Section 9.3 indisputably sets forth the duration of the sick leave. That the duration of the sick leave is longer than NUMMI would now like does not mean that the period it sets forth is not of defined duration, or that it is not the one to which NUMMI agreed.[3] Recognizing that the right to sick leave provided in the contract would be illusory if there were no minimum period during which ill or disabled employees have a right to remain on sick leave, NUMMI attempts to argue that all employees have a right to remain on sick leave as long as their conditions are permanent. But the "substitute" minimum

---

[3] NUMMI also contends that giving to effect employees' right to remain on leave for up to the full length of the time for time clock would "eviscerate[] the central premise of the *Staudohar* case." Co. Opening Brf. at 17. NUMMI is attempting to relitigate the issue it already lost in the prior stage of these arbitration proceedings. Contrary to NUMMI's assertion, Arbitrator Staudohar did not hold that NUMMI has "the right to end leave of absences notwithstanding Section 9.3" or "that the Company need not extend a leave of absence for long periods of time where the employee is permanently disabled." Co. Opening Brf. at 17. As this Arbitrator has already ruled, "*Staudohar* did *not* constitute a binding arbitral ruling concerning the entitlement of permanently disabled employees who may have accrued separate leave entitlement under Section 9.3. It is further concluded that the Employer's implemented policy of terminating employees whose Section 9.4 leave rights have expired because they have permanent and stationary injuries or medical conditions, without granting such employees accrued rights to sick leave as provided in Section 9.3, is not consistent with the actual rulings in *Staudohar*." Jt. Exh. A at 20 (emphasis in original).

15

period that NUMMI offers has no basis in the contract language. *See* Un. Opening Brief at 21 n. 6.

Second, NUMMI seeks to import a definition of "leave of absence" from a miscellaneous collection of authority, including 65-year old out of state cases, Co. Opening Brf. at 15 – even though the parties expressly defined the term "leave of absence." Art, XXIII, Sec. 1. That definition – "approved time off from work . . . for a specific period of time" – nowhere includes the additional limitations that NUMMI now seeks to impose and is entirely consistent with the Union's interpretation of the time for time clause. Un. Opening Brf. at 25-26. There is no justification for superseding the parties' own definition of the term with the definition ventured in cases, none of which construe the contract in this case, and where even the cases upon which NUMMI relies acknowledge that there is no absolute rule that a leave of absence is always "temporary." *See, e.g., Smith v. Hartford Ins. Group*, 6 F.3d 131, 138 (3d Cir. 1993) ("leave of absence is *typically* temporary") (emphasis added).

In short, the stipulated practice of terminating sick leave only when employees exhausted their time for time clocks, rather than at the point at which their conditions became permanent, is well grounded in – indeed commanded by – the language of Article XXIII, Sections 9.1 and 9.3, and Article XI, Section 3(g).

3.    Moreover, NUMMI introduced evidence that it pays approximately $12,000 per year in health insurance benefits for each employee on a leave of absence and that in 2005 the leave of absence rolls had grown to approximately 600 employees. Tr. at 217:6-12. At the same time, NUMMI's "Basic Management Philosophy" is predicated on the concept of eliminating "muda" or waste in Japanese and keeping "productions costs . . . at the lowest level possible."

16

Un. Exh. W at 15; Un. Exh. Q at 1 (encouraging "[c]omplete elimination of muda (waste) in our jobs [as] the most efficient way to build vehicles with the highest level of quality at the lowest possible cost."). In an effort to achieve " to the fullest extent possible, economy of operations," the Company in negotiations for prior contracts has proposed changes to leave of absence rights. Un. Exh. U at 5, 36. And on a daily basis, NUMMI is constantly engaged in cost-reduction campaigns, encouraging employees to submit cost-saving suggestions. *See, e.g.,* Un. Exh. Q at 4, R at 4, T at 1.

In light of NUMMI's consistent efforts to reduce costs through everything from major bargaining proposals to day-to-day measures such as encouraging employees to turn lights "off during non-production hours," Un. Exh. S at 2, it is utterly implausible that NUMMI would have allowed employees to remain on sick leave – at a cost of thousands of dollars per year per employee – if it did not recognize itself to be contractually obligated to do so. "If the Company had determined to provide the subsidy as a gratuity 'like a Christmas bonus or a Thanksgiving Turkey,' as is suggested in its brief, it surely would have made some formal announcement of its beneficence, notifying employees that the Company hand voluntarily and unilaterally offered this subsidy." *US Airways*, 122 LA 815, 826 (2006) (rejecting employer's effort to characterize past practice as freestanding rather than interpretive, and finding that because practice was grounded in contract language, it could not be unilaterally repudiated).

4.    Finally, the parties' practice is not the only evidence of their mutual interpretation. NUMMI consistently, repeatedly, and expressly acknowledged that employees are *entitled* to remain on sick leave for up to the full length of their time for time clocks and that it remains

17

contractually *obligated* to continue a sick leave of absence until the employee exceeds that clock. *See* Un. Opening Brf. at 5-7 (citing Company statements).

**B.    NUMMI CANNOT UNILATERALLY REPUDIATE THE PARTIES' MUTUALLY ADOPTED INTERPRETATION OF THE CONTRACT**

NUMMI's self-serving, belated, and unilateral statements at the bargaining table do not change the longstanding interpretation of the contract that the parties themselves have mutually agreed upon – as evidenced by NUMMI's own statements and the parties' conduct over many years.

The relevant provisions of the contract have remained unchanged and been carried forward in each of the seven collective bargaining agreements executed by the parties since their collective bargaining relationship commenced in 1985. Jt Exh. 1 (2005 CBA) at p. 27, 65; Jt. Exh. 2 (2001 CBA) at p. 29, 69-70; Jt. Exh. 3 (1988 CBA) at p. 19, 42; Co. Exh. 1 at 102:4-12.

NUMMI first articulated a new "interpretation" of the contract in the year leading up to the 2005 negotiations, but even then, offered shifting interpretations. *See* Un. Opening Brf. at 7-8. Prior to that time, and during bargaining over the *six* prior contracts – in which the parties initially adopted and then repeatedly re-adopted the relevant contract provisions – NUMMI never articulated the interpretation on which it now relies. Because NUMMI did not articulate its new interpretation until 2004 at the earliest, has offered two different new interpretations since 2004,[4] acted upon an entirely different interpretation for at least the last decade and a half, and cannot

---

[4] As the Arbitrator previously found, the Company first took the position in 2004 that it "had the right to terminate employees with *industrial* injuries" once their conditions became permanent. Jt. Exh. A at 10:24-25 (emphasis in original). It then expanded its position and now asserts that it has a right to terminate *all* employees, *i.e.*, employees with personal or industrial conditions, once the condition becomes permanent. *Id.* at 11:18-20.

18

even explain why it waited so long to implement its belatedly announced interpretation,[5] it is

highly doubtful that its current interpretation reflects NUMMI's actual intent.  Even if it did,

however, "the true intent of the party is irrelevant," as NUMMI itself concedes, "if it is

unexpressed."  Co. Opening Brf. at 18.  That being so, the prevailing interpretation mutually

adopted by the parties when they entered into the *first six* collective bargaining agreements – an

interpretation evidenced by NUMMI's express statements and the parties' conduct during this

period – "bec[a]me a formal part of the contract between the parties" and is now binding.  *Motor

Wheel Corp.*, 102 LA 922, 930 (1994).

Although NUMMI places great reliance on its statements at the bargaining table in 2005,

it is well-established that the relevant intent question is the parties' mutual intent at the time they

*originally* adopted the contract provision at issue – not a revisionary and unilateral statement of

that intent years later.  *Flathead Valley Community College*, 116 LA 1659, 1661, 1663 (2002)

(where same language carried over from prior contract, relevant question is "mutual intent of the

parties *at the time the language . . . was drafted*") (emphasis added); *Martin Marietta Materials

Co.*, 115 LA 1327, 1331 (2001) ("self-evident" that employer's statements at bargaining table in

1998 characterizing language adopted by parties in 1974 was "not relevant").  "Obviously, the

'plain meaning' of the words either *per se* or in context are preferable to *post hoc* attempts to

create self-serving interpretations."  *See Ohio Dept. of Transp.*, 103 LA 225, 229 (1994).

---

[5] The Union asked the Company why, if it believed it had the right to terminate sick
leave once the medical condition became "permanent," the Company "waited so long to
implement" that interpretation of the contract.  Tr. at 152:10.  Bob McCullough, Vice-President
of NUMMI's Legal and Human Resource Departments, responded, "I don't know why we
didn't."  Tr. at 152:12, 207:16-17.

If NUMMI's belated and unilateral interpretation could determine the meaning of the contract originally adopted in 1985, a party could "alter or amend [its] contractual obligations" through "self-serving unilaterally issued" statements. *Crane Plumbing*, 95 LA 942 (1990) (company could not alter contractual obligation to provide maternity benefits by unilaterally issuing insurance booklet that excluded such benefits). Such an approach would completely undermine "the stability of the parties' relationship . . . , contrary to the recognized purpose of collective bargaining agreements." *Del Monte Foods*, 121 LA 835, 840 (2005) ("meaning of collective bargaining" agreements does not turn on "self-serving testimony"). "In the framework of a Labor Contract, there would be little stability or much purpose in a collective bargaining relationship if the Company had the power to excuse itself from the economic obligations set out therein." *Teledyne Monarch Rubber*, 89 LA 565, 569 (1987).

As discussed above, the past practice in this case is evidence of the parties' mutual intent in adopting the contract language to provide employees with a right to remain on sick leave for up to the full length of their time for time clock. NUMMI cannot now repudiate that evidence. That being so, NUMMI had the burden of obtaining agreement from the Union to change the language of the contract, if it now wishes to have the authority to terminate sick leave prior to the expiration of the time for time clock. *See* Mittenthal, "Past Practice in Contract Administration," 59 Mich. L. Rev. at 1041; *Adjutant General of Michigan*, 77 LA at 207; *Community Mental Health Center of Linn County*, 76 LA at 1240-41; *Mason and Hangersilas Mason Co., Inc.*, 75 LA at 109; *A.O. Smith Corp.*, 23 LA at 32; *Webster Tobacco Co.*, 5 LA at 166.

Even if repudiation of this evidence were permissible – which it is plainly not – there is no argument whatsoever, and NUMMI does not even assert, that it can repudiate the evidence of

its intent as reflected in its repeated and express statements acknowledging its contractual

obligation to provide leave for up to the full length of the time for time period. *See* Un. Opening

Brf. at 5-7.

NUMMI's unilateral statements at the bargaining table in 2005 – in the absence of any

agreement from the Union to change the contract language – does not alter the longstanding,

mutually accepted meaning of the contract language. As Arbitrator Levak explained in language

directly on point: "Long before that belated and after-the-fact notice, the Employer's obligation .

. . had become an established obligation under the then-existing, and thereafter continued,

language. Any change in obligation could, by then, only have come about through an Employer-

initiated negotiated change in the [contract] language." *Inland Empire*, 88 LA at 1103. NUMMI

is "confusing its right to unilaterally revoke past practices not covered by the agreement through

pronouncements during negotiations, with the instant situation." *Id.*[6]

Indeed, NUMMI is simply seeking "to give new meaning to old contract language. But

that approach is essentially no different from proposing a change in the language of the contract

in order to effect a change in the terms of the contract. However, . . . it is well-established that a

---

[6] *See also School District No. 25*, 121 LA 316, 320 (2005) (parties' practice over 17 years revealed what "[t]he early retirement provision came to mean: "The District's obligation to amend the contract by negotiating a change in its language remained intact. Its practice could not be repudiated unilaterally."); *Hydro Conduit Corp.*, 105 LA 964, 967 (1995) (where "twenty years of a consistent practice" is grounded in contract language and that language "was not changed in the current agreement," the practice is "not 'somehow eliminated' by the Union's merely 'raising the issue at the table'"); *Standard Furniture Manufacturing*, 122 LA 986, 993 (2006) ("If the past practice in this case" "of permitting foremen or supervisors to do bargaining unit work" under particular contract clause "is to be changed, the Parties need to negotiate a change in the language of [the contract] to reflect their mutual wishes and/or agreement in clear and unambiguous language.").

party may not gain through arbitration what it was unable to achieve in negotiations." *Hydro Conduit Corp.*, 105 LA at 967 (internal quotation marks, citations omitted).

The zipper clause on which NUMMI relies actually underscores this point. The clause provides:

> This Agreement constitutes the entire Agreement between the parties, *except as modified by written side letters to this Agreement* and signed by the Company's Vice President, Human Resources and the UAW Vice President. During the negotiations which resulted in this Agreement, each party had the right and opportunity to make demands and proposals on any subject or matter not removed by law from the area of collective bargaining. The understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Furthermore, for the term of this Agreement or any extension thereof, each party waives all statutory rights to bargain collectively over the subject matter of this Agreement.

Art. XXX, Sec. 1 (emphasis added).

It is undisputed that prior to the 2005 negotiations, the parties had never mutually interpreted the agreement to authorize NUMMI to terminate sick leave as soon as an employee's medical condition becomes permanent. It is also undisputed that the "letter" presented by the Company to the Union during the 2005 negotiations announced a radical *new* interpretation of the collective bargaining agreement that the parties had never previously mutually adopted. To secure the change sought by NUMMI in the parties' longstanding, mutual interpretation of the existing contract language, NUMMI either needed to obtain a change in the language itself or at a minimum – pursuant to the zipper clause – Union consent to NUMMI's proposed side letter. NUMMI failed to obtain any such agreement.[7]

---

[7] NUMMI put a package of proposals across the bargaining table in 2005 that included the letter which it now contends sufficed to alter its longstanding contractual obligations, even though the Union never agreed to that letter. Un. Exh. 21 at 4. NUMMI's package of proposals

(continued...)

22

The Company's own conduct demonstrates that it does not really believe that it can repudiate its contractual obligations merely by putting a side letter across the bargaining table and failing to obtain the Union's agreement to that side letter. *Cf. City of Indian Harbour Beach*, 103 LA 634, 636 (1994) (Union's conduct at bargaining demonstrated that it "does not really interpret the present contract language" in the fashion it was arguing at arbitration). Another of the side letters that the Company proposed at the 2005 negotiations, but as to which the Company did not secure Union consent and which was not incorporated into the current contract, would have eliminated health care for employees on a leave of absence. The Company continues under the current contract to provide health care benefits to employees on leave. *See* Un. Exh. 21 at 5; Tr. 149:21-150:15; Un. Opening Brf. at 9.

## III.    NUMMI'S REMAINING ARGUMENTS ARE ALL MERITLESS

NUMMI makes various additional arguments, all of which are meritless.

### A.    NEITHER ALLEGED "ABUSE" NOR "CHANGED CIRCUMSTANCES" RELIEVE NUMMI OF ITS CONTRACTUAL OBLIGATIONS

Neither alleged "abuse" nor "changed circumstances" empower NUMMI to terminate unilaterally the parties' mutually agreed upon interpretation of the contract language. This is so because arbitrators only permit unilateral repudiation on these grounds when the past practice at issue is freestanding.

---

[7] (...continued)
also included several other proposed side letters to the contract. Un. Exh. 21 at 2-3. The Union agreed to several *other* side letters. The parties signed off on those side letters, Un. Exhs. 47, 48, and the agreed-upon content was incorporated into the collective bargaining agreement. Tr. at 145:23-149:19, Jt. Exh. 1 (2005 CBA) at p. 154 at ¶14, 194. Unlike these other Company-proposed side letters, the sick leave letter never was agreed to by the Union, and was not incorporated into the current contract. Tr. at 150:16-151:8.

NUMMI relies on *Mechanical Products*, 91 LA 977 (1988), to argue that it may terminate employees' right to time for time leave based on "abuse." But unlike this case, *Mechanical Products* involved a freestanding past practice. The company had a longstanding policy of allowing employees to use vending machines at any time during the work day, although the parties had never negotiated such a provision in their contract, and the contract itself was "silent on the issue of vending machine usage." *Id.* at 977-78, 980. During bargaining for a new contract, the company expressed its concern about employee productivity and announced that it would prospectively permit trips to vending machines only during breaks and lunch. *Id.* at 979. The arbitrator found that the employer was not bound by the prior practice. As a threshold matter, the arbitrator explained that even though the contract was "silent" on vending machine usage, the past practice became "binding" because the parties "by their mutually accepted practice, fill[ed] the 'gap.'" *Id.* at 980. But once the Company "made the Union aware during bargaining" that "abuse" of the vending machine usage policy "would not be tolerated," "the parties' mutually accepted practice was no longer a part of the parties' agreement." *Id.* at 981-82.

The rationale for terminating the past practice in *Mechanical Products* is identical to the rationale for terminating freestanding past practices in general: Where the contract itself is "silent" on the issue, the practice can nevertheless become binding based on an inference from the parties' mutual acquiescence in the practice. Yet once one party expressly states that it does not acquiesce in the practice – for reasons of "abuse" or otherwise – there is no longer any basis for the inference that the parties have mutually agreed to the practice. *See supra* at 4-6. By contrast in this case, there is much more than an "inference" that the parties mutually agreed to be bound: The contract language (Article XXIII, Sections 9.1 and 9.3 and Article XI, Section

24

3(g)) demonstrates that the parties agreed to be bound, and the parties' longstanding past practice and NUMMI's express statements over many years provide evidence of their mutual interpretation of that contract language. Under these circumstances, NUMMI had the burden of obtaining the Union's agreement to change the contract language. *See supra* at 6-9.

NUMMI also asserts, without any explanation or citation, that it may repudiate past practice based on "changed circumstances." Co. Opening Brf. at 31. The only circumstance that has changed is that NUMMI no longer wishes to live up to its contractual obligations. As arbitrators have made clear, a Company's financial concerns about the cost of a practice does not warrant termination of an interpretive practice. *US Airways*, 122 LA at 826. Indeed, in *US Airways*, the Company recognized and the arbitrator affirmed that although a *freestanding* past practice is subject to unilateral discontinuance based on changed circumstances, an employer cannot do so with an interpretive past practice. *Id.* at 825-26. "Whether the Company's assumption" of the obligation to provide sick leave to ill or disabled employees for up to the full length of their time for time clocks "was imprudent, or has unforeseeably become so," NUMMI cannot now "relieve itself of this Contractual obligation merely because it has become financially burdensome. And, by the same token, whether or not it may be in the long run best interest of the Association to waive this benefit to avoid further staffing reductions, cannot weigh upon the Decision." *Id.* at 826.[8]

---

[8] Moreover, nothing as a factual matter has changed. NUMMI contends "at the time the parties negotiated the Agreement and even for the intervening years between the Agreement and later contracts, the seniority of employees was modest. Thus, it was much less of an issue for NUMMI to allow a team member to remain on leave for the full period of seniority . . . . Now the seniority of many team members is more than 20 years." Co. Opening Brf. at 16 n.8. The argument is not that circumstances have changed, but that NUMMI did not understand the full implications of the contractual bargain to which it had agreed. But given the plain language of
(continued...)

## B.    THE UNION DOES NOT CONTEND THAT THE CONTRACT PROVIDES FOR MULTIPLE SICK LEAVES

NUMMI devotes a portion of its brief to mischaracterizing the Union's interpretation and then refuting that interpretation.  NUMMI asserts that the Union interprets the contract to create "a new Section 9.3 leave" after "a team member's Section 9.4 leave ends per *Staudohar*" and that the Union's alleged interpretation of the contract to create "multiple" leaves renders Section 9.4 of the contract superfluous.  Co. Opening Brf. at 19.  The Union does not interpret the contract to create "multiple" sick leaves and its interpretation does not render any portion of the contract superfluous.

As the Union previously stated, the Union contends that all employees have the right to sick leave as long as they are ill or disabled and fulfill the contract's procedural eligibility requirements of submitting timely medical documentation.  Un. Opening Brf. at 13-19.  Section 9.3 sets forth the amount of time up to which employees have a right to remain on sick leave.  *Id.* at 19-24.  The plain language of the contract means, and the Company concedes, that Section 9.3 applies to all employees, regardless of whether the medical condition is personal or industrial. *Id.* at 24 (citing Tr. 263:23-25).  The Union does not contend that Section 9.4 creates a sick leave separate or apart from Section 9.3, only that it defines "seniority," and thus provides a special

---

[8] (...continued)
Article XXIII, Section 9.3 – which on its face ties the length of a leave of absence to the employee's seniority – it was entirely foreseeable at the time the parties originally negotiated the agreement that the length of an employee's allowable leave of absence would grow as the plant matured and average seniority increased.  Indeed, the record further shows that the parties fully understood the financial implications of the leave provisions when they negotiated the contract. Just two years after the first contract in 1985, the parties met and the Company expressed concern about the high number of employees on a long-term leave of absence.  Union Exh. V at 4-5.  At that meeting, the Company expressed concerns "about many employees being on a long-term leave of absence" and that this was "very expensive."  Tr. 470:5-15.

26

methodology for calculating the length of the time for time clock, for an employee with an

industrial medical condition.[9] For the reason's set forth in the Union's Opening Brief, this

interpretation does not render Section 9.4 of the contract "superfluous." *Id.* at 16-18.

## CONCLUSION

For the foregoing reasons, the grievance should be sustained.


Dated:  October 19, 2007

                              Respectfully submitted,

                              Jonathan Weissglass
                              Linda Lye
                              ALTSHULER BERZON LLP

                         by:  _____
                              Linda Lye

                              Attorneys for the Union


---

[9] The Union's view regarding the interaction of Section 9.3 and 9.4 in determining the proper methodology for calculating the length of the time for time clock for employees with industrial medical conditions was set forth in the Union's opening statement at the hearings in 2006, and in the Union's opening brief in the prior stage of this arbitration. Tr. at 25:3-16, 38:7-43:15; Un.'s Opening Brief (dated September 28, 2006) at 35-38. But the Union has not specifically addressed the methodology in this stage of the proceedings based on the Arbitrator's framing of the issue at the outset of the hearing. Tr. at 304:22-306:18.

# EXHIBIT J

**ALTSHULER BERZON** LLP

ATTORNEYS AT LAW

177 POST STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94108

(415) 421-7151

FAX (415) 362-8064

www.altshulerberzon.com

FRED H. ALTSHULER
STEPHEN P. BERZON
EVE H. CERVANTEZ
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
REBEKAH B. EVENSON
JAMES M. FINBERG
EILEEN B. GOLDSMITH
LAURA P. JURAN
SCOTT A. KRONLAND
PETER E. LECKMAN
DANIELLE E. LEONARD
STACEY M. LEYTON
LINDA LYE
PETER D. NUSSBAUM
KATHERINE M. POLLOCK
DANIEL T. PURTELL
MICHAEL RUBIN
REBECCA SMULLIN
JENNIFER SUNG
PEDER J. THOREEN
JONATHAN WEISSGLASS

JAMIE L. CROOK
FELLOW

January 14, 2008

*Via Facsimile and U.S. Mail*

Nick C. Geannacopulos, Esq.
Seyfarth Shaw
560 Mission Street, Suite 3100
San Francisco, CA 94105

Re:    UAW v. NUMMI - Time for Time Arbitration

Dear Mr. Geannacopulos,

I write in regard to the remedy in the time for time arbitration.  The Union has made repeated efforts to initiate discussions with the Company about implementation of the remedy in this matter.  I am attaching a copy for your information of the Union's correspondence in this regard.  Unfortunately, the parties have not even come close to reaching a resolution regarding the remedy or its implementation.  I am writing to inform you that we will be sending a letter to AAA requesting a list of arbitrators tomorrow.

Sincerely,

Linda Lye

Enclosures
cc:    Christian Rowley, Esq.



*Region 5*
**FREMONT AREA OFFICE**
45201 Fremont Blvd.
Fremont, California 94538



Phone: (510) 656-9901
Fax:    (510) 656-9904

**UAW**

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA – UAW**

*Jim Wells*
**Director**
(Member, International Executive Board)

*Ron Gettelfinger*
President

*Elizabeth Bunn*
Secretary-Treasurer

November 27, 2007                                      By Certified Mail and Fax

Mr. Bob McCullough, V.P.
H.R. and Legal
NUMMI
45500 Fremont Blvd.
Fremont, CA  94538

Dear Bob,

I am sure you have received a copy of Arbitrator Askin's award in the time-for-time matter in which he held that the Company's so-called Staudohar Program violates the collective bargaining agreement. The Union would like to schedule a meeting with the Company later this week or early next week to discuss implementation of the remedy. We are available to meet on November 30, December 3, December 4 and December 5. Please advise us as to your schedule as soon as possible.

The Union's position is that:

1. All team members terminated pursuant to the Staudohar program should be reinstated to sick leave status, with attendance group benefits coverage, immediately.

2. All such reinstated employees will remain on sick leave for the remainder of their time-for-time clocks and, during this period, the Company will continue to make efforts to find jobs for such employees that match their restrictions and seniority.

3. Each improperly terminated employee, or his or her survivors, is entitled to make whole relief to compensate for losses incurred from the time he or she was terminated to the time he or she is reinstated.

4. Each improperly terminated employee, or his or her survivors, will be compensated for any individualized issues arising out of the Company's improper termination of the employee.

Item number 1 should be implemented immediately and need not await resolution of items 2 through 4.

Bob McCullough                          -2-                          November 27, 2007

We believe that we should be able to resolve the remedy in this matter promptly and without the need for resort to arbitration. If, however, we are not able to arrive at a suitable resolution on remedy by January 15, 2007, the Union will seek arbitral resolution of any outstanding remedial issues, to ensure that our members' right to obtain relief is fully protected. Unless we mutually agree to an arbitrator, we will ask AAA to provide a list of arbitrators, in accordance with the normal procedure in the contract.

Yours truly,

Earlie A. Mays
International Representative


cc.    Scott Bean, International Representative
       Linda Lye, Esq.
       Victor Quesada, Bargaining Chairman, Local 2244

EAM:vm
/Staudohar Letter
Opeiu494

### *Region 5*

**FREMONT AREA OFFICE**
45201 Fremont Blvd.
Fremont, California 94538



Phone:  (510) 656-9901
Fax:     (510) 656-9904

---

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA – UAW**

*Jim Wells*
**Director**
(Member, International Executive Board)

*Ron Gettelfinger*
President

*Elizabeth Bunn*
Secretary-Treasurer

December 4, 2007

By Fax and Certified Mail

Mr. Bob McCullough, V.P.
H.R. & Legal. NUMMI
45500 Fremont Blvd.
Fremont, CA  94538

Subject:       Time for time remedy

Dear Bob,

        Last week, I wrote to you requesting a meeting to discuss implementation of Arbitrator Askin's decision, in which he found the Company's so-called Staudohar program to have violated the contract.  After repeated follow-up phone calls from my office to yours, my secretary was told this afternoon that the Company is not ready to meet on Staudohar at this time, and was not provided any proposed date for a meeting.  This is not an acceptable response, particularly given that this grievance has now been pending for two years and the Union has already provided the Company with its position on remedy in my letter to you of November 27, 2007.

        The Union seeks prompt implementation of the remedy in the time for time matter.  Prompt resolution is in all parties' interests:  The Union is entitled to proper enforcement of the contract. Team members who were improperly terminated two years ago now are entitled to immediate reinstatement.  And prompt reinstatement will limit the amount of damages the Company is ultimately required to pay improperly terminated team members in the form of make whole relief.

        The Union is still available to meet on December 5, 2007, and is also available to meet anytime on December 10, 12, 13 or December 14 in the afternoon.  A meeting the week of December 10 will be approximately three weeks from the time Arbitrator Askin issued his decision on November 20, 2007 -- more than enough time for the Company to prepare for a meeting to discuss remedy issues. Please let me know as soon as possible when the Company is available to meet.  The Union believes that we should be able to resolve remedy issues without the need to return to arbitration, but we cannot do so if the Company is not even willing to meet to discuss these matters.  As I indicated in my previous letter, the Union will seek arbitral resolution of the remedy issues unless we are able to reach resolution by January 15, 2008.

Yours truly,

*Earlie A Mays*
Earlie A. Mays
International Representative

cc.    Scott Bean, Intl. Rep.
        Victor Quesada, Bargaining Chairman
        L. Lye, Esq.

EAM/vm
Opeiu494/timefortimeremedy

# EXHIBIT K

**ALTSHULER BERZON LLP**

ATTORNEYS AT LAW

177 POST STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94108

(415) 421-7151

FAX (415) 362-8064

www.altshulerberzon.com

FRED H. ALTSHULER
STEPHEN P. BERZON
EVE H. CERVANTEZ
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
REBEKAH B. EVENSON
JAMES M. FINBERG
EILEEN B. GOLDSMITH
LAURA P. JURAN
SCOTT A. KRONLAND
PETER E. LECKMAN
DANIELLE E. LEONARD
STACEY M. LEYTON
LINDA LYE
PETER D. NUSSBAUM
KATHERINE M. POLLOCK
DANIEL T. PURTELL
MICHAEL RUBIN
REBECCA SMULLIN
JENNIFER SUNG
PEDER J. THOREEN
JONATHAN WEISSGLASS

JAMIE L. CROOK
FELLOW

January 15, 2008

**Via Facsimile and United States Mail**

Sandra Marshall
American Arbitration Association
Western Case Management Center
6795 North Palm Avenue, 2nd Floor
Fresno, CA 93704
Facsimile: (559) 490-1919

Re:   UAW Local 2244 and NUMMI Request for Arbitrators
      Remedy for "time for time" contract grievance

Dear Ms. Marshall:

I am writing on behalf of UAW Local 2244 to request, under your list only service, one list of seven potential arbitrators to arbitrate a dispute between the Union and New United Motor Manufacturing, Inc. ("NUMMI") over the determination of the appropriate remedy, and all other outstanding issues arising from, a contract grievance filed by the Union. The Union and NUMMI are parties to a collective bargaining agreement which provides for arbitration of disputes arising thereunder. Arbitrator Charles Askin has ruled in favor of the Union on its contract grievance and remanded "determination of the appropriate remedy, and all other outstanding issues arising from the subject grievance" to the parties, but ordered that the parties retain the right to seek arbitral resolution of any outstanding issues on which no mutual agreement is reached. A copy of Arbitrator Askin's decision is attached. The parties have not reached a mutual resolution on the issues Arbitrator Askin remanded to the parties, and so the Union now seeks to arbitrate these issues, pursuant to the parties' collective bargaining agreement and Arbitrator Askin's decision.

Sandra Marshall
January 15, 2008
Page 2

    Please provide the list of seven potential arbitrators at your earliest convenience.  The arbitration will take place in the San Francisco Bay Area, so it would be appropriate to have arbitrators from there.

    Please send the lists to myself and to Nick Geannacopulos and Christian Rowley, Seyfarth Shaw, 560 Mission Street, Suite 3100, San Francisco, CA 94105; fax: (415) 397-8549.

    Sincerely,

Linda Lye
Attorney for UAW Local 2244

Enclosure

cc:   Nick Geannacopulos
      Christian Rowley

1   CHARLES A. ASKIN
    31 LOMA VISTA
2   WALNUT CREEK, CA 94597

3

4

5

6

7                           IN ARBITRATION PROCEEDINGS

8                  PURSUANT TO AGREEMENT BETWEEN THE PARTIES

9

10

11  In the Matter of a Controversy

12      Between

13  NEW UNITED MOTOR                          SUPPLEMENTAL
    MANUFACTURING, INC.,                      OPINION AND AWARD
14
                        Employer
15      and

16  INTERNATIONAL UNIION, UNITED
    AUTO WORKERS UNION, LOCAL 2244,
17
                        Union
18
    Involving the interpretation of Article XXIII,
19  Section 9.3 ("time for time" provision).

20

21          This dispute involves the application and interpretation of a Collective Bargaining Agreement

22  between the above-named Employer and Union.  Pursuant to the provisions of the Agreement, the

23  parties selected the undersigned Arbitrator to issue a final and binding decision.

24          A hearing was held in Fremont, California on June 6 and June 18, 2007.  During the course

25  of the hearing, the parties were given full opportunity to examine and cross-examine witnesses and

26  to introduce relevant exhibits.  Counsel for both parties submitted post-hearing briefs and reply

27  briefs.  The matter was deemed submitted upon the Arbitrator's receipt of the reply briefs on October

28  20, 2007.

1    APPEARANCES:

2        On Behalf of the Union:

3            Jonathan Weissglass, Esq. and Linda Lye, Esq.
             Altshuler, Berzon, Nussbaum, Rubin & Demain
4            177 Post Street, Suite 300
             San Francisco, CA 94108
5
         On Behalf of the Company:
6
             Nick C. Geannacopulos, Esq. and Christian J. Rowley, Esq.
7            Seyfarth Shaw LLP
             560 Mission Street, Suite 3100
8            San Francisco, CA 94105

9                                    **ISSUES**

10       Did the Employer violate the Collective Bargaining Agreement by implementing a
         new policy regarding long-term leaves of absence and terminating certain employees
11       on leave before the expiration of "time-for-time" leave under Article XXIII, Section
         9.3 of the Collective Bargaining Agreement?  If so, what is the appropriate remedy?[1]
12

13                       **Relevant Provisions of the Agreement**

14       **XI.    SENIORITY**

15       **3.     Loss of Seniority**

16           Seniority will be broken and lost, and employment shall cease for the
             following reasons:
17
             .....
18
             e.    Failure to return to work within four (4) consecutive working days
19                 (excluding Saturday and Sunday) after the expiration of a leave of
                   absence unless unusual conditions or circumstances exist;
20
             .....
21
             g.    Being on sick leave beyond the period set forth in Paragraph 9.3 and
22                 9.4, Article XXIII of this Agreement.

23
     ///
24
     ///
25

26   _____

27       [1] The parties were unable to reach agreement upon a joint statement of the issue to be submitted for
     resolution, but authorized the Arbitrator to frame the issue.  The foregoing issue statement was framed by
28   the Arbitrator and read to the parties at hearing.

                                       - 2 -

XXIII.        LEAVES OF ABSENCE

**1.        Definition**

A leave of absence means approved time off from work with or without pay for a specified period of time for serious or compelling reasons as described below.

**2.        Eligibility**

2.1        Employees who have not completed their initial evaluation period are not eligible for a leave of absence, except where such leave is legally required.
            .....

**9.        Sick Leave**

Employees who become ill or disabled are eligible for an unpaid leave of absence after an absence of five (5) consecutive working days. Requests for such leave will be submitted within this five (5) day period and will include medical documentation from their attending physician indicating they are unable to work and the estimated duration of their absence. The Company may, at its expense, request an impartial medical opinion from a mutually agreed upon medical examiner.

**9.3**        A sick leave of absence may not exceed the employee's length of seniority as of the date of the illness or disability, or eighteen (18) months for an employee with less than one (1) year of seniority, or thirty-six (36) months for an employee with more than one (1) year of seniority, whichever is greater.

**9.4**        In compensable injury and legal occupational disease cases, sick leave will be granted automatically and seniority will accumulate for the full period of legal temporary disability. Employees disabled during evaluation period by compensable injury or legal occupational disease shall be given credit for the period of such disability toward acquiring seniority.

**Pertinent Facts**

This is the second arbitration proceeding before this Arbitrator arising from a grievance filed by the Union on November 10, 2005. Generally, the Union's grievance challenges the propriety of the Employer's decisions to implement a policy terminating employees' leaves of absence before the expiration of employees' so-called "time for time" leave pursuant to Article XXIII, Section 9.3 of the Agreement. The grievance also challenges the termination of employees affected by adoption of the foregoing policy. The pertinent facts in this stage of the controversy are summarized below.

1.    The Employer and the Union have been parties to successive collective bargaining agreements since the plant re-opened as a joint venture in the mid-1980's. Since at least 1989, and possibly since the parties' first contract, the pertinent language quoted above (Article XI, Section 3

- 3 -

1    and Article XXII, Section 9) has been identical, or identical in all material respects.

2        2.  As stated in Section 9.3 of the Agreement, the amount of leave provided to ill or disabled

3    employees with more than 36 months of seniority may not exceed the employee's length of seniority

4    as of the date of an illness or disability.  Because of its linkage of leave "time" to seniority "time,"

5    the  parties refer to the leave in Section 9.3 as "time for time" leave.  Time for time leave is an

6    unpaid leave.  However, employees on a time for time leave of absence are eligible to return to work

7    if and when their medical condition permits them to do so.  In addition, employees on a time for time

8    leave of absence receive company-paid health care and other benefits while on the medical leave of

9    absence (Tr. 184-185, 413), which cost about $12,000 annually for each employee.  Historically,

10   some employees have been on a medical leave of absence for years, even as long as a decade.

11       3.  On April 6, 1989, the Employer terminated four employee who were on sick leave or

12   medical after determinations that each of them had medical restrictions that would not enable them

13   to return to their jobs. The Union filed a policy grievance challenging the four terminations that was

14   heard by Arbitrator Paul Staudohar. On December 17, 1990, Arbitrator Staudohar issued an Opinion

15   in that matter wherein he sustained the Company's right to terminate a leave of absence "in cases

16   like we have here," subject to certain procedural/technical issues not material herein.  More

17   specifically, Arbitrator Staudohar ruled that an employee on leave who 1) was unable to perform

18   work in their classifications, and 2) whose injuries were medically determined to cause permanent

19   restriction, could have his or her leave of absence terminated.  Stated another way, it is undisputed

20   that the Staudohar Decision authorized the Employer to terminate an employee's leave of absence

21   under Section 9.4 (compensable injury and legal occupational disease cases, or "industrial injuries")

22   when the employee's medical condition becomes "permanent."

23       4.  After the Staudohar Decision was issued in late 1990, and until August 6, 2005,

24   employees whose medical condition was deemed permanent, and whose Section 9.4 leave was

25   accordingly terminated, were not automatically discharged from employment.  Rather, during the

26   15 years from December 17, 1990 until August 6, 2005, employees whose Section 9.4 leave of

27   absence rights were terminated were deemed "entitled" to their maximum allowance of time for time

28   leave pursuant to Section 9.3 of the Agreement.  For example:

- 4 -

- Following the issuance of the Opinion in *Staudohar*, there was continued litigation between the Union and the Company concerning the employment status of the three employee grievants. In processing Ms. Adeola's grievance, the Company advised the Union that Ms. Adeola had not been terminated (subsequent to the Staudohar Decision) solely because her medical condition was permanent and stationary, i.e., upon the expiration of her leave under Section 9.4 pursuant to *Staudohar*. Rather, the Company stated that it was "*obligated* to continue a leave not to exceed the employee's length of seniority," i.e., to grant her "time for time" sick leave. The Company stated that "because Ms. Adeola has a) been on a sick leave exceeding her seniority; b) has been deemed permanently disabled, the Company is no longer *obligated* to Ms. Adeola *after her...time for time date*" (emphasis added).

- The parties stipulated that after the Staudohar Decision and until the fall of 2005, the leave of employees who had personal or industrial injuries was not terminated at the time the medical condition became permanent; rather such employees remained on a leave of absence "for the maximum period set forth under Article XXIII, Section 9.3, with seniority measured from the date of hire to last day worked."

5.    The Employer has repeatedly stated in writing, as late as October 30, 2004, that employees are "entitled" under Section 9.3 of the contract to time for time leave no longer than the length of the employee's seniority, and that such employees are subject to termination when their Section 9.3 leave of absence "entitlement" is exhausted. (Union Exh, C, D, and E). The Union's position in this grievance, and at all times material herein, is consistent with the Employer's written statements that employees are "entitled" to time for time leave, and are subject to separation from employment upon the exhaustion of their maximum leave "entitlement."

6. Article XXIII, entitled "Leaves of Absence," provides for multiple kinds of leave. In addition to sick leave (also referred to as medical leave) provided in Section 9 at issue herein, Article XXIII provides separate leaves for bereavement, jury duty, short and long-term military service, service in public office, personal reasons, and further education. The Agreement expressly states that personal leave and education leave are subject to the Company's approval and/or the Company's discretion. The leave provisions for bereavement, jury duty, short and long-term military service, service in public office – and the sick leave provided in Section 9 of Article IIXXX – each contain "definitions" specifying the conditions for which an employee is "eligible" for that leave, but there is no comparable language stating those leaves are subject to company discretion or approval. Prior to the policy implemented on August 7, 2005 at issue herein, there is no evidence in this record that the Employer denied a sick leave of absence to any employee who satisfied the two qualifying

- 5 -

criteria for sick leave "eligibility" in Section 9 (completion of the initial evaluation period and submission of unchallenged medical documentation by a physician that the employee is unable to work, with an estimated duration of absence) on the asserted basis of the Employer's "discretion."

7. The payment of benefits to employees on medical leaves of absence has been costly, in excess of millions of dollars. In 2004, the Employer sought to reduce costs and advised the Union, for the first time, of its belief that under the Staudohar Decision it had the right to terminate employees with "industrial" injuries whose leave expired under Section 9.4 because their injuries had been classified as permanent and stationary, i.e., that it was not required to defer separation from employment of such employees until after the expiration of the "maximum period" of time for time leave. The Employer's disclosure of its new interpretation of the Staudohar Decision was made during the term of the predecessor contact. The Employer took no action to implement its interpretation of the Staudohar Decision during the term of the predecessor contract.

8. In July of 2005, the parties commenced negotiations for the current Collective Bargaining Agreement. At the outset of negotiations, by letter dated July 19, 2005, the Employer reiterated its new interpretation of the Staudohar Decision that an employee's seniority could be broken (and the employee terminated) once the employee's condition was determined to be permanent and stationary. In the same letter, the Employer notified the Union that it intended to comply with its interpretation effective August 7, 2005, the first day after the then-existing contract expired.

9. The Union did not agree with the Employer's new interpretation of the Staudohar Decision. However, neither party sought to negotiate about their conflicting interpretations of the contract language and/or how it was applied in light of that Decision. There was no change made in the language in Sections 9.3, 9.4, or Article XI, Section 3 of the new, current Agreement.

10. In September of 2005, the Employer met with the Union and presented a written proposal concerning its plan to implement its new interpretation of the Staudohar Decision. It appears that the Union then first learned that the Employer's interpretation of the Staudohar Decision applied to all employees whose injuries were deemed permanent and stationary, i.e., both industrial and non-industrial injuries or conditions.

11. The Employer implemented its new interpretation of the Staudohar Decision by

- 6 -

1  contacting about 301 employees who had been on medical leave for extended periods and who had

2  "permanent" medical conditions.   The affected employees were contacted in a series of  five

3  successive "waves."  The employees were invited to participate in an interview with company

4  representatives to discuss the nature of their permanent restrictions, and whether the employee was

5  able to perform available work at the Employer's facility.  In the course of these interviews, the

6  Employer learned that some of the employees who had been identified did *not* have permanent

7  restrictions; those employees were removed from the "program," i.e., returned to their time for time

8  leave due to their temporary disability.  Some of the affected employees retired, resigned their

9  employment, or failed to appear for the requested interviews.  The Employer terminated employees

10  whose medical condition were permanent and stationary, and who could not be placed in a position,

11  without regard to those employees' continued eligibility for time for time leave under Section 9.3

12  as it had been applied at least from 1990 until August, 2005.  About 99 employees whose maximum

13  time for time leave had not expired were terminated, some after many years of absence.

14      12.  On November 10, 2005, the Union grieved the Company's interpretation of the

15  Staudohaar Decision and the employment separations that resulted on the basis that the employees'

16  employment could not be terminated until their time for time leave expired.

17      13. The Union also contends that the current method of calculating the maximum time for

18  time leave violates the parties' contract.  Specifically, the Union asserts that employees are entitled

19  to an amount of "seniority" time based on the full period of temporary disability up to the point the

20  injury is deemed "permanent and stationary," rather than up to the last date worked as time for time

21  has been applied historically.

22      14.  On November 24, 2006, in the prior proceeding arising from this grievance, this

23  Arbitrator issued an Opinion and Award wherein it was held that the Employer's policy regarding

24  time for time leaves of absence is not consistent with Article XI, Section 3 and Article XXIII,

25  Section 9.3 of the Collective Bargaining Agreement, as interpreted by the Staudohar Decision.  The

26  subject hearing was convened to hear evidence and to issue an arbitral ruling concerning the issue

27  of whether the Employer's implementation of its new time for time policy, and its consequent

28  termination of affected employees, violated the parties' Collective Bargaining Agreement.

- 7 -

**CONTENTIONS OF THE PARTIES**

**The Union**

The Union contends that the Employer's implementation of its new interpretation of the Staudohar decision constitutes a unilateral repudiation of its longstanding contractual obligations. The Employer sought to obtain the change it implemented during contract negotiations, but the parties did not agree to a change in the contract language. No arbitral authority allows the Employer to obtain through unilateral action what it failed to obtain through negotiation.

Under the plain language of the contract, employees who are ill or disabled and satisfy the procedural prerequisites set forth in the contract of submitting time medical documentation have a right to a sick leave of absence. The Employer has no discretion to deny sick leave to which employees are entitled. Without a provision setting forth the amount of sick leave to which employees are contractually entitled, the contractual right to sick leave would be meaningless; the Employer could terminate sick leave at its discretion. The provision on sick leave accrual rights is known as the "time for time" provision and generally provides that employees have a right to remain on sick leave for a period of time equal to their seniority (except in certain cases for less senior employees). The contract explicitly provides that employees have a right to remain on sick leave, and that they have a right to do so for the full period of time set forth in the time for time provision. The Employer complied with this requirement for years.

In the fall of 2005, the Employer suddenly implemented a new sick leave policy. The Employer now believes that it has the right to terminate the sick leave of absence of any employee whose medical condition has become permanent, even if the employee has not yet been on leave for the full length of her time for time clock. The new policy was based on the Employer's interpretation of a 1990 decision by Arbitrator Staudohar, but this Arbitrator has rejected that argument. Now that the Employer's new policy cannot rely upon the Staudohar Decision, the express language of the contract compels the conclusion that the grievance must be sustained. Under the plain language of the contract, employees have the right to remain on a sick leave of absence for the full period of their time for time clocks, and the Employer cannot unilaterally repudiate that written contract obligation.

- 8 -

1    Because employees' right to time for time leave is evident from the plain language of the

2   contract, no resort to extrinsic evidence is necessary to interpret the contract. But even if the contract

3   could be construed as ambiguous, the parties' past practice unequivocally supports the Union's

4   interpretation. The parties themselves – as evidenced through their longstanding conduct – have

5   always interpreted the contract to provide employees a *right* to remain on sick leave for up to the full

6   length of their time for time clocks and to deny the Company discretion to terminate a sick leave

7   before that point. Pursuant to the parties' undisputed and longstanding practice, the Employer has

8   continued the sick leave of employees, past the point at which their conditions became "permanent"

9   and past the point when no work was available in the plant that matched the employees' restrictions.

10  Pursuant to the parties' undisputed and longstanding practice, and in light of the Employer's repeated

11  and express acknowledgment that employees have a "right" to time for time leave, the Employer

12  only terminated sick leave once the employees exceeded their time for time clocks, not before.

13    The past practice of treating time for time leave as a right sheds light on the meaning of the

14  contract language governing sick leave. Unlike a past practice that lacks any basis in the language

15  in the contract, this past practice may *not* be unilaterally repudiated by a party. This is so because

16  the type of practice at issue here – one that is grounded in the language of the contract – reflects the

17  parties' mutual understanding of the meaning of the contract language itself. This principle was

18  recognized by Arbitrator Mittenthal in his "classic" treatise on Past Practice, when he wrote that

19  "because [an "interpretative"] practice "is essential to an understanding of the ambiguous provisions,

20  it becomes in effect a part of that provision." Mittenthal, "Past Practice in Contract Administration,"

21  59 Mich L. Rev. 1017, at 1041 (1961). Thus, unilateral repudiation cannot "eliminate" the type of

22  past practice at issue in this case any more than unilateral repudiation would allow a party to

23  eliminate a contract term. Quoting Arbitrator Mittenthal again,

24        ...this kind of practice can be terminated only by mutual agreement, that is, by the
          parties rewriting their the ambiguous provision to supersede the practice, by
25        eliminating the provisions entirely, etc.

26  Id. Because the Union has never agreed to change the contractual right of employees to time for time

27  leave, the Employer's so-called Staudohar Program violates the Agreement.

28    For the foregoing reasons, the Union's grievance should be sustained.

**The Employer**

The Employer contends that its implementation of the so-called Staudohar Program is fully consistent with the Collective Bargaining Agreement. The language, intent and structure of hte parties' contract demonstrate that the Employer is not required to give sick leave for the full length of an employee's seniority, or "time for time." The parties did not intend to create a potentially two-decades-long disability benefit or early retirement option when they created a "leave of absence" for illness in Article IIXXX, Section 9. The commonly understood meaning of "leave of absence" is a "*temporary absence* from employment or duty with the intention to return." (emphasis added) *Pollett v. Rinker Materials Corp.,* 477 F.3d 376, 380 (6th Cir. 2007).

Consistent with this common meaning, Article XXIII, Section 9.1 creates one "leave of absence" for illness, which leave, per Section 9.3, "may not exceed" the time for time period. In other words, it provides an absolute upper limit on sick leave. Nothing in Section 9.3 automatically requires NUMMI to grant sick leave for the full time for time period. The parties clearly knew how to require sick leave "automatically" if they wanted to do so, because they did so in Section 9.4 for industrial injuries (for the period of temporary disability). Indeed, the Section 9.4 requirement – that sick leave automatically granted for the period of temporary disability for industrial injuries – would be superfluous if Section 9.3 mandated sick leave for the time for time period in all circumstances.

The Arbitrator should construe any ambiguity in the contract language against the Union. The Employer advised the Union of the meaning of Article XXIII, Section 9 in 2005, and the Union accepted that language without proposing an alternate meaning. It is axiomatic that a contract is an agreement between two or more parties. The ultimate goal of an arbitrator is always to determine what the parties intended by an ambiguous term, and to give effect to that intent. The Union is basically arguing, based on pre-contract behavior, that the parties mutually intended Section 9 to be interpreted in a way that is expressly contrary to NUMMI's stated intent in 2005. There cannot possibly be a "meeting of the minds" as to the interpretation proposed by the Union in view of the Employer's stated interpretation at the bargaining table. The foregoing conclusion is especially forceful in view of the inclusion in this contract of a zipper clause. See *Grand Haven,* 107 LA 131 (1996) at 137. Under black letter law, the Union is bound by the Employer's interpretation.

1    The Agreement does not require NUMMI to provide sick leave for the full length of an

2    employee's seniority. Rather, the Employer is only required to provide sick leave for a temporary

3    period until such time as the employee is permanently disabled and unable to return to work despite

4    the best efforts of NUMMI and the Union. The Agreement grants NUMMI the discretion to provide

5    a leave of absence beyond that period, but not to exceed the length of an employee's seniority.

6    There is no dispute that prior to August 7, 2005, the Employer allowed most employees to

7    take sick leave for the full length of their seniority (and in some cases more) regardless of whether

8    there was any reasonable chance that the employees would ever return to work. Nevertheless, the

9    Employer terminated that practice prior to the new contract term by providing notice to the Union

10    and by incorporating a zipper clause in the new Contract. The Employer also had the right to end

11    the practice to preclude fraud and waste, and it did so.

12    Richard Mittenthal, in a rarely-cited passage, suggested that an amorphous category of past

13    practices involving interpretation issues cannot be terminated at the end of a contract term, contrary

14    to the rule that applies to all other past practices. His opinion is basically ignored in the case law and

15    does not comport with black-letter contract law. "Interpretative" past practice is merely an aid to

16    glean the parties' intent where ambiguous language exists. Where one party has clearly stated what

17    is meant by the certain language, and the other party has agreed to that language, pre-contractual past

18    practice is not relevant to determining what the parties intended. To argue that an alleged past

19    practice, which one party has clearly disavowed, continues on into a new contract despite the party's

20    intent (and a zipper clause) eviscerates the core contractual concept of mutual consent and the rules

21    generally applicable to past practice. Arbitrators agree that one party can terminate a past practice

22    at the end of the agreement by giving notice to the other party. As has been often stated:

23    If either side should, during negotiations of later agreement, object to the continuance of this
     practice, it could not be inferred from the signing of a new agreement that the parties
24    intended the practice to remain in force. Without their acquiescence, the practice would not
     longer be a binding condition of employment. In the face of a timely repudiation of a
25    practice by one party the other must have the practice written into the agreement is it is to
     continue to be binding.

26

27    *Grand Haven Stamped Products Co.*, 107 LA 131 (Daniel, 1996) at 137 (quoting Mittenthal, NAA,

28    14th Proceedings).

- 11 -

1    Even if Arbitrator Mittenthal's interpretative had merit, which it does not, this is not an

2    "interpretation" case. Rather, in this case, the Union is arguing that the scope of a right that the

3    employees clearly have under the Agreement – sick leave – has been *expanded* by an alleged past

4    practice. Specifically, the Union claims that past practice created the benefit of full time for time

5    leave in all sick leave cases, a benefit that is *not* provided for in the Agreement. Unlike a purely

6    contract interpretation situation, the issue in this arbitration is not what is meant by some vague word

7    or phrase, such as "reasonable notice" or "agreed medical examination." Here, the words of Section

8    9 are clear: "A sick leave of absence may not exceed the employee's length of seniority..." What the

9    Union is really claiming is that NUMMI has a contractual obligation based on past practice to

10   provide benefits to people who are totally disabled for potentially more than 20 years, even when

11   there is virtually no chance that they will ever return to work. This case is squarely within the group

12   of "contractual benefit" cases that even Mittenthal agrees can be terminated by proper notice.

13   In summary, the Employer does not dispute that the Agreement provides for sick leave. But

14   it also gives NUMMI the discretion to determine the maximum amount of time that an employee

15   may be on sick leave, up to the length of an employee's seniority, after his or her condition becomes

16   permanent. The Agreement does not require the Employer to provide sick leave for the length of

17   seniority, which could be 23 years for an employee, even if the employee is totally disabled and not

18   getting better. The Employer's notice to the Union during contract negotiations in 2005 extinguished

19   any and all past practice that gave team members the benefit of sick leave for the full length of their

20   seniority. Accordingly, the Employer respectfully asks the Arbitrator to deny the Union's grievance.

21                                              **OPINION**

22   **I.    *Overview***

23   In contract interpretation disputes, the fundamental role of an arbitrator is to discern the

24   mutual intent of the parties and enforce the bargain which was struck. To satisfy that obligation, the

25   arbitrator must first review the pertinent language and determine whether it is clear and

26   unambiguous. If so, the plain meaning of the words used by the parties must be strictly enforced.

27   However, an ambiguity exists where plausible arguments can be advanced for conflicting

28   interpretations of the disputed language. In such cases, it is appropriate and proper for an arbitrator

- 12 -

1  to look beyond the four corners of the contract to ascertain the parties' true intent by reviewing

2  extrinsic evidence such as bargaining history and/or past practice.

3      In this case, Article XXIII, Leaves of Absence, provides for various kinds of employee leaves

4  of absence. Section 9, entitled "Sick Leave," provides two discrete circumstances for the use of sick

5  leave in Section 9.3 and Section 9.4, and two different periods of time for the leaves in each section.

6  Thus, Section 9.4 grants "automatic" sick leave in cases involving injury and legal occupational

7  disease, i.e., "industrial" injures. Based on the contract language, as interpreted by the Staudohar

8  Decision, Section 9.4 sick leave is granted "for the full period of legal disability," and that sick leave

9  is subject to termination when an employee's condition is deemed to be permanent and stationary.

10  Section 9.3 sick is authorized for a broader class of medical conditions than in Section 9.4, e.g., also

11  for "personal" (non-industrial) injuries or illnesses that preclude an employee's ability to work. The

12  leave provided in Section 9.3 is also for a different duration of time – namely, a period "not to

13  exceed the employee's length of seniority...", or as it is referred to by the parties, "time for time."

14  Based on the evidence presented and the arguments submitted, there is no dispute that the Agreement

15  provides a sick leave benefit to employees. This controversy involves a dispute over the meaning

16  of Section 9.3 with respect to the length of that leave – specifically, whether Section 9.3 means that

17  employees are entitled to the "full" amount of time for time leave before they can be terminated.

18      The Employer notes, correctly, that Section 9.4 provides for an "automatic" grant of sick

19  leave for industrial injuries, but the parties did not use the word "automatic" in describing the sick

20  leave provided in Section 9.3. It is further noted that Section 9.3 does not expressly identify a

21  specific minimum period of time for time entitlement; rather, the only language addressing the length

22  of time for time leave ("may not exceed") appears to represent a "maximum" ceiling, or upper limit,

23  without regard to any mandatory "minimum" time period. In the Arbitrator's view, the contention

24  that Section 9.3 does not "automatically" require the Employer to grant each "eligible" employee the

25  maximum period of time for time leave, but only an amount "not to exceed" the maximum allowed,

26  constitutes a plausible interpretation of the "time for time" provision in Section 9.3.

27      The Union notes, correctly, that two of the leave provisions in Section 9 (personal leave and

28  education leave) specifically condition entitlement to those leaves upon the Employer's "discretion"

- 13 -

1  or "approval." Eight other leave benefits in Section 9 – bereavement, jury duty and witness

2  subpoenas, short-term and long-term military service, service in public office, union activity, and

3  sick leave – do not contain comparable language that those leaves are subject to Employer

4  "discretion" or "approval." There is no evidence that the Employer has ever exercised "discretion"

5  to deny employees who meet the respective eligibility or definitions of bereavement leave, jury duty

6  leave, military service (either short-term or long-term), or the any of the other cited eight leave

7  benefits – including sick leave – except the policy adopted in September of 2005 at issue here. In

8  these circumstances, the Union's claim that employees who satisfy the eligibility requirement for

9  leave (completing the initial evaluation period) and the documentary requirements for sick leave

10  (submission of medical documentation by an attending physician stating the employee is unable to

11  work, and the estimated duration of the absence) have the contractual right to the full amount of

12  leave described in Section 9.3, so long as the employee is unable to work, is also a plausible

13  interpretation of the Agreement. The latter interpretation is reinforced by the language in Article XI,

14  Section 3, which provides that seniority "will be broken and lost, and employment shall cease

15  for...Being on sick leave *beyond* the period set forth in Paragraphs 9.3 *and* 9.4, Article XXIII..."

16  (emphasis added). The word "beyond" in Section 3 suggests that employees are not subject to

17  separation from employment until the employee has exhausted the *entire* amount of sick leave

18  entitlement; moreover, the inclusion of the word "and" in the same section indicates, contrary to the

19  Employer's interpretation, that employees are entitled to exhaust both Section 9.3 sick leave *and*

20  Section 9.4 sick leave before their seniority may be broken and the employee can be terminated.

21      Based on the foregoing, the Arbitrator finds that there are plausible arguments for conflicting

22  interpretations of the meaning of Section 9.3 with respect to whether employees have a contractual

23  right to the full amount of sick leave before they can be terminated. Since an ambiguity exists, it is

24  appropriate to consider external evidence in the form of the parties' bargaining history and past

25  practice to discern the meaning of contract language. Neither party adduced evidence of the parties'

26  discussions of the meaning of Section 9.3 at the bargaining table when that language was negotiated,

27  which would be pertinent in considering what the parties intended, and meant, *when they agreed to*

28  *the language*.

1    The parties stipulated that for 15 years from 1991 until August 7, 2005, employees whose

2    medical conditions were deemed permanent and stationary were not terminated, but instead remained

3    on a leave "for the maximum period" in Section 9.3.    This stipulation, and the entire record,

4    supports a finding that there was a past practice reflecting the parties' mutual acceptance and

5    understanding that the language of Section 9.3 meant that employees whose Section 9.4 leave had

6    expired were not subject to separation of employment, and were "entitled" to remain on a leave of

7    absence until the full amount of their time for time leave was exhausted.    There is evidence that the

8    Employer sought to terminate that practice in 2005, before the implementation of the new policy at

9    issue herein.    Ultimately, the issue submitted herein turns upon a legal analysis of the status and

10    significance of this past practice.

11    **II.    *Past Practices***

12    **A.    <u>Different Types of Past Practice</u>**

13    The "bible" of labor arbitration, *How Arbitration Works* by Elkouri and Elkorui, identifies

14    three "major purposes" of past practices in American labor-management arbitration:

15    1.    To provide the basis of rules not included in the written contract;

16    2.    To support proper interpretation of written contract language; and

17    3.    To resolve claims that the "clear language" of a written contract has been amended
     by mutual agreement of the parties, i.e., to make the written contract consistent with
18    the parties regularly administer their contract.

19    *How Arbitration Works* (Sixth Ed.), at 605. There are fundamental differences in the character and

20    significance of past practices. Two of the above "purposes" of past practice are premised upon extra-

21    contractual *conduct* by the parties: the "addition" of rules (or implied contract terms) based on the

22    parties' mutual behavior, or a "change" in the written contract consistent with the parties' mutual

23    conduct and thus acceptance of a modification of the written agreement.  These extra-contractual

24    practices, when proven, are deemed by law to constitute binding, unwritten Implied Terms of the

25    Contract because the practices are not contained in the written contract (either by omission or

26    because the parties' practice changes the written language of their contract).

27    The third purpose of "past practice" – interpretation of a written contract – has an entirely

28    different origin.   It is based upon a  document that is memorialized and executed by the parties as

- 15 -

1    the written codification of their specific rights and obligations. When contract language is clear and

2    unambiguous, there is no need to "interpret" that language; both parties are bound by the plain

3    meaning of clear and unambiguous language of a written contract. When the contract language is

4    ambiguous, the parties' custom and practice is "the most widely used standard to interpret" the

5    *meaning* of that ambiguous language. *How Arbitration Works,* at 623.

6        Apart from the issues of how different customs and practices may be terminated, the different

7    origins of Extra-Contractual Past Practices and Interpretative Past Practices lead to different facts

8    when a practice has been "terminated." When an Extra-Contractual Practice is properly terminated,

9    it ceases to exist; the very basis of its existence – the mutual conduct and mutual acceptance of the

10   parties – is destroyed by its termination by one of the two parties. However, when an Interpretative

11   Practice of the parties is "terminated," *the written language of the contract remains*. If that written

12   language is ambiguous – the rationale for examining the Interpretive Practice – the *same words* must

13   still be "interpreted" because the written language/rights/obligations remain enforceable. If the

14   meaning of those ambiguous words has been resolved, or interpreted, relying upon Interpretative Past

15   Practice, i.e., the parties' own mutual past conduct revealing their mutual understanding of the

16   meaning of the ambiguous words they previously used in the contract, the meaning of *the same*

17   *words* does not "change" simply because one party suddenly claims that the words mean something

18   different. Stated another way, once ambiguous contract language is interpreted, its meaning becomes

19   just as clear and enforceable as contract language that is clear and unambiguous on its face. The

20   parties may agree to change patently clear contract language, or ambiguous language that has been

21   clarified by Interpretative Past Practice. However, if the patently clear *language* is not changed by

22   the parties, or the formerly ambiguous *language* that has been clarified by interpretation is not

23   changed, *the meaning of the same words* in the written contract does not change either.

24       The Employer argues that the distinctions between past practices made by commentators such

25   as Arbitrator Richard Mittenthal are "amorphous," rarely cited, and contrary to black-letter law. A

26   review of case law and accepted authorities supports a different conclusion. The foregoing overview

27   provides a contextual background of the distinct, different origins of Extra-Contractual Past Practices

28   (Implied Contract Terms added to a written contract) in comparison with Interpretative Past Practices

1   (use of the parties' own conduct to discern the *meaning* of existing written language that is

2   ambiguous).  In addition to the different character and origin of Interpretative Past Practices in

3   contrast to Implied Contract Terms, the law recognizes at least three significant, substantive

4   differences in the legal treatment of these different types of past practice.

5       **B.**      **Different Levels of Proof for Different Practices**

6       In a section in *How Arbitration Works* entitled "Evidence Required to Establish a Binding

7   Past Practice," the authors noted, "When it is asserted that a practice constitutes an implied term of

8   a contract, strong proof of its existence ordinarily will be required." Id. at 607.  It also cites the well-

9   established standard for proving a practice sufficient to be deemed an implied contract term; the

10  asserted practice must be 1) unequivocal, 2) clearly enunciated and acted upon, and 3) readily

11  ascertainable over a reasonable period of time as a fixed and established practice accepted by both

12  parties. Id. at 608.  In a separate section addressing the role of custom and practice in interpreting

13  ambiguous contract language, Elkouri and Elkouri noted that Interpretative Past Practices require

14  less evidence than the "strong proof" needed to establish practice as an implied contract term:

15          As it has been noted, to establish a binding past practice as an implied term of the contract,
            "the way of operating must be so frequent and regular and repetitious so as to establish a
16          mutual understanding that the way of operating will continue in the future."  Put somewhat
            differently, "the practice must be of sufficient generality and duration to imply acceptance
17          of it as an authentic construction of the contract." Accordingly, a "single incident" has been
            held insufficient to establish a "practice."
18
            *In contrast,* for purposes of interpreting ambiguous language, relatively few past instances
19          have been required to establish a binding practice.

20  *How Arbitration Works*, at 625 (emphasis added).

21      The rationale for these different levels of proof is self-evident in view of their different

22  origins and character, as discussed above.  Thus, when parties add a new benefit in their written

23  contract, and the Employer's implementation of that new benefit is not challenged by the Union, it

24  is reasonable to conclude that the "practice" is consistent with the parties' mutual understanding of

25  the new contact clause they negotiated.  However, where an entirely new condition of employment

26  arises in the workplace, without any express contractual basis, it is necessary to consider more

27  instances of the practice, over a longer period of time, before concluding that both parties, by their

28  conduct, have mutually accepted that wholly new practice as a binding Implied Contract Term.

C.    **Different Applications of Zipper Clauses to Different Practices**

Some parties include language in their written contract that limits the enforcement of unwritten practices as Implied Contract Terms, which are often referred to as "zipper clauses." Commonly, zipper clauses contain language to the effect that the parties' written contract reflects the parties' "entire agreement" and/or specific contract language stating that any prior practices not memorialized in the written contract are null and void. Where such "zipper clauses" or other contract language is explicit, the binding effect of prior Implied Contract Terms established by past practice may be eliminated. *How Arbitration Works*, at 621. However, a zipper clause does *not* eliminate an Interpretative Past Practice:

> Of course, zipper clauses do not negate practices that are relied on for the purpose of casting light on ambiguous contract language.    Id.

The fact that the existence of a zipper clause has completely opposite legal consequences for past practices in support of Implied Contract Terms (the practice is eliminated) than for Interpretative Past Practices (the zipper clause does not eliminate the practice/interpretation of the contract) shows that there are, in fact, very significant differences in the legal treatment of these different practices.

D.    **Different Rules for Terminating Past Practices**

A third example of completely different legal consequences for different past practices is the difference in what is required to "terminate" these distinct practices. The Employer cites the widely-accepted principle that a binding practice that cannot be terminated during the term of a contract is subject to termination after the contact expires with due notice to the other party. In such cases, it is widely-held that if the other party wants to retain the practice that is the subject of the termination notice, the other party must incorporate the practice into the next written contract. *How Arbitration Works*, at 619. This is an accurate statement of the applicable law with respect to terminating unwritten, Implied Contract Terms. The Employer's brief states, "As has been often stated:

> If either side should, during negotiations of later agreement, object to the continuance of this practice, it could not be inferred from the signing of a new agreement that the parties intended the practice to remain in force. Without their acquiescence, the practice would not longer be a binding condition of employment. In the face of a timely repudiation of a practice by one party the other must have the practice written into the agreement is it is to continue to be binding."

- 18 -

1   The foregoing summary of the law cites Arbitrator Daniel's decision in *Grand Haven Stamped*

2   *Products Co.*, 107 LA 131 137 (1996), quoting "Mittenthal." The language is quoted accurately;

3   however, it omits the context of the stated rule, which is set forth in the first sentence of the same

4   source: "*Consider first a practice which is, apart from any basis in the agreement...*"[2] The stated

5   rule, and the practice at issue in *Grand Haven*,[3] involve conditions of employment not expressly

6   addressed in a written contract, i.e., asserted new or modified Implied Terms of Contract.

7       The "Mittenthal" cited by Arbitrator Daniel and quoted by Elkouri and Elkouri as cited in

8   the Employer's brief is Arbitrator Richard Mittenthal, the author of what has been called a "classic"

9   law review article on past practice back in 1961. The article states pertinently:

10      Consider next a well-established practice which serves to clarify some ambiguity in the
        agreement. Because the practice is essential to an understanding of the ambiguous provision,

11      it becomes in effect a part of that provision. As such it will be binding for the life of the
        agreement. And *the mere repudiation of the practice by one side* during the negotiations of

12      a new agreement, *unless accompanied by a revision of the ambiguous language, would not
        be significant. For the repudiation alone would not change the meaning of the ambiguous*

13      *provision*...this kind of practice can be *terminated only by* mutual agreement, that is, by the
        parties *rewriting the ambiguous provision* to supersede the practice, by eliminating the

14      provision entirely, etc.

15  59 Mich. L. Rev. 1017, at 1041 (1961). Arbitrator Mittenthal reiterated this distinction when he was

16  invited to address the National Academy of Arbitrators in 1998 on the subject of past practices.[4]

17  Finally, is noted that in the most recent edition of *How Arbitration Works* (Sixth Ed.), the authors

18

19      [2] Elkouri and Elkouri, *How Arbitration Works* (Sixth Ed.), at 619, quoting Mittenthal, NAA 14th
    Proceedings, at 56.

20

21      [3] *Grand Haven*, like the current case, involves a dispute about leave usage. The pertinent contract
    language provided that leave requests for up to 30 days "may be granted." The company therein adopted a

22  practice that employees had to exhaust any unused vacation time before unpaid leave would commence; the
    practice was not applied to leaves for personal illness or injury. This practice was not authorized or

23  addressed in the parties' contract; accordingly, it was not an Interpretive Past Practice seeking clarification
    of language in the written contract. The Union objected to the practice during the parties' negotiations, and

24  the practice was not included in the new agreement. The arbitrator ruled that the prior unwritten practice had
    been terminated and that the written contract language was not subject to any established practice.

25

26      [4] Thirty-seven years after his classic article, Mittenthal repeated that there were different methods
    for terminating a practice lacking "any basis in the agreement" from practices used to interpret ambiguous

27  language in a written contract. Specifically, Arbitrator Mittenthal that noted an Interpretative Past Practice
    "becomes the definitive interpretation *of that term*" until the contract is re-written and that Interpretive

28  Practice "cannot be repudiated unilaterally." NAA, <u>The Common Law of Arbitrators</u> at 83-84 (BNA,
    1998)(emphasis added).

1   quote Mittenthal's description of how unwritten practices which become Implied Contract Terms

2   can be terminated (p. 18 above, as modified by the phrase quoted on p. 19: 2-4).  The Mittenthal

3   language quoted by the Elkouri's therein concludes with a footnote, which states in pertinent part:

>   In contrast, repudiation of a practice that gives meaning to ambiguous language in the
>   written agreement would not be significant – the effect of *this kind of practice can
>   be terminated only by rewriting the language.*

6   *How Arbitration Works*, at 619, n. 71.  The foregoing "rule" with respect to terminating Interpretive

7   Past Practices is not described in *How Arbitration Works* as a "rarely-cited" rule, as a minority view,

8   or even as a majority view.  It is the *only* rule cited for termination of Interpretative Practices.  It is

9   submitted that this rule is fully consistent with both the rationale and the other legal treatment of

10  Interpretive Practices (different standards of proof, different applications of zipper clauses) as

11  summarized above.

**E.    <u>Illustrative Example of Different Types of Past Practices</u>**

13      The Arbitrator believes that the foregoing summary of the applicable legal principles is

14  accurate and persuasive.  However, in view of the significant conflict in the parties' briefs in this

15  matter, and in further view of the understandable confusion that arises in this context due to the use

16  of the term "past practice" to describe different concepts (and different legal obligations and

17  consequences), the following example of the different applications of past practice is submitted for

18  the parties' consideration in recognizing the differences discussed above.  Consider these facts:

- *Scenario A*. ER and U executed a contract effective December 17, 1990 with a new contract clause, stating: "The Employer shall provide to all employees, at the conclusion of each work day, a choice of company-paid beverages." *Scenario B*. The contract contained no such benefit.

- *Stipulation*: The parties stipulate that from December 17, 1990, until August 6, 2005, the Employer provided to employees, at the conclusion of each work day, a choice of two beverages: commercially-prepared coffee served in a provided paper cup, and individual bottles of water served in separate sealed plastic containers.

- In July of 2005, during contract negotiations for the current contract, ER gave notice to the U that the ER had determined that the practice described in the preceding stipulation was too costly. ER gave further notice that as of August 7, 2005, ER would provide employees with a daily option of two beverages: tap water available from a kitchen sink in the employee lounge and refrigerated tap water available from a communal drinking fountain located adjacent to the rest rooms. ER noted that the water provided was paid by ER in form of water utility fees. U objected to ER's change, but neither party proposed changes in the content of the pertinent contract language, which was retained without change in Scenario A.

- 20 -

1    It is respectfully submitted that if the factual issues set forth above were pursued to
2  arbitration, there would be completely different outcomes in the two scenarios. In Scenario B, the
3  past practice that evolved had no express basis in the parties' contract. The ER provided timely and
4  proper notice that the practice was terminated, and in fact, it had no obligation to "explain" why
5  there were two beverage options, or who paid for the tap water. The Union's grievance would be
6  denied. In Scenario A, the ER's purported termination of the beverage benefit provided for 15 years
7  does not remove its written contractual obligation to provide "a choice of company-paid beverages."
8  In the second arbitration, the 15 ½ year practice of providing individual cups of commercial coffee
9  and individual bottles of water would be considered an Interpretative Past Practice with respect to
10  the meaning of the terms "choice" and "company-paid beverages." The longstanding past practice
11  would be deemed definitive of the parties' mutual understanding and agreement of the meaning of
12  the ambiguous contract language pertaining to the ER's still-written contractual obligation to provide
13  "a choice of company-paid beverages." The Union's grievance in Scenario A would be sustained.

14  **III.**    *The Interpretation of Section 9.3*

15    Article XXIII, Section 9 of the Agreement states that employees who are ill or disabled are
16  eligible for an unpaid leave of absence after their first five days of consecutive absences. The same
17  section provides for two kinds of sick leave, including one in Section 9.3: "A sick leave of absence
18  may not exceed the employee's length of seniority as of the date of illness or disability..." The
19  critical issue in this case is whether the language specifying the duration of the sick leave provided
20  in Section 9.3 means that an employee is entitled to the full amount of the "time for time" leave, as
21  argued by the Union, or whether that language means the Employer retains discretion to deny the full
22  amount of time for time leave and break seniority before such leave is exhausted. In interpreting the
23  meaning of this language, the Arbitrator has given particular weight to the following salient facts:

- Two of the leave articles in Article XXIII expressly condition granting leave upon the Employer's "discretion" or "approval." There is no comparable language in Section 9.3 restricting time for time leave based upon the Employer's discretion.

- Each of the leave entitlement sections in Article XXIII, contain specific periods of eligibility and duration. Section 9.3 likewise contains a single specific period of duration and the specific eligibility requirements for receiving such leave.

- 21 -

- It appears that the Employer contends that employees are entitled to sick leave under the Agreement, including time for time sick leave in most circumstances, but that the Employer retains the discretionary right to terminate such leave in one specific circumstance – namely, when an employee's medical condition is deemed to be permanent and stationary. There is no contract language about the partial entitlement claimed herein, or any partial entitlement, of time for time leave.

- The parties' own conduct in routinely describing Section 9.3 leave as "time for time" leave succinctly captures the essence of the parties' own understanding of that leave – a one-to-one "equivalence" (seniority time equals leave time), a concept wholly at odds with a "partial" entitlement to "time for time."

- Article XI, Section 3 of the Agreement provides that seniority can be broken (and employment will cease) "for...Being on sick leave beyond the period set forth in Paragraphs 9.3 and 9.4, Article XXIII..." This language supports the Union's interpretation of Section 9.3 that employees are not subject to separation from employment until their maximum Section 9.3 leave (and 9.4 leave) is exhausted.

- Most significantly, the parties stipulated that from December of 1990 until the fall of 2005, the leave of employees whose medical condition became permanent was not terminated and such employees continued to receive sick leave "for the maximum period set forth" in Section 9.3, with seniority measured from the date of hire to last day worked. This conduct by the parties constituted an Interpretative Past Practice reflecting the parties' mutual understanding and acceptance that language in Section 9.3 provides an entitlement to the "full" amount of time for time sick leave, with seniority measured form the date of hire to the last day worked, before such leave can be terminated and before seniority can be broken.

- During the parties' negotiations that resulted in the current Agreement, the Employer gave notice to the Union that it intended to terminate the practice set forth in the preceding "stipulation" and implement a different interpretation of the time for time provision. The Union did not agree with the Employer's interpretation. Neither party made proposals to modify the language in Section 9.3, and the same language was carried over into the current agreement. These facts warrant the finding that the Employer's unilateral repudiation of the parties' Interpretative Past Practice with respect to the meaning of Section 9.3 was of no legal consequence because that mutual interpretation could be terminated only by mutual agreement.

Based on the foregoing, the language of the contract, the 15-year Interpretive Past Practice, and the entire record, the Arbitrator finds and concludes that the language in Section 9.3 means that employees, including employees whose medical condition is permanent, who satisfy the contractual eligibility and documentary requirements for sick leaves of absence, are entitled to the full amount of time for time sick leave set forth in Section 9.3, with seniority measured from the date of hire to last day worked, before such leave can be terminated and before an employee can be separated from employment. Accordingly, the Employer's implementation of its new policy known as the Staudohar Program, and the consequent termination of employees who had not exhausted their full time for time entitlement under Section 9.3, violated the Collective Bargaining Agreement.

1

## SUPPLEMENTAL AWARD

2   1.   The language in Article XXIII, Section 9.3 means that employees are entitled to the full amount of time for time sick leave set forth therein, with seniority measured from the date of hire to the last day worked, before such leave can be terminated and before an employee's seniority can be broken.  Accordingly, the Employer violated the Collective Bargaining Agreement by implementing a new policy regarding long-term leaves of absence that terminated "time for time" sick leave entitlement before the "maximum period set forth" in Section 9.3, and by terminating employees whose entitlement to time for time leave had not been exhausted.[5]

3

4

5

6

7   2.   The determination of the appropriate remedy, and all other outstanding issues[6] arising from the subject grievance, are remanded to the parties for appropriate mutual resolution.  Both parties shall retain the right to seek arbitral resolution of any outstanding remedial issues arising from the subject grievance before a different arbitrator, who shall be selected by mutual agreement or selected in accordance with the parties' customary method of selecting an arbitrator.[7]

8

9

10

11

12   DATED:    November 20, 2007

13   CHARLES A. ASKIN,
     Arbitrator

14

15

16   [5] In the first hearing involving this grievance, extensive arguments were advanced about Arbitrator Staudohar's 1990 decision in light of evidence and arguments presented to Arbitrator Staudohar.  In this matter, evidence was presented showing that on July 19, 2005, the date that the Employer gave notice to the Union of its intent to comply with its new interpretation of Section 9.3 and the Staudohar Decision, the Employer gave separate notice to the Union of its position that the Employer's practice of providing benefits to employees on leave was "not required by the collective bargaining agreement" and that the Employer likewise intended to terminate Group Benefits to employees except those on an FMLA/CFRA leave.  The latter issue was not litigated by the parties in this proceeding.  Nothing in this Supplemental Opinion and Award should be construed as a finding or conclusion with respect to whether the Employer terminated any benefits pursuant to its July 19, 2005 letter, and if so, the legal significance of any such action in light of the findings, analysis, and conclusions herein.

17

18

19

20

21

22   [6] The issue statement authorized the Arbitrator to determine the "appropriate remedy" for any violation.  However, at the hearing herein, the Employer expressly declined to submit the "liability" issue of the Union's claim that the current method of calculating time for time leave is improper.  Based on the Employer's position concerning the scope of the issue at this stage of the dispute and the Arbitrator's statements to the parties about his authority in light of the Employer's position, there was an implied understanding that any determination of an appropriate remedy, including the Union's calculation claim, would be deferred to a later proceeding on "liability" issues.

23

24

25

26   [7] The parties authorized this Arbitrator to retain jurisdiction of the remedy, if any, arising from this dispute.  This Arbitrator respectfully declines that delegation of authority.  The parties are encouraged to negotiate a resolution of this dispute.  Alternatively, the parties have the opportunity to select a different arbitrator to resolve any and all outstanding issues arising from this grievance.

27

28

- 23 -

# EXHIBIT L



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Western Case Management Center*
*Jeffrey Garcia*
*Vice President*
*Cathe Stewart*
*Assistant Vice President*

January 22, 2008

6795 North Palm Ave, 2nd Floor, Fresno, CA 93704
telephone: 877-528-0880 facsimile: 559-490-1919
internet: http://www.adr.org/

**VIA ELECTRONIC MAIL ONLY**

Linda Lye, Esq.
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, CA 94108

Nick C. Geannacopulos, Esq.
Seyfarth Shaw, LLP
560 Mission Street, Suite 3100
San Francisco, CA 94105

Re: 74 300 L 00035 08 LYMC
        U.A.W. Local 2244
        Remedy for "time for time" Contract
        VS
        New United Motor Manufacturing, Inc.

Grievances:    Remedy "time for time" Contract

Dear Parties:

This will acknowledge receipt of a letter dated January 15, 2008, from Ms. Lye, requesting that the Association submit a list of 7 arbitrators for the above-referenced grievance. In accordance with this request, enclosed please find a list of Arbitrators from our Panel and their resumes for your consideration.

As the submission of this list was the only service requested the Association will consider this matter closed upon receipt of filing fee. If you are interested in additional administration services, please do not hesitate to contact me.

Thank you for choosing the American Arbitration Association.

Sincerely,
/s/
Lynn M. Cortinas - Case Manager
Direct: 559-490-1854  Fax: 559-490-1837
E-mail: cortinasl@adr.org
*Patrick Tatum- Supervisor: Direct: 559-490-1905/E-mail: tatump@adr.org*

Enclosure(s)

#1

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

6795 North Palm Ave, 2nd Floor
Fresno,CA 93704

| STMT DATE | AMOUNT DUE |
|---|---|
| 01/22/2008 | 75.00 |
| **CASE#** | |
| 74-300-L-00035-08 LYMC-R | |

Payment Due Upon Receipt

## INVOICE/STATEMENT

Linda Lye Esq.
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco CA 94108

Representing U.A.W. Local 2244
Re: New United Motor Manufacturing, Inc.
Remedy "time for time" Contract

---

Please Detach and Return with Payment to the Above Address      Please Indicate Case No. on check

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

6795 North Palm Ave, 2nd Floor
Fresno,CA 93704

**NAME**    Linda Lye Esq.
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco CA 94108

Representing U.A.W. Local 2244
Re: New United Motor Manufacturing, Inc.
Remedy "time for time" Contract

| STMT DATE | CASE# | PREVIOUS BALANCE | CURRENT CREDITS | NEW CHARGES | TOTAL BALANCE DUE |
|---|---|---|---|---|---|
| 01/22/2008 | 74-300-L-00035-08 01 LYMC-R | 0.00 | 0.00 | 75.00 | 75.00 |

| DATE | REF# | DESCRIPTION | AMOUNT | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 01/17/2008 | 9574617 | Initial Administrative Fee | 75.00 | | |
| | | | | | 75.00 |

**Remarks:** For any inquiry please call: 559-490-1854
This is a full statement showing all financial activity on this case.

| TOTAL BALANCE DUE | 75.00 |
|---|---|

Please Indicate Case No. on check

| INVOICE SUMMARY: | | NET BILLED | NET PAID | NET DUE | |
|---|---|---|---|---|---|
| | INITIAL/COUNTER-CLAIM FEES | 75.00 | 0.00 | 75.00 | |
| | HEARING/POSTPONEMENT/ROOM/PROCESSING FEES | 0.00 | 0.00 | 0.00 | |
| | REALLOCATION AT CASE END FEES | 0.00 | 0.00 | 0.00 | |
| | NEUTRAL COMPENSATION/EXPENSES | 0.00 | 0.00 | 0.00 | EIN: 13-0429745 |

**Important Notice for California Consumers**
Pursuant to section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit the AAA's Affidavit for Waiver of Fees. Please contact AAA's Western Case Management Center if you have any questions.

# AMERICAN ARBITRATION ASSOCIATION

Re: 74 300 L 00035 08
    U.A.W. Local 2244
    Remedy for "time for time" Contract
    VS
    New United Motor Manufacturing, Inc.

Grievances:    Remedy "time for time" Contract

DATE LIST SUBMITTED: January 22, 2008
CASE MANAGER:  Lynn M. Cortinas

## LIST FOR SELECTION OF ARBITRATOR(S)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

After striking the name of any unacceptable arbitrator, please indicate your order of preference by number. We will try to appoint a mutually acceptable arbitrator who can hear your case promptly. Leave as many names as possible.

Barbara  Bridgewater
Morris E. Davis
William B. Gould IV
Elinor S. Nelson, Ph.D.
C. Allen  Pool
William E. Riker
Paul D. Staudohar

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Party _____

By _____    Title _____

NOTE: Biographical information is attached. Unless your response is received by the Association **WITHIN 10 CALENDAR DAYS OF THE DATE OF THIS LIST**, all names submitted may be deemed acceptable.

**The following resume(s) are printed for Lynn Cortinas**

processed on Jan 22 2008 12:42 PM

**Contact** American Arbitration Association
6795 N. Palm Avenue
2nd Floor
Fresno, CA 93704
**telephone: 877-528-0880   facsimile: 559-490-1919**

**Barbara Bridgewater, Esq.**

## Occupation   Labor-Management Arbitrator

**Experience**   Full-time arbitrator and fact-finder in public and private sectors since 1974. Member of the following panels: Federal Mediation and Conciliation Service; American Arbitration Association; California State Mediation and Conciliation Service; California Public Employment Relations Board; and Alameda, Los Angeles, San Francisco, and Santa Clara Counties.

**Issues**   Absences, alcohol/drug abuse, arbitrability, assignment/reassignment/transfer, automation/technological change, bonuses, call-in/call-back, classification, compensation, contract interpretation, crew size, disability, discharge, discipline, discrimination, dishonesty/theft, environment, fights/altercations, fringe benefits, health and welfare, hiring, holidays/holiday pay, incentive pay/standards, incompetence/inefficiency, insubordination, insurance, interest arbitration, job assignment, job evaluation, jurisdiction, layoff/bumping/recall, leave, management rights, mergers/acquisitions, negligence/carelessness, overtime pay/distribution, past practice, pay rates, pensions, performance appraisal, posting/bidding, premium pay, production standards, promotion/upgrade, representation, resignation, retirement, safety, seniority, severance pay, sexual harassment, shift assignment, shut down, sick time/pay, subcontracting, transfers, union representation, union rights, vacancy, vacations/vacation pay, work assignment, working conditions, work rules, work schedules, work stoppages.

**Industries**   Can, candy, chemical, communications, construction, distillery, education (colleges, schools), food, governments (federal, state and local), law enforcement, lumber, manufacturing, metal, postal, railroad, sawmill, transit, winery, etc.

**Permanent Arbitrator**   Hotel & Restaurant Employees Local 340 & Restaurant & Hotel Owners Association; Fresh Fruit & Vegetable Workers Union Local 78-B & Fresh Express, Inc.; Airports Commission & San Mateo Building & Construction Trades Council; Stokeley-Van Camp, Inc. & Teamsters, Cannery Warehousemen, Food Processors, Drivers & Helpers, Local 750; candy & food companies & Teamsters; Wineries & Distillery, Rectifying, Wine & Allied Workers Union; General Electric & International Union of Electrical, Radio & Machine Workers; railroad industry & Brotherhood of Railway, Airline & Steamship Clerks; Associated, Affiliated & Kaiser Hospitals & California Nurses Association; San Francisco Chronicle/Examiner/Oakland Tribune/San Francisco Newspaper Printing Co. & Local 52, Newspaper Guild; Alameda-Contra Costa Transit District & Amalgamated Transit Union, Local 1555, United Public Employees Local 390; other transit districts & unions; law enforcement agencies & Peace Officers Research Association of California; military & civilian federal agencies & AFGE; Federal Metals Trades Council; National Federation of Federal Employees; USPS & APWU; various state & local governmental agencies, colleges, & school

*Barbara Bridgewater, Esq.*
*127247*

districts & California State Employees Association; AFSCME; California Teachers Association; Classified School Employees Association; telephone & communications equipment companies & Communications Workers of America; lumber industry & Productions, Lumber & Sawmill Workers; Kaiser Aluminum & Chemical Corp. & USWA; can manufacturers & USWA.

**Work History**   Arbitrator and Fact-finder, Self-employed, 1974-present; Public Health Chemist, California State Department of Health, 1961-74; Chemist, University of California, 1958-61.

**Education**   University of California (BA, Chemistry and Mathematics-1958); Hastings College of the Law (JD-1977).

**Professional Associations**   Society of Professionals in Dispute Resolution; Industrial Relations Research Association.

**Alternative Dispute Resolution Training**   AAA Labor Arbitrator II Training, San Francisco, 7/03; various other ADR training through University of California and University of Michigan.

**Compensation**                    $1,200.00 Per Day
Cancellation: per diem rate charged for cancellation less than 30 calendar days' prior to scheduled hearing dates (to be borne equally by the parties unless informed otherwise).

**Locale**  Berkeley, CA

*Barbara Bridgewater, Esq.*
*127247*

**Contact** American Arbitration Association
6795 N. Palm Avenue
2nd Floor
Fresno, CA 93704
**telephone: 877-528-0880   facsimile: 559-490-1919**

**Morris E. Davis, Esq.**

**Current Employer-Title**   Self-employed - Arbitrator, Mediator

**Occupation**   Arbitrator - Mediator - Hearing Officer - Attorney

**Experience**   Since 1980, arbitrator, mediator, and former administrative judge.  Presided over 2,500 cases involving private/public sector employment disputes and labor arbitration related to mass transit, oil/gas, building/construction trades, hospital/health care facilities, aerospace, education, public safety, and postal service.

**Issues**   absenteeism, alcohol and drug abuse, demotion, discharge, discipline, discrimination, disability retirement, job classification, evaluation and performance, management rights, past practice, reduction in force, strike, vacation pay, working conditions.

**Permanent Arbitrator**   General Teamsters, Local 439 & Summit Logistics (Safeway Stores); Fruit & Vegetable Workers Union, Local 1096 & Fresh Express, Inc ; Ass'n of Machinists, District Lodge 508 & Lockheed Missiles & Space; United Stanford Workers, Local 715 & Stanford University; California State Employees Ass'n & State of California; U.S. Postal Service & American Postal Workers Union; U.S. Dept. Health & Human Services & Nat'l Treasury Employees Union; Social Security Admin. & American Fed. of Gov't Employees; Bay Area Rapid Transit Dist. I Amalgamated Transit Union (ATU), Local 1555; Alameda-Contra Costa Transit Dist. I ATU, Local 192; Santa Clara Valley Transportation Auth. & ATU, Local 265; San Mateo County Transit Dist. I ATU, Local 1574; Los Angeles County Metropolitan Transportation Auth. I ATU, Local 1277; County of Santa Clara & SEIU, Locals 536 and 715; Sacramento Area Fighters, Local 522 & City of Sacramento; County of Santa Clara & Deputy Sheriffs Ass'n & Correctional Peace Officers' Ass'n; Alaska Correctional Officers Assoc. & State of Alaska; County of Sacramento & Stationary Engineers, Local 39 & United Public Employees Union, Local 1; Coalition of Univ. Employees I Univ. of California (Berkeley, Davis & San Francisco); City of San Francisco I Service Employees int'l Union (SEIU), Local 790; County Civil Service Commissions' San Francisco, Santa Clara, Sacramento, City of Los Angeles & Los Angeles City Employee Relations Board.

**Work History**   Arbitrator, Mediator and Hearing Officer, Self-employed, 1986-present; Associate, Law Office of David P. Corsi, 1986-87; Administrative Judge, U.S. Merit Systems Protection Board, 1980-85; Executive Director, Labor Center - Occupational Health Program, Institute of Industrial Relations, University of California at Berkeley, 1974-80; Attorney/Advisor, U.S. Department of Housing and Urban Development, 1970-72.

**Education**   North Carolina Agricultural and Technical State University (BS-1967); University of Iowa (JD-1970); University of California at Berkeley (MPH-1973).

**Professional Associations**   State Bar of California (Labor and Employment Law Section); National Bar Association; Alameda County Bar Association; Charles Houston Bar Association.

**Professional Licenses**   Admitted to the Bar:  Iowa, 1970; U.S. District Court:  Southern District of Iowa, 1970; Northern District of California, 1986.

**Publications and Speaking Engagements**   PUBLICATIONS:  Co-author, "Problems Faced by Minority Workers," chapter 29, OCCUPATIONAL HEALTH, Little, Brown & Co., 3rd ed., 1994; "Industries Handling Products After Harvest," California Industrial Welfare Commission, Wage Board Order 8-80, April 10, 1992; co-author, "Survey of Organizational and Legal Issues Related to Support of Workplace Health and Safety Committees," U.S. Department of Labor. Contract No. B9F06405, September 5, 1990; "Health and Safety Provisions in Union Contracts," MINNESOTA LAW REVIEW, 64:4, April 1981; "Workplace Health & Safety - Collective Bargaining Trends, SAN FERNANDO VALLEY LAW REVIEW, vol. 8, 1980.

SPEAKING ENGAGEMENTS:  "Introduction to Mediation," University of California at Berkeley Boalt Hall School of Law, 1997, 1996; "Just Cause Doctrine and Difficult Issues in Labor Arbitration," Labor Arbitration Institute, San Francisco, 1995; "A Worker's Guide to Documenting Health and Safety Problems," Institute of Industrial Relations, University of California, Berkeley, 1978.

**Alternative Dispute Resolution Training**   AAA Labor Arbitrator II Training: Advanced Case Management Issues, 2003; AAA Commercial Arbitrator Training, 1999; Advanced Aspects of Employment Mediation, 1997; AAA Employment Arbitrator Training, 1997; State Bar of California, Labor and Employment Law Section, Free Speech and Privacy Rights of Public Employees, 1997; JAMS/Endispute, Effective Use of ADR in Employment Disputes; INR, Sexual Harassment and Violence in the Workplace; faculty, AAA Arbitration and Labor Relations in the 90s - Arbitration Case Analysis; faculty, AAA Positive Approaches to Discipline and Employee Grievances.

**Compensation**                     $1,400.00 Per Day
Cancellation fee:  per diem rate charged if hearing cancelled within 20 workdays of scheduled date. Travel:  per diem rate charged if four (4) or more hours to hearing location.  Three-four (3-4) hours of travel, only half per diem charged.

**Citizenship**   United States of America

**Locale**   Oakland, CA

*Morris E. Davis, Esq.*
*16336*

**Contact** American Arbitration Association
6795 N. Palm Avenue
2nd Floor
Fresno, CA 93704
**telephone: 877-528-0880   facsimile: 559-490-1919**

# William B. Gould IV

### Occupation   Law Professor, Educator; Arbitrator, Factfinder

### Experience   Professor of Law, Stanford University Law School since 1972 and Charles A.
Beardsley Professor of Law since 1984.  Charles A. Beardsley Professor of Law, Emeritus and
William M. Ramsey Distinguished Professor of Law at Willamette University College of Law since
2002.  Arbitrator in public and private sectors since 1965.  Arbitrated salary disputes between the
Major League Baseball Player Relations Committee and Major League Baseball Players Association.
Served as Chairman of the city and county of San Francisco Task Force on Collective Bargaining
from 1990-91.  Was co-chairman of the California Bar Ad Hoc Committee on Wrongful Dismissals,
1983-84.  Impartial investigator and consultant for Writers Guild of America, West, 2003-2004.

### Permanent Arbitrator   San Jose Mercury News & News Guild; Hotel Employers'
Association & HREBU; Directors Guild of American & Alliance of Motion Picture and Television
Producers, Inc.

### Work History   Professor of Law, Stanford University Law School, 1972-present; Charles A.
Beardsley Professor of Law, Emeritus and William M. Ramsey Distinguished Professor of Law,
Willamette University College of Law, 2002-present; Consultant, Province of British Columbia,
1988, 2003; Chairman, National Labor Relations Board, DC, 1994-98; Fulbright Visiting Professor,
University of Witwatersrand, S. Africa, 1991; Visiting Professor, Howard University Law School,
1989; Visiting Professor, Harvard, 1971-72; Associate, Battle, Fowler et al., 1965-68; Consultant,
EEOC, 1966-67; Attorney, National Labor Relations Board, 1963-65; Assistant General Counsel,
UAW, 1961-62.

### Education   University of Rhode Island (AB-1958); Cornell University (LLB-1961).

### Professional Associations   National Academy of Arbitrators.

### Publications and Speaking Engagements   INTERNATIONAL LABOR STARDARDS:
GLOBALIZATION, TRADE AND PUBLIC POLICY, Stanford University Press, 2003; DIARY OF
A CONTRABAND:  THE CIVIL WAR PASSAGE OF A BLACK SAILOR, Stanford University
Press, 2002; LABORED RELATIONS:  LAW, POLITICS AND THE NLRB - A MEMOIR, MIT
Press, 2000; AGENDA FOR REFORM:  THE FUTURE OF EMPLOYMENT RELATIONSHIPS
AND THE LAW, MIT Press, 1993; LABOR RELATIONS IN PROFESSIONAL SPORTS, Auburn
House, 1986; STRIKES, DISPUTES AND ARBITRATION:  ESSAYS ON LABOR LAW,
Greenwood Press, 1985; JAPAN'S RESHAPING OF AMERICAN LABOR LAW, MIT Press, 1984;

A PRIMER ON AMERICAN LABOR LAW, MIT Press, 1982, 2nd ed., 1986, 3rd ed., 1993, 4th ed.,
2004; BLACK WORKERS IN WHIT UNIONS:  JOB DISCRIMINATION IN THE UNITED
STATES, Cornell University Press, 1977.

**Alternative Dispute Resolution Training**  AAA Labor Arbitrator II Training, San
Francisco, 12/04.

**Compensation**                 $2,000.00 Per Day
Per diem cancellation/postponement fee within 3 weeks of scheduled date.  For Seattle cases, will
only charge travel time from Portland, OR.

**Locale**  Stanford, CA

*William B. Gould IV*
*127372*

**Contact** American Arbitration Association
6795 N. Palm Avenue
2nd Floor
Fresno, CA 93704
**telephone: 877-528-0880   facsimile: 559-490-1919**

**Elinor S. Nelson, Ph.D.**

**Current Employer-Title**   Private Practice

**Occupation**   Arbitrator, Mediator, Fact-finder - Labor and Employment

**Experience**   Twenty-five years' experience in mediation, fact-finding, and arbitration, both in the public and private sector.  Member of the Washington Public Employment Relations Commission, California Mediation and Conciliation Service, and Public Employment Relations Boards for the states of California, Alaska, Montana, Oregon, Hawaii, Nevada, and Idaho.  Labor arbitrator for the Federal Mediation and Conciliation Service.

**Issues**   Absenteeism, affirmative action, arbitrability (procedural and substantive), assignment of work, bargaining unit work, benefits, bumping rights, compensation, contract interpretation, cost-of-living pay, demotion, discipline, discrimination (ADA, Title VII, sexual harassment, ADEA, etc.), drug and alcohol testing, Family Medical Leave Act, hiring practices, insubordination, job assignment, job bidding, job classification, job evaluation, job posting, layoffs, leaves, management rights, merit pay, off-duty and personal conduct, promotion, retirement, seniority, subcontracting, substance abuse, training, work rules, wrongful discharge.

**Industries**   Aerospace, aluminum, building products, clerical, coal, construction, energy/power, government (city, county, state, and federal), health care, hydropower, manufacturing (various types), maritime, military, mining, nursing, packaging, public education (kindergarten-higher education), transportation, utilities, public sector (police, fire, corrections).

**Permanent Arbitrator**   State of Alaska/IBEW Local 1547; USGSA/AFGE; State of Alaska/ Alaska Public Employees Association; State of Alaska/Alaska State Employees Association.

**Work History**   Employment/Labor Mediator, Fact-finder, and Arbitrator, Self-employed 1981-present; Adjunct Professor of Collective Bargaining, Labor Relations, Human Resources Administraton, and Educational Administration, University of Arizona, 1990-91; Assistant Professor of Human Resources Administraton, Labor Relations, Collective Bargaining, AA/EEO, and Educational Administration, St. Louis University, 1981-86; Secondary School Administrator, St. Cloud School, 1980-81; Principal Researcher, Collective Bargaining Processes and Outcomes/Administrative Fellow, University of Minnesota, 1975-80.

**Education**   Marshall University (BA, Speech Communications, magna cum laude-1974);

*Elinor S. Nelson, Ph.D.*
*129043*

University of Minnesota (MA, Personnel Administration and Labor Relations, Educational Administration-1976; PhD, Personnel Administration and Labor Relations, Educational Administration -1980).

**Professional Associations**   Industrial and Labor Relations Research Association; Society for Professionals in Dispute Resolution.

**Alternative Dispute Resolution Training**   AAA Labor Arbitrator II Training: Advanced Case Management Issues, 2004; Bureau of Mediation Services, Mediation Training; National Academy of Arbitrator Apprenticeship; faculty and attendee, numerous national/state labor relations and ADR conferences and AAA workshops.

**Compensation**                              $1,200.00 Per Day
                                              $150.00 Per Hour
Per diem for grievance arbitration, interest arbitration, mediation and fact-finding.  Per Diem includes study, research, award writing, preparation, travel time & all expenses.  Hourly rate for pre-hearing motions, administrative, etc.  $100.00 docket fee.  No charge for 1-15 minute conference call to set hearing.  Cancellation fee: Per Diem for each hearing day scheduled if less than 14 days notice; 1/2 per diem if more than 14 days.  If postponed & rescheduled:  1/2 Per Diem for each day postponed.  Also maintains Mill Creek (Seattle), WA address.

**Citizenship**   United States of America

**Locale**   Dublin, CA

*Elinor S. Nelson, Ph.D.*
*129043*

**Contact** American Arbitration Association
6795 N. Palm Avenue
2nd Floor
Fresno, CA 93704
**telephone: 877-528-0880   facsimile: 559-490-1919**

# C. Allen Pool

## Current Employer-Title   Self-employed - Labor Arbitrator

## Occupation   Arbitrator, Mediator, Fact-finder

## Experience   Full-time arbitrator, mediator, and fact-finder in public and private sectors.
Member of the following panels:  San Bernardino County Civil Service Commission, Oregon
Employee Relations Board, Montana Employee Relations Board, Washington Public Employment
Relations Commission, Hawaii Labor Relations Board, and City of Los Angeles Labor Relations
Board.  Chairperson of wage board hearing for California IWC.  Interest arbitrator and fact-finder for
State of Hawaii, City of San Luis Obispo, and public schools.  Civil service hearing officer for the
City of Los Angeles and the County of Los Angeles.

## Industries   Agriculture, beverage, construction, container, Department of Defense Dependent
schools-Pacific Region, education, electrical equipment, food processing, furniture, health care,
hotel/restaurant, law enforcement, lumber, mining, manufacturing, packaging, public sector, public
transportation, pulp and paper, trucking, warehousing.

## Permanent Arbitrator   Oakland Unified School District & OEA, CSEA; Monterey-Salinas
Transit District & ATU; City of Phoenix; Santa Cruz Metro Transit & UTU; County of Santa Clara
& SEIU Local 1587; U.S. Postal Service & NPMHU; New Mexico UFCW Local 1564 & Smith's
Food & Drug Stores, Inc.

## Work History   Labor Arbitrator, Mediator and Fact-finder, Self-employed, 1983-present;
Adjunct Professor, Golden Gate University, 1983-present.

## Education   Arizona State University (BA-1958; MA-1962); University of Houston (PhD,
Education-1981).

## Professional Associations   National Academy of Arbitrators; Society of Professionals in
Dispute Resolution; Industrial Relations Research Association; California State Bar (Labor and
Employment Law Section).

## Publications and Speaking Engagements   Published Arbitration Awards:  AAA, Labor
Arbitration Reports (BNA), Commerce Clearing House (CCH), Labor Relations Press (LRP), CPER
JOURNAL.

*C. Allen Pool*
*67413*

**Alternative Dispute Resolution Training**  AAA Labor Arbitrator II Training: Advanced Case Management Issues, San Francisco, 7/03; NAA Workshops; faculty, Montana Arbitrators' Conference; faculty, OPM Collective Bargaining Workshops; Federal Sector Arbitration Symposium; faculty, Golden Gate University Negotiation and Conflict Resolution courses; faculty, University of California, University Hearing Officer & Factfinder Training.

**Compensation**                    $1,500.00 Per Day
Per-diem cancellation fee for each scheduled hearing day within 20 working days of hearing.

**Citizenship**  United States of America

**Locale**  Monterey, CA

*C. Allen Pool*
*67413*

**Contact** American Arbitration Association
6795 N. Palm Avenue
2nd Floor
Fresno, CA 93704
**telephone: 877-528-0880   facsimile: 559-490-1919**

# William E. Riker

## Occupation   Arbitrator

**Experience**   Since 1979, has been an arbitrator, mediator, fact-finder, conflict/dispute facilitator, and civil service hearing officer, as well as a Multiemployer (Taft/Hartley) Trust Fund Administrator for the Carpenters, Ironworkers, and Teamsters.  From 1958 to 1978, worked as an advocate in the private and public sectors, engaged in collective bargaining negotiations, grievance processing, wage and salary and personnel administration, supervisor and management education, and equal employment opportunity (including affirmative action and implementation).  From 1975 to 1984, was a part-time instructor teaching Organizational Behavior, Labor Relations, and Governmental Relations for Canada College and Sonoma State University, as well as being a guest lecturer on arbitration at McGeorge Law School.

**Issues**   Absenteeism, affirmative action, agency fee objector disputes, arbitrability, bargaining unit work, conduct (off-duty/personal), demotion, discipline (non-discharge), discrimination (national origin, religious), drug/alcohol offenses, fringe benefits (bonus, holidays, insurance, leave, vacation), grievance mediation, health/hospitalization, hiring practices, job performance, job posting/bidding, jurisdictional disputes, layoffs/bumping/recall, management rights, official time, past practices, pension and welfare plans, pension claims (federal statutes), promotion, retirement, safety/health conditions, seniority, sexual harassment, strikes/lockouts, slowdown, subcontracting/contracting out, tenure/reappointment, union security, violence and threats, wages (cost-of-living pay, holiday pay, incentive pay, job classification and rates, merit pay, overtime pay, severance pay, vacation pay), work hours/schedules/assignments, work stoppages, work orders, working conditions.

**Industries**   Agriculture, automotive, bakery, beverage, brewery, broadcasting, building products, canning, cement, chemicals, communications, construction, dairy, distillery, education (primary, secondary and university), electrical equipment/appliances, electronics, entertainment/arts, feed and fertilizer, food (manufacturing/processing service), foundry, furniture, glass/pottery, grain mill, health care, hospitals/nursing homes, hotels/motels/casinos/resorts, iron, lumber, machinery, maritime, meat packing, office workers/clerical, organizations, packaging, petroleum/petrochemicals, prison guards, publishing, pulp and paper, restaurants, retail stores, rubber/tire, shipbuilding/dry-dock, stone/quarry, tile, transportation, trucking and storage, upholstering, utilities, warehousing.

**Permanent Arbitrator**   City and County of San Francisco; Alameda County; San Francisco Deputy Sheriffs Association & City and County of San Francisco Sheriff's Department; San Jose Mercury News & San Jose Newspaper Guild; San Jose News & Mailers; Kindred Health Care & SEIU; County of Fresno & SEIU Local 535; Raytheon Systems Company & Electronic and Space Technicians Local 1553; Bay Area Rapid Transit District & SEIU Local 790; Associated General

*William E. Riker*
*128654*

Contractors, Las Vegas, Nevada & Teamsters Local 631; General Employees Trust Fund Panel of Arbitrators; Apartment Employees Trust Funds' Panel of Arbitrators.

**Work History**   Executive Director, Ironworker Employees' Benefit Corporation, 1990-97; Deputy Director, Northern California Carpenter Trust Funds, 1979-90; Industrial Relations Advisor, Golden Gate Bridge District, 1972-79; Regional Labor Relations Officer, Housing and Urban Development, 1970-72.

**Education**   Niagara University (BA, Sociology-1958); Golden Gate University (MBA, Management-1970).

**Professional Associations**   National Academy of Arbitrators; Industrial Relations Research Association.

**Publications and Speaking Engagements**   Bureau of National Affairs Labor Arbitration Reports: 80: LA 387, 82: LA 996, 86: LA 809, 86: LA 851, 87: LA 337, 90: LA 228, 90: LA 469, 92: LA 752, 92: LA 1291, 93: LA 64, 93: LA 841, 93: LA 1065, 93: LA 1161, 95: LA 393, 95: LA 825, 96: LA 713, 96: LA 792, 97: LA 142, 97: LA 752, 97: LA 759, 98: LA 406, 98: LA 406, 98: LA 1019, 101: LA 1061, 101: LA 1080, 102: LA 175, 102: LA 373, 102: LA 537, 103: LA 862, 105: LA 129, 105: LA 662, 106: LA 702, 106: LA 1200, 107: LA 1096, 109: LA 1208, 109: LA 326, 110: LA 304, 110: LA 920, 111: LA 330, 111: LA 317, 112: LA 164, 112: LA 696, 113: LA 200, 113: LA 800, 114: LA 140, 114: LA 1115, 114: LA 1444, 115: LA 331, 115: LA 116, 117: LA 263, 1225; 118LA: 247, 699, 1146; 119LA 251, 355, 1686; LA 120; 338, 1207; 121LA, 622, 818, 993,1178, 1588; LA 122 & LA123. cases also published in CPER 1983-2007.

**Alternative Dispute Resolution Training**   AAA Labor Arbitrator II Training: Advanced Case Management Issues, 2003.

**Compensation**                    $1,400.00 Per Day
Charges daily rate for each eight-hour day or partial day of hearing plus time required for study and award preparation. Charges actual expenses for travel, including airfare, auto rental, taxi, parking, tolls, lodging, and meals. Mileage charged at IRS rate. Per diem cancellation fee if cancelled within 30 calendar days of hearing. Additional offices in Seattle and Southern California.

**Citizenship**   United States of America

**Locale**   San Francisco, CA

*William E. Riker*
*128654*

**Contact** American Arbitration Association
6795 N. Palm Avenue
2nd Floor
Fresno, CA 93704
**telephone: 877-528-0880   facsimile: 559-490-1919**

**Paul D. Staudohar**

## Occupation   Educator, Arbitrator

## Experience   Professor of Business Administration at California State University since 1969. Has handled cases on a variety of issues in industries such as government (federal, state, and local), retail grocery and department stores, telecommunications, manufacturing, chemical, petroleum, furniture, bakery, airlines, and public utilities.  Also has interest arbitration experience.  Author of many articles and ten books on labor-management relations and arbitration.

## Permanent Arbitrator   Brockway Glass Co. & Glass, Pottery, Plastics & Allied Workers; Retail Clerks, Employer Benefit Plans of Northern Calif.; University of California & AFSCME.

## Work History   Professor of Business Administration, California State University, 1969-present; Visiting Assistant Professor, College of Business Administration, University of Hawaii, 1971-72; Instructor, University of Southern California, 1967-69; Administrative Officer, United California Bank, 1964-66.

## Education   University of Minnesota (BA-1962); University of Southern California (MBA-1966; MA-1968; PhD-1969).

## Professional Associations   National Academy of Arbitrators; American Economic Association; Industrial Relations Research Association; International Association of Sports Economists (Past President).

## Alternative Dispute Resolution Training   AAA Labor Arbitrator II Training, San Francisco, 7/03.

## Compensation              $1,200.00 Per Day
Per-diem cancellation fee if less than 10 working days from the hearing.

## Locale   Lafayette, CA

*Paul D. Staudohar*
*127272*

# EXHIBIT M



Writer's direct phone
(415) 544-1001

Writer's e-mail
crowley@seyfarth.com

January 22, 2008

OVERNIGHT MAIL

Linda Lye, Esq.
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Fax: 415.362.8064

Re:    UAW Local 2244 v. NUMMI—"Time for Time" Grievance

Dear Ms. Lye:

I am writing in response to your letter of January 14, 2007 to us, and your letter of January 15, 2007, to the AAA. First, NUMMI is still in the process of reviewing Arbitrator Askin's opinion, and has not made a final decision as to its position regarding the validity or enforceability of that opinion. Among other things, NUMMI did not empower Arbitrator Askin to decline to decide the complete issue presented to him, and instead, to attempt to pass jurisdiction to another arbitrator.

Second, without waiving any objections NUMMI may have to the Askin opinion, your unilateral decision to solicit AAA arbitrators is not consistent with that opinion. Arbitrator Askin instructed the parties to "mutually agree" on an arbitrator unless there was a "customary method" of selecting an arbitrator. You made no attempt to contact us to seek a mutually agreeable arbitrator, or indeed to discuss the arbitration decision in anyway. Further, as these circumstances have never come up before, there is not a customary method of picking an arbitrator in this type of situation. Therefore, there is nothing in the opinion or custom that gives you the right to solicit unilaterally arbitrators from the AAA on less-than-one-day's notice to us.

Third, it is not clear to us what you want to arbitrate at this point; since again, you have made no attempt to communicate with us regarding the arbitration, except as noted above? What is the precise issue that you believe is subject to arbitration? NUMMI, together with the Union, selected Arbitrator Askin and empowered him personally to decide the issues presented and remedy; he elected not to do so. What issues, at this point, do you believe properly remain for arbitration?

BRUSSELS    WASHINGTON, D.C.    SAN FRANCISCO    SACRAMENTO    NEW YORK    LOS ANGELES    HOUSTON    CHICAGO    BOSTON    ATLANTA



Fourth, it appears that the UAW has not provided any materials as to alleged damages at any time.  Setting aside for discussion purposes the enforceability of the opinion, what are the exact damages?  Again, the UAW appears to be seeking to arbitrate an alleged remedy before presenting any evidence of damages supposedly suffered by unit members.

To reiterate, again without waiving any objections to the opinion, NUMMI does not agree to your method of selecting an arbitrator, and will not, at this point, agree to a AAA arbitrator check-off.  We are, of course, willing to discuss the above issues with you at a mutually agreeable time and place.

Sincerely yours,

SEYFARTH SHAW LLP

Christian J. Rowley

Encl.

cc:    Julie C. Nelson, Esq.
       Nick C. Geannacopulos, Esq.

SF1 28286341.1

# EXHIBIT N

**ALTSHULER BERZON** LLP

ATTORNEYS AT LAW

177 POST STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94108

(415) 421-7151

FAX (415) 362-8064

www.altshulerberzon.com

FRED H. ALTSHULER
STEPHEN P. BERZON
EVE H. CERVANTEZ
BARBARA J. CHISHOLM
JEFFREY B. DEMAIN
REBEKAH B. EVENSON
JAMES M. FINBERG
EILEEN B. GOLDSMITH
LAURA P. JURAN
SCOTT A. KRONLAND
PETER E. LECKMAN
DANIELLE E. LEONARD
STACEY M. LEYTON
LINDA LYE
PETER D. NUSSBAUM
KATHERINE M. POLLOCK
DANIEL T. PURTELL
MICHAEL RUBIN
REBECCA SMULLIN
JENNIFER SUNG
PEDER J. THOREEN
JONATHAN WEISSGLASS

JAMIE L. CROOK
FELLOW

February 5, 2008

*By facsimile and United States mail*

Mr. Christian Rowley
Seyfarth Shaw LLP
560 Mission Street, Suite 3100
San Francisco, CA 94105

      re:    time for time

Dear Mr. Rowley,

      I write to respond to your letter of January 22, 2008, which seems to ignore the Union's repeated, good faith efforts to negotiate a framework for a remedy from the end of November through the middle of January.

      You assert that it was improper for the Union to request a list of arbitrators from AAA. The Union's request of a list from AAA was entirely consistent with both the collective bargaining agreement and Arbitrator Askin's decision. Arbitrator Askin did not require the Union to seek mutual agreement on an arbitrator first, before resorting to the customary method for selecting an arbitrator. And the customary method as set forth in the parties' collective bargaining agreement is to request a list from AAA, which is precisely what the Union did here. To the extent you wish to suggest an arbitrator, we are open to your doing so.

      You also state that it is not clear what the Union seeks to arbitrate. This assertion is strange in light of the Union's correspondence with the Company and my correspondence with your office and AAA. As clearly set forth in my letter to you of January 14, 2008 and to AAA of January 15, 2008, the Union seeks to arbitrate the appropriate remedy and all other outstanding issues arising from the time for time grievance, in which Arbitrator Askin held that the

Mr. Rowley
February 5, 2008
Page 2

Company's so-called Staudohar program violated the collective bargaining agreement.

You assert that the Union has "made no attempt to communicate with us regarding the arbitration, except" for my letters to you of January 14, 2008 and to AAA of January 15, 2008. This is incorrect. The Union has repeatedly sought to discuss implementation of the remedy in this case with the Company, and has clearly set forth its proposed framework for such a remedy. These efforts have been largely rebuffed, and for that reason, the Union has had no choice but to seek arbitral resolution.

Finally, there is nothing premature about the Union's effort to seek arbitral resolution of the remedy in this matter. The Union has attempted in good faith since the end of November to negotiate the remedial framework with the Company. It bears emphasis that approximately 100 employees were improperly terminated – over two years ago now – pursuant to a Company policy that Arbitrator Askin has definitively found to violate the collective bargaining agreement. The Union simply seeks prompt implementation of the remedy for its successful grievance. In broad brushes, the remedy in this case would obviously involve reinstatement of all improperly terminated employees and some kind of make whole relief. There is no reason to delay implementation of the reinstatement portion of the remedy while the parties resolve issues pertaining to make whole relief. But to date, the Company has refused the Union's repeated demands to reinstate improperly terminated employees. Given the Company's unwillingness to reinstate improperly terminated employees or engage in meaningful discussions over a remedial framework, the Union has sought to initiate arbitration. The Union remains open to discussing and potentially negotiating a settlement on remedial issues prior to arbitration, but there is no reason to defer initiation of the arbitral process.

In sum, the Union reasonably and properly requested a list of arbitrators from AAA after its efforts over an almost two-month period to negotiate a remedy in this case were unfruitful. The Union does not agree with the Company's position that the Union's request for a list of arbitrators from AAA is premature or otherwise improper. Nevertheless, in light of your statement that you are now "willing to discuss" these issues, please advise as to your available dates to meet this week, and the weeks of February 11 and 18.

Sincerely,

Linda Lye

cc:    Nick Geannacopulos
       Scott Bean
       Earlie Mays
       Victor Quesada